**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

Case Nos. 23-2(L) and 23-3

**UNITED STATES OF AMERICA,**
Appellee
v.
**CHADRICK EVAN FULKS AND
BRANDON BASHAM**
Appellants.

On Appeal from Order of United States District Court,
District of South Carolina (Hon. Joseph F. Anderson, Jr.)
entered (January 10, 2023), in Criminal Action
No. 4:02-992 and Civil Action Nos. 4:16-cr-2058
and 4:15-cv-2027

**JOINT APPENDIX
VOLUME II**

Peter Williams
Assistant Federal Defender
Federal Community Defender Office
for the Eastern District of
Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
 (215) 928-0520

Leticia Marquez
Lindsey Layer
Assistant Federal Public Defenders
Federal Public Defender's Office
District of Arizona
407 W. Congress Street, Suite 501
Tucson, Arizona 85701
(520) 879-7622

*Counsel for Appellant, Chadrick Fulks*

*Counsel for Appellant, Brandon Basham*

Dated: July 21, 2023

***United States v. Fulks*, Case No. 23-2**
***United States v. Basham*, Case No. 23-3**

## Joint Appendix Table of Contents

JA0001   Docket Sheet, *U.S.A. v. Fulks*, et al., No. 4:02-CR-00992-JFA (D.S.C.)

JA0148   Superseding Indictment, Apr. 23, 2003, ECF No. 1666-1

JA0164   Reporter's Transcript of Proceedings (Fulks's plea), May 4 & 7, 2004

JA0361   Reporter's Transcript of Proceedings (Fulks's trial), June 1, 2004, at 21–22 (excerpts from opening remarks by trial court), 31, 85–86 (excerpts from opening statement by prosecution)

JA0367   Reporter's Transcript of Proceedings (Fulks's trial), June 29, 2004, at 27–94, 101–07, 250, 284–85 (excerpts from prosecutor's closing argument)

JA0446   Reporter's Transcript of Proceedings (Fulks's trial), June 30, 2004, at 2 (excerpt from jury instructions)

JA0448   (Fulks's) Special Verdict Form (Count 1 – Carjacking Resulting in Death), June 30, 2004, ECF No. 648

JA0459   (Fulks's) Special Verdict Form (Count 2 – Kidnaping Resulting in Death), June 30, 2004, ECF No. 649

JA0470   Reporter's Transcript of Proceedings (Basham's trial), Sept. 29, 2004, at 91–92, 100–02, 135–36, 199–200, 207–10, 221–23 (excerpts from jury instructions)

JA0487   (Basham's) Verdict (guilt), Sept. 30, 2004, ECF No. 766

JA0490   Reporter's Transcript of Proceedings (Basham's trial), Oct. 12, 2004, at 15–16, 33–34, 86 (excerpts from jury instructions)

JA0496   Reporter's Transcript of Proceedings (Basham's trial), Nov. 1, 2004, at 37–90, 164–70, 193–95, 201, 233 (excerpts from jury instructions)

JA0563      (Basham's) Special Verdict Form (Count 1 – Carjacking Resulting in Death), Nov. 2, 2004, ECF No. 805

JA0575      (Basham's) Special Verdict Form (Count 2 – Kidnaping Resulting in Death), Nov. 2, 2004, ECF No. 806

JA0587      Order (Fulks denying Motion to Vacate), Jan. 10, 2023, ECF No. 1739

JA0623      Judgment (Fulks), Jan. 10, 2023, ECF No. 1740

JA0624      Order (Basham denying Motion to Vacate), Jan. 10, 2023, ECF No. 1741

JA0660      Judgment (Basham), Jan. 10, 2023, ECF No. 1742

JA0661      Notice of Appeal (Fulks), Mar. 7, 2023, ECF No. 1743

JA0663      Notice of Appeal (Basham), Mar. 7, 2023, ECF No. 1746

government intends on calling Ronnie Fulks as a witness. We also intend on calling his brother Duane Fulks as a witness. Duane Fulks saw Mr. -- his brother with two guns, before they even left to go to West Virginia early on in this spree.

I would just note for the record that when we call any relative of Mr. Fulks, the government would respectfully request the court's consideration of Rule 6 -- 610 (c), I believe, because they are adverse parties. And I just want to note that now for the record, as far as the method or mode of interrogation, or witness questioning.

Mr. Ronnie Fulks has admitted in the statement to the FBI that when his brother comes to his house that Tuesday evening, November the 19th, that he asks him and inquires about that he has seen him on TV, because that chase actually made it on the news down in Ohio. And he asked him about the situation, in which Mr. Fulks admits to his brother that he, Mr. Fulks, carjacked the lady in South Carolina.

That testimony, that information was provided by Ronnie Fulks to FBI agents, so we intend on offering that. Should Mr. Fulks deny that, we intend on impeaching him. That is Tuesday, November the 19th. He spends the night on November 19th.

Sometime that day or the next day, Wednesday, November the 20th, he gets his brother to follow him, his brother and his brother's girlfriend, Ms. Adams. He's in the

BMW, he being Mr. Chad Fulks. His brother and Ms. Adams follow him, and he takes Ms. Donovan's car to a farm outside of Goshen, Indiana. He parks the car in a barn and he puts a tarp over the car.

Sometime later on that day, Your Honor, law enforcement had been made aware by the FBI that Mr. Fulks had relatives in that area, and so the local police department were using undercover narcotics agents and other individuals to surveil several places in the Goshen area, including Ronnie Fulks' residence.

They have photographs of Mr. Chad Fulks. The undercover recognized Mr. Fulks at the house on Wednesday, November the 20th. Ms. Fulks gets in the back seat of his brother's and Ms. Adams' car, they are driving somewhere. And the undercover radioed to a marked unit, they attempt to a stop the car, the car speeds up for a short distance, stops.

Mr. Fulks jumps out of the carp, flees on foot. More law enforcement are called to the scene. And he is on Wednesday, November the 20th, on the 17th day of this episode, he is arrested in Goshen, Indiana.

As I indicated, Amy Ward's driver's license is found in his pocket, other items are found in Ms. Donovan's car.

You have published into the record his 302, Mr. Fulks' 302, and as I indicated, Your Honor, Mr. Basham has given a statement in which he denies being the actual killer.

So, there are statements as a part of this investigation in which Mr. Basham actually has indicated that Mr. Fulks is the killer.

THE COURT: A counselor where?

MR. GASSER: When he was a youth, a counselor when he was growing up, at one of his schools.

THE COURT: All right.

MR. GASSER: So, you have got the statement you published into the record of Mr. Fulks claiming that he was present and he is guilty of carjacking and kidnapping, "But I didn't kill anybody."

And, of course, you have got some statements of Mr. Basham indicating, "I was present and -- aiding and abetting and kidnapping and carjacking, but I didn't kill anybody."

And then we have got other statements Mr. Basham made to this counselor in which he implicates himself and Mr. Donovan in both killings.

And then there are letters that Mr. Basham wrote to Ms. McGuffin, the woman I told you about in Huntington, West Virginia, in which he implicates the defendant. And again, I wanted to put all of that on the record at this guilty plea.

THE COURT: The version to the youth counselor that

implicates both, did it give details of who did what?

MR. GASSER: No, sir. The youth counselor specifically asked Mr. Basham a question and he responded -- and the words he used were that "We killed those women."

You have heard from the statements with regard to forensics, the van of course, when it was caught or stopped in the field on November the 14th in Horry County, South Carolina, it was processed.

Most of -- a lot of that evidence deals with the Samantha Burns matter, so it not applicable to this particular proceeding.

Ms. Donovan's car was processed for evidence, Your Honor. They found -- on certain items inside the car they found both Mr. Basham's and Mr. Fulks' fingerprints.

Of course, we have got a dozen or more witnesses that can place both of them in Ms. Donovan's car from November 14th to when Mr. Basham was arrested on the 17th. And, of course, from November 14th to when Mr. Fulks was arrested on November the 20th.

Nonetheless, there are fingerprints on certain items. Mr. Fulks' fingerprints are found on a Swisher cigar wrapper, found on a mirror inside the car. And Mr. Basham's fingerprints were found on duct tape, several fingerprints were found on duct tape that's found inside Ms. Donovan's car.

On the back seat of the car there was a stain on the

back seat. That section of the back seat was removed pursuant to a court order that you signed. Blood and body hairs were extracted from both Mr. Basham and Mr. Fulks. Those items were sent to the FBI laboratory in Quantico.

An FBI serologist and DNA analyst were able to determine that a semen stain on the back seat of Ms. Donovan's BMW is in fact the DNA of Chad Fulks. There was no serological evidence linking Mr. Basham to the car.

And, of course, there is no body, so we have no way of knowing whether she was strangled, whether her throat was cut, whether she was shot. So, there is nothing to take from the body to compare to any of the firearms or anything else.

Forcibly removed head hairs were found in the trunk of Ms. Donovan's car during the vacuuming of that trunk. Hairs consistent with Branden Basham and a hair consistent with Chad Fulks were included in that trunk vacuuming. That is the extent of the forensic evidence from the car.

Trace evidence, the government's position is somewhat irrelevant since again they can physically be put in the car by eyewitness testimony and by fingerprint evidence. But that is the extent of the forensic evidence.

Your Honor, with regard to the searches of the body, I think the record needs to be clear. Because again if anybody, you know, directly or collaterally attempts to attack Mr. Fulks' decision to plead guilty when there are no bodies, I

believe the government -- I need to just briefly spend some time on that issue.

To the extent of the searches early on, Mr. Basham was arrested, as I indicated, in Ashland, Kentucky. He was being interviewed by the FBI in Ashland, Kentucky.

Mr. Fulks was arrested in Goshen, Indiana and taken into federal custody, actually. He had lawyers in Indiana and Mr. Basham had lawyers in Kentucky.

With the consent -- as you well know, based on other hearings -- Mr. Basham and Mr. Basham's lawyer in Kentucky were cooperating with law enforcement, and Mr. Basham was describing an area on a map. And that map was faxed from Kentucky to the FBI and Myrtle Beach Police Department, the Conway Police Department in South Carolina.

One of the Conway police officers noticed that map that was sketched at the direction of Mr. Basham as being the Savannah Bluff area. I mean, he drew 501, the motel, there's a boat ramp, there's a gravel road.

I mean, when you look at an aerial photograph and you look at the map that Branden Basham -- it's almost exact, and one of the officers noticed that. And, of course, we have got the witnesses that placed the van there in their description as well.

Mr. Basham had indicated that that's where you would find Ms. Donovan's body. They interviewed Mr. Fulks' lawyer,

and as a result of that interview, searches -- as a result of the interview, searches were conducted of the Savannah Bluff area and 501 for Ms. Donovan's body.

The searches lasted, Your Honor, for three full days. There were cadaver dogs, there were dive teams, there were four wheelers, there were helicopter searches with thermo imaging. People from the United States Army, people from the United States Marines, law enforcement officials from SLED, Conway City, FBI, Horry County Sheriff's Department, Horry County Police, they searched three days in the Savannah Bluff area. They found nothing.

You know about the Thanksgiving day episode up in the Bee Tree Farm with Mr. Basham, and the thorough search involving the location of Alice Donovan's body.

After -- even before that November the 28th search, Your Honor, starting on November the 21st, North Carolina has what unfortunately South Carolina doesn't have, but they have a network of search and rescue teams throughout the State of North Carolina. They are volunteer workers that come together and assist law enforcement. They are actually certified, there's a training you go through.

Starting on November the 21st, literally up until almost -- as I'm standing here before this court today, tens of thousands of man hours involving law enforcement officials, involving the same mechanisms -- helicopters, dogs, dive teams,

military personnel, concerned citizens -- have logged tens of thousands of man hours searching for Ms. Donovan's body in the Brunswick County area, to no avail.

With the advice of counsel, Mr. Fulks in April -- the 302 that you published indicates that she is somewhere off of Highway 90. I would note that as a result of talking with his lawyer, law enforcement reinforced their search of Savannah Bluff and Highway 90 where, in April of 2003 -- isn't anywhere near the Savannah Bluff area that they searched.

He indicates through his lawyers and private investigator that she is in a specific area and he actually describes a specific boardwalk. And he describes in the 302 driving down there and seeing that boardwalk. And that boardwalk exists.

And it's amazing, it's something that is very, very unique. And he remembers seeing it on the right-hand side and turning around and coming up and stopping by these poles.

And they hired cadaver dogs from -- the defense team did, and notified the FBI of the results, that there were hits by these cadaver dogs. And, of course, the FBI conducted a thorough grid search of that area, to no avail.

And then in March of this year, some 11 months later, Mr. Fulks at the request of his lawyers, takes law enforcement, members of the U.S. Attorney's Office to a completely separate area, away from that one area, at the other end of the

boardwalk, and drives to that particular area.

And out there, knowing it can be used against him, he tells the FBI agents, "I am absolutely positive Ms. Donovan's remains are here," and describes that area. And for hours they conduct searches, defense counsel is out there, some of their team, to no avail.

THE COURT: Well, are you going to take the position that this defendant, Mr. Fulks, deliberately misled authorities looking for the body?

MR. GASSER: Absolutely. Then in March of this year, he then took us to another area where he claims, "We are -- I am now -- now this is it, I am absolutely positive," to another area. And, of course, that area was searched to no avail.

So, to the extent that -- I want the record to reflect the extent that the searches were conducted by not only law enforcement personnel, but military personnel, as well as concerned citizens throughout both the states of North Carolina -- based on what Branden Basham is telling us, with lawyers present on November the 28th, as well as with Mr. Fulks -- had indicated with lawyers present.

THE COURT: You know, in the case of the missing intern in Washington, D.C. they finally located those remains very close to a walkway in a public park.

MR. GASSER: Rock Creek Park, I'm familiar with that.

THE COURT: They just missed it. I mean, I don't

know if that search was as extensive as this one was, but that was always puzzling to me.

MR. GASSER: Yes, sir.

THE COURT: You say he's taken you to essentially three different locations?

MR. GASSER: Well, the first being Savannah Bluff, the second being one section off of Highway 90, the third being another section off of Highway 90, the fourth being another section off of Highway 90. I mean, he's danced all around that area off of Highway 90.

THE COURT: All right.

MR. GASSER: Again, for purposes of the record, I would like to -- and I'm almost finished with my presentation.

THE COURT: Well, let's finish and then we will take a little recess and come back.

MR. GASSER: Yes, sir. Again, I'm almost -- just a few more minutes. On the elements sheet, again, so the record is complete, on the elements sheet, the offense charged on count 1, I would note for the record that --

THE COURT: I'll tell you, let's take our break now and come back and get into these elements, because we -- the defense lawyers understand, as to these counts 3 through 8, or 4 through 8, I guess, we do have to get some kind of acknowledgement for the elements of those offenses.

MR. NETTLES: I think if you ask him, "Do you admit

that this element -- do you admit that this element is proven?" is sufficient, Judge.

THE COURT: All right. Let's take a 15 minute recess.

(Short recess)

THE COURT: The jury clerk is really pushing me to rule on these excuses. Have y'all had a chance to look at them?

MR. BLUME: Yes, sir.

THE COURT: Is there any objection to my proposed -- there are two that I changed my mind on after the jury clerk showed me. I was looking at the wrong part of the questionnaire. Excuse number E 244, I just read the part at the bottom that says, "Please excuse me, I think I will be too nervous." I thought that wasn't enough. But up above it says that they have -- they have to take dialysis, et cetera, et cetera. I missed that part.

MR. GASSER: Your Honor, I noted E 244, and would indicate to the court that the government would have no objection to excusing that juror.

THE COURT: Well, I propose to change that no to a yes then. Mr. Blume, what about that?

MR. BLUME: No objection.

THE COURT: No objection? And then the other one I was going to change, this apparently was written by the spouse,

it's E 245. "I'm writing this letter for my husband. I can't do my best on the jury, my education is very limited. I have only a fifth grade education. I don't believe I could understand everything that might be said."

What about -- I put no on that excuse and said he needs to come in. But the jury clerk asked me to take a second look at it. What about that, Mr. Gasser?

MR. GASSER: The government would have no excuse to excusing that juror.

MR. BLUME: I agree.

MR. GASSER: I mean, no objection to excusing that juror.

THE COURT: All right, very good. Now, all the rest of them, I kind of stand by my tentative decision. What about it from the government?

MR. GASSER: What about E 257?

THE COURT: Is that near the back?

MR. GASSER: It was not one of the eight you gave us today, it was one of the -- it was included in the material.

THE COURT: I don't see 257. What is the excuse?

MR. GASSER: It indicates at the top a medical history of arthritis.

THE COURT: All right, that's another one where I didn't look at -- I looked at the part down below that said she had already served on jury once in state court, that's not an

excuse. I didn't see the medical history up top.

MR. GASSER: I think with three apparently major health problems, the government's position would be that we have no objection.

THE COURT: All right. So, you say excuse this one as well? What about that, Mr. Blume?

MR. BLUME: No objection.

THE COURT: All right. Without objection then we will put a yes on 257. All right, any others of mine that you disagree with?

MR. GASSER: The government concurs with all of the other requests and the decisions the court has made.

THE COURT: Mr. Blume?

MR. BLUME: I only have one other one, which was that -- potentially at least further inquiry could be made, number 252, indicates that the juror was a special education teacher.

And in all the other cases with teachers -- just for consistency's sake -- the court figured school would probably end sometime, maybe we can just find out when this person's school ends and whether they might be moved to the second or third week, if we get that far, of scheduling jurors, just for consistency's sake.

THE COURT: All right. So, what do you propose that we do with her?

MR. BLUME: If they can just find out when her school ends. Most teachers -- school is ending right about now --

THE COURT: Right.

MR. BLUME: -- and this is just one that -- I mean, it may be that because she's some teacher and -- her program goes year round. I don't know that, it just seems --

THE COURT: Tell me the number again.

MR. BLUME: 252.

THE COURT: That's in the new stack?

THE CLERK: No.

MR. BLUME: No, I believe it was one of the old ones. Yes, it came with the list --

THE COURT: Well, see, I have got to find mine because I have got to mark on it.

Well, how about we move her to the last day of the second week and ask to follow up and see when her school ends?

MR. BLUME: That's fine, Your Honor. And if in fact it does not end, or goes -- that she is in some year round program, I can go ahead and say now that we wouldn't have any objection at that point to her being excused.

THE COURT: All right, very good, then we have agreement on pretty much all of them then.

All right, pick up where we left off.

MR. GASSER: Thank you, Your Honor. Again, I'm referencing the elements document. With regard to count 1, the

car-jacking resulting in death, with regard to element 2, the Alice Donovan BMW was manufactured in Germany, so that fact would take care of that particular element.

With regard to element 5, the one we have been discussing and dealing with --

THE COURT: Let's take one at a time. Does the defendant concede that the automobile subject to the car-jacking was manufactured in Germany and therefore the interstate commerce requirement has been met?

MR. NETTLES: Yes, sir.

THE COURT: Mr. Fulks, do you agree with that?

THE DEFENDANT: Yes, sir.

THE COURT: All right.

MR. GASSER: And my understanding is the defendant has already admitted to elements 1, 3, and 4 of that count.

THE COURT: Right, he has.

MR. GASSER: As to element 5 again, I know the court indicated it would allow the government to expand on its position with regard to "In doing so the defendant intended to cause death or serious bodily harm."

We agree or we acknowledge that Pinkerton versus United States would be applicable. However, Your Honor, I can't stress enough how the government does not -- and disagrees with any position or premise that only his guilt on that element would only be applicable based on the Pinkerton

theory.

It's the government's position, based on the totality of the presentation that has been provided to this court today, that Title 18, Section 2, aiding and abetting, would also be applicable based on Mr. Fulks' 302, as well as other evidence that was presented to this court.

THE COURT: All right, now, I can't accept your competing version if he doesn't admit it.

MR. GASSER: I understand that. What I want to be able to do is put on the record what the government's position is.

THE COURT: All right.

MR. GASSER: Because it's our position -- Mr. Schools, Mr. Thurmond and I -- that we have a responsibility to put as much on the record -- so if anybody collaterally attacks defense counsel's advice to plead guilty even under Pinkerton.

THE COURT: All right, I see. I see.

MR. GASSER: And it's our position that Section 2 of Title 18, "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission is punishable as a principal."

Your Honor, it's the government's position, particularly based on the admission of Mr. Fulks today and in his 302, that Mr. -- it was Mr. Fulks' aiding and abetting, he was the one that knew the area of Myrtle Beach, he had been to

Myrtle Beach on a number of occasions. I don't believe they will dispute that.

On his own admission, he pulled off of an interstate or a highway that had other cars and other people. He pulled off that interstate, he drove the car to a dirt road, he's the one that stopped. Had he not stopped the car, Branden Basham and Alice Donovan would never have between able to get out of the car.

So, it's the government's position that he was aiding and abetting in the car-jacking resulting in death in that element, in the intent element.

In the light most favorable to him, that he is claiming that it was Branden Basham that was the killer, that based on the totality of the circumstances that day, and based on that fact that he -- based on the evidence that the government has presented that he himself shot at and attempted to kill Carl Jordan moments before Alice Donovan was abducted -- Mr. Jordan only had a brief opportunity to see his face, to be able to later identify him -- it's the government's position that it is a reasonable inference that a jury, had this case gone to trial, that a jury would find that both Mr. Basham and Mr. Fulks had the intent to cause death and serious bodily harm because they had raped Alice Donovan, and she had spent hours with them and would be able to come into court and identify them.

And therefore based -- the government's position is, there's a reasonable inference that a court and a jury would be able to draw that he himself not only as an aider and abetter, that he himself developed the intent to cause death or serious bodily harm because Alice Donovan would be able to identify him and put him in prison for the rest of his life.

THE COURT: All right, as I understand your position then, you say, number 1, there is enough of a factual record established by Mr. Fulks' 302 to establish the intent requirement without reference to Pinkerton?

MR. GASSER: Absolutely, Your Honor, that's the government's position.

THE COURT: All right. As a fallback position, you say if it's not enough, Pinkerton will come to the rescue, and through a Pinkerton vicarious liability theory for the acts of Mr. Basham, there's a factual basis for the plea?

MR. GASSER: That's the government's position.

THE COURT: And then your third position is, you have what you say is a wealth of other evidence showing intent and actual commission of the murder that bears on the reasonableness of his decision to plead guilty today in case there is a later challenge over the decision to plead guilty?

MR. GASSER: That's the government's position, and that's why we wanted to clearly state that on the record and have the proceedings reflect that.

THE COURT: All right.

MR. GASSER: Finally, Your Honor, with regard again to that intent factor, I go back to the beginning of my presentation -- and I know that it was somewhat lengthy, as far as what charges were filed against him. And I'm not going to go through it all again, but if you recall, the record does reflect what he was wanted for and what he was being investigated for.

All of those crimes together clearly would have put Mr. Fulks in prison probably for the rest of his life. Taking several of them, the serious ones, the aggravated child abuse, if he were to be found guilty of that, the armed robberies out on I-65, if he would have been found guilty of those, it's the government's position that once he decided to break out of jail, that it was his desire not to be apprehended. And that if anybody or anything stood in his way of going back to prison, he would take care of that personally.

THE COURT: How many -- tell me again how many total charges were pending against him when he escaped?

MR. GASSER: He had a supervised release violation from the Eastern District of Tennessee, federal court, he had a parole violation out of Lagrange, Indiana, state, there was a state parole violation when he was released on March, 22nd, 2002, from the Westville Corrections Institute.

He had a pending, they call it resisting arrest, in

Middlebury, Indiana where he had run from the police in a car. He was being investigated for two armed robberies on I-65, and an attempted armed robbery on I-65. He was being investigated for possession of thousands of dollars' worth of stolen items.

He had in fact pled guilty on October the 28th, several days before he escaped, to 12 counts of credit card fraud, based on the items that were discovered when the police searched his mobile home on August the 26th, 2002, after he was arrested.

He had pled guilty, in fact was sentenced in his absence to five years, but he had pled guilty with counsel on October the 28th, 2002.

And he had been served with and was indicted for aggravated child abuse, second degree, in the State of Kentucky, which I believe might carry a penalty of as much as 40 years in prison.

All of those charges, whether the -- and I understand the defense is not going to concede that he's guilty of those, but it's the government's position that we intend to offer evidence of his guilt of those.

But nonetheless, the mere fact that those were allegations that he was facing, most likely prison for the rest of his life, is critical to understanding what his state of mind was and these intent factors when he was in South Carolina committing the crimes that are included in the eight count

indictment.

With regard to element 6, I want the record to reflect -- of course, he has acknowledged that death resulted. And I would cite to the court -- I provided this case months ago to defense counsel as well as the court -- the Government of the Virgin Islands versus Harris, and it is 938 Fed. 2d 401, it's a 1991 Third Circuit case. But it is, the case, Your Honor, is a compendium of all the relevant federal circuit courts, as well as state courts, that -- law on missing body cases.

And there are a lot of differences in the federal court law and many of the individual 50 state court laws, but where there is one area of uniformity, in states across this country and in the federal circuit courts, is that they look to the common law when it comes to somebody being held accountable for a homicide in which the body has never been discovered.

And the record will reflect that the Government of the Virgin Islands versus Harris stands for several legal premises. "Corpus delicti is defined as the body or substance of the crime charged; it has two components, unlawful injury and an individual's unlawful conduct as the source of that injury.

"Establishing corpus delicti requires proof that a specific injury, loss, or harm resulted, that the injury was caused by a criminal agency rather than by an innocent or

accidental one.

"To establish corpus delicti, the government need only prove that the crime has been committed, identifying the defendant as the perpetrator of the crime is not required. Proof of corpus delicti may be based on circumstantial evidence. Corroboration of confession is a factor to be considered in weighing the sufficiency of the evidence."

It goes on to say neither the body of the missing person nor evidence of the method used to produce death is required to establish corpus delicti. Evidence of the means used to produce death need not be shown to sustain a murder conviction.

The Fourth Circuit, Your Honor, addressed this issue in the United States versus Wills. It is cited as 2003 WL 22293602, it is a kidnapping case, Eastern District of Virginia. It was decided by the Fourth Circuit on October the 7th, 2003. Judge Widener wrote the opinion for the court of appeals.

In this case it was a kidnapping resulting in death case, the body has never been found, and the court reaffirmed the common law and applies it in the Fourth Circuit:

"Evidence sufficient to support a finding that the defendant killed the victim, supporting the conviction, although the victim's body was never found, the prosecution could rely exclusively on circumstantial evidence to establish

the victim's death."

I would note for the record that both Mr. Basham and Mr. Fulks have indicated on numerous occasions that Alice Donovan is in fact dead. And that the government also, Your Honor, can prove that Alice Donovan was 44 years old, she was in good health on November the 14th. She was happily married.

Her two daughters, from up in the northeastern part of the country had recently moved down to live with her. She had three grandchildren. She was actively involved in her grandchildren's lives.

She had a very good job at Precision Southeast in Marion, South Carolina. She earned a very good wage. Her ATM records reflect that she had several thousand dollars in that particular bank account. Her and her husband had just -- and was just finishing up building literally their dream home.

According to everybody that law enforcement has interviewed -- family members, friends, associates at work -- she was the happiest she had ever been in her life. And we would have, had this case gone to a jury, we would proved all of those factors and all of those facts to prove from a circumstantial perspective and to corroborate the statements of Mr. Fulks that she is in fact dead.

And I would just respectfully request -- I know that the court is going to inquire of defense if they also agree with that particular -- I figure they have agreed with that

particular element.

With regard to count 2 --

THE COURT: Why don't we take it one count at a time?

MR. GASSER: Okay. That's all the presentation we would have on count 1.

THE COURT: Mr. Nettles?

MR. NETTLES: Your Honor, we have already agreed to the element as to count 2, that the automobile was made in Germany. In terms of count 5, of course, we intend to plead under the Pinkerton vicarious --

THE COURT: You mean element 5?

MR. NETTLES: Element 5, I'm sorry, excuse me -- the Pinkerton liability, and we don't dispute the death as a result thereof.

THE COURT: All right, let me speak to Mr. Fulks also.

BY THE COURT:

Q. Mr. Fulks, this may sound overly technical, but before I can accept a plea from you I must determine that there are facts brought out in this courtroom proving these five elements of count 1. In your statement that we read earlier this morning, you admitted taking a motor vehicle from another person using force, violence, or intimidation; is that right?

A. Yes, sir.

Q. Now, that just leaves two other elements -- three other

elements, I'm sorry. One is that the vehicle had moved in interstate commerce. You have agreed it was manufactured in Germany and moved here; is that right?

A. Yes, sir.

Q. That satisfies that element. The sixth element is that death resulted. Do you agree that Ms. Donovan is dead?

A. Yes, sir.

Q. And then the only one left is number 5. That in taking the car, you intended to cause death or intended to cause serious bodily harm to Ms. Donovan. Your 302 statement does not indicate that you intended to cause death or bodily harm.

There is a body of law known as the Pinkerton doctrine -- and this is very legalistic but I need to explain it to you -- that holds that in a conspiracy where two or more people agree to commit some illegal act, the act of any conspirator can be imputed to the other members of the conspiracy.

For purposes of this case, that means if Mr. Basham intended to cause death or intended to cause serious bodily harm at the time Ms. Donovan was abducted, that will be sufficient to meet this element, element number 5, if y'all were working in a conspiracy together.

The government and your lawyers have agreed that this Pinkerton doctrine that I have just tried to explain on a very elementary basis would apply to number 5. Do you agree with

that?

A. Yes, sir.

THE COURT: All right, please continue.

MR. GASSER: Thank you, Your Honor. Count 2, the kidnapping. My understanding is the defendant has already acknowledged all of the elements of the kidnapping, and the government would concur with the court's analysis that Pinkerton is inapplicable to count 2 for several reasons, and one being also that there is no intent element required, unlike the car-jacking, required for the federal kidnapping statute.

THE COURT: I think a proper factual record has been demonstrated based on the 302 statement.

MR. GASSER: Yes, sir. And just for the record, when it talks about "held the victim for ransom, reward, or otherwise --" I apologize, I don't have the citing, but Fourth Circuit case law is -- corresponds to other circuit courts across the country in which that word "otherwise" is interpreted extremely broadly and extremely liberal as far as what their intent was.

And clearly again, just for the record, they had just been spotted, they had been in a shooting, they had been spotted breaking into a home. They were in a white pickup truck, it was an old beat up pickup truck.

And it's the government's position and what our position will be -- not only today but also before the

sentencing jury -- is that these two individuals, including Mr. Fulks, needed to get rid of the white pickup truck because it was broad daylight, and they needed better -- they needed better transportation.

And they saw what was obviously an easy mark, a woman by herself in a BMW. And therefore law enforcement -- if they could get into that car, law enforcement, instead of looking for two while males in a white pickup truck, law enforcement would not know to be looking for two while males and a white female in a blue BMW. And again that is purely for the record.

And the government would, would rely on the previous presentation of the evidence for counts 3 and 4 -- I mean, elements 3 and 4.

THE COURT: All right.

MR. GASSER: As to count 3, I believe we again would rely on our presentation of facts and the previous colloquy that the court has had with Mr. Fulks.

THE COURT: And I think the 302 statement covers all three of these elements.

MR. GASSER: Yes, sir.

THE COURT: He admitted to participating in stealing the BMW, or at least knowing it was stolen, and it went across a state line, and it was stolen.

MR. GASSER: Yes, sir.

THE COURT: I mean, all of those elements have been

fulfilled already from the 302 form.

MR. GASSER: We agree. As to count 4, the same. We feel that the 302, as well as previous statements by Mr. Fulks and his attorneys, account for all of the elements of count 4.

I'm not sure whether or not Mr. Fulks, through his attorneys, would like to address the final element, number 4, the overt act aspect since we allege multiple overt acts, and my presentation of facts covered multiple --

THE COURT: I need some help from the lawyers here, from the defendant, to explain how these four elements have been met in this case.

MR. NETTLES: Well, I think that clearly the first three elements have been met by the 302. If you go into the 302 you will find specific overt acts that he admits to that correspond to the overt acts within the indictment, Judge. And you only have to have one.

Not only that, Judge, it's a multi-object conspiracy. So, all they have to do is prove one of the objects, they don't have to prove them all.

THE COURT: So, you say the 302 is sufficient --

MR. NETTLES: Yes, sir.

THE COURT: -- for count 4?

MR. NETTLES: Yes, sir.

THE COURT: All right, I agree.

MR. GASSER: Thank you. With regard to count 5,

we -- it's the government's position that the 302 and the government's presentation account for the three elements, and I would again note for the record, as Mr. Schools noted previously on Tuesday, that no overt acts are required under 924 (o).

THE COURT: All right, Mr. Nettles?

MR. NETTLES: We would agree that the 302 establishes guilt under that -- under this crime.

MR. GASSER: As to count 6, the 924 (c) count --

THE COURT: All right, I agree as to count 5.

MR. GASSER: I'm sorry.

THE COURT: All right.

MR. GASSER: As to count 6, with regard to element 1, the first element, the defendant used, carried, or possessed a firearm.

Your Honor, the government's position would be either direct -- we have offered evidence of his direct possession, we have offered evidence of his constructive possession of firearms, and we have offered evidence that he aided and abetted under Section 2. And therefore, either directly, constructively, or through the aiding and abetting statute, we believe the circumstances and facts of element 1 has been met.

THE COURT: What about that, Mr. Nettles?

MR. NETTLES: I think the 302 establishes all of

these elements, Judge.

THE COURT: All right, I agree.

MR. GASSER: As to count 7, element 1, the defendant has previously been convicted of a crime punishable by a term of prison exceeding one year.

THE COURT: All right, now, I'm not sure the defendant has conceded that here in the courtroom yet.

MR. GASSER: I'm going to publish into the record his previous conviction -- at least two of his previous convictions that would satisfy that element, I believe. Mr. Nettles is going to affirm and concede.

Your Honor, the first would be, the defendant pled guilty in Lagrange Superior Court, and was sentenced on February 15th, 2000 to burglary.

And I'm referring to the official sentencing order signed by Judge George E. Brown of Lagrange Superior Court in Lagrange, Indiana. Judge Brown accepted the defendant's guilty plea and entered a judgment of conviction for the offense of burglary as a class B felony, and sentenced Mr. Fulks to the following:

That he pay a fine to the state of Indiana in the amount of $500, plus court costs of $125, and that he serve 10 years at the Indiana Department of Corrections. The government would rely on that conviction.

And I don't know if you want to take them separately.

GARY N. SMITH, CM
COLUMBIA, SC

JA0330

THE COURT: All right.

MR. NETTLES: We agree that that is a felony under 921 (a), Judge, and that he's been convicted of that offense, It carries more than one year.

THE COURT: Mr. Fulks, do you agree with that?

THE DEFENDANT: Yes, sir.

MR. GASSER: And just to be absolutely thorough in case something would have happened to that conviction, on December the 1st, 1998, Mr. Fulks pled guilty in the Eastern District of Tennessee in federal court to the following federal felony offenses:

The interstate transportation of a stolen motor vehicle, violation of 18, United States Code 2312, aiding and abetting burglary of a vehicle with intent to commit theft, in violation of a Tennessee statute, and also 18, USC Section 13 and 2, two counts. Those are felonies, those are felonies in the Tennessee state statute as well. And evading arrest, in violation of 18, USC Section 13, 2 as well, and referencing the Tennessee state statute, which is a felony.

So, those four guilty pleas on December 1st, 1998, in federal court, the Eastern District of Tennessee, would also be applicable and would bar him from ever owning or possessing, either directly or constructively, a firearm in this country.

THE COURT: Mr. Nettles?

MR. NETTLES: Judge, I apologize, I'm sure the 2312

conviction is a federal felony, I know that. And I did not go into the Tennessee state court convictions, but if Mr. Gasser says they are felonies, he knows what the rule is, I don't dispute that at this time, Judge.

THE COURT: Well, do you agree that there is a conviction there?

MR. NETTLES: Yes, we do agree. He was convicted in the Eastern District of Tennessee of a felony, yes, sir, in addition to the previous one he had sustained in Lagrange, Indiana.

THE COURT: Mr. Fulks, do you agree with what Mr. Nettles just said?

THE DEFENDANT: Yes, sir.

THE COURT: All right.

MR. GASSER: We would rely on both actual constructive possession, as well as aiding and abetting with regard to element 2 of count 7.

And we would, with regard to element 3, "The possession was in or affecting commerce because the firearm had traveled in interstate or foreign commerce at some point during its existence," I would like the record to reflect, Your Honor, that the .22 caliber revolver that was stolen from Mr. Talsma, from his residence in Michigan City, Indiana, was a Harrington and Richardson, model 949, .22 caliber 9 shot revolver, and it was made and manufactured in Gardner, Massachusetts;

The Llama model Mini Max, .45 caliber semiautomatic pistol that was also stolen from Mr. Talsma's residence in Michigan City, Indiana, and recovered in the duffel bag along the woods line of Ms. Moore's residence in Horry County, South Carolina, was manufactured in Spain;

The Remington model 870 12 gauge shotgun that was stolen from Sam Cooper's residence in Myrtle Beach, in Conway, that was recovered from Tina Severance's van, was manufactured in Ilion, New York;

The -- I'm sorry, Sam Jordan for the record, Sam Jordan's residence.

The Marlin model 882SS .22 caliber revolver that was stolen from Sam Jordan's residence in Conway, South Carolina, recovered in Tina Severance's van, was manufactured in North Haven, Connecticut;

The Remington model 1100 12 gauge shotgun that I made reference to earlier in my presentation, that was discovered in Tina Severance's van, and that was stolen from Sam Jordan's residence, was manufactured in Ilion, New York;

The Marlin model 60 .22 caliber rifle, again stolen from Sam Jordan's residence and recovered from Tina Severance's van in Horry County, was manufactured in North Haven, Connecticut;

The Connecticut Valley Arms Magbolt 150 rifle, stolen from Sam Jordan's residence in Horry County and recovered from

Tina Severance's van was manufactured in Norcross, Georgia.

That would be all the government has with regards to count 7.

THE COURT: All right, Mr. Nettles, do you agree all the elements of count 7 have been put on the record?

MR. NETTLES: Yes, Judge.

BY THE COURT:

Q. Mr. Fulks, do you agree with the fact that the three elements of number 7, of count 7, have been established here today? In other words, do you agree that the firearms that Mr. Gasser has been talking about all traveled from one state to another state at some point in time?

A. Yes.

Q. You agree to that?

A. Yes, sir.

THE COURT: And you have already said that you have been convicted of a crime punishable by imprisonment for more than a year, and your 302 statement indicates that you possessed at some point some of those weapons, so I find a factual basis has been shown for count 7.

MR. GASSER: With regard to count 8, the government relies on its previous presentation of facts, previous 302 that was admitted to by Mr. Fulks, and we rely on the law of both actual -- or of actual constructive possession, as well as aiding and abetting with regard to element 1.

And we would rely on our presentation with regard to elements 2, 3, and 4, including the previous ATF tracing report that I just published into the record.

THE COURT: Mr. Nettles?

MR. NETTLES: We don't disagree with that, Your Honor, we think all four elements have been established.

BY THE COURT:

Q. All right, Mr. Fulks, the last count, count 8, charges you with possession of stolen firearms. You have already admitted that you possessed some of these firearms, your 302 statement talks about stealing them.

So, you -- since you have participated in the theft, you knew they were stolen, and then you have already conceded that they traveled in interstate commerce at some time, so do you agree that all four elements have been demonstrated here in court today as to count 8?

A. Yes, sir.

MR. GASSER: Your Honor, just let the record reflect it is the government's position -- again, not only should anyone challenge this matter, these proceedings today directly or collaterally, that the government has today presented and the defendant has in fact admitted through his 302 to a case that, based on the eight count indictment and the elements that need to be proven, a factual set of circumstances that is overwhelming, to a large degree uncontradicted, and extremely

powerful as far as the substance of its evidence.

I want to thank the court for giving me the -- all the time to be able to present the government's side in this, and I would just ask you to indulge me one moment while I confer with Mr. Thurmond and Mr. Schools.

Thank you, Your Honor.

THE COURT: All right. So, let's be very clear now, the defendant takes the position that there is an adequate basis for taking the plea to count 1, the car-jacking resulting in death, based on Pinkerton, and you concede that is enough for acceptance of a guilty plea; you reserve the right to take issue with the government's contention that your client had the requisite intent to receive the death penalty, which will be a question for the jury in the penalty phase?

MR. NETTLES: That's correct.

THE COURT: All right. And the government does in fact intend to prove one of the four statutory intent factors which will be required to obtain the death penalty from the jury, if there is one?

MR. GASSER: Yes, sir, we intend on -- it's our position we intend on offering evidence of all four, knowing that we only have to prove one.

THE COURT: All right. I want to be sure Mr. Basham understands this too before I make a final determination on accepting the plea -- I'm sorry, Mr. Fulks.

BY THE COURT:

Q. Mr. Fulks, you remember when we were here yesterday -- when we were here Wednesday, I explained to you your rights as a defendant if this case went to trial and I told you about the fact that the government has to prove that you are guilty, you don't have to prove that you are innocent.

And I told you you have a right to have your lawyers there representing you. I told you about various other procedural protections you would be entitled to. I want to be sure you understand, if you plead guilty and I accept your plea today, I want to be sure you understand what happens from this point forward. Okay?

A. Yes, sir.

Q. If I accept the guilty plea from you, we will then have a trial in front of a jury, which is known as a penalty phase, at which the jury, not me, but the jury will decide whether you should receive the death penalty or whether you should serve life in prison without parole.

And I want to emphasize, life in prison without parole means just what those words say. You would serve in prison the rest of your natural life, you would never be released on parole, supervised release, early release, or anything such as that. You would -- the rest of your life would be in prison. Do you understand what that means?

A. Yes.

Q. And obviously you understand what the death penalty means?

A. Yes, sir.

Q. I believe the federal law says if the death penalty is called for, it's carried out in a manner allowed by the state where the trial occurred --

THE COURT: Right?

MR. GASSER: That's correct.

BY THE COURT:

Q. Now, Mr. Fulks, that means that if the jury should determine that you should receive the death penalty, in South Carolina there are two methods of execution, one is by electrocution, the second is by lethal injection.

If the jury returned the death penalty, you would have to choose which one of those methods would be employed. If you refused to make a choice, it would be done by lethal injection, if the jury returns a death penalty verdict. Do you understand that?

A. Yes, sir.

Q. Now, if I accept a plea from you today, we are currently scheduled to begin selecting the jury for the penalty phase starting Monday of next week. Your lawyers have filed a motion asking me to delay the trial. They have asked me to delay jury selection and trial, or at least delay the trial, to give them some more time to go into some new evidence that they contend the government has presented to them.

But at some point, whether it's jury selection next week followed by a trial, or whether it's a little bit later, at some point we will have a trial in this courthouse, and a jury will be selected.

Normally in Columbia, South Carolina, the jury panel is brought from a region of the state that goes from Columbia up to Rock Hill and over to Myrtle Beach, about a -- if you sort of slice the state up like a piece of pie, we would be a third of the state going to Myrtle Beach and Rock Hill.

Your lawyers have suggested to me that because there has been so much news, publicity, about this case in the Pee Dee area, that we should draw the jury statewide, that is to say, the potential jurors can come from all over South Carolina.

I have agreed with your lawyers that that is a fair thing to do in your case. So, the jury, the potential jurors could be from anywhere in South Carolina. I will exclude from the jury anybody who has read enough about this case or heard enough about this case to form an opinion so they couldn't be fair.

I will also exclude people from potential service on the jury who for some reason or another cannot serve as a juror. If they tell me they are so strongly opposed to the death penalty that they would never give it under any circumstances, no matter what the facts are, I would have to

excuse them from potential service.

On the other hand, if a juror tells me that they are so much in favor of the death penalty that they would award the death penalty every time there is a conviction for something that calls for the death penalty, I would exclude people on that side as well.

We would make an overriding effort to determine -- to select, rather, a fair and impartial jury that could put aside whatever notions it had about the death penalty and decide the case based solely on the evidence presented in the courtroom and in accordance with the rules of law as I would explain them to the jury.

If any of the jurors had any connection with the prosecutors of any type, if they were social friends or had some acquaintance or connection, I would probably excuse them from the jury.

We will probably select 12 jurors -- the jury must consist of 12 people. We will probably select four alternates in case some of the jurors get sick or have to be dropped off the jury for some legitimate reason, we would have those alternates to bring in.

At the penalty phase the government would have to prove certain things before you could receive the death penalty, and that's what the whole penalty phase is about, is whether you receive the death penalty or whether you receive

life in prison without parole.

During that penalty phase, the government will go first. And they have to prove, first, that you acted with some type of intent, that you had some mental state with regard to these crimes, and that's what we have been talking about so much here this morning.

The statutory intent factors are set out in the notice of intent to seek death, which has been filed in your case. And just so you understand, even though you have not admitted here today that you had any intent to kill or commit serious bodily harm to Ms. Donovan, the government is going to try to prove that you did, at the penalty phase.

They are going to try to prove one of the following four things: Number one, that you intentionally killed Alice Donovan. Number two, that you intentionally inflicted serious bodily injury that resulted in the death of Alice Donovan.

Number three, that you intentionally participated in an act contemplating that the life of Alice Donovan would be taken, and intending that lethal force would be used in connection with Alice Donovan, and that Alice Donovan died as a direct result of the act.

And the fourth intent element they are going to try to prove is that you intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of danger to Alice Donovan, who was not a participant in the

offense, such that participation in the act constituted a reckless disregard for human life and that Alice Donovan died as a direct result of the act.

Now, Mr. Gasser just told me he's going to try to prove all four of those things happened in your case. In order for the jury to return a verdict of death, the government has to prove at least one of those four things beyond a reasonable doubt. They don't have to prove all four, but they have to prove at least one of those fours things beyond a reasonable doubt.

And that is one of the issues that the jury will have to decide in the penalty phase in your case. Do you understand that?

A. Yes, sir.

Q. Now, in addition to the statutory intent factors, there are also statutory aggravating factors that the government must prove. Under the law, the government must prove at least one statutory aggravating factor in addition to one statutory intent factor.

Now, these aggravating factors the government will attempt to prove are as follows: First, death during the commission of another crime. The government contends that the death of Alice Donovan, and the injury resulting in her death, occurred during your commission and attempted commission of, and during your immediate flight from, kidnapping as defined in

federal law.

The second one they are going to try to prove is pecuniary gain.

THE COURT: Have I ruled on that motion that related to pecuniary gain yet?

MR. GASSER: I don't believe so, Your Honor.

BY THE COURT:

Q. All right. Another issue that might be for the jury is pecuniary gain. The government contends that you committed the killing of Alice Donovan as consideration for the receipt and in the expectation of the receipt of something of pecuniary value.

The third thing they are going to try to prove is participation in additional uncharged murders, attempted murders, or other serious acts of violence.

MR. NETTLES: Those would be non-statutory --

BY THE COURT:

Q. Oh, I'm sorry, these are non-statutory factors.

The first two factors I have read to you, death during the commission of another crime and pecuniary gain are statutory factors. The government has to prove at least one of those two beyond a reasonable doubt.

The other non-statutory factors that the government does not have to prove but will attempt to prove in an effort to convince the jury you should receive the death penalty are,

first, participation in additional uncharged murders, attempted murders, or other serious acts of violence.

THE COURT: Thank you, Mr. Nettles, for correcting me. Y'all don't hesitate to pop up and correct me if I misstate something.

BY THE COURT:

Q. The other acts of violence they are going to try to prove against you, Mr. Fulks, are, first, you escaped from a detention facility in Hopkins, Kentucky on November 4th, 2002, where you were awaiting trial on serious charges.

Number two, that you, subsequent to the escape, participated in a car-jacking and kidnapping that resulted in the death of Samantha Burns, a 19 year old woman, in Huntington, West Virginia.

Number three, that you, subsequent to the escape, participated in a burglary and other criminal conduct that resulted in the attempted murder of Carl Jordan, a citizen of Conway, South Carolina.

Next, that subsequent to your escape, you participated in the kidnapping and car-jacking of James Hawkins, a citizen in Hanson, Kentucky.

And, fifth, subsequent to your escape, you participated in a high speed vehicle chase that resulted in endangering the lives and safety of officers of Ohio state police.

Now, do you understand those factors I have just read to you?

A.  Yes, sir.

Q.  The next non-statutory aggravating factor the government will attempt to prove is future dangerousness.  The government contends that you are likely to commit in the future criminal acts of violence that would be continuing and a serious threat to the lives and safety of other persons, including but not limited to, inmates and correctional officers in a correctional setting, as evidenced by the offenses charged in the superseding indictment and the statutory and non-statutory aggravating factors.

In addition to the capital offenses charged in counts 1 and 2, the circumstances that demonstrate your future dangerousness include the following, according to the government:

They will attempt to prove that you had previously escaped from a detention facility prior to your escape from the Hopkins County jail, and you will continue to present an escape risk.

The government contends that you have engaged in a continuous pattern of violence throughout your adult life, some have been adjudicated and other conduct has been non-adjudicated, and that you have specifically admitted to numerous acts of violence after your escape from jail on

November 4th, 2002.

Next, that you have failed to adapt your behavior to societal norms thereby demonstrating a significantly low rehabilitative potential. Next, that you demonstrated a lack of remorse for your criminal conduct.

Next, that subsequent to your escape, you continuously participated in the use of illegal drugs, to include the smoking of crack cocaine and alcohol during the course of your criminal conduct, including prior to and after the killing of both Samantha Burns and Alice Donovan.

Do you understand those elements the government will attempt to prove?

A. Yes, sir.

Q. Then we come to victim impact evidence. The government contends that you caused injury, harm, and loss to Alice Donovan, to her family, and her friends and co-workers, as demonstrated by her personal characteristics as an individual human being and the impact of the death upon her family.

The government will present information concerning the effect of the offenses on Ms. Donovan and her family, which will include evidence and testimony that describes in detail the extent and scope of the injury and loss suffered by Alice Donovan, her family, and any other relevant information.

The government further alleges that the family of Ms. Donovan has suffered injury, harm, and loss as a result of her

death, including, but not limited to, one or more of the following things:

Number one, you engaged in a series of lies and deceit during the law enforcement's initial efforts to locate Ms. Donovan's body which resulted in obstructing the search efforts and gave the family a false sense of hope during a period of intense despair.

Number two, you engaged in a premeditated plan to dispose of Alice Donovan's body in such a manner that recovery of the remains has not been achieved.

This action by you has caused significant emotional and psychological pain to Alice Donovan's family beyond the expected grief associated in homicide cases, and has caused a tremendous burden on law enforcement, which has expended a large amount of time and resources in the search efforts.

MR. NETTLES: Your Honor, before you go any further, I think the government, while not agreeing, has conceded that the last clause of that aggravating factor is not applicable in this case.

THE COURT: The last clause of number 2?

MR. NETTLES: Large burden that was on law enforcement.

THE COURT: All right. Is that correct, Mr. Gasser, you are going to back off of that one?

MR. GASSER: Yes, sir.

BY THE COURT:

Q. All right, Mr. Fulks, what I told you just a moment ago about the search for the body caused a large amount of time and resources to law enforcement, that's not going to be a part of this case. The government is not going to attempt to prove that. Do you understand?

A. Yes, sir.

Q. Then the final one is that you committed a sexual assault upon Alice Donovan prior to her death. It is alleged that the evidence of this most egregious act of violence against Ms. Donovan not only will be offered to demonstrate the impact on her as a human being, but to also explain the emotionally devastating impact this act has had on her husband, her mother, her daughters, and those that were closest to her.

MR. NETTLES: Judge, a portion of that was struck off of there.

THE COURT: Which one?

MR. NETTLES: Which was the effect that that act had on the family members, Judge.

BY THE COURT:

Q. All right. The government has agreed to drop this one as well, Mr. Fulks, the effect that the sexual assault had upon Ms. Donovan's family will not be an issue in this case as well. Do you understand?

A. Yes, sir.

Q. But the fact that you committed a sexual assault upon her will be something the government will put before the jury, and you have admitted to that. Do you understand?

A. Yes, sir.

Q. All right. Now, Mr. Fulks, I just want to be sure you understand the procedure from this point forward.

Now, as I said, Mr. Fulks, if we held a trial, it will be a penalty phase trial only. And I told you that the government must first prove beyond a reasonable doubt that you acted with at least one of four mental states about intent to kill, or intent to commit an act that was contemplating that the life of a person would be taken and so forth.

If the government proves one of those four mental states beyond a reasonable doubt, the government would then have to prove what are called aggravating factors. I have gone over those aggravating factors with you.

Before the jury may vote to impose the death penalty, the jury must be unanimously persuaded that you acted with the required state of mind, unanimously persuaded that at least one statutory aggravating factor has been proven, and unanimously persuaded that the aggravating factors outweigh any mitigating factors.

Now, you will be offered the opportunity to present any mitigating factors that you or your attorney think need to be presented to the jury.

Mitigating factors are factors that any one juror might determine is a reason not to give you the death penalty. Mitigating factors are circumstances about the crime or about your life, background, character, or mental condition that suggest that the death penalty is not the appropriate punishment.

The law defines mitigations as any reason which might lead a juror to choose life imprisonment without the possibility of parole over death. Mitigating factors do not have to be proved beyond a reasonable doubt. The jury does not need to be unanimous in its decision or determination about mitigating factors. Any juror can find a mitigating factor. Unanimity is required only for the jury's determination that aggravating factors outweigh any mitigating factor found by one or more jurors.

Importantly, even if the jury finds no mitigating factors exist at all, the jury must still be unanimously persuaded that the aggravating factors themselves justify a death sentence. Absent such unanimous agreement, a jury cannot impose death.

It is also important to know that even if the jury unanimously finds that the death sentence is justified, no individual juror is ever required to impose a sentence of death upon a defendant. Each and every juror has the absolute right to determine that life imprisonment without parole is the

GARY N. SMITH, CM
COLUMBIA, SC

appropriate sentence for any reason, or for no reason at all.

However, if a jury decides to impose a death penalty, the court cannot change the jury's decision. Finally, if a jury determines, based on the facts and the law given by the court that the death penalty is the appropriate punishment, each juror must sign a verdict of death, return it in the presence of the parties, and if requested affirm his or her individual vote orally in open court.

Do you understand what I have just gone over with you, Mr. Fulks?

A. Yes, sir.

Q. Have you discussed these matters with your lawyers?

A. Yes, sir.

Q. The matters of how the case will proceed from this point forward if you plead guilty?

A. Yes, sir.

Q. And once again, you understand the jury will make the determination as to whether you get life imprisonment without parole or the death penalty. I have no say so on that question, and if the jury returns a verdict of death, I cannot overturn that verdict, I cannot disagree with the jury and give you life imprisonment instead. The jury gets to speak the final word on death or life imprisonment without parole. Do you understand that?

A. Yes, sir.

THE COURT: All right, Mr. Blume, Mr. Nettles, do you think I have correctly predicted or described the trial that will occur if a guilty plea is accepted by the defendant -- or by the court from the defendant?

MR. BLUME: Yes, Your Honor.

THE COURT: Mr. Nettles?

MR. NETTLES: Yes, Your Honor.

THE COURT: Is the government satisfied I have explained the procedure from this point forward?

MR. GASSER: Yes, sir.

THE COURT: Anything further from the government before I rule on the determination of accepting or rejecting the plea?

MR. GASSER: No, sir.

THE COURT: Mr. Blume, anything further?

MR. BLUME: No, sir.

THE COURT: Mr. Nettles, anything further?

MR. NETTLES: No, sir.

BY THE COURT:

Q. All right, Mr. Fulks, I'm going to give you one last opportunity. When we started Wednesday I made sure you understood the charges against you and the elements of each charge that the government would have to prove, I went over the penalties that could be imposed in each case on all eight counts, I told you about your rights to have a trial and let

the jury determine if the government could prove you guilty.

I explained to you a little bit about the law of sentencing guidelines that will apply to counts 3 through 8. When we came back today we went through the facts of what happened in terms of your statement that you gave to the FBI.

I have explained to you the process we will follow from this point forward if I accept a plea, and I have tried to make sure that you were competent and understood what we were doing at each step of the way.

Having been through all of that, do you still want to plead guilty to all eight counts of the indictment against you?

A. Yes, sir.

Q. You understand that as to counts 1 and 2, that means we will go forward with a penalty phase trial in front of a jury, after which the jury might impose a sentence of death upon you?

A. Yes, sir.

Q. Have you given very serious thought to the question of whether you should plead guilty?

A. Yes, sir.

Q. Do you think that's in your best interest?

A. Yes, sir.

Q. Once again, has anyone done anything improper to you to make you plead guilty against your will?

A. No, sir.

Q. Has any law enforcement officer that has been assigned to

191

carry you around done anything improper to you to make you

plead guilty?

A. No.

Q. Understand, it makes no difference to me what you do. I'm in here trying cases every day anyway, so I don't care whether you plead guilty or not. All I want to know is, is this your free will, is this what you want to do, has anyone threatened you to do it, and do you understand what will happen if you plead guilty? And you seem to be quite comfortable on all of those issues; is that right?

A. Yes, sir.

THE COURT: All right, I am satisfied that pursuant to Rule 11 of the Federal Rules of Criminal Procedure that the defendant, Mr. Fulks, first is competent to plead to these charges.

I was somewhat concerned about that issue before we began, but Dr. Berg has done an excellent job of convincing me that there is absolutely no problem with competency Wednesday or today. Both her report, her explanation of the medication, and my own conversations with the defendant lead me to the conclusion that he is competent.

Mr. Nettles?

MR. NETTLES: I agree, Judge.

THE COURT: All right. Secondly, I find that the defendant understands the nature of the charges against him

GARY N. SMITH, CM
COLUMBIA, SC

JA0354

generally, he understands the maximum penalty that can be imposed on each count.

There is one count with a mandatory minimum penalty, he understands that. He understands the concept of supervised release, which will probably not ever come into play in his case. He understands his right to a jury trial and all the associated procedural rights that go along with that.

I find that he has admitted to an adequate factual basis to support a finding of guilt as to each of the eight counts of the indictment.

As I said, count 1 creates the most difficulty, but I am persuaded that the Pinkerton doctrine can be applied to allow the plea to go forward based on the statements contained in the 302 report of interview provided by the FBI. No party has raised any due process challenge or other challenge to the application of Pinkerton to count 1 of this case.

For all the foregoing reasons, I find that the defendant's plea is freely and voluntarily made and it is accepted by this court, which means we will proceed then to a penalty phase before a jury as to counts 1 and 2.

I will impose a sentence on counts 3 through 8 after the preparation of a presentence report and calculation of the sentencing guidelines.

I will direct the probation office to withhold preparation of that presentence report and the guideline

calculation until after we conduct the penalty phase jury trial.

We have some other matters to attend to, not the least of which is the motion to continue. We have got a motion relating to the method of jury selection. Before we get into those matters, is there anything else from the government on the guilty plea that has been tendered?

MR. GASSER: No, sir.

MR. BLUME: No, sir.

THE COURT: Anything further from the defendant?

MR. NETTLES: No, sir.

THE COURT: Well, I would like to take just a quick lunch break if you don't mind. I know you all probably would like to get back to your office and get some work done, but we just need to take an hour for lunch.

And when we come back we have got the continuance, we have got the method of jury selection, we have already taken up the hardship requests, the video that needs to be altered.

We need to decide if the defendant is going to give notice of intent to use mental health evidence today, or at some point. Are you prepared to state your position on that today?

MR. BLUME: Well, I think the procedure, Your Honor, is that we contend we get to see the government's report, and then we need to establish a procedure. I e-mailed Mr. Schools

about that, I don't know that we ever came to any resolution of it. Possibly we may chat briefly about it and see if we've got some agreement. But I think we get to see the report and then we get -- have to reaffirm, as I understand it.

THE COURT: Yes. I thought you made the first step and announced your intent to use it, if you are, then you get to see their Butner report, and then you get a second chance to decide whether you are going to persist in it, or reaffirm it.

MR. BLUME: We do intend at this point.

THE COURT: All right. Let's take a one hour lunch break and come back at 2:30 and let me ask --

All right, the clerk may publish the plea.

THE CLERK: May it please the court, United States of America versus Chadrick Evan Fulks, Criminal Number 4:02-992, plea:

The defendant, Chadrick Evan Fulks, having withdrawn his plea of not guilty entered May 20th, 2003, pleads guilty to counts 1 through 8 of the superseding indictment after arraignment in open court, signed by the defendant, Chadrick Evan Fulks, on May 7th, 2004.

THE COURT: All right, just before we break, on Wednesday we sent you a revised script of the video that we intend to play for the jury. Did that kind of hastily, and I looked at it yesterday, and I realized I think that it needs to include reference to the statutory intent factors.

GARY N. SMITH, CM
COLUMBIA, SC

JA0357

It doesn't, we got that off of a standardized charge, and I think -- y'all may have submitted some to us as well, but I think that just not to confuse the jury, I think I'm going to add a sentence or two about the statutory intent factors having to be proved as well.

I'm going to give them much more detailed instructions once we begin the trial, but I would like to include that just for the sake of completeness. And also I think I would like to put in there, just to allay any concern that they have, in the video, that they will not be sequestered during the trial.

Some of them are going to be coming from far away places, I'm going to tell them that they will be free to go home each night, but they also can stay in a local hotel and be reimbursed for their expenditures over and above what they receive for their juror per diem and travel expense. I think those things need to be added to the script.

Any problem with that, Mr. Gasser?

MR. GASSER: No, sir.

THE COURT: Mr. Blume?

MR. BLUME: No, sir, that was one of the suggestions. If it would speed things up, Mr. Gasser gave me several typos or several things he wanted to add, and I put them on a cassette.

THE COURT: All right, we will look at them over

lunch. I would like to try to film it late today or tonight, if I can, and be done with it.

One other thing. I think I need to tell the jury a little bit more about this case. I think I need to say the two charges are kidnapping and car-jacking. The alleged victim is Ms. Alice Donovan who was allegedly abducted from a WalMart parking lot in Conway, South Carolina on November 14th, 2003.

That way, when we bring them in for oral voir dire, I can ask them, "Have you heard anything about this case or read anything about this case?" and I won't have to explain it every time one on one with each juror. Is there any problem in putting that into the video?

MR. GASSER: I agree with the court, I think that would be very helpful and --

THE COURT: Well, I was going to read the counts and elements, but if we start reading the elements, I'm sure not going to try to explain Pinkerton to them on a video. That put a stop to that.

I need to take a real important phone call. Y'all think about this over lunch, we will be back at 2:35. All right.

(Lunch recess)

THE COURT: All right, let me say, let me correct one thing. Before lunch I made repeated references to the hearing we held on Wednesday. My law clerk pointed out that it

197

was actually Tuesday of this week that we began this proceeding.

All right, we are now down to the motions that have been filed, and at the top of the list is the motion for continuance filed by the defendant. I have read the memorandum, be glad to hear from you.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

INDEX

Proceedings May 4, 2004 . . . 2

Proceedings May 7, 2004 . . . 74

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from my stenographic notes in the above-entitled matter.

_____      _____
Gary N. Smith, CM                              Date

GARY N. SMITH, CM
COLUMBIA, SC

JA0360

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

UNITED STATES OF AMERICA,    )    CR. NO. 4:02-992
                             )    COLUMBIA, SC
                             )    JUNE 1, 2004
                             )
    VERSUS                   )
                             )
CHADRICK E. FULKS            )
        DEFENDANT.           )
_____ )

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.,
CHIEF UNITED STATES DISTRICT COURT JUDGE
JURY TRIAL
VOLUME I

APPEARANCES:

FOR THE GOVERNMENT:          STROM THURMOND, JR., USA
                             SCOTT SCHOOLS, AUSA
                             JONATHAN S. GASSER, AUSA
                             UNITED STATES ATTORNEY'S OFFICE
                             1441 MAIN STREET, SUITE 500
                             COLUMBIA, SC  29201

FOR THE DEFENDANT:           WILLIAM F. NETTLES, IV, AFPD
                             FEDERAL PUBLIC DEFENDER'S OFFICE
                             MCMILLAN FEDERAL BUILDING
                             401 WEST EVANS STREET, ROOM 240
                             FLORENCE, SC 29503

                             JOHN H. BLUME, III, ESQ.
                             BLUME AND WEYBLE
                             P. O. BOX 11744
                             COLUMBIA, SC  29211

                             SHERRI LYNN JOHNSON, ESQ.
                             1118 AUTUMN RIDGE LANE
                             ITHACA, NEW YORK 14850

COURT REPORTER:              DEBRA R. JERNIGAN, RPR, CRR
                             UNITED STATES COURT REPORTER
                             901 RICHLAND STREET
                             COLUMBIA, SC 29201

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
*** *** *** ***

BY THREE ATTORNEYS. I WOULD ASK THAT THEY STAND AND LET ME INTRODUCE THEM FORMALLY TO YOU AT THIS TIME.

UNITED STATES ATTORNEY STROM THURMOND, JR.; FIRST ASSISTANT UNITED STATES ATTORNEY SCOTT SCHOOLS; AND, ASSISTANT UNITED STATES ATTORNEY JONATHAN GASSER.

THE DEFENDANT, CHADRICK EVAN FULKS, IS REPRESENTED BY HIS LAWYERS: MR. JOHN BLUME, MR. WILLIAM NETTLES, AND MS. SHERRI JOHNSON.

ALSO SEATED AT COUNSEL TABLE IS THE DEFENDANT, MR. CHADRICK EVAN FULKS.

NOW, WHEN YOU WERE SELECTED, YOU REMEMBER WE ASKED YOU A LONG SERIES OF QUESTIONS. IN SOME OF THE EARLY GROUPS, I NEGLECTED TO ASK ANY JUROR IF HE OR SHE KNEW MR. FULKS OR WAS CONNECTED OR ASSOCIATED WITH MR. FULKS IN ANY WAY. AND SO, I WOULD ASK YOU THAT AT THIS TIME. DO ANY OF YOU KNOW OR HAVE ANY ASSOCIATION OF ANY KIND WITH MR. FULKS.

NOW, THE ALLEGED VICTIM IN THE CASE, IS MS. ALICE DONOVAN OF GALLIVANTS FERRY, SOUTH CAROLINA. I ALSO NEGLECTED TO ASK IF ANY OF YOU, IN SOME OF THE GROUPS, IF ANY OF YOU ARE RELATED OR HAVE ANY ACQUAINTANCE WITH MS. ALICE DONOVAN. ALL RIGHT.

NOW, THE DEFENDANT IN THIS CASE, MR. FULKS, HAS BEEN CHARGED BY THE GOVERNMENT WITH VIOLATION OF FEDERAL LAW. THERE ARE EIGHT COUNTS OR CHARGES CONTAINED IN THE INDICTMENT AGAINST HIM. MR. FULKS HAS PLED GUILTY TO ALL EIGHT COUNTS.

FOR PURPOSES OF YOUR PARTICIPATION IN THIS PROCEEDING, HOWEVER, WE NEED TO FOCUS ONLY ON THE FIRST TWO COUNTS. THE FIRST TWO COUNTS CHARGE MR. FULKS WITH OFFENSES FOR WHICH THE PENALTY IS EITHER DEATH OR LIFE IMPRISONMENT WITHOUT THE POSSIBILITY OF PAROLE. THESE TWO OFFENSES ARE: COUNT ONE, CARJACKING, RESULTING IN DEATH; AND, COUNT TWO, KIDNAPING, RESULTING IN DEATH.

AS I HAVE SAID, THE DEFENDANT HAS PLED GUILTY TO BOTH OF THESE CHARGES. BECAUSE OF THIS PLEA, HE IS, IN FACT, GUILTY AS A MATTER OF LAW AND FACT. YOU SHOULD NOT, THEREFORE, CONCERN YOURSELVES WITH THE QUESTION OF MR. FULKS'S GUILT AS TO THE TWO CHARGES. HIS GUILTY PLEA MEANS THAT THE ONLY THING REMAINING FOR DETERMINATION IN THIS CASE IS THE APPROPRIATE PUNISHMENT TO BE IMPOSED.

THERE ARE TWO FORMS OF PUNISHMENT POSSIBLE UNDER THE LAW FOR THE OFFENSES TO WHICH MR. FULKS PLED GUILTY: FIRST, THE DEATH PENALTY, WHICH MEANS WHAT THOSE WORDS IMPLY. MR. FULKS WOULD BE PUT TO DEATH; AND, SECOND, LIFE IMPRISONMENT WITHOUT THE POSSIBILITY OF PAROLE, WHICH, ONCE AGAIN, MEANS JUST WHAT THOSE WORDS IMPLY. THE DEFENDANT WOULD SERVE THE REST OF HIS NATURAL LIFE IN PRISON WITH NO POSSIBILITY OF BEING PAROLED UNDER ANY CIRCUMSTANCES.

WHETHER OR NOT THE CIRCUMSTANCES IN THIS CASE AUTHORIZE OR JUSTIFY IMPOSING A SENTENCE OF DEATH OR A SENTENCE OF LIFE IMPRISONMENT WITHOUT THE POSSIBILITY OF PAROLE, IS A DECISION

JURORS. IT IS IMPORTANT THAT YOU KEEP AN OPEN MIND AND NOT DECIDE ANY ISSUE IN THE CASE UNTIL THE ENTIRE CASE IS SUBMITTED TO YOU, AND YOU HAVE RECEIVED MY FINAL INSTRUCTIONS REGARDING THE LAW THAT YOU MUST APPLY TO THE EVIDENCE.

NOW, YOU MAY DECIDE TO IMPOSE A SENTENCE OF DEATH FOR EITHER ONE OF THE TWO CRIMES MR. FULKS PLED GUILTY TO, ONLY IF, AFTER THIS HEARING, YOU FIND EACH OF THE FOLLOWING THINGS UNANIMOUSLY: FIRST, YOU MUST UNANIMOUSLY FIND BEYOND A REASONABLE DOUBT THAT THE DEFENDANT WAS AT LEAST 18 YEARS OF AGE AT THE TIME HE COMMITTED THE OFFENSE.

SECOND, YOU MUST FIND UNANIMOUSLY AND BEYOND A REASONABLE DOUBT THAT THE GOVERNMENT HAS PROVEN THE EXISTENCE OF AT LEAST ONE STATUTORY INTENT FACTOR. I WILL DEFINE THE TERM STATUTORY INTENT FACTOR FOR YOU IN JUST A MOMENT.

THIRD, YOU MUST UNANIMOUSLY FIND BEYOND A REASONABLE DOUBT THAT THE GOVERNMENT HAS PROVEN THE EXISTENCE OF AT LEAST ONE STATUTORY AGGRAVATING FACTOR. I WILL DEFINE THE TERM STATUTORY AGGRAVATING FACTOR FOR YOU SHORTLY.

IF, AFTER A FAIR AND IMPARTIAL CONSIDERATION OF ALL THE EVIDENCE IN THIS CASE, YOU DO NOT UNANIMOUSLY MAKE THESE FINDINGS BEYOND A REASONABLE DOUBT, YOUR DELIBERATIONS WILL BE OVER. THE DEFENDANT DOES NOT HAVE THE BURDEN OF DISPROVING THE EXISTENCE OF ANYTHING THE GOVERNMENT MUST PROVE BEYOND A REASONABLE DOUBT. THE BURDEN IS WHOLLY UPON THE GOVERNMENT; THE LAW DOES NOT REQUIRE THE DEFENDANT TO PRODUCE

SO, HOW DOES ALL OF THIS FIT INTO THIS LEGAL STRUCTURE? I TOLD YOU A LOT OF FACTS AND A LOT OF INFORMATION. YOU WILL HEAR 150 WITNESSES COME IN HERE TO PROVE THE EVIDENCE THAT I HAVE JUST DESCRIBED FOR YOU. HOW DOES IT FIT IN THE LAW. I KNOW THAT ONE OF THE FIRST THINGS YOU HEARD WAS HE PLED GUILTY TO KIDNAPING, RESULTING IN DEATH AND CARJACKING, RESULTING IN DEATH, BUT THAT HE DENIES THAT HE INTENDED TO KILL ANYBODY. HOW DOES SOMEONE DO THAT? WELL, FIRST OF ALL, CHAD FULKS ACTUALLY PLED GUILTY TO EIGHT SEPARATE CHARGES. HE PLED GUILTY TO THE TWO CHARGES WE MENTIONED. HE ALSO PLED TO INTERSTATE TRANSPORTATION OF A STOLEN MOTOR VEHICLE. HE PLED TO A CONSPIRACY TO COMMIT THE CRIMES ALLEGED IN COUNTS 1, 2 3, 7 AND 8. HE PLED TO A CONSPIRACY TO POSSESS FIREARMS AND USE THEM IN A CRIME OF VIOLENCE. HE PLED GUILTY TO USING A FIREARM DURING A CRIME OF VIOLENCE. HE PLED GUILTY TO POSSESSION OF FIREARM BY CONVICTED FELON AND POSSESSION OF STOLEN FIREARMS. ONLY THE FIRST TWO COUNTS ARE CONSIDERATION FOR YOU DURING THIS TRIAL BECAUSE THOSE ARE THE COUNTS THAT MAKE HIM ELIGIBLE FOR THE DEATH PENALTY DUE TO CERTAIN FINDINGS THAT YOU MAY MAKE.

I WANT TO TALK TO YOU ABOUT HOW IT IS THAT HE WOULD HAVE PLED GUILTY TO THOSE CRIMES WITHOUT ADMITTING THAT HE INTENDED TO KILL ANYBODY. IN THE FEDERAL SYSTEM, LADIES AND GENTLEMEN, EACH CRIME HAS WHAT WE CALL ELEMENTS OR COMPONENTS OF THE CRIME. IF WE WERE TO GO TO TRIAL, THE JUDGE WOULD

INSTRUCT YOU THAT WE WOULD HAVE TO PROVE EACH ONE OF THOSE ELEMENTS BEYOND A REASONABLE DOUBT. WELL, IF SOMEONE PLEADS GUILTY TO A CRIME, THAT INDIVIDUAL HAS TO ADMIT ALL OF THOSE ELEMENTS OF THAT CRIME IN ORDER TO PLEAD GUILTY. WITH RESPECT TO KIDNAPING, RESULTING IN DEATH, THE ELEMENTS ARE: THE DEFENDANT KIDNAPED SOMEONE; THE DEFENDANT HELD THE VICTIM FOR RANSOM, REWARD, OR OTHERWISE. AND THE LAW SAYS "OTHERWISE" CAN BE ANY REASON THAT IS A BENEFIT TO THE DEFENDANT. THE DEFENDANT WILLFULLY TRANSPORTED THE VICTIM IN INTERSTATE COMMERCE, IN THIS CASE FROM SOUTH CAROLINA TO NORTH CAROLINA, AND DEATH RESULTS. SO YOU CAN SEE THERE IS NOT AN ELEMENT OF THAT CRIME THAT HE INTENDED TO KILL ANYBODY, THAT IS HOW HE PLED GUILTY DIRECTLY TO THAT OFFENSE.

HE ALSO PLED GUILTY TO CARJACKING, RESULTING IN DEATH, WHICH HAS AS ELEMENTS: THE DEFENDANT TAKES A MOTOR VEHICLE; THE MOTOR VEHICLE HAS BEEN TRANSPORTED AND SHIPPED IN INTERSTATE OR FOREIGN COMMERCE, THIS CAR BEING MANUFACTURED IN GERMANY; THE DEFENDANT TAKES THE MOTOR VEHICLE FROM THE PERSON OR PRESENCE OF ANOTHER, IN THIS CASE, ALICE DONOVAN; THE TAKING IS DONE BY ATTEMPTED FORCE, VIOLENCE AND INTIMIDATION, BRANDON BASHAM'S GUN; IN SO DOING, THE DEFENDANT INTENDS TO CAUSE DEATH OR SERIOUS BODILY HARM, AND DEATH RESULTS. YOU SEE THAT FIFTH ELEMENT, YOU THINK, WELL IF HE HAS ADMITTED THAT, HE MUST HAVE ADMITTED THAT HE INTENDED TO KILL SOMEBODY. THIS GETS A LITTLE COMPLICATED, BUT PLEASE HANG WITH ME.

                    IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF SOUTH CAROLINA
                           FLORENCE DIVISION

UNITED STATES OF AMERICA,   )    CR. NO. 4:02-992
                            )    COLUMBIA, SC
                            )    JUNE 29, 2004
                            )
   VERSUS                   )
                            )
CHADRICK E. FULKS           )
        DEFENDANT.          )
                            )

           BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.,
             CHIEF UNITED STATES DISTRICT COURT JUDGE
                              JURY TRIAL
                             VOLUME XXI

APPEARANCES:
FOR THE GOVERNMENT:          STROM THURMOND, JR., USA
                             SCOTT SCHOOLS, FIRST AUSA
                             JONATHAN S. GASSER, AUSA
                             UNITED STATES ATTORNEY'S OFFICE
                             1441 MAIN STREET, SUITE 500
                             COLUMBIA, SC  29201
FOR THE DEFENDANT:
                             WILLIAM F. NETTLES, IV, AFPD
                             FEDERAL PUBLIC DEFENDER'S OFFICE
                             MCMILLAN FEDERAL BUILDING
                             401 WEST EVANS STREET, ROOM 240
                             FLORENCE, SC 29503
                             JOHN H. BLUME, III, ESQ.
                             KEIR M. WEYBLE, ESQ.
                             BLUME AND WEYBLE
                             P. O. BOX 11744
                             COLUMBIA, SC  29211
                             SHERRI LYNN JOHNSON, ESQ.
                             1118 AUTUMN RIDGE LANE
                             ITHACA, NEW YORK 14850
COURT REPORTER:              DEBRA R. JERNIGAN, RPR, CRR
                             UNITED STATES COURT REPORTER
                             901 RICHLAND STREET
                             COLUMBIA, SC 29201

               STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
                       *** *** *** *** ***

JA0367

IS, VIRTUALLY, IMPOSSIBLE TO, WITH DIRECT EVIDENCE, TO PROVE WHO THE KILLER IS.  THAT IS WHY THE GOVERNMENT DOES NOT HAVE TO PROVE THAT.  IT IS COMMON SENSE.  AND IT IS JUSTICE.

SEVENTEEN DAYS IN NOVEMBER.  TUESDAY -- I'M SORRY, MONDAY NOVEMBER 4TH, 2002, ESCAPED FROM THE HOPKINS COUNTY DETENTION CENTER.  WHAT ARE THE FACTS? ABOUT 6:30 THAT NIGHT, CHAD FULKS AND BRANDON BASHAM GO AND THEY ASK TO BE LET OUT IN THE REC AREA, THAT IS THE OPEN AIR REC AREA.  THEY ARE TOGETHER. THEY ARE BOTH MAKING REQUESTS.  BRANDON BASHAM IS DOING THE TALKING.  CHAD FULKS IS RIGHT THERE.  THEY GO OUT TOGETHER BY THEMSELVES.  THEY HAVE GOT THEIR WATER BOTTLES.  BRANDON BASHAM HAS THE BLANKET DRAPED OVER HIS SHOULDER.  WHAT DO WE KNOW? WE KNOW THEY HAVE TAKEN SHEETS AND, ULTIMATELY, TIED THOSE SHEETS TOGETHER AND BLANKETS, AND USED THAT WATER BOTTLE AS WEIGHT IN ORDER TO SCALE THAT 15-FOOT WALL TO GET UP ON THE ROOF.  THAT IS WHAT WE DO KNOW.

NOW, LADIES AND GENTLEMEN, HOW DO THEY GET THOSE SHEETS OUT THERE? WHEN YOU SAW HOW BAGGY THE CLOTHES ARE, YOU SAW HOW BAGGY THEY WERE.  THEY DIDN'T HAVE, DIAN HERE TESTIFIED, THEY DIDN'T HAVE TIME TO GO OUT THERE, RIP THE SHEETS ALL TOGETHER, TIE THEM UP TOGETHER.  THE GOVERNMENT SUBMITS TO YOU, THEY COULD HAVE RIPPED THOSE SHEETS, TIED THEM AROUND THEIR LEGS, BOTH LEGS, TIED THEM AROUND THEIR WAIST.  THERE IS NO WAY ANYONE WOULD HAVE EVER SEEN, BECAUSE THOSE BAGGY PANTS AND BAGGY SHIRTS ARE STANDARD-ISSUE DETENTION FACILITY

JA0368

UNIFORM.  NOT WASTE THE TIME DOING ALL OF THAT CUTTING AND RIPPING.  DIDN'T FIND ANY FIBERS.  ONLY FOUND ONE BLANKET THAT WAS DRAPED OVER THE SHOULDER OF BRANDON BASHAM.  SO, THE GOVERNMENT SUBMITS TO YOU, THIS WAS PLANNED.

THEY KNEW DIAN BLAIR'S ROUTINE.  AT 6:30, SHE STARTS DELIVERING MEDS, AND SHE IS SLOW AT DOING IT.  IT TOOK HER AN HOUR AND A HALF.  WHY IS ALL OF THAT IMPORTANT? BECAUSE IT TOOK PLANNING.  IT TOOK DECEPTION.  THEY HAD TO KNOW TO GO OUT ALONE.  THEY HAD TO KNOW WHAT DIAN BLAIR'S ROUTINE WAS. THEY HAD TO HAVE THE ROPE ALREADY PRECUT.  PLANNING AND DECEPTION.  AND THAT IS IMPORTANT WHEN YOU ARE DETERMINING CHAD FULKS'S EXECUTIVE FUNCTION.  CHAD FULKS'S BRAIN INACTION.

PLANNING AND DECEPTION.  WHAT ABOUT CHAD FULKS'S STATE OF MIND ON THAT DAY?  THIS IS VERY IMPORTANT, LADIES AND GENTLEMEN.  THE STATE OF MIND OF CHAD FULKS ON MONDAY NOVEMBER 4TH, 2002, WHEN HE MADE THE CHOICE TO ESCAPE.  YOU REMEMBER BRANDON BASHAM WAS SERVING A FIVE-YEAR MISDEMEANOR SENTENCE FOR FORGERY.  REMEMBER, SCOTT SMITH TESTIFIED THAT, NORMALLY, FOR THOSE MISDEMEANORS, YOU SERVE A FIFTH OF YOUR SENTENCE WHEN YOU ARE RELEASED, ONE YEAR.  AND BRANDON HAD ALREADY SERVED A YEAR AND A HALF.  SO, HERE IS A GUY WHO IS ALREADY ELIGIBLE TO BE RELEASED AT SOME POINT IN TIME.  HE IS SERVING A MISDEMEANOR SENTENCE.

WHAT ABOUT CHAD FULKS? WHAT WAS HIS SITUATION, LADIES AND

GENTLEMEN? WELL,  ON OCTOBER 28TH,  SOME SEVEN DAYS BEFORE THAT,  HE PLED GUILTY AND NEGOTIATED A PLEA.  HE KNEW HE WAS GOING TO GET SENTENCED TO FIVE YEARS ON THOSE 12 CREDIT CARD FRAUDS.  SO,  HE HAD A FIVE-YEAR SENTENCE, AT LEAST, TO DO IN THE STATE OF KENTUCKY ON THOSE CREDIT CARD FRAUDS HE PLED GUILTY TO.

WHAT ELSE DID HE HAVE? LADIES AND GENTLEMEN,  HE HAD AN OUTSTANDING WARRANT IN MIDDLEBURY FOR THE MAY FAILURE TO STOP FOR RUNNING FROM POLICE IN MIDDLEBURY,  INDIANA.  THAT CHARGE WAS STILL PENDING. HE HAD VIOLATED HIS PAROLE WHEN HE WAS RELEASED FROM WESTVILLE CORRECTIONAL INSTITUTE IN THE STATE OF INDIANA.  HE VIOLATED SUPERVISED RELEASE IN THE EASTERN DISTRICT OF FEDERAL COURT IN TENNESSEE.   HE WAS BEING INVESTIGATED BY THE FBI AND BY THE KENTUCKY STATE POLICE FOR A SERIES OF ARMED ROBBERIES ON I-65, THE TWO YOUNG MEN IN THE RV, THE ATTEMPTED ARMED ROBBERY OF BUCK MINTON.  BEING INVESTIGATED FOR ALL OF THAT STOLEN PROPERTY THAT WAS FOUND IN HIS HOUSE BY THE KENTUCKY STATE POLICE.   HE HAD ALL OF THOSE CHARGES PENDING AGAINST HIM.   ALL OF THAT TIME THAT HE WAS LOOKING AT.

AND MOST IMPORTANTLY,  ON NOVEMBER 3RD,  OF 2002, DETECTIVE SCOTT SMITH SERVES HIM WITH A WARRANT.   BECAUSE THAT DAY, CHAD FULKS HAD BEEN INDICTED BY THE HOPKINS COUNTY GRAND JURY IN KENTUCKY FOR CRIMINAL ABUSE IN THE FIRST DEGREE AGAINST A CHILD UNDER THE AGE OF 12.   THAT IS WHAT HE HAD

BEEN INDICTED FOR.  CHAD FULKS IS SERVED WITH THIS INDICTMENT ON SUNDAY NOVEMBER 3RD.  AND THE COMMENT HE MAKES IS,  "Y'ALL ARE TRYING TO KILL ME.  I CAN'T LET THAT HAPPEN."  AND THE NEXT DAY, HE IS GONE.

WHAT ELSE DO WE KNOW? WE KNOW HE IS WRITING TO TINA SEVERANCE BEFORE HE ESCAPES.  WHEN HE IS BEING INVESTIGATED FOR THE ARMED ROBBERIES AND ATTEMPTED ARMED ROBBERIES; WHEN HE IS LOOKING AT THE PAROLE VIOLATIONS AND THE SUPERVISED RELEASE VIOLATIONS; WHEN HE ALREADY HAS THE FIVE YEARS COMING UP, WE KNOW HE IS BEING INVESTIGATED FOR SOME SERIOUS,  SERIOUS CRIMES.  AND HE KNOWS IT.  AND HE WRITES TINA SEVERANCE,  FROM THE JAIL,  JUST BEFORE HE ESCAPES,  I PROBABLY WILL NEVER GET OUT.

SO,  LADIES AND GENTLEMEN,  WHO IS THE ONE WHO HAS THE MOST TO LOSE? BRANDON BASHAM, WHO IS SERVING -- HE HAS ALREADY SERVED A YEAR AND A HALF ON A FIVE-YEAR MISDEMEANOR; OR CHAD FULKS?  CHAD FULKS WAS LOOKING AT SERIOUS AND SIGNIFICANT TIME.  IN HIS WORDS,  HE PROBABLY WILL NEVER GET OUT.  THAT MEANS A LIFE SENTENCE, IN HIS WORDS.  HE WAS THINKING, HE WAS TELLING TINA SEVERANCE, I PROBABLY WILL NEVER GET OUT.  AND WHY IS THAT IMPORTANT? BECAUSE YOU KNOW WHAT HE IS ASKING YOU TO DO.  AT THAT POINT IN TIME ON NOVEMBER 4TH,  WITH ALL OF THAT TIME, KNOWING HE WILL SPEND EITHER THE REST OF HIS LIFE OR THE MAJORITY OF HIS ADULT LIFE INCARCERATED,  HE MAKES A CHOICE, AND HE ESCAPES, AND HE PARTICIPATES IN THE KIDNAPING,

AND THE RAPE, AND THE MURDER OF TWO WOMEN, AND HE IS CAUGHT. AND YOU KNOW WHAT HE IS ASKING YOU JURORS TO DO? TO GIVE HIM A PASS.

MR. BLUME:  I OBJECT.

MR. GASSER:  ON NOVEMBER 4TH.

MR. BLUME:  I OBJECT.

THE COURT:   WHAT IS THE OBJECTION?

MR. BLUME:  OBJECTION IS, HE WAS NOT FACING LIFE WITHOUT PAROLE BEFORE.   LIFE WITHOUT PAROLE IS NOT A PASS. IT IS THE SECOND MOST SEVERE AND SUBSTANTIAL PUNISHMENT.

MR. GASSER:  HE CAN ARGUE THAT HE --

THE COURT:   I DETERMINE THAT, AS A MATTER FOR ARGUMENT, NOT A FACTUAL MATTER, AND THE DEFENSE WILL BE ALLOWED FREE REIN AND TO MAKE WHATEVER ARGUMENT IS APPROPRIATE ON THIS POINT.

MR. GASSER:  I DON'T WANT YOU TO THINK I AM DECEIVING YOU.   HIS WORDS TO TINA SEVERANCE, I PROBABLY WILL NEVER GET OUT.   THOSE AREN'T MY WORDS.   THOSE AREN'T DETECTIVE SMITH'S WORDS.   THOSE ARE CHAD FULKS'S WORDS.   I PROBABLY WILL NEVER GET OUT.   SO, WHAT HE IS ASKING YOU TO DO,  FACING ALL OF THAT TIME,  COMMITS ALL OF THESE HORRIBLE CRIMES, KILLS TWO WOMEN, AND HE IS ASKING YOU FOR A LIFE SENTENCE.   IT IS THE GOVERNMENT'S CONTENTION, IN ESSENCE, THAT THAT TWO-WEEK CRIME SPREE,  HE IS NOT HELD ACCOUNTABLE FOR.   HE WAS LOOKING AT SERIOUS AND SIGNIFICANT TIME BEFORE, AND NOW HE IS LOOKING AT

LIFE WITHOUT PAROLE.   SO, WHERE IS THE PUNISHMENT? WHERE IS THE ACCOUNTABILITY FOR WHAT HE DID TO THESE TWO WOMEN?

HE ESCAPES, AND HE EVADES.   HE EVADES THE DOGS THAT WERE BROUGHT OUT THERE.  HE EVADES THE POLICE THAT WERE LOOKING FOR HIM.  HE AND BRANDON BASHAM HAD A CHANGE OF CLOTHES.  THEY REALIZE THEY NEED A CAR.   THEY NEED TO GET OUT OF HOPKINS COUNTY.   NEED TO GET OUT OF THE STATE OF KENTUCKY. PLANNING,  EXECUTIVE FUNCTION, BRAIN IN ACTION.

DAY TWO,  TUESDAY, NOVEMBER 5TH, 2002.   THE ABDUCTION, THE CARJACKING OF JAMES HAWKINS.   INITIALLY, NO QUESTION ABOUT IT.  BRANDON BASHAM APPROACHES THE DOOR.   IT IS BRANDON BASHAM'S INITIAL DECEPTION, NO QUESTION ABOUT IT.  WHERE IS CHAD FULKS? HE IS HIDING BEHIND A TREE IN THE BUSH IN THE FRONT YARD.   INITIALLY, BRANDON BASHAM'S DECEPTION AND LIES, BUT WHO JOINS IN THAT DECEPTION? WHO JOINS IN THAT DECEIT? CHAD FULKS DOES.   WHEN CHAD FULKS ENTERS JAMES HAWKINS' PICKUP TRUCK, CHAD FULKS AGREES TO THE SAME STORY THAT BRANDON BASHAM HAD GIVEN, WHICH WAS THE CAR HAD BROKEN DOWN.   BRANDON BASHAM TAKES OVER WHERE TO GO, WHERE THE CAR IS.   IT IS CHAD FULKS TAKING THE PHONE CARD MAKING THE PHONE CALLS AT MCDONALD'S.

THEN WHO TAKES OVER THAT EPISODE? WHO ASSUMES THE LEADERSHIP ROLE? AND, LADIES AND GENTLEMEN,  YOU HEARD FROM JAMES HAWKINS,  A LIVE WITNESS.   JAMES HAWKINS DOESN'T KNOW CHAD FULKS OR BRANDON BASHAM.  WHY WOULD JAMES HAWKINS TRY AND

JA0373

SECURE HIS TESTIMONY ONE WAY OR THE OTHER FOR OR AGAINST CHAD FULKS?  FOR OR AGAINST BRANDON BASHAM.   THEY BOTH CARJACK HIM.   THEY BOTH KIDNAPED HIM, SO YOU HAVE A NEUTRAL OBSERVER. AND WHY IS THAT IMPORTANT? BECAUSE YOU HAVE A LIVE WITNESS. YOU HAVE A LIVE,  CREDIBLE,  BELIEVABLE WITNESS IN JAMES HAWKINS THAT CAN PROVIDE YOU WITH INSIGHT INTO THE, MIND AND INTO THE ACTION, AND INTO THE MALICE,  INTO THE HEART OF CHAD FULKS.

BECAUSE, WHO TAKES OVER THAT EPISODE,  LADIES AND GENTLEMEN?  WHO? WHO IS THE PERSON THAT TELLS JAMES HAWKINS TO PULL OVER IN THE WHIRLPOOL PLANT THERE?  WHO IS THE PERSON WHO GETS BEHIND THE WHEEL OF THE CAR?  WHO IS THE PERSON WHO STARTS DRIVING?  WHO IS THAT PERSON? IT IS CHAD FULKS.   WHO IS THE ONE WHO IMMEDIATELY STARTS ASKING JAMES HAWKINS IF HE HAS ANY GUNS OR MONEY? WHO IS THE ONE WHO FRANTICALLY STARTS LOOKING AROUND THE CAB FOR GUNS AND MONEY?  WHO IS THE PERSON THAT ORDERS BRANDON BASHAM TO TAPE JAMES HAWKINS' HANDS.   WHO IS DOING ALL OF THESE THINGS? CHAD FULKS.   WHO IS THE PERSON WHO GETS STUCK IN THE MUD DRIVING JAMES HAWKINS'S CAR? WHO IS THE PERSON WHO SWEARS AT JAMES HAWKINS WHEN HE ASKED HIM HOW HE GETS INTO FOUR-WHEEL DRIVE?  WHO IS THE PERSON WHO DRIVES OFF THAT ROAD 200 YARDS DOWN THAT TREELINE? WHO IS DOING THOSE THINGS? CHAD FULKS.   WHO IS THE PERSON THAT TELLS BRANDON BASHAM TO DUCT TAPE JAMES HAWKINS TO THAT TREE? WHO IS THE PERSON THAT TELLS BRANDON BASHAM WHEN HE IS NOT DOING A GOOD

ENOUGH JOB, WHEN HE IS DOING IT TOO LOOSELY?  WHO IS THE PERSON THAT SWEARS AT BRANDON BASHAM? AND THESE ARE HIS WORDS. AND LET ME JUST SAY, FROM THE VERY BEGINNING,  LADIES AND GENTLEMEN, PARTICULARLY TO YOU WOMEN ON THE JURY, I APOLOGIZE FOR THE LANGUAGE.   I APOLOGIZE, BUT IT HAS GOT TO BE EXACTLY. IT HAS GOT TO BE SAID BECAUSE YOU WILL NOT HAVE AN UNDERSTANDING OF WHAT WAS GOING ON DURING THESE EPISODES. BUT WHO IS THE ONE WHO SAYS, "YOU AIN'T FUCKING DOING IT RIGHT?" AND TAKES OVER THE TAPING AND TAPES JAMES HAWKINS TIGHT TO THAT TREE? WHO IS THE ONE WHO IS GIVING, ACCORDING TO JAMES HAWKINS'S TESTIMONY, EVIL STARES AND HATEFUL GLANCES AT HIM WHEN BRANDON BASHAM -- WHEN IT IS REVEALED THAT BASHAM ADMITTED THEY HAD ESCAPED?  WHO IS THE ONE ACTING MALICIOUSLY? WHO IS THE ONE ACTING MEAN.   WHO IS THE ONE ACTING VIOLENT? CHAD FULKS.  AND THIS IS FROM THE TESTIMONY OF A SURVIVING VICTIM, OF A CITIZEN OF KENTUCKY THAT CAN COME INTO THIS COURTROOM AND GIVE YOU A BIRD'S-EYE VIEW AS TO WHO ASSUMED THE LEADERSHIP ROLE,  AND WHO WAS AGGRESSIVE, AND WHO WAS MEAN. AND WHO IS THE ONE, BEFORE LEAVING MR. HAWKINS OUT THERE IN THAT COLD, AND, ULTIMATELY, THAT RAIN, IN A PAIR OF SHORTS, AND FLIP-FLOPS, AND A VEST.  WHO DUCT-TAPED HIS HEAD? WHO DUCT-TAPED HIS MOUTH? WHO? CHAD FULKS.

NOW,  THEY MAY TRY TO COME UP HERE,  YOU REMEMBER, DURING CROSS-EXAMINATION OF JAMES HAWKINS, THEY TRIED TO INFER THAT THEY PUT -- THAT CHAD FULKS PUT THE DOGHOUSE BEHIND HIM IN

JA0375

ORDER TO BLOCK THE WIND, AS IF CHAD FULKS WAS DOING SOMETHING TO BENEFIT HIM.  YOU KNOW WHY HE PUT THAT DOGHOUSE THERE?  TO BLOCK THE VIEW FROM THE PEOPLE FROM THE ROAD.   WHAT ARE THEY GOING TO ARGUE, THAT CHAD FULKS DUCT-TAPED JAMES HAWKINS' MOUTH TO KEEP HIS LIPS FROM GETTING CHAPPED? IT IS MEANNESS, PURE AND SIMPLE.   MEANNESS.

THEN THEY LEAVE.   AND WHERE IS THEIR DESTINATION? WHERE ARE THEY GOING? ARE THEY GOING TO VISIT BRANDON BASHAM'S FRIENDS? ARE THEY GOING TO VISIT BRANDON BASHAM'S FAMILY? WHO IS DRIVING THIS TRAIN,  LADIES AND GENTLEMEN? CHAD FULKS. THEY HEAD NORTH.   NORTHERN INDIANA,  PORTAGE AREA,  GOSHEN, WHERE CHAD FULKS'S FRIENDS ARE.   WHERE CHAD FULKS'S FAMILY IS.

DAY THREE,  WEDNESDAY,  NOVEMBER 6TH.  THEY ARRIVE IN PORTAGE,  INDIANA.  THEY GET A MOTEL ROOM AT THE SANDS.  THEY ARE DRINKING.

DAY FOUR,  THURSDAY,  NOVEMBER 7TH. SAME HOTEL ROOM AS SANDS.  WHAT IMPORTANT EVENTS OCCUR THAT DAY?  THE KNIFE IS NOT GOOD ENOUGH.   BEFORE I SAY THAT,  JUST REMEMBER ONE THING.  WHEN TALKING ABOUT HOW IT TOOK TWO PEOPLE,  HOW IT TOOK A TWO-MAN TEAM,  REMEMBER THE TESTIMONY THAT THAT WINDOW, THAT WINDOW BY THAT LEDGE,  THAT IS 7,  8 FEET OFF THE GROUND, AND THAT ROOF LINE IS ABOUT 12 TO 15 FEET.   IT TOOK TWO PEOPLE.   SOMEBODY HAD TO BOOST SOMEBODY UP ON THAT WINDOW. ONE PERSON COULDN'T HAVE ESCAPED.   ONE PERSON COULDN'T HAVE

JA0376

ESCAPED FROM THE HOPKINS COUNTY DETENTION CENTER.  IT REQUIRED BOTH OF THEM.  THEY ARE GOING TO TRY TO MAKE IT LOOK LIKE THE HOPKINS COUNTY DETENTION CENTER WAS SOME MICKEY MOUSE OPERATION.   BUT WHAT WAS THE TESTIMONY? IT HAS BEEN THERE FOR FOUR YEARS.   FOUR YEARS NOW IT HAS BEEN IN EXISTENCE,  BEEN OPERATING.   THOUSANDS OF INMATES HAVE GONE THROUGH THAT FACILITY. AND HOW MANY PEOPLE HAVE ESCAPED FROM INSIDE THE SECURE FACILITY?  TWO.   TWO PEOPLE WITH THOUSANDS OF INMATES, CHAD FULKS AND BRANDON BASHAM.   AND YOU HEARD JAMES LANTRIP TESTIFY.  IN 17 YEARS OF BEING A JAILER,  ALL THE SECURITY FACILITIES HE HAS RUN IN HOPKINS COUNTY,  HOW MANY HAVE ESCAPED FROM INSIDE, A BREAKOUT, A PHYSICAL BREAKOUT IN HIS 17 YEARS? TWO.   CHAD FULKS AND BRANDON BASHAM.   BRAIN IN ACTION.

THAT THURSDAY IN THE SANDS MOTEL, THE KNIFE IS NOT GOOD ENOUGH.   WHO IS THE PERSON ASKING TINA SEVERANCE WHERE HE CAN GET GUNS? WHO IS THE PERSON ASKING TINA SEVERANCE WHERE HE CAN GET GUNS? CHAD FULKS.

THEY ARE ALTERING THEIR APPEARANCE.   YOU REMEMBER WHAT THEIR HAIR LOOKED LIKE AT HOPKINS COUNTY DETENTION CENTER, THE PHOTOGRAPHS, WHAT CHAD FULKS AND BRANDON BASHAM'S HAIR LOOKED LIKE.  WELL,  WHEN TINA AND ANDREA GET BACK TO THE HOTEL ROOM THAT NIGHT, WHAT DOES THEIR HAIR LOOK LIKE NOW? WHAT DOES THEIR HAIR LOOK LIKE? THEY HAVE CUT THEIR HAIR.   THERE IS BRANDON BASHAM,  CUT HIS HAIR.  ACTUALLY, CHAD FULKS CUT HIS

JA0377

HAIR.   TOOK CLIPPERS FROM TINA SEVERANCE CHANGING HIS APPEARANCE.   CHAD FULKS CUT HIS HAIR ALTERING HIS APPEARANCE BECAUSE THEY KNOW THEY ARE WANTED.   SO, THEY CHANGE THEIR APPEARANCE.   THEY ARE THINKING.   THEY ARE PROCESSING THIS INFORMATION.   THEY ARE DRINKING.   THEY GOT TWO WOMEN WITH THEM.   THEY ARE CHANGING THEIR APPEARANCE.

CHAD FULKS IS ASKING FOR GUNS.   ASK YOURSELF THIS, LADIES AND GENTLEMEN.   WHAT DOES CHAD FULKS NEED GUNS FOR? WHAT DOES AN ESCAPED CONVICT NEED GUNS FOR? THERE IS ONLY ONE REASON WHY CHAD FULKS WILL NEED GUNS, AND THAT IS TO KILL. WHAT OTHER REASON WOULD IT BE THAT CHAD FULKS NEEDED GUNS? THERE IS NOBODY,  NOBODY, THERE IS NO EVIDENCE HE WAS IN A FIGHT OR FEUD WITH SOMEBODY.   WHAT WOULD CHAD FULKS NEED GUNS FOR OTHER THAN TO KILL?

AND WHO CHOSE ROBERT TALSMA? CHAD FULKS.   HE IS THE ONE WHO BROUGHT IT UP TO TINA.   HE IS THE ONE WHO SAID, WHAT ABOUT THAT GUY WHO HAS BEEN TEACHING YOU TO SHOOT THAT YOU WORK WITH?   CHAD FULKS CHOSE TO GET THE GUNS.   CHAD FULKS CHOSE THE VICTIM.

FRIDAY,  NOVEMBER 8TH.  THE PLAN WORKS.   THEY LURE ROBERT TALSMA OUT.   CHAD FULKS GOES WITH BRANDON BASHAM AND THE END RESULTS,  TWO .45 CALIBER REVOLVERS,  ONE OF WHICH WE HAVE NEVER RECOVERED; .22 REVOLVER; AND, A SEMIAUTOMATIC .45 CALIBER,  SEMIAUTOMATIC.   FOUR HANDGUNS ARE THE RESULTS OF THE BURGLARY OF ROBERT TALSMA.   SO,  NOW THEY ARE ARMED.

JA0378

THAT FRIDAY, THEY ARE ARMED.

WHERE DO THEY HEAD? THEY HEAD TO STURGIS, MICHIGAN.  THEY GET A MOTEL ROOM AT THE WOOD MOTEL IN STURGIS, MICHIGAN.  THE VAN BREAKS DOWN.  BRANDON AND ANDREA STAY IN THE HOTEL ROOM.  WHAT DOES CHAD AND TINA DO?  THEY TAKE THE JEEP, TINA'S JEEP, THEY DRIVE.  WHERE DO THEY GO? THEY GO TO DEWAYNE FULKS'S HOUSE.  THEY PICK UP DEWAYNE.  THEY GO TO HIS BROTHER RONNIE IN GOSHEN, INDIANA.  WHY IS THAT DAY IMPORTANT? THE DEFENSE LAWYER WOULD HAVE YOU BELIEVE THAT CHAD FULKS WAS NEVER ARMED WITH ANY GUNS DURING THESE CRIME SPREES.  DO YOU REMEMBER WHEN I HAD DEWAYNE FULKS ON THE WITNESS STAND?  I ASKED HIM ABOUT WHETHER OR NOT HE SAW CHAD FULKS WITH ANY GUNS THAT FRIDAY, THAT SATURDAY?  YOU REMEMBER HIS INITIAL RESPONSE WAS, NO? AND THEN I HAD TO KIND OF REMIND HIM OF THE FBI SUMMARY REPORT.  I HAD TO PUT HIM ON NOTICE THAT PERJURY IS A FEDERAL CRIME.  RIGHT IN THAT WITNESS CHAIR HE LOOKED AT YOU AND SAID, I LIED, I LIED.  I SAW HIM WITH THE TWO .45'S.  HIS OWN BROTHER.  CHAD FULKS IS ARMED WITH THESE TWO .45'S THAT FRIDAY.  AND WHAT DOES HE DO ON THAT FRIDAY? HE IS DRINKING, HE IS SMOKING METH, HE IS USING DRUGS, AND HE IS CELEBRATING.

ON INTO SATURDAY HE CONTINUES TO CELEBRATE.

WE COME TO SUNDAY, NOVEMBER 10TH.  SUNDAY, NOVEMBER 10TH. THEY GET UP AND THEY LEAVE GOSHEN, INDIANA.  WHO IS DRIVING? CHAD FULKS.  WHAT CAR ARE THEY IN? THE VAN.  WHERE ARE THEY

GOING? WHERE IS THEIR DESTINATION? IT IS NOT WHERE BRANDON BASHAM'S FAMILY LIVES.  IT IS NOT WHERE BRANDON BASHAM'S FRIENDS ARE.  THEY ARE HEADING TO OHIO, HUNTINGTON, WEST VIRGINIA AREA WHERE CHAD FULKS GREW UP,  WHERE CHAD FULKS'S MOTHER AND SISTER LIVE.  THAT IS WHERE THEY ARE GOING.  CHAD FULKS IS TAKING THEM THERE.

THAT SUNDAY THEY STOPPED IN PIKETON IN WAVERLY,  OHIO. WAVERLY AND PIKETON ARE RIGHT NEXT TO EACH OTHER, ABOUT 60 MILES FROM HUNTINGTON, 30 MILES FROM PLYMOUTH, WHICH IS ANOTHER 30 MILES FROM ASHTON, KENTUCKY.  THEY GO TO THE WAL-MART.  YOU REMEMBER ANDREA AND TINA'S TESTIMONY.  THEY PULL INTO THE WAL-MART, PULL NEXT TO A LITTLE BLUE PICKUP TRUCK.  OPENS UP -- CHAD OPENS THE BACK SLIDING DOOR, BREAKS THE WINDOW,  GETS THE PURSE,  GIVES TO IT BRANDON LOOKING FOR MONEY AND WHATNOT.  WHY IS THAT IMPORTANT? REMEMBER THOSE FACTS,  LADIES AND GENTLEMEN.  I WILL GET BACK TO THEM.

SUNDAY, NOVEMBER 10TH, AT THE WAVERLY WAL-MART, RIGHT OUTSIDE OF PIKETON, OHIO, YOU REMEMBER THAT PICKUP TRUCK.  IT WAS AMY WARD'S BOYFRIEND.  YOU REMEMBER AMY WARD TESTIFYING. THEY WENT TO THE WAL-MART TO GET HER BOYFRIEND'S BROTHER SOMETHING FOR A COMPUTER GAME, AND THEY ARE DRIVING A LITTLE BLUE PICKUP TRUCK.  THEY WERE IN THE STORE FOR FIVE MINUTES. THEY CAME OUT, THE PURSE WAS STOLEN,  HER ID'S,  TEN BUCKS, AND TWO CELL PHONES.  REMEMBER THAT POINT.  THEY THEN, ULTIMATELY, GET IN THE TOWN AND COUNTRY MOTEL THAT NIGHT IN

JA0380

PIKETON.  THEY LEAVE THE WOMEN,  THEY GO OUT.  BRANDON BASHAM WRITES A BUNCH OF CHECKS AT WAL-MART AND K-MART ON TALSMA'S. HE PURCHASES A BUNCH OF CAMOUFLAGE FOR HIM AND CHAD FULKS. THEY SPEND THE NIGHT, SUNDAY NIGHT, NOVEMBER 10TH IN THE TOWN OF PIKETON AT THE TOWN AND COUNTRY MOTEL, 60 MILES FROM HUNTINGTON, WEST VIRGINIA.  AND SAMANTHA BURNS HAD NO IDEA THAT THAT SUNDAY NIGHT WOULD BE THE LAST NIGHT THAT SHE EVER SPENT WITH HER FAMILY.  AND THE LAST NIGHT SHE SPENT ON EARTH.

MONDAY, NOVEMBER 11,  2002.  THEY GET UP.  THEIR DESTINATION IS HUNTINGTON, 60 MILES AWAY.  WHO GREW UP IN HUNTINGTON? WHO KNOWS HUNTINGTON? WHO IS DRIVING? CHAD FULKS. DO YOU HONESTLY BELIEVE, DO YOU HONESTLY BELIEVE, AFTER ALL OF THE TESTIMONY THAT YOU HEARD, THAT SIX FOOT,  200-POUND, MUSCULAR, ATHLETIC 25-YEAR-OLD CHAD FULKS IS BEING MANIPULATED AND BOSSED AROUND BY FIVE FOOT EIGHT,  150-POUND BRANDON BASHAM SERVING TIME FOR A FORGERY? DO YOU, HONESTLY, BELIEVE THAT?

THEY ARE GOING TO HUNTINGTON.  THEY ARE GOING TO AN AREA THAT CHAD FULKS KNOWS.  THEY GET IN THE MOTEL ROOM, AND WHAT DO THEY DO? THEY DON CAMOUFLAGE.  CHAD FULKS AND BRANDON BASHAM PUT ON CAMOUFLAGE PANTS.  CHAD FULKS AND BRANDON BASHAM PUT ON CAMOUFLAGE SHIRTS.  CHAD FULKS AND BRANDON BASHAM PUT ON CAMOUFLAGE MASKS.  CHAD FULKS AND BRANDON BASHAM PUT ON BOONEY HATS.  WEARING CAMOUFLAGE BOOTS.  THEY

BOTH GOT GLOVES ON.   THEY BOTH DRESS IN CAMOUFLAGE, LITERALLY, HEAD TO TOE.

WHY? WHAT IS CAMOUFLAGE USED FOR? OUR MILITARY USES IT. OUR MILITARY USES IT TO CONCEAL THEMSELVES TO ASSIST IN WHAT THEY DO.   AND WHETHER YOU LIKE IT OR NOT, WHAT THEY DO IS, THEY KILL.   THAT IS, ULTIMATELY, THE PURPOSE OF THE MILITARY. HUNTERS,  LAWFUL HUNTERS, USE CAMOUFLAGE TO CONCEAL.   TO GO AFTER GAME, TO HUNT, TO KILL.

WHAT ARE BRANDON BASHAM AND CHAD FULKS DOING DRESSED OUT IN CAMOUFLAGE THAT NIGHT? NO OTHER NIGHT.   NO EVIDENCE OR TESTIMONY THEY WORE THIS CAMOUFLAGE ANY OTHER NIGHT.   THEY WERE HUNTING, THE GOVERNMENT SUBMITS TO YOU.   THEY WERE HUNTING DOWN SOMEBODY.   THEY WERE HUNTING, AND THEY LOCATED, AND THEY ISOLATED, AND THEY ABDUCTED, AND THEY RAPED, AND THEY ROBBED, AND THEY KILLED THEIR PREY.   SHE JUST HAPPENED TO BE A 19-YEAR-OLD COLLEGE COED NAMED SAMANTHA BURNS.   WHAT OTHER REASON?

WHAT IS THE TIME LINE OF SAMANTHA BURNS?   SIX-THIRTY, SHE AND HER AUNT ARE AT THE J. C. PENNEY'S AT THE MALL.   WE KNOW THAT BECAUSE OF THE RECEIPT.   SHE IS ABDUCTED FROM THE MALL. EVEN CHAD FULKS ADMITS THAT.   SHE IS ABDUCTED AT THE MALL. AT 8:12, WE HAVE A PHOTOGRAPH.   AT 8:12, SAMANTHA BURNS'S ATM CARD IS BEING USED AT AN ATM MACHINE, AND THERE IS CHAD FULKS. HE ADMITS IT.   OH, HE ADMITS THAT IS HIM, THAT IS HIM IN THE HAT, THAT IS HIM IN THE SKI MASK,  THAT IS HIM IN THE

JA0382

SHORT-SLEEVED SHIRT. THAT IS CHAD FULKS. THAT IS CHAD FULKS DRIVING SAMANTHA BURNS'S CAR. THAT IS NOT A VAN. THAT IS CHAD FULKS DRIVING HER CAR. THAT IS CHAD FULKS ATTEMPTING TO STEAL HER MONEY. TWO HUNDRED FIFTY DOLLARS ($250) THEY GOT, EVENTUALLY, THAT NIGHT FROM HER ACCOUNT. BUT THAT IS CHAD FULKS. MAKE NO MISTAKE ABOUT IT. THAT IS THE CHAD FULKS THAT SAMANTHA BURNS SAW. NOT THAT CHAD FULKS SITTING THERE. THAT IS THE CHAD FULKS THAT SAMANTHA BURNS CONFRONTED.

NINE FORTY-SIX (9:46) WE KNOW SHE IS MOVING. WE KNOW THEY ARE MOVING. HOW DO WE KNOW THAT? BECAUSE THE CELL TOWER INFORMATION. CALL COMES INTO THE MOTHER'S HOUSE AT 9:46. IT GOES FROM ONE CELL TOWER TO ANOTHER, SO IT IS MOVING, THEY ARE ON THE ROAD. THEY MAKE HER -- THEY MAKE SAMANTHA BURNS TELL A LIE. TELL A STORY. WHY IS THAT? THEY NEED TO BUY TIME. WHAT OTHER REASON WOULD BRANDON BASHAM AND CHAD FULKS MAKE SAMANTHA CALL? THEY NEEDED TO BUY TIME BECAUSE THEY WEREN'T THROUGH WITH HER YET. THEY WEREN'T FINISHED WITH SAMANTHA BURNS.

THE NEXT THING WE KNOW, AT 3:00 O'CLOCK, MACK KILGORE HEARS THE EXPLOSION. HE IS IN BED WITH HIS WIFE, HEARS THE EXPLOSION, DOG IS BARKING. HE GRABS HIS GUN, HE GOES UP, AND THE CAR IS ENGULFED. THE CAR IS ENGULFED IN FLAMES. THIS IS THE CAR. REMEMBER THAT PICTURE. IN A FEW MOMENTS, I WILL EXPLAIN THE IMPORTANCE OF THAT PICTURE. THAT IS THE CAR. AND WE KNOW SOME TIME BEFORE SUNUP, WE DON'T KNOW WHEN, SOME

TIME BEFORE SUNUP, CHAD FULKS AND BRANDON BASHAM ARRIVED BACK AT THE HOTEL.  THE GIRLS DON'T REMEMBER WHEN.  ANDREA AND TINA DON'T REMEMBER WHEN, IT WAS SOME TIME BEFORE SUNUP.

WHAT PHYSICAL EVIDENCE DO WE HAVE? WE HAVE CHAD FULKS'S STATEMENT.  WHAT PHYSICAL EVIDENCE DO WE HAVE THAT LINKED THEM TO SAMANTHA BURNS?  WE HAVE THE CANDY BOX.  EVERYBODY, FATHER, MOTHER, BROTHER, IDENTIFIED THIS CANDY BOX THAT CAME OUT OF TINA SEVERANCE'S VAN.  WHAT IS IMPORTANT ABOUT THIS CANDY BOX?  BOTH TINA AND ANDREA SAID, WHEN THEY GOT UP THE NEXT DAY, THAT IS THE FIRST TIME THEY SAW, THE CANDY BOX. AND THEY WERE HONEST.  THEY SAID, IF THE CANDY HAD BEEN THERE BEFORE THEY GOT TO WEST VIRGINIA, THEY WOULD HAVE EATEN IT. THEY ATE SOME OF THE CANDY AFTERWARDS.  THIS BOX WAS NOT THERE BEFORE.  AND THIS BOX BELONGS TO SAMANTHA BURNS, AS WELL AS THIS CANDY.  AND TINA AND ANDREA EVEN ASKED BRANDON AND CHAD ABOUT IT.  BRANDON BASHAM TELLS BOTH OF THEM, BOTH WOMEN, THAT THEY TOOK IT OFF OF A GIRL.  CHAD FULKS TELLS TINA, THAT THEY GOT IT WHEN THEY BROKE INTO A CAR.  SO, THEY ADMIT TO STEALING THAT CANDY BOX.  AND THAT CANDY BOX WAS SAMANTHA BURNS'S.

WHAT ELSE DO YOU HAVE? THE RING.  THE RING THAT BRANDON BASHAM WAS WEARING.  THE RING THAT BRANDON BASHAM SAID THAT HE GOT -- THAT HE GOT FROM A GIRL.  HE TELLS ANDREA RODDY HE GOT IT FROM A GIRL, THE SAME PLACE HE GOT THE CANDY BOX FROM. IF YOU REMEMBER KANDI BURNS, SAMANTHA'S MOTHER, SHE WAS ABLE

JA0384

TO LOCATE THE RECEIPT WHEN SAMANTHA BURNS'S THEN BOYFRIEND BOUGHT THAT RING.  SHE WAS ABLE TO SEE EXACTLY WHAT KIND OF RING IT WAS, THEN PROVIDE LAW ENFORCEMENT WITH THE EXACT SAME RING.  AND TINA SEVERANCE AND BETH MCGUFFIN BOTH HAD AN OPPORTUNITY TO SEE THAT RING THAT BRANDON BASHAM HAD CLAIMED. THAT WAS THE EXACT RING THAT BRANDON BASHAM HAD.  YOU HAVE THE CANDY BOX,  THE RING,  YOU HAVE CHAD FULKS USING SAMANTHA BURNS -- USING SAMANTHA'S ATM CARD AT 8:12 DRESSED UP IN CAMOUFLAGE.  WHAT ELSE?

REMEMBER, YOU HAVE THE DRIVER'S LICENSE.  ON WEDNESDAY, BEFORE ALICE DONOVAN IS ABDUCTED ON THAT WEDNESDAY, WHEN SHE IS LOOKING THROUGH ID'S,  TRYING TO FIND AN ID OF SOMEONE WHO SIMILARLY MATCHES HER ON THE ID, IN MYRTLE BEACH, SOUTH CAROLINA, SHE COMES ACROSS A DRIVER'S LICENSE,  HAS A WOMAN WITH BROWN HAIR, LOOKING FOR SOMETHING SIMILAR, SHOULDER LENGTH BROWN HAIR, AND IT HAS THE FIRST NAME "SAMANTHA."  SHE SAID, THIS IS SOMEBODY WHO HAS BROWN HAIR.  CHAD FULKS SNATCHED THAT ID AWAY FROM HER.  SHE, SUBSEQUENTLY, LOOKED AT THIS PICTURE OF SAMANTHA BURNS, SAID THAT IS THE PICTURE ON THE ID, THE ID CHAD SNATCHED AND THREW AWAY.

THEY WILL TELL YOU TINA SEVERANCE MADE THAT UP.  WHEN YOU ARE JUDGING PEOPLE'S CREDIBILITY,  THINK ABOUT THIS.  THEY WANT YOU TO BELIEVE TINA SEVERANCE WHEN SHE TALKS ABOUT ALL OF THE BAD STUFF THAT BRANDON BASHAM DID.  THEY WANT YOU TO BELIEVE TINA SEVERANCE WHEN SHE SAYS THAT BRANDON WAS

JA0385

IMPULSIVE, BRANDON WAS CARRYING A GUN, BRANDON WAS MEAN, BRANDON TOLD ME HE WOULD THROW ME IN THE RIVER. ALL THE BAD THINGS TINA SEVERANCE SAYS ABOUT BRANDON BASHAM, SAID ABOUT BRANDON, THE DEFENSE LAWYERS WILL SAY IS TRUE. WHEN BRANDON BASHAM SAYS SOMETHING BAD ABOUT CHAD FULKS, SHE IS LYING. IS THAT FAIR? IS THAT LOGICAL? IS THAT HOW YOU ARE GOING TO APPLY THE TRUE TEST HERE? OR IS IT MORE LOGICAL, IF SHE IS GOING TO LIE ABOUT SOMEBODY, SHE WILL BE LYING ABOUT THE PERSON BRANDON BASHAM SHE DOESN'T KNOW, NOT THE MAN SHE FELL IN LOVE WITH. SHE DIDN'T SAY THAT THE DRIVER'S LICENSE SAID SAMANTHA BURNS, SHE SAID "SAMANTHA." AND CHAD FULKS AND BRANDON BASHAM HAD ALL THE OPPORTUNITIES TO GET RID OF THAT DRIVER'S LICENSE. THEY DIDN'T GET RID OF THE CANDY BOX. THEIR PLAN WAS IMPERFECT. BUT THEY GOT RID OF THE DRIVER'S LICENSE.

NOW, HOW DO WE KNOW -- WHAT EVIDENCE DO WE KNOW THEY WERE BOTH INVOLVED WITH SAMANTHA BURNS? WELL, LADIES AND GENTLEMEN, YOU HAVE HEARD THE TESTIMONY. IT TOOK TWO DRIVERS. IT TOOK TWO DRIVERS TO ACCOMPLISH THIS. WE KNOW, FROM ALL OF THE TESTIMONY THAT YOU HAVE HEARD IN THIS CASE, EXCEPT FOR THE STATEMENT OF CHAD FULKS, THAT BRANDON BASHAM DIDN'T KNOW HOW TO DRIVE. THE ONLY PERSON, THE ONLY PERSON THAT YOU HEARD FROM THROUGH HIS STATEMENT THAT WAS OFFERED BY THE GOVERNMENT THAT EVER SAW BRANDON BASHAM DRIVING WAS CHAD FULKS WHEN HE IS GIVING A STATEMENT IN THE PRESENCE OF HIS

LAWYERS.  THERE IS NO OTHER EVIDENCE OR TESTIMONY THAT BRANDON BASHAM EVER DROVE.  IN FACT, THE TESTIMONY IS THAT HE NEVER DROVE.  FROM ALL THE PEOPLE THAT WERE AROUND,  ALL OF THE PEOPLE IN WEST VIRGINIA,  TINA AND ANDREA,  CHAD FULKS WAS THE DRIVER.  BRANDON BASHAM NEVER DROVE.  SO, IT TOOK TWO PEOPLE.  IT TOOK SOMEBODY DRIVING THE VAN,  CHAD FULKS; AND IT TOOK SOMEBODY HOLDING A GUN ON SAMANTHA BURNS AS THEY DROVE HER AROUND, BRANDON BASHAM.  AS THEY DROVE HER UP TO THAT MOUNTAIN TOP, IT TOOK TWO PEOPLE.  TWO PEOPLE BECAUSE SOMEBODY HAD TO DRIVE AWAY.  AND THAT SOMEBODY IS CHAD FULKS.  SO, IT TOOK TWO PEOPLE.

AND WHAT ELSE DID YOU HEAR? THEY DID EVERYTHING TOGETHER. THAT NIGHT BEFORE THEY LEFT,  THEY GOT CAMOUFLAGE CLOTHES TOGETHER,  THEY LEFT TOGETHER IN CAMOUFLAGE CLOTHING.  IT WAS CHAD FULKS WHO WAS STEALING MONEY FROM THE ATM MACHINE,  AND THEY RETURNED TOGETHER.  EVERYTHING THEY DID THAT NIGHT, THEY DID TOGETHER.  THE TWO OF THEM ACTING AS ONE.  AND WHAT ELSE DID YOU HEAR WHEN THEY ARRIVED BACK AT THE MOTEL ROOM.  NOT ONE,  BOTH OF THEM WERE COVERED IN MUD.  BOTH OF THEM HAD MUD ON THEIR PANTS.  BOTH OF THEM HAD MUD ON THEIR SHOES.  BOTH OF THEM.  AND GUESS WHERE ELSE THERE WAS MUD? THERE WAS MUD ON BOTH THE PASSENGER SIDE AND DRIVER SIDE.  I HAD TO REMIND ANDREA ABOUT IT.

ANDREA RODDY HAS NOW STRUCK UP THIS FRIENDSHIP WITH THIS DEFENDANT.  SHE ADMITS SHE IS WRITING TO HIM, AS WE SPEAK,

BACK AND FORTH TO THE JAIL.  AT FIRST, I HAD TO REMIND HER OF WHAT SHE TOLD THE FBI,  HOW THERE WAS MUD IN THE FLOORBOARD IN BOTH FRONT AND PASSENGER SEATED.  AND DEFENSE LAWYERS CROSS-EXAMINED HER,  SAID IT WAS ONLY MUD ON ONE SIDE.  IT IS A GOOD THING THEY TOOK A PICTURE.  IT IS A GOOD THING THAT YOU JURORS HAVE EVIDENCE CLEARLY INDICATING MUD ON BOTH THE PASSENGER SIDE AND THE DRIVER'S SIDE FLOORBOARD.  AND WHY IS THAT IMPORTANT? BECAUSE, LADIES AND GENTLEMEN,  YOU HAVE GOT THE DIRECT TESTIMONY THAT THEY BOTH HAD MUD ON THEIR PANTS, THEY BOTH HAD MUD ON THEIR BOOTS,  MUD ON BOTH PARTS OF THE CAR.  BOTH OF THEM WERE INVOLVED IN GETTING RID OF HER BODY. BOTH OF THEM GOT MUDDY ALONG THE BANKS OF EITHER THE OHIO OR GUYANDOTTE WHEN THEY DUMPED HER BODY IN THE RIVER.  NOT ONE OF THEM,  BOTH OF THEM.  IT WASN'T JUST BRANDON BASHAM.  IT WAS BOTH OF THEM TOGETHER.  WHAT WAS CHAD FULKS DOING GETTING RID OF SAMANTHA BURNS BODY IF HE WASN'T INVOLVED IN HER RAPE? IF HE WASN'T INVOLVED IN HER MURDER? BOTH OF THEM TOGETHER.

NOW,  THEY MAY GET UP HERE AND TALK ABOUT MUD EVIDENCE. YOU RECALL ANDREA RODDY.  CHAD FULKS TRIED TO SAY, WELL, THE MUD WAS FROM THE MUD THAT WAS BY THE CAR WHEN WE PARKED.  OF COURSE, THAT WAS PEACH,  SANDY-COLORED MUD BY THE CAR.  THE MUD ON THE VAN WAS DARK MUD.  YOU REMEMBER THE MUD EXPERT, AS I REFERRED TO HER, FROM THE FBI.  THE MUD EXPERT WHO TESTIFIED, SHE SAID IT IS REAL DIFFICULT BECAUSE YOU GOT TO GET CLOSE IN TIME, YOU GOT TO GET CLOSE TO THE AREA, YOU NEED

JA0388

EYE WITNESS TESTIMONY OR SOMETHING TO THAT EFFECT BECAUSE MUD MIGHT BE DIFFERENT, LITERALLY, FROM ONE SQUARE FOOT TO ANOTHER SQUARE FOOT.

NOW, THEY DUG UP SOME DIRT WHERE THE CAR WAS FOUND, BUT IT WAS NEGATIVE. BUT LADIES AND GENTLEMEN, HOW IS THE FBI OR THE WEST VIRGINIA STATE POLICE SUPPOSED TO KNOW, OF THE HUNDREDS OF SQUARE MILES ALONG THE GUYANDOTTE, IN THE HUNDREDS OF SQUARE MILES ALONG THE OHIO, ARE THEY SUPPOSED TO GO EVERY SQUARE FEET AND GRAB SOME MUD AND SEND IT TO THE LAB? HOW ARE THEY SUPPOSED TO KNOW? IT IS IMPOSSIBLE FOR THEM TO KNOW WHERE. PARTICULARLY, DURING THAT TIME PERIOD. A DAY COULD GO BY AND THE MUD MAY BE DIFFERENT. YOU HAVE HEARD ALL THE TESTIMONY HOW THE WATER RISES AND DROPS, LITERALLY, ON A WEEKLY BASIS. THE IMPORTANCE IS THAT BOTH OF THEM HAD MUDDY PANTS, MUDDY BOOTS, MUD ON BOTH SIDES OF THE CAR. THEY WERE ACTING TOGETHER.

NOW, CHAD FULKS'S STATEMENT REGARDING SAMANTHA BURNS, WHAT DOES HE SAY REGARDING SAMANTHA BURNS? HE CLAIMS THAT IT WAS BRANDON BASHAM. HE CLAIMS IT WAS BRANDON BASHAM, ALONE, THAT DEALT -- THAT DID SAMANTHA BURNS, RAPED SAMANTHA BURNS, AND THAT KILLED SAMANTHA BURNS. HE CLAIMS, HE ADMITS HE WAS WEARING CAMOUFLAGE, BUT HE HAD NO DEVIANT INTENTIONS. HE ADMITS HE WAS THE ONE DRIVING ALL AROUND THE HUNTINGTON AREA. AT THAT POINT IN TIME HE WAS GIVING THAT STATEMENT, TEN MONTHS LATER HE KNOWS, THE LAW ENFORCEMENT KNOWS THAT BRANDON BASHAM

WOULD NOT KNOW HIS WAY AROUND HUNTINGTON, WEST VIRGINIA.  HE ADMITS THAT.  YEAH, I WAS THE ONE DRIVING AROUND.  I AM THE ONE WHO KNEW MY WAY AROUND.  BUT HE DENIES HAVING ANYTHING TO DO WITH SAMANTHA BURNS.

THINK ABOUT THIS.  YOU HEARD THE TESTIMONY OF HOW HE TREATED WOMEN.  HOW HE TREATED WOMEN HIS ENTIRE LIFE.  THEY HAD SAMANTHA BURNS FROM 6:30 UNTIL SOME TIME AFTER 3:00 O'CLOCK WHEN THE EXPLOSION WAS HEARD.  THEY HAD HER FOR EIGHT AND A HALF TO NINE HOURS.  AND SHE HAD EVERY OPPORTUNITY POSSIBLY TO SEE CHAD FULKS'S FACE.  DO YOU THINK, FOR ONE MINUTE, IN THAT NINE-HOUR PERIOD OF TIME, HE STEALS HER MONEY, SHE CAN IDENTIFY HIM, THAT YOUNG, 19 YEAR OLD GIRL, DO YOU THINK, FOR ONE MINUTE, THAT CHAD FULKS WAS NOT INVOLVED IN THE DEVIANT CONDUCT THAT, OBVIOUSLY, WENT DOWN AGAINST SAMANTHA BURNS?

WHAT ELSE DOES HE SAY? HE TELLS YOU, LADIES AND GENTLEMEN, THAT HE IS DRIVING ALONG, JUST SO HAPPENS TO BE ON A ROAD, AND BRANDON BASHAM STOPS THE CAR.  DO YOU REMEMBER THE STATEMENT THAT WAS PUBLISHED BY AGENT LONG?  THAT HE IS DRIVING DOWN THE ROAD, HE LOOKS IN HIS REARVIEW MIRROR, BRANDON HAD ALREADY PULLED OVER SAMANTHA'S CAR, AND HE HAD ALREADY GOTTEN OUT AND ALREADY STARTED THE PROCESS.  WHY IS THAT NOT BELIEVABLE? WHY IS THAT, IN FACT, INCREDIBLE? WHY IS THAT? THINK ABOUT ALL OF THE SQUARE MILES OF HUNTINGTON, WEST VIRGINIA.  THINK ABOUT THE THOUSANDS OF SQUARE MILES IN THE

JA0390

HUNTINGTON, KENOVA, BARBOURSVILLE, ALL OF THAT AREA OF WEST VIRGINIA, AND ALL OF THAT AREA OF KENTUCKY.   IN THE ONE SPOT THAT BRANDON BASHAM JUST HAPPENS TO PICK IS HANEY BRANCH ROAD NEAR GERMAN BRANCH ROAD.   A PLACE WE KNOW, FROM AMBER FOWLER, CHAD FULKS HAS BEEN THERE BEFORE. HE GOT HER VAN,  HER VAN BROKE DOWN.  HE HAD TO GET HER VAN TOWED FROM THAT ROAD WHEN SHE WAS DATING CHAD FULKS.   AND MORE IMPORTANTLY,  CHAD FULKS USED TO TAKE AMBER FOWLER UP TO THAT ROAD AND PARK WHEN THEY WERE YOUNGER WHEN THEY WERE DATING.

AND WHERE WOULD THEY PARK? RIGHT ACROSS FROM THE CEMETERY ON THE RIGHT.   RIGHT IN THAT CLEARING.  WHAT ARE THE ODDS? WHAT ARE THE ODDS THAT BRANDON BASHAM WOULD BE DRIVING AROUND AT NIGHT WITH SAMANTHA BURNS, AND OF ALL OF THE SQUARE MILES OF HUNTINGTON, WEST VIRGINIA, LO AND BEHOLD, HE JUST HAPPENS TO PULL OVER ON THE SIDE OF THE ROAD. HE JUST HAPPENS TO PICK THE SPOT ON TOP OF A MOUNTAIN IN A REMOTE ISOLATED AREA.  HE JUST HAPPENS, ON HIS OWN, TO PICK A SPOT THAT CHAD FULKS USED TO PARK.   THAT CHAD FULKS HAD NOTHING TO DO WITH TAKING BRANDON BASHAM TO THAT LOCATION.  HE HAD NOTHING TO DO WITH PICKING THAT ISOLATED SPOT.   DO YOU BELIEVE THAT? DO YOU BELIEVE THAT?

WHY IS THAT IMPORTANT? DO YOU REMEMBER MS. ANDREWS TESTIFIED FOR THE DEFENSE THAT CHAD FULKS HAS LEARNED,  HE HAS LEARNED BEHAVIOR.   HE HAS LEARNED TO MINIMIZE AND DENY.   HE KNEW WHAT EVIDENCE WAS AGAINST HIM; HE KNEW WHAT THE

GOVERNMENT HAD ON HIM.  AND HE TELLS YOU JURORS THAT BRANDON BASHAM JUST HAPPENED ON TOP OF A MOUNTAIN AT 3:00 O'CLOCK IN THE MORNING, JUST HAPPENS TO PICK A SPOT IN THE SAME, EXACT LOCATION THAT HE KNOWS ABOUT.  YOU CAN'T BELIEVE HIM BECAUSE THAT IS JUST UNBELIEVABLE.  THAT IS UNBELIEVABLE.  IF YOU CAN'T BELIEVE HIM ON THAT FACT, HOW CAN YOU BELIEVE HIM ON ANYTHING ELSE? HOW CAN YOU BELIEVE HIM WHEN HE SAYS HE DIDN'T RAPE SAMANTHA BURNS?  HOW CAN YOU BELIEVE HIM WHEN HE SAYS HE DIDN'T KILL HER?  HOW CAN YOU BELIEVE HIM WHEN HE SAYS HE DIDN'T DISPOSE OF THE BODY?

AND WHAT ELSE DOES HE TELL YOU IN THAT STATEMENT?  THAT WHEN CHAD FULKS OR WHEN BRANDON BASHAM WERE BURNING THAT CAR, HIS HAIR CAUGHT ON FIRE.  HIS FACE AND HAIR CAUGHT ON FIRE. THOSE WEREN'T MY WORDS.  THAT HE WAS STICKING HIS HEAD OUT THE WINDOW, THAT HIS HAIR AND HIS FACE WERE ON FIRE.  AND YET, THE TESTIMONY FROM TINA SEVERANCE AND ANDREA RODDY, THERE WAS NO DAMAGE TO HIS HEAD.  HE DIDN'T SMELL.  THAT IS WHY YOU RECALL, WHY WE WERE ASKING THOSE QUESTIONS OF THOSE TWO WOMEN.  THEY DIDN'T SMELL.  YOU KNOW WHAT BURNED FLESH AND BURNED HAIR SMELLS LIKE.  NOTHING ABNORMAL.

LAW ENFORCEMENT CAME IN FOR BRANDON BASHAM.  HE WAS IN THE HOSPITAL, FOR GOD'S SAKE, IN ASHLAND, KENTUCKY A WEEK LATER. NO BURN MARKS ON HIS FACE.  CHAD FULKS MINIMIZING, AND CHAD FULKS DENYING, AND CHAD FULKS PUTTING ALL THE BLAME ON BRANDON BASHAM.

AND YOU WANT TO KNOW THE REAL EVIDENCE OF HIS DEPRAVITY? THE REAL EVIDENCE, BECAUSE IT IS UNCONTROVERTED, THE DEFENSE AGREES.  SAMANTHA BURNS IS DEAD.   THEY AGREE WITH THAT. SHE IS DEAD.   HER BODY HAS BEEN DISPOSED OF.   BUT THE REAL EVIDENCE OF CHAD FULKS'S DEPRAVITY THAT NIGHT,  REMEMBER TINA SEVERANCE'S TESTIMONY, WHEN THESE GUYS CAME RUNNING IN ALL MUDDY? DO YOU REMEMBER THAT TESTIMONY?  CHAD FULKS HAD JUST BEEN INVOLVED IN THE CARJACKING,  IN THE KIDNAPING OF AN INNOCENT, 19-YEAR-OLD GIRL.   YOU SAW HIM ON THAT ATM MACHINE. YOU SAW HIM DECKED OUT IN HIS CAMO.  HE HAS JUST BEEN INVOLVED IN CARJACKING AND KIDNAPING, THE GOVERNMENT SUBMITS TO YOU, THE RAPE AND THE KILLING AND THE DISPOSAL OF A 19-YEAR-OLD GIRL, WHAT DOES CHAD FULKS DO WHEN HE GOT BACK TO THE HOTEL ROOM? HE MAKES HIMSELF A SANDWICH, AND HE DRINKS HIMSELF A POP.   IN CHAD FULKS'S WORLD, LIFE IS GOOD.   LIFE GOES ON.

THE NEXT DAY, TUESDAY, NOVEMBER 12TH, THEY LEAVE HUNTINGTON, WEST VIRGINIA.  THEY TRAVEL TO SOUTH CAROLINA. THEY GET A MOTEL, LAKE SHORE MOTEL, IN LITTLE RIVER.

ON WEDNESDAY,  NOVEMBER 13TH,  THEY GET UP.  THEY GO ABOUT THEIR BUSINESS.  THEY ARE CASING THE SAVANNAH BLUFF AREA.  WE KNOW THAT FROM THE WITNESS, HELEN COOK.   LOOKING TO BURGLARIZE.  WHO IS DRIVING? WHO CHOSE SOUTH CAROLINA? CHAD FULKS.  NO EVIDENCE BRANDON BASHAM HAD EVER BEEN TO SOUTH CAROLINA.  WHO IS DRIVING THE WHOLE WAY TO SOUTH CAROLINA? CHAD FULKS OR TINA SEVERANCE, AND HE IS DIRECTING HER.  WHO IS

JA0393

DRIVING THIS TRAIN? CHAD FULKS.  WHO TELLS TINA TO GET THE HOTEL ROOM IN LITTLE RIVER? CHAD FULKS.  WHO DRIVES THE VAN ON WEDNESDAY AWAY FROM THE HOTEL ROOM?  WHO DRIVES THE VAN TO SAVANNAH BLUFF PLANT,  I MEAN -- SAVANNAH BLUFF AREA? CHAD FULKS.  YOU HEARD THE TESTIMONY FROM HELEN COOK, THE BLOND HAIRED GUY WAS DRIVING.

CHAD FULKS, ON THAT WEDNESDAY, THEY BROKE INTO OTHER CARS.  THEY GO BACK, AND THEY GET THE WOMEN.  THEY GO ON A CREDIT CARD SPREE WHERE THEY BUY HUNDREDS OF THOUSAND OF DOLLARS OF CLOTHES AT ALL OF THOSE DEPARTMENT STORES USING FRAUDULENT CREDIT CARDS AND FRAUDULENT CHECKS.  ON THE WAY BACK, STOP BY THE FOOD LION AND GET THEMSELVES SOME ALCOHOL AND PICK UP SOME MARIJUANA FROM SOMEBODY AT THE HOTEL AT LAKE SHORE.  THEY START TO DRINK,  THEY GET DRUNK,  THEY GET HIGH.  AND 48 HOURS BEFORE THEY ARE GETTING DRUNK AND GETTING HIGH,  WHAT HAPPENED?  THE CARJACKING OF A 19-YEAR-OLD GIRL, AND THEY ARE RAPING HER AND THEY ARE KILLING HER.  BUT ON WEDNESDAY, NOVEMBER 13TH,  AT THE LAKE SHORE MOTEL,  FOR CHAD FULKS, LIFE IS GOOD.  LIFE GOES ON.

THAT NIGHT, WHAT HAPPENS? BRANDON BASHAM, ANDREA RODDY PASS OUT.  TINA SEVERANCE IS WATCHING SOME SORT OF CABLE EXERCISE SHOW, AND SHE COMMENTS ON THE LEGS OF A MAN.  AND WHAT DOES CHAD FULKS DO? HE GETS ANGRY.  HE GETS JEALOUS.  HE GETS ENRAGED.  SHE TRIES TO GO FOR A WALK KNOWING -- TRIES TO GO FOR A WALK TO GET OUT OF IT,  SEPARATE HERSELF FROM THE

JA0394

SITUATION.  CHAD FULKS GRABBED ONE OF THE GUNS.  SHE DOESN'T KNOW IF IT WAS THE .45 OR .22,  DOES IT MATTER? HE GRABS ONE OF THE GUNS.  AND HE STICKS IT WITHIN A FOOT OF HER HEAD.  HE STICKS IT WITHIN A FOOT OF HER HEAD.  AND THEN THROWS THE GUN.

NOW,  THEY MAY ARGUE THAT ANDREA RODDY DIDN'T SEE THIS. HER OWN TESTIMONY WAS SHE WAS ASLEEP,  SHE WAS PASSED OUT. SHE DOESN'T KNOW WHAT HAPPENED WHEN SHE WAS ASLEEP.  WHEN SHE WAKES UP, HE DOESN'T HAVE THE GUN.  WHY IS THAT TESTIMONY IMPORTANT? YOU HAVE ALREADY HEARD FROM JAMES HAWKINS, THE ONE LIVE WITNESS I TOLD YOU ABOUT WHO GAVE YOU A DISPLAY AND TOLD YOU ABOUT WHAT CHAD FULKS'S DEMEANOR WAS LIKE,  HIS INTENSITY, HIS VIOLENCE.  NOW YOU HEAR FROM TINA SEVERANCE, ANOTHER LIVE WITNESS.  THE CLOSEST TINA SEVERANCE CAME TO DYING DURING THAT TRIP WAS WHEN CHAD FULKS HAD THAT GUN POINTED A FOOT FROM HER HEAD.  HE CAME WITHIN A SQUEEZE OF THAT TRIGGER FROM PUTTING A BULLET INTO THE HEAD OF TINA SEVERANCE, THE WOMAN THAT HE LOVED.

WHAT DO YOU THINK HE WOULD DO WITH SAMANTHA BURNS, A WOMAN THAT CAN IDENTIFY HIM IN COURT? WHAT DO YOU THINK HE WOULD DO TO ALICE DONOVAN,  A WOMAN THAT CAN IDENTIFY HIM IN COURT? HE IS WILLING TO POINT A GUN AT THE WOMAN THAT HE IS SLEEPING WITH,  THAT THE WOMAN THAT HE SLEPT WITH THAT NIGHT.  WHAT DO YOU THINK HE IS CAPABLE OF DOING TO WOMEN THAT CAN HURT HIM WITH THEIR TESTIMONY?

THURSDAY, NOVEMBER 14TH, THE KIDNAPING, THE CARJACKING, RAPE, AND MURDER OF ALICE DONOVAN. THEY GET UP THAT MORNING, DESTINATION, BEACH WALK MOTEL. WHO IS DRIVING? CHAD FULKS. THEY GET THERE. THEY DROP THE WOMEN OFF. THEY LEAVE. DESTINATION, SAVANNAH BLUFF. WHO IS DRIVING? CHAD FULKS. WE KNOW THEY GO TO SAVANNAH BLUFF BECAUSE TONYA RICHARDSON, HELEN COOK'S NEXT DOOR NEIGHBOR, SEES THE VAN, THE SAME GREEN VAN. THE SAME GREEN VAN THAT HELEN HAD TALKED ABOUT WITH THE SAME TWO GUYS MATCHING THE SAME DESCRIPTION, SHORT, MILITARY-STYLE, BLOND HAIR DRIVING; SHORT, MILITARY, DARK HAIR IN THE PASSENGER SEAT. AND THEY ARE CASING THAT AREA. AND TONYA RICHARDSON, ACTUALLY, GETS THE LICENSE NUMBER AND WRITES IT DOWN. IT COMES BACK TO TINA SEVERANCE'S VAN. THEY ARE LOOKING TO BREAK INTO HOMES, LOOKING TO STEAL. CHAD FULKS IS DRIVING THIS TRAIN.

THE ATTEMPTED KILLING OF CARL JORDAN THAT DAY. CARL JORDAN ARRIVES AT HIS SON'S HOUSE. YOU WILL SEE THE AERIAL PHOTOGRAPH. HE ARRIVES AT HIS SON'S HOUSE. AND UP THERE IN THE BACK AREA, BEFORE THE BARN AREA, IS SAM JORDAN'S RESIDENCE. AND IT IS ABOUT 1:45, 2:00 O'CLOCK, AND HE ARRIVES AT THAT HOUSE. AND WHAT DOES HE SEE? HE SEES A GREEN VAN PARKED BEHIND, AND HE SEES IT FACING A LITTLE ROADWAY. HE PULLS UP, HE DOES A U-TURN, A THREE POINT TURN, HE COMES BACK, HE PARKS IN FRONT OF THAT VAN. HE IS PARKED THERE. IT IS BROAD DAYLIGHT AND HIS WINDOW IS DOWN. WHAT DOES HE SEE,

JA0396

LADIES AND GENTLEMEN?  HE SEES A BLOND HAIR GUY WALKING OUT OF HIS SON'S MOBILE HOME, THAT IS WHAT HE SEES.  HE GETS IN THE VAN.  HE DOESN'T HAVE MUCH TIME TO SEE HIM,  BUT HE SAW HIM GET IN THAT VAN AND PULL THAT VAN RIGHT UP TO HIM.  AND IT WAS A 90 DEGREE ANGLE.

I AM CARL JORDAN SITTING IN MY PICKUP TRUCK, AND THAT VAN COMES RIGHT HERE.  WHAT ELSE DID HE SEE? HE SEES A DARK HAIRED GUY RUNNING FROM IN FRONT OF HIM, AND HE IS LOOKING AT HIM.  AND HE NOW KNOWS THAT PERSON IS BRANDON BASHAM.  HE KNOWS THE PERSON IS CHAD FULKS.  HE HAS SINCE IDENTIFIED HIM. HE KNOWS THE PERSON IN FRONT IS BRANDON BASHAM.  WHAT DOES BRANDON BASHAM START DOING?  HE STARTS SHOOTING AT HIM.  HE SCRUNCHES DOWN AFTER BRANDON BASHAM IS SHOOTING FROM THE FRONT,  FROM THE FRONT, HE IS SHOOTING AT HIM.  IF HE IS GOING TO HIT, HE WILL HIT THE FRONT WINDSHIELD,  FRONT PART OF THE TRUCK.  WE CAN'T CHANGE PHYSICS.  LAWYERS CAN DO A LOT OF THINGS,  THEY CAN'T CHANGE PHYSICS.

THE NEXT THING HE KNOWS, WHEN HIS ATTENTION IS TO THE FRONT,  HIS BACK WINDOW, WITHIN A FOOT OF HIS HEAD, IS SHATTERED.  HE HEARS AN EXPLOSION.  THE ONLY PERSON THAT COULD HAVE FIRED THAT GUN,  THE ONLY PERSON IS CHAD FULKS. THERE IS A REASON WHY MR. NETTLES SPENT 30 MINUTES,  45 MINUTES TRYING TO GET CARL JORDAN TO ADMIT THAT IT COULD HAVE BEEN BRANDON BASHAM.  THERE IS A REASON.  AND, YOU KNOW WHY? BECAUSE IF YOU JURORS, AND ANY REASONABLE JUROR FINDS THAT, AT

JA0397

1:45, LESS THAN AN HOUR BEFORE ALICE DONOVAN IS CARJACKED AND KIDNAPED, THAT CHAD FULKS IS TRYING TO KILL CARL JORDAN, TRYING TO SHOOT CARL JORDAN IN THE HEAD,  THAT IS AN INTENT TO KILL.  BECAUSE REASONABLY,  A REASONABLE INFERENCE IS THAT, IF HE IS TRYING TO KILL A MAN THAT BARELY HAD AN OPPORTUNITY TO SEE HIS FACE, IF HE IS TRYING TO SHOOT HIM IN THE HEAD AT 1:45,  WHAT DO YOU THINK HE WILL DO TO A WOMAN THAT HE SPENT SEVERAL HOURS WITH THAT HE ROBBED? THAT HE RAPED? LET HER GO? YOU CAN'T CHANGE THE LAWS OF PHYSICS.

WHAT ABOUT THE PHOTOGRAPHS OF THAT PICKUP TRUCK? LET ME JUST TOUCH ON THE TESTIMONY OF THE BALLISTICS EXPERT.  LET ME TELL YOU WHY, IN THE WHOLE, GRAND SCHEME OF THINGS, IT IS NOT REALLY THAT RELEVANT.  HERE IS THE TRUCK.  THE BACK WINDOW SHOT OUT.  THE SAME WINDOW DIRECTLY ON THE LINE OF FIRE OF CHAD FULKS.  THERE IS A HOLE RIGHT NEAR THE LIGHT.  NOW WE DO KNOW THIS.  THERE IS ONLY ONE HOLE.  THERE IS NOT TWO HOLES.  THE DEFENSE EXPERT WAS CONFUSED WHEN THAT BULLET GOES THROUGH THE WINDOW, IT DOESN'T SPLINTER AT THAT POINT IN TIME, BECAUSE, IF IT WOULD HAVE SPLINTERED GOING THROUGH THE WINDOW, THERE WOULD BE TWO HOLES IN THE ROOF AND THERE IS ONLY ONE HOLE.  SO,  TO THE EXTENT THAT IT SPLINTERED, IT HAD TO HAVE SPLINTERED AFTER IT GOT IN THE ROOF.  IT IS JUST COMMON SENSE.

SO, THE NEXT PICTURE THERE IS THE HOLE.  THE ONE HOLE. AND YOU REMEMBER WHEN MR. THURMOND, ON CROSS-EXAMINATION, WAS ASKING HOW BIG IT WAS,  HE SAID IT WAS SLIGHTLY SMALLER THAN A

DIME, THAN THE CIRCUMFERENCE OF A DIME. HE SAID, YOU KNOW WHAT, OF COURSE WE DON'T KNOW, WE DON'T HAVE IT, WE CAN'T GET THE BULLET. HE SAID, IN HIS OPINION, HE SAID IT WAS NOT A HIGH CALIBER BULLET, MORE LIKELY A LOW CALIBER BULLET. LADIES AND GENTLEMEN, HERE IS THE .45 THAT GOES IN THIS GUN THAT DEWAYNE FULKS SAID HE SAW CHAD FULKS WITH. HERE IS THE .45. HERE IS THE .22 BULLET THAT GOES IN THIS GUN. NOW, WE KNOW CHAD FULKS WAS HOLDING ON TO THIS GUN. THAT IS WHY I HAVE BEEN TELLING YOU THIS WHOLE GRAND SCHEME OF THINGS, IT IS NOT THAT RELEVANT. THE .22 FIRED FROM THIS GUN. HERE IS A DIME. WHAT DO YOU THINK WOULD MAKE A HOLE CONSISTENT WITH SLIGHTLY LESS THAN A DIME? A .45 OR A .22? BARELY THE SIZE OF A PENCIL ERASER HEAD.

NOW, WE CAN PUT CHAD FULKS WITH THIS, WITH A .45 LIKE THIS, BUT IN THE WHOLE, GRAND SCHEME OF THINGS, WE KNOW THEY WERE EXCHANGING GUNS. WE KNOW THEY WERE EXCHANGING COATS. BECAUSE WE GOT SEVERAL WITNESSES THAT SAW CHAD FULKS WITH THIS .22. WHAT GUN DID CHAD FULKS HAVE IN HIS POSSESSION WHEN HE FIRED AND TRIED TO KILL CARL JORDAN? WE DON'T KNOW. AND WE DON'T CARE. AND NEITHER SHOULD YOU. DOES IT MAKE A DIFFERENCE? DO YOU THINK IT MATTERS TO CARL JORDAN IF HE IS SHOT IN THE HEAD WITH A .45 OR A .22? DO YOU THINK IT WOULD HAVE MADE A DIFFERENCE TO CARL JORDAN? DOES IT REALLY MAKE A DIFFERENCE? CHAD FULKS WAS HOLDING ON TO THIS GUN IN WEST VIRGINIA AFTER THE FACT. BRANDON BASHAM WAS HOLDING ON TO

THIS GUN.  HE DITCHED IT THE DAY HE WAS ARRESTED.   HERE WE ARE EXCHANGING GUNS JUST LIKE THEY WERE EXCHANGEING THAT BLACK COAT THAT I WILL GET TO.   THE IMPORTANCE IS, WHO IS THE ONLY PERSON THAT COULD HAVE BEEN FIRING A GUN, ATTEMPTING TO SHOOT AND KILL CARL JORDAN, ATTEMPTING TO SHOOT HIM IN THE HEAD?  THERE IS ONLY ONE PERSON.   AND THAT IS, CHAD FULKS.

AFTER CARL JORDAN, WHAT DO THEY DO? THEY GET IN A HIGH-SPEED CHASE.  HE CHASES THEM.  THEY DRIVE THROUGH COOPER METAL.   CHAD FULKS ALMOST RUNS OVER BILLY MARTINI.  YOU REMEMBER HIS TESTIMONY.  THE VAN CAME WITHIN TWO FEET OF HIM, HAD TO JUMP OFF THE MACHINERY THAT HE WAS ON.   ALMOST RUNS OVER BILLY MARTINI.

THEY DITCH THE VAN.  THEY GO UP TO MS. MOORE'S RESIDENCE.  BRANDON BASHAM BEGINS THE DECEPTION.  HE IS THE ONE DECEIVING.  HE IS THE ONE THAT FIRST STARTS TELLING THE STORY,  IT DOESN'T WORK.   WALK DOWN HER DRIVEWAY,  THEY COME BACK, CHAD FULKS IS KNOCKING ON HER DOOR,  YOU REMEMBER THAT? IT IS HIS TURN.  FORTUNATELY, SHE DOESN'T ANSWER THE DOOR.

THEY LEAVE, THEY CROSS THE STREET, THEY GO TO OLEITA HYMAN'S RESIDENCE.  SHE HAS A PICKUP TRUCK, FAMILY FARM.  FORTUNATELY, FOR BRAD CHAD FULKS AND BRANDON BASHAM, UNFORTUNATELY FOR ALICE DONOVAN, THE KEYS ARE IN THE TRUCK.  THEY GET IN THE TRUCK; THEY START DRIVING.   NOW, THEY ARE 10, 11 MILES FROM MS. HYMAN'S HOUSE, WHO TESTIFIED, TO THE WAL-MART.   THEY GOT TEN MINUTES OR SO TO THINK,  TO PLAN.

JA0400

AND WHAT IS THEIR INITIAL PLAN WITH REGARD TO GETTING RID OF THAT CAR? NO QUESTION THAT THEIR INITIAL INTENT WAS THEY JUST NEEDED WHEELS.

THERE WAS TWO WHITE MEN IN A WHITE PICKUP TRUCK IS WHAT AUTHORITIES WOULD BE LOOKING FOR BASED ON ALL OF THE TESTIMONY FROM PEOPLE I JUST DESCRIBED.  AND THAT WOULD BE A LOT DIFFERENT THAN TWO WHITE MEN AND A WOMAN OR WHATEVER, WHATEVER COLOR,  SIZE OR SHAPE, WHATEVER DIFFERENT COLOR CAR. WHAT THEY WERE TRYING TO DO IS CHANGE OUT THE GAME.  THEY DIDN'T WANT TO BE TWO MEN IN A WHITE PICKUP TRUCK.  THEY NEEDED TO CHANGE THAT FACT UP TO CONFUSE LAW ENFORCEMENT.

SO, INITIALLY, ALL THEY WERE LOOKING FOR WAS A TARGET. BUT THEY WERE LOOKING FOR AN EASY TARGET.  AND THEY FOUND ONE.  BECAUSE, WHEN THEY GOT IN THAT WAL-MART,  THEY FOUND ALICE DONOVAN.  CHAD FULKS SAW THAT BMW.  AND LET'S SEE IT AGAIN,  LADIES AND GENTLEMEN.  THAT IS, OBVIOUSLY, FAST TIME, BUT YOU GET THE PICTURE.  TOOK APPROXIMATELY 45 SECONDS. FORTY-FIVE SECONDS. ALICE DONOVAN WAS 45 YEARS OLD, AND IN 45 SECONDS, HER FATE WAS DECIDED.  THEY WANT TO TELL YOU THAT CHAD FULKS WAS NOT SERIOUSLY INVOLVED IN THIS CRIME.  HE HAD NO ILL INTENTIONS.  WHO WAS DRIVING THAT WHITE PICKUP TRUCK INTO THAT WAL-MART PARKING LOT?  WHO IS THE ONE THAT TARGETED THE BMW?  WHO PULLED IN BEHIND THE BMW.  WHO SLOWED DOWN SO BRANDON BASHAM COULD GET OUT.  WHO TURNED AROUND?  WHO FOLLOWED THE BMW TO THE BACK PARKING LOT?  WHO? CHAD FULKS.

JA0401

ALICE DONOVAN COULD NOT HAVE BEEN ABDUCTED BY BRANDON BASHAM ALONE.   ALICE DONOVAN COULD NOT HAVE BEEN ABDUCTED BY CHAD FULKS ALONE.   IT REQUIRED BOTH OF THEM ACTING TOGETHER AS ONE.

LET'S MAKE ONE POINT ABSOLUTELY CLEAR.   CHAD FULKS ABANDONS THAT PICKUP TRUCK, AND CHAD FULKS GETS IN THAT BMW, AND THEY ORDER ALICE DONOVAN TO PULL AWAY, AND THEY DRIVE FOR A DISTANCE, AND THEY ORDER HER TO PULL OVER, AND CHAD FULKS GETS BEHIND THE WHEEL OF HER BMW.   LADIES AND GENTLEMEN, THERE IS ONE ABSOLUTE FACT, ONE ABSOLUTE FACT.   IF CHAD FULKS LETS ALICE DONOVAN GO,  IF HE DOESN'T PULL AWAY FROM THAT PARKING LOT,  SHE IS ALIVE TODAY.   CHAD FULKS MADE THAT CHOICE.   IF CHAD FULKS TELLS ALICE DONOVAN, GET OUT OF THE CAR,  WE GOT WHAT WE WANT,  SHE IS ALIVE TODAY.   REGARDLESS OF WHAT HAPPENED FROM THAT POINT ON,  HE HAS GOT CONTROL OF THE CAR.   HE HAS GOT CONTROL OF THE SITUATION. HE HAS GOT CONTROL OF ALICE DONOVAN'S LIFE.   ALL HE HAS TO DO IS TELL HER TO GET OUT.   BUT HE HAD OTHER INTENTIONS.   AND THEY LEAVE.   AND THEY DRIVE.  AND WHO IS DRIVING? CHAD FULKS. AND WHERE DO THEY GO?

AT THAT POINT IN TIME,  LADIES AND GENTLEMEN,  THE CARJACKING AND THE KIDNAPING HAS BEGUN.   AND CARJACKING AND KIDNAPING ARE A CONTINUOUS CRIME.   THE ENTIRE TIME THEY WERE TOGETHER,  THE ENTIRE TIME THAT SHE IS ALIVE,  SHE IS BEING CARJACKED,  SHE IS BEING KIDNAPED.   WHERE DO THEY GO? THEY GO

JA0402

TO THE PANTRY THERE ON HIGHWAY 90.  WHO DRIVES TO THE PANTRY? CHAD FULKS.  WHO USED ALICE DONOVAN'S ATM AT THE PANTRY? CHAD FULKS.  HE ADMITS TO THAT.  CAN'T SEE HIM ON THAT VIDEO, BUT HE ADMITS TO THAT.  BRANDON BASHAM CAN'T EVEN USE AN ATM CARD.  BRANDON BASHAM CAN'T EVEN USE A PHONE CARD.  YOU HEARD THE TESTIMONY FROM JAMES HAWKINS AND FROM ALL OF THE WITNESSES.  YOU HEARD JAMES HAWKINS, BRANDON BASHAM DIDN'T KNOW HOW TO USE A PHONE CARD, DIDN'T KNOW HOW TO USE AN ATM CARD, HE DIDN'T KNOW HOW TO DRIVE A CAR.

CHAD FULKS DRIVES TO THAT PANTRY.  HE DOESN'T GET ANY MONEY OUT.  DRIVES TO CAROLINA FIRST IN LITTLE RIVER, CHAD FULKS AND THAT ATM MACHINE WITH THE LETTER P ON THE SWEATER.  CHAD FULKS STEALING ALICE DONOVAN'S MONEY, $400 FROM AN ATM MACHINE.  CHAD FULKS MAKING THAT DECISION, CHAD FULKS MAKING THAT CHOICE.  HE GETS BACK IN THE CAR, AND HE DRIVES.  CHAD FULKS IS DRIVING.  CHAD FULKS TAKES ALICE DONOVAN INTO NORTH CAROLINA.  CHAD FULKS DRIVES ALICE DONOVAN TO THAT AMOCO DODGE STATION IN SHALLOTTE, NORTH CAROLINA.  WHO PULLS UP INTO THAT SERVICE STATION? CHAD FULKS.

WHO IS HOLDING THE GUN ON ALICE DONOVAN?  BRANDON BASHAM? CHAD FULKS?  BRANDON BASHAM ACTING AS A TEAM.  WHO GOES INSIDE? WHO GOES INSIDE THAT AMOCO STATION CONVENIENCE STORE? YOU SAW THE VIDEO.  I WILL NOT PLAY IT FOR YOU HERE, YOU WILL HAVE IT IN THE JURY ROOM.  WHO GOES INSIDE? CHAD FULKS.  WHO BUYS THE THREE MOUNTAIN DEWS? WHO BUYS THE DUCT TAPE OR

ELECTRICAL TAPE,  MASKING TAPE? WHO IS MAKING THE PURCHASE OF THAT TAPE? CHAD FULKS.  WHO GETS BACK IN THE CAR AND PULLS AROUND TO THE PUMP? WHO IS DOING THAT? CHAD FULKS.  AND LOOK AT THIS STILL SHOT.  LOOK AT THIS MAN.  HE IS STANDING THERE,  HAND IN HIS POCKET, PUMPING GAS.  A BEAUTIFUL, SUNNY DAY,  THURSDAY, NOVEMBER 14TH, 2002, IN SHALLOTTE,  NORTH CAROLINA AND LOOK AT CHAD FULKS.  HERE IS A MAN -- HERE IS A MAN THAT, WITHIN THE LAST HOUR OR SO, HE ATTEMPTED TO KILL ANOTHER HUMAN BEING BY SHOOTING THEM IN THE HEAD.  HE HAS INVOLVED HIMSELF IN A KIDNAPING AND A CARJACKING OF AN INNOCENT WOMAN.  AND HERE HE IS,  PUMPING GAS AS IF HE IS GOING TO A TAILGATE PARTY.  NOT A CARE IN THE WORLD.  LIFE IS GOOD FOR CHAD FULKS.

IT DOESN'T STOP THERE.  WHERE DOES CHAD FULKS AND BRANDON BASHAM GO FROM THERE?  THEY GO TO BEE TREE FARMS.  THEY DRIVE OFF OF A HIGHWAY, THEY DRIVE OFF GREEN HILL ROAD, AND THEY GET ONTO A DIRT ROAD.  WHO IS DRIVING? WHOSE CHOICE WAS IT TO GET OFF THE HIGHWAY WITH THOSE PEOPLE?  WHOSE CHOICE WAS IT TO DRIVE DOWN THAT ROAD?  IT WAS CHAD FULKS'S CHOICE.  WHY WOULD THEY DO THAT? WHY WOULD CHAD FULKS BE DOING THAT? WHAT WERE THEIR INTENTIONS? EVERYONE IN THIS JURY BOX KNOWS WHAT THEIR INTENTIONS WERE.  EVERYONE.  AND THEY MADE GOOD ON THEIR INTENTIONS.  THE TWO OF THEM TOGETHER,  THEY DRIVE DOWN, THEY GO BY THE HUNT CLUB,  THEY SEE THE HUNTERS,  THEY DRIVE BACK TO THE CEMETERY.

LADIES AND GENTLEMEN, LOOK AT THIS PICTURE RIGHT HERE, THIS AERIAL. LOOK HOW SECLUDED THIS IS. LOOK AT HOW ISOLATED THIS IS. CHAD FULKS IS DRIVING ALICE DONOVAN AWAY FROM CIVILIZATION. HE HAD NO IDEA THERE WOULD BE A HUNT CLUB AT THE END OF THAT ROAD. WHAT HE IS LOOKING FOR IS AN ISOLATED SPOT. WHAT CHAD FULKS IS LOOKING FOR IS A PLACE TO DO HIS THING. BRANDON BASHAM ISN'T DRIVING THAT CAR. CHAD FULKS IS DRIVING THAT CAR. BRANDON BASHAM DIDN'T PULL INTO THAT CEMETERY, CHAD FULKS PULLS INTO THAT CEMETERY. IT WAS HIS CHOICE. AND HE ONLY HAD ONE INTENTION IN MIND. AND WE KNOW WHAT THAT INTENTION WAS. THE ONLY REASON WHY THEY PULLED OFF IN THAT ISOLATED AREA WAS TO TAKE FROM ALICE DONOVAN WHAT THEY HADN'T TAKEN YET.

IF THERE IS ONE SET OF FACTS THAT EXHIBITS CHAD FULKS'S CALLOUSNESS, IT IS WHAT THEY DID TO THIS WOMAN IN THAT CEMETERY ON THAT DAY. IT WASN'T GOOD ENOUGH FOR CHAD FULKS TO STEAL ALICE'S CAR. IT WASN'T GOOD ENOUGH FOR CHAD FULKS TO STEAL HER MONEY. IT WASN'T GOOD ENOUGH THAT, UNBEKNOWNST TO ALICE DONOVAN, THAT HER FATE WAS SEALED. YOU ALL KNOW THAT. EVERY REASONABLE PERSON KNOWS THAT HER FATE IS SEALED AT THIS POINT. BUT IT WASN'T GOOD ENOUGH. THEY HAD TO TAKE, THEY HAD TO ROB FROM ALICE DONOVAN THE MOST PRECIOUS, PERSONAL POSSESSION A WOMAN HOLDS. HER DIGNITY. HER PRIVATE AND PERSONAL DIGNITY. AND THEY RAPED HER. AND THEY RAPED HER. AND THEY RAPED HER. NINE-TENTHS OF A MILE FROM

JA0405

THAT HUNT CLUB IN BROAD DAYLIGHT.  THEY DIDN'T CARE.  THEY WANTED, AND THEY TOOK.

MR. BLUME SAYS IN HIS OPENING STATEMENT THAT, ONLY TWO MEN, ONLY TWO MEN KNOW HOW ALICE DONOVAN WAS KILLED.  AND ONLY TWO MEN KNOW WHERE ALICE DONOVAN'S REMAINS ARE.  HE IS RIGHT.  AND THOSE MEN ARE CHAD FULKS AND BRANDON BASHAM.  AND THEY ARE RESPONSIBLE FOR HER DEATH, AND THEY ARE RESPONSIBLE FOR DISPOSING OF HER BODY, AND THEY DESERVE JUSTICE.  AND IT IS YOUR JOB TO GIVE JUSTICE TO CHAD FULKS.

AFTER THE RAPE, SHE IS KILLED.  AND THEY DISPOSE OF HER BODY.  AND THEY GO BACK TO THAT MOTEL ROOM AT BEACH WALK MOTEL, AND THEY GET IN THAT MOTEL ROOM, AND CHAD FULKS HAS A CHOICE AT THAT POINT THIS TIME, LADIES AND GENTLEMEN.  HE HAS A CHOICE.  YOU KNOW WHAT HIS CHOICE IS? TO TELL TINA SEVERANCE, YOU REMEMBER THE TESTIMONY, THEY GO INTO THE BATHROOM TOGETHER, AND WHAT DOES CHAD FULKS TELL TINA SEVERANCE? HE TELLS TINA SEVERANCE THAT BRANDON BASHAM WAS IN A SHOOTOUT WITH THE COPS, AND WE LOST YOUR VAN.  NOW, IF CHAD FULKS WAS AFRAID OF BRANDON BASHAM, IF CHAD FULKS HAD NOTHING TO DO WITH KILLING ALICE DONOVAN, IF CHAD FULKS DID NOT HAVE ANYTHING TO DO WITH DISPOSING OF HER BODY, WHY DOESN'T CHAD FULKS TELL TINA SEVERANCE THE TRUTH? WHY DOESN'T HE TELL HER THE TRUTH?

MORE IMPORTANT, DO YOU KNOW WHAT TINA SEVERANCE TESTIFIED TO BEFORE SHE LEFT WEST VIRGINIA ON THAT TUESDAY, NOVEMBER

JA0406

12TH?  REMEMBER SHE TAKES CHAD ASIDE.  REMEMBER SHE SAYS SHE DOESN'T LIKE BRANDON, SHE IS AFRAID OF BRANDON.  CHAD, YOU REMEMBER WHAT SHE SAYS, CHAD, LET'S ME AND YOU, LET'S LEAVE BRANDON AND ANDREA.  LET'S ME AND YOU GO OFF TOGETHER, JUST THE TWO OF US.  NOW, IF CHAD FULKS WAS AFRAID OF BRANDON BASHAM, WOULDN'T HE SAY, YOU KNOW, YOU ARE RIGHT, TINA, YOU ARE RIGHT, TINA. WE NEED TO SEPARATE.  YOU DON'T KNOW HOW CRAZY THIS GUY IS.  WAIT UNTIL HE GOES TO SLEEP, WAIT UNTIL HE PASSES OUT FROM DRINKING, AND WE NEED TO TAKE OFF. IF HE IS AFRAID, IF HE IS NOT DRIVING THIS TRAIN, IF HE IS NOT THE LEADER, IF HE IS NOT CALLING THE SHOTS, THAT IS WHAT HE WOULD HAVE DONE.

THE PLAIN FACT OF THE MATTER IS, HE IS THE LEADER. BRANDON BASHAM IS RESPONSIBLE FOR HIS CONDUCT.  BRANDON BASHAM, HE MADE CHOICES, AND BRANDON BASHAM DESERVES TO DIE FOR HIS CHOICES.  WE WILL BE STANDING UP IN FRONT OF A JURY THIS FALL ASKING THOSE JURORS TO SENTENCE BRANDON BASHAM TO DIE.  BUT MAKE NO MISTAKE ABOUT IT, BRANDON BASHAM WAS A PUPPET, AND CHAD FULKS WAS PULLING HIS STRINGS THROUGHOUT A LOT OF THIS CRIME SPREE.  AND HE HAD AN OPPORTUNITY.  AND WHAT DID HE TELL TINA SEVERANCE? WHAT DID HE TELL HER? HE LAUGHED AND SAID, NO.  BRANDON BASHAM IS SO STUPID, HE WILL DO ANYTHING.  THOSE AREN'T MY WORDS.  THOSE AREN'T TINA SEVERANCE'S WORDS.  THOSE ARE CHAD FULKS'S WORDS.  BRANDON BASHAM IS SO STUPID, HE WILL DO ANYTHING.  SO, HE STAYS.  SO,

JA0407

HE IS BACK IN THAT HOTEL ROOM ON THURSDAY NIGHT OF NOVEMBER 14TH, AND THEY HEAD ON.

NOW, HIS STATE OF MIND.  WHAT IS HIS STATE OF MIND AT THAT POINT, LADIES AND GENTLEMEN?  HERE IS A MAN -- HERE IS A MAN WHO HAS BEATEN AND PHYSICALLY ABUSED JUST ABOUT EVERY WOMAN IN HIS LIFE.  THINK ABOUT THE TESTIMONY YOU HEARD FROM AMBER FOWLER, AND HEATHER GOODMAN, AND FROM VERONICA EVANS.  WHERE HE WOULD PUNCH THEM.  WHERE HE WOULD SLAP THEM.  WHERE HE WOULD KICK THEM.  WHERE HE WOULD BLACKEN THEIR EYES.  WHERE HE WOULD BLOODY THEIR NOSE.  WHERE HE WOULD BLOODY THEIR LIPS.  WHERE HE WOULD MAKE THEM SUCK ON THE END OF A GUN BARREL.  WHERE HE WOULD PISTOL-WHIP THEM.   THAT IS HOW HE TREATED THE WOMEN IN HIS LIFE.  AND THESE WERE WOMEN THAT HE LOVED, THAT HE CARED ABOUT.   THAT IS HOW HE TREATED THE WOMEN THAT HE CARED ABOUT.  WHAT DO YOU THINK HE WAS GOING TO DO WITH ALICE DONOVAN AFTER HE RAPED HER? DO YOU THINK HE WOULD JUST PULL OVER TO THE SIDE OF THE ROAD, AND LET HER OFF, AND LET HER GO TO THE POLICE, AND LET THEM TESTIFY AGAINST HIM IN COURT?  DO YOU THINK CHAD FULKS WOULD HAVE ALLOWED SAMANTHA BURNS AND ALICE DONOVAN TO PUT HIM IN PRISON? YOU SEE HOW HE TREATS THE WOMEN HE CARES ABOUT.   WHAT DO YOU THINK HE DID TO THE WOMAN THAT MEANT NOTHING TO HIM?

HIS STATEMENT, WITH REGARDS TO ALICE DONOVAN, THAT HE TELLS THE POLICE,  HE CLAIMS,  HE ADMITS,  AGAIN,  THE GENERAL ERROR OF CONFESSING ERROR,  MINIMIZE,  DENY,  LEARNED

BEHAVIOR, ACCORDING TO THEIR SOCIAL WORKER, WHAT DOES HE TELL THE POLICE? HE TELLS THE POLICE THAT, WHEN THEY WENT INTO THE WAL-MART, HE THOUGHT BRANDON WAS GOING TO GET AN UNOCCUPIED VEHICLE.  HOW? IT IS ONE THING TO FIND THE KEYS OF A CAR IN A PICKUP TRUCK ON A FAMILY FARM.  HOW MANY PEOPLE LEAVE THEIR KEYS IN A CAR AT A CROWDED WAL-MART? BRANDON BASHAM DOESN'T KNOW HOW TO USE AN ATM CARD, AND HE DOESN'T KNOW HOW TO USE A PHONE CARD.  DO YOU THINK HE KNOWS HOW TO HOT-WIRE A CAR,  A CAR HE DOESN'T KNOW HOW TO DRIVE? THERE IS A REASON HE MINIMIZED.  YOU SAW THE VIDEOTAPE,  TARGETED ALICE DONOVAN, ALONE,  VULNERABLE,  EASY PREY.  HE IS MINIMIZING TO THE POLICE, IN FRONT OF HIS LAWYERS,  I THOUGHT HE WAS GOING OUT FOR AN UNOCCUPIED CAR.  IT LESSENS HIS INTENT IN THE EYES OF A JURY,  I SUPPOSE.

WHAT ELSE DOES HE SAY? HE SAYS HE ISN'T ARMED WITH A GUN. OH, I NEVER HAD A GUN.  BRANDON BASHAM IS THE ONLY ONE THAT EVER HAD A GUN.  AND WHAT ELSE DOES HE CLAIM? HE ADMITS,  HE ADMITS TO DOING ALL OF THE DRIVING,  HE ADMITS, AFTERWARDS, TO DRIVING BACK FROM NORTH CAROLINA.  AND HE ADMITS, AND THIS IS ANOTHER INCREDIBLE STATEMENT OF CHAD FULKS, HE ADMITS TO GOING TO THE SCOTCHMAN GAS STATION.  LADIES AND GENTLEMEN, CHAD FULKS WANTS YOU TO BELIEVE THAT THEY KIDNAPED AND CARJACKED ALICE DONOVAN,  BUT THEY TOOK HER TO NORTH CAROLINA,  THAT THEY BOTH RAPED HER,  THAT SHE WAS NAKED IN THE BACK SEAT OF THAT CAR WEARING NOTHING BUT HER PANTIES AND A PAIR OF TENNIS

SHOES, AND THAT HE DRIVES HER BACK INTO NORTH MYRTLE BEACH ON THE BUSIEST THOROUGHFARE AT AROUND 8:00 O'CLOCK,  8:30 AT NIGHT, ON A THURSDAY NIGHT, BUSIEST THOROUGHFARE IN NORTH MYRTLE BEACH,  SOUTH CAROLINA, WHERE THERE ARE RESTAURANTS, BANKS,  CONVENIENT STORES,  CARS, AND PEOPLE WALKING.  AND HE PULLS INTO THIS SERVICE STATION WITH ALL OF THOSE LIGHTS, AND HE STOPS TO GET GAS.  THAT HE PULLS A NAKED WOMAN THAT WAS JUST RAPED, WHO IS A VICTIM OF AN ONGOING CARJACKING AND KIDNAPING, INTO THAT PARKING LOT WITH THOSE LIGHTS FOR EVERYBODY TO SEE.  THE NAKED ALICE DONOVAN IN THE BACK SEAT. DO YOU BELIEVE THAT? THE FACT OF THE MATTER IS, ALICE DONOVAN NEVER MADE IT OUT OF THE WOODS OF EITHER NORTH CAROLINA OR SOUTH CAROLINA, WHEREVER SHE MAY BE.  THAT WOMAN NEVER MADE IT OUT OF THE WOODS.  SHE WAS A CARJACK VICTIM,  SHE WAS A KIDNAP VICTIM, AND SHE WAS A RAPE VICTIM.  THEY WOULD NOT HAVE BROUGHT HER BACK AND EXPOSED HER TO THAT ENVIRONMENT YOU SEE ON THAT SCREEN.

WHY DOES HE SAY THAT? IT MAKES IT LOOK LIKE HE IS DRIVING HER BACK TO NORTH MYRTLE BEACH.  MAKES IT LOOK LIKE HE DOESN'T KNOW WHAT IS GOING TO HAPPEN TO HER.  PLEASE. WHATEVER HAPPENED TO HER,  LADIES AND GENTLEMEN,  HE DOES ADMIT HE IS DRIVING, HE IS DRIVING HER OFF OF THE HIGHWAY IN SOUTH CAROLINA, ACCORDING TO HIS TESTIMONY.  HE IS DRIVING DOWN A PAVED ROAD.  HE IS MAKING THOSE CHOICES.  HE IS PULLING OFF OF THAT PAVED ROAD.  HE IS DRIVING DOWN A DIRT

JA0410

ROAD.  IF CHAD FULKS DOESN'T PULL OFF OF A HIGHWAY, ALICE DONOVAN IS ALIVE TODAY.  IF CHAD FULKS, THIS IS IN THE LIGHT MOST FAVORABLE TO CHAD FULKS, IF YOU BELIEVE HIS VERSION, IF HE DOESN'T PULL DOWN A DIRT ROAD, ALICE DONOVAN IS ALIVE TODAY.  IF HE DOESN'T STOP IN THAT RURAL, ISOLATED AREA, ALICE DONOVAN IS ALIVE TODAY.  DOESN'T ALLOW BRANDON BASHAM TO GET OUT OF THE CAR, IF HE IS TELLING THE TRUTH, ALICE DONOVAN IS ALIVE TODAY.  HE DOES NOTHING.  HE LIFTS NO FINGER TO PROTECT ALICE DONOVAN.  IN HIS OWN WORDS, SHE IS NAKED WITH A PAIR OF PANTIES AND SHOES BEING WALKED OFF INTO THE WOODS WITH A MAN WITH A GUN THREE DAYS AFTER THE ABDUCTION, RAPE, THE MURDER OF SAMANTHA BURNS.

AND THAT IS, IF YOU BELIEVE HIS STORY, IN WHICH THE GOVERNMENT SUBMITS TO YOU IS NOT BELIEVABLE.  DO YOU HONESTLY BELIEVE THAT CHAD FULKS WOULD HAVE ALLOWED ALICE DONOVAN TO LIVE AND TO TESTIFY AGAINST HIM?  DO YOU HONESTLY BELIEVE THAT?

FRIDAY, NOVEMBER 15TH.  I WILL SPEED THINGS UP HERE. FRIDAY, NOVEMBER 15TH, THEY LEAVE SOUTH CAROLINA, DESTINATION HUNTINGTON, WEST VIRGINIA.  ASK YOURSELVES THIS.  HE CLAIMS ON THE RIDE BACK TO HUNTINGTON THAT BRANDON BASHAM SAYS, OH, BY THE WAY, I KILLED SAMANTHA BURNS, AND I KILLED ALICE DONOVAN.  I DID IT FOR THE BOTH OF US.  WHY WOULD YOU BE GOING BACK TO HUNTINGTON?  UNDER HIS THEORY, HE ADMITS HE IS INVOLVED IN A CARJACKING, KIDNAPING, STEALING SAMANTHA BURNS'S

JA0411

MONEY.   WHY WOULD HE BE GOING BACK TO THE AREA?   UNDER HIS THEORY, HE DOESN'T KNOW WHETHER SAMANTHA BURNS'S BODY HAS BEEN FOUND.   HE DOESN'T KNOW WHAT BRANDON BASHAM DID.   UNDER HIS THEORY, HE IS IMPLICATING HIMSELF TO CARJACKING AND KIDNAPING. SOMEONE MIGHT IMPLICATE HIM IN A MURDER.   HE IS DRIVING BACK TO HUNTINGTON, WEST VIRGINIA.   THERE IS A REASON HE IS DRIVING BACK TO HUNTINGTON, WEST VIRGINIA.   THERE IS ONLY ONE REASON. ONLY ONE EXPLANATION.   HE KNOWS THEY AREN'T GOING TO FIND THAT BODY.   HE KNOWS THERE IS NOBODY THAT CAN IMPLICATE HIM OTHER THAN BRANDON BASHAM INTO THAT CRIME.   HE KNOWS THAT. HE KNOWS THEY ARE NOT GOING TO FIND THAT BODY.   HE HELPED PUT THAT BODY IN THE RIVER.   WHY ELSE WOULD HE BE GOING BACK TO HUNTINGTON, WEST VIRGINIA?

ON THE RIDE BACK TO HUNTINGTON, WEST VIRGINIA, THEY MAKE A STOP AT 12:28 AT NIGHT.   THEY MAKE A STOP.   HERE IS A PHOTO OF THE RALEIGH MACHINE IN RALEIGH, NORTH CAROLINA.   SEE THAT BLACK COAT?   CHAD FULKS ADMITS, ADMITS THAT IS HIM IN HIS STATEMENT TO THE POLICE.   HE ADMITS HE GOT THE $60 FROM ALICE DONOVAN'S ACCOUNT WHEN HE ACCESSD THE ACCOUNT AT THE ATM MACHINE AT 12:28.   THAT IS THE COAT THAT HE WAS WEARING. THAT IS TINA SEVERANCE'S BLACK COAT THAT YOU WILL HAVE BACK IN EVIDENCE WITH YOU.   THAT IS THE COAT THAT BRANDON BASHAM WAS WEARING WHEN HE WAS PULLED OUT OF THE OHIO RIVER.   SO, NOT ONLY ARE THEY EXCHANGING GUNS, THEY ARE EXCHANGING COATS.

SO, TO THAT EXTENT, THERE IS HUMAN BLOOD ON THAT COAT.

JA0412

THE GOVERNMENT HAS NO WAY OF KNOWING WHO WAS WEARING THAT COAT WHEN HUMAN BLOOD GOT ON THAT COAT.  IT IS IMPOSSIBLE FOR US TO PROVE THAT.  ALL OF THE TELEVISION SHOWS YOU WATCH,  THOSE AREN'T THE REAL DEALS.  THEY DON'T HAPPEN THAT WAY IN REAL LIFE.  IT IS IMPOSSIBLE.  HE IS WEARING THE COAT WHEN HE IS STEALING ALICE DONOVAN'S MONEY ON NOVEMBER 15TH.  MR. BASHAM IS WEARING THE COAT TWO DAYS LATER WHEN HE IS FISHED OUT OF THE OHIO.  HOW CAN WE PROVE WHO IS WEARING THE COAT?  JUST LIKE, HOW CAN WE PROVE WHO PULLED THE TRIGGER ON THIS GUN IF WE FOUND THE BODIES AND MATCHED THE BULLETS?  THOSE ARE IMPOSSIBLE BURDENS.  WE DO KNOW THIS.  THEY ARE ACTING TOGETHER AS ONE.  THE FACTS AND THE EVIDENCE CLEARLY DEMONSTRATE THAT.

THAT FRIDAY, NOVEMBER 15TH, THEY DRIVE UP TO BETH MCGUFFIN'S HOUSE, FRIEND OF CHAD FULKS.  IN ONE OF THE PICTURES I SHOWED HER, A FAMILY PICTURE, THERE IS BETH MCGUFFIN. WHO IS DRIVING?  CHAD FULKS IS DRIVING.  WHOSE CAR IS HE DRIVING?  DRIVING ALICE DONOVAN'S BMW.  CHAD FULKS IS DRIVING HER CAR,  CHAD FULKS IS CHOOSING THE DESTINATION.  IT IS CHAD FULKS'S FRIEND.  THEY ARE GOING TO BETH MCGUFFIN'S.

WHEN THEY GET THERE, WHAT DOES CHAD FULKS SAY ABOUT THAT CAR?  HE SAYS THAT IS HIS CAR.  TELLS EVERYBODY UP IN HUNTINGTON,  HE TRADED HIS TRANS AM FOR THAT CAR.  THAT IS WHAT CHAD FULKS SAYS.  WHO HAS THE MONEY? WHO IS BUYING THE DRUGS?  WHO ASKED FOR $150 FOR MARIJUANA?  WHO IS PAYING FOR

THE CRACK THAT WHOLE WEEKEND? NOT BRANDON BASHAM.  CHAD FULKS.  CHAD FULKS MAKES THE DECISION WHERE THEY GO.  CHAD FULKS IS GETTING MONEY OUT OF THE ATM MACHINE.  CHAD FULKS IS DRIVING THE CAR.  CHAD FULKS HAS THE MONEY.  BUT CHAD FULKS ISN'T TAKING A LEADERSHIP ROLE.  IT IS BRANDON BASHAM CALLING ALL THE SHOTS.  THAT IS WHAT THEY WANT YOU TO BELIEVE.

CONCERNING THE GUNS,  BETH MCGUFFIN SEES A WOOD-HANDLED REVOLVER FROM BRANDON BASHAM.  NO QUESTION SHE TESTIFIED TO THAT.  SAW SOME SEMIAUTOMATIC IN THE GLOVE BOX.  WE KNOW IT WASN'T THIS GUN BECAUSE THIS GUN WAS IN A DUFFLE BAG THAT WAS FOUND WHEN THEY ABANDONED THE VAN ALONG MS. MOORE'S PROPERTY LINE BEFORE MS. DONOVAN WAS ABDUCTED.  WE KNOW IT WASN'T THIS GUN BECAUSE THIS GUN WAS FOUND INSIDE THE VAN WHEN THEY ABANDONED THE VAN BEFORE THEY EVEN ABDUCTED ALICE DONOVAN. WE KNOW THERE IS A .45 REVOLVER THAT HAS NEVER BEEN FOUND FROM ROBERT TALSMA.  WE KNOW THIS .22 WAS FOUND IN THE RAILROAD BOXCAR ALONG THE BANKS OF THE OHIO RIVER ON SUNDAY, NOVEMBER 17TH, WHEN BRANDON BASHAM WAS ARRESTED.

SO,  THERE IS A GUN.  DON'T KNOW WHERE THE GUN IS,  COULD BE HIDING.  BETH MCGUFFIN SAYS SHE SEES A GUN, A SEMIAUTOMATIC.  IT IS SEMIAUTOMATIC,  NOT A REVOLVER.  NOT THIS GUN.  IS IT UNBELIEVABLE, WITH ALL THE CARS THEY BREAK-IN TO, THEY COULDN'T FIND A GUN?  THIS IS A GUN THEY FOUND IN THE BACK SEAT OF THE CAR THEY WERE ARRESTED IN IN AUGUST OF '02. THE GUN THAT OFFICER HOOPER FROM MYRTLE BEACH POLICE OFFICER

GOT FROM THE ROOM WHEN HE ASSAULTED VERONICA EVANS IN JULY OF '02. HE BREAKS INTO PEOPLE'S CARS, HOMES, HE STEALS, GETS GUNS. IS IT HARD TO IMAGINE HE MAY HAVE GOTTEN ANOTHER GUN AND GOTTEN RID OF THAT GUN?

CONCERNING THE BMW. WHO IS TRYING TO GET RID OF THAT BMW? CHAD FULKS IS TRYING TO TRADE THAT BMW TO CHE MCCOY ON FRIDAY NIGHT. THE NEXT DAY, SATURDAY, ANTHONY CREMEANS, HE GOES WITH HIM TO THE DEALERSHIP TO GET RID OF IT. FIRST TRIES TO SELL THIS .22 TO CHE MCCOY AND THEN TRADE IT FOR THE LEGAL WEAPON THAT CHE MCCOY HAD. WHO IS TRYING TO GET RID OF THE GUN? WHO IS TRYING TO GET RID OF THE CAR? IT IS NOT BRANDON BASHAM, IT IS CHAD FULKS.

AND WHAT IS CHAD FULKS'S DEMEANOR LIKE, LADIES AND GENTLEMEN. THIS IS ABSOLUTELY CRITICAL. WHAT IS CHAD FULKS'S DEMEANOR LIKE ON FRIDAY NIGHT OF NOVEMBER 15TH IN HUNTINGTON, WEST VIRGINIA? WELL, AT LARRY TOMBLIN'S HOUSE, YOU HEARD THE TESTIMONY. TALKING ABOUT GOING TO A BIKE RALLY IN PENNSYLVANIA, I BELIEVE, OR NORTH CAROLINA FIRST. HE TOLD THE WOMEN HE WAS GOING TO A BIKE RALLY IN ARIZONA. HE IS TELLING THESE GUYS HE IS GOING TO A BIKE RALLY. WE ASKED EVERY ONE OF THOSE WITNESSES, WHAT WAS CHAD FULKS'S DEMEANOR LIKE, HIS BEHAVIOR LIKE? WHAT DID THEY SAY? CAREFREE, NO BIG DEAL. HE WAS HAVING A GOOD TIME. HE WAS LAUGHING. HE WAS JOKING.

AND YOU REMEMBER BETH MCGUFFIN. WE ASKED BETH MCGUFFIN

JA0415

AND HER FRIEND STACY WORKMAN.  STACY WORKMAN KNOWS NOBODY IN THIS CASE.   HAS NO REASON TO FABRICATE A STORY.   TWO GUYS, CHAD AND BRANDON, LAUGHING,  CUTTING UP,  THEY WERE WANTING US TO GO TO A BIKE RALLY IN ARIZONA.   TWO NORMAL GUYS.   THAT IS WHAT THEIR DEMEANOR WAS LIKE.   AND WHAT DOES ANTHONY CREMEANS TELL YOU?  AND, AGAIN, LADIES,  I APOLOGIZE.  THESE AREN'T MY WORDS.   WHAT DOES ANTHONY CREMEANS TELL YOU? WHAT DOES CHAD FULKS WANT THAT FRIDAY NIGHT? CHAD FULKS WANTS "TO GET FUCKED UP AND HE WANTS SOME PUSSY."   THOSE AREN'T MY WORDS.   DON'T YOU HOLD THOSE WORDS AGAINST THE GOVERNMENT.   THOSE AREN'T ANTHONY CREMEANS' WORDS.   THOSE ARE HIS WORDS.   THOSE ARE HIS WORDS.

THINK ABOUT IT.   ON FRIDAY NIGHT, NOVEMBER 15TH,  AS JOHN BURNS -- AS JOHN BURNS IS HITTING HIS KNEES THAT NIGHT ASKING HIS GOD FOR SOME SORT OF DIVINE INTERVENTION,  ASKING FOR ASSISTANCE IN FINDING HIS LITTLE GIRL,  HOPING BEYOND HOPE TO FIND HIS LITTLE GIRL AND BRING HER HOME, WHAT IS CHAD FULKS DOING? HE IS SMOKING CRACK.   HE IS GETTING DRUNK.   AS BARRY DONOVAN IS WONDERING, WHAT IN GOD'S NAME HAS HAPPENED IN HIS WORLD?   WHERE IS ALICE? WHAT HAS HAPPENED TO ALICE? HAS SHE SUFFERED? IS SHE IN PAIN? WILL I FIND HER? THIS IS LESS THAN 24 HOURS AFTER ALICE DISAPPEARED, WHAT IS CHAD FULKS DOING? HE IS LAUGHING.   HE IS PARTYING.   HE IS, IN ESSENCE, CELEBRATING.   AND AS THE BODY OF A 19-YEAR-OLD GIRL AND A 44-YEAR-OLD WOMAN LIES BURIED, OR HIDDEN, OR IMMERSED IN WATER

SOMEWHERE IN WEST VIRGINIA OR IN NORTH CAROLINA OR SOUTH CAROLINA, WHAT IS CHAD FULKS THINKING ABOUT? HIS ONLY CARE IN THE WORLD? HE WANTS "TO GET FUCKED UP AND HE WANTS SOME PUSSY," ACCORDING TO HIS WORDS. TWENTY-FOUR HOURS BEFORE THAT, HE WAS THEN PENETRATING ALICE DONOVAN. HE WAS RAPING ALICE DONOVAN. AND THE ONLY THING THAT HE CAN THINK ABOUT IS MORE. HE WANTS MORE. BECAUSE FOR CHAD FULKS, ON FRIDAY NIGHT, NOVEMBER 15TH, LIFE WAS GOOD. LIFE GOES ON.

I APOLOGIZE FOR THAT LANGUAGE, LADIES AND GENTLEMEN. LET ME JUST SAY THIS. YOU KNOW THIS WHOLE PROCESS, THIS WHOLE PROCESS THAT WE HAVE BEEN THROUGH FOR THE LAST FOUR WEEKS, IT IS SO TECHNICAL. IT IS SO SANITIZED. I HAVE BEEN UP HERE NOW FOR ABOUT AN HOUR AND A HALF. I HAVE GOT LESS THAN 30 MINUTES TO GO BEFORE I BREAK. BUT I HAVE BEEN UP HERE FOR ABOUT AN HOUR AND A HALF. AND I AM THE ONLY ONE THAT GETS TO TALK. YOU GET TO ASK NO QUESTIONS. AND THERE ARE RULES, AND THERE ARE PROCEDURES. AND THE WHOLE STRUCTURE OF THE COURTROOM IS ALMOST CHURCH-LIKE. AND THE JUDGE SITS ABOVE EVERYONE ELSE, AND WEARS A BLACK ROBE, AND THE LAWYERS WEAR SUITS. AND EVERYTHING IS SO CLEAN. AND EVERYTHING IS SO TECHNICAL. AND EVERYTHING IS SO PROPER. IT WASN'T THAT WAY FOR SAMANTHA BURNS ON NOVEMBER 11TH. AND IT WASN'T THAT WAY FOR ALICE DONOVAN ON NOVEMBER 14TH. THE CHAD FULKS YOU SEE SITTING IN THIS COURTROOM HERE TODAY IS NOT THE CHAD FULKS SAMANTHA BURNS CONFRONTED. IT IS NOT THE CHAD FULKS THAT

ALICE DONOVAN SAW FACE-TO-FACE LYING ON TOP OF HER.

YOU KNOW, I REFER TO THIS AS A CAGED LION ANALYSIS.  YOU TAKE YOUR KIDS TO THE ZOO.  THE LIONS ARE LETHARGIC.  WE KNOW ZOO ANIMALS HAVE TO BE DOPED UP, DRUGGED UP. LETHARGIC.

MR. BLUME:  YOUR HONOR, I OBJECT.  MAY WE APPROACH?

(WHEREUPON, A BENCH CONFERENCE WAS HELD.)

MR. BLUME:  I THINK IT IS IMPROPER TO COMPARE THE DEFENDANT TO A WILD ANIMAL.

MR. GASSER:  THAT IS WHY I ASKED EVERY ONE OF THESE EXPERTS IF HE IS ON MEDICATION OR NOT.

MR. BLUME:  BASICALLY, COMPARING IT TO A YOUNG ANIMAL IN THE ZOO.

THE COURT:  THE ANALYSIS WILL STOP WITH THE FACT THAT WILD ANIMALS ARE DRUGGED OR SEDATED.  I WILL OVERRULE THE OBJECTION, AS LONG AS THAT IS AS FAR AS YOU ARE GOING.

MR. GASSER:  THANK YOU, JUDGE.

(WHEREUPON, THE BENCH CONFERENCE CONCLUDED.)

MR. GASSER:  THE POINT IS THIS.  THAT IS WHY I ASKED ALL OF THOSE DOCTORS IF THEY ARE AWARE OF THE MEDICATION THAT CHAD FULKS IS ON, THE SEDATIVES, TRANQUILIZERS, ALL THE DRUGS HE IS ON.  THE POINT I AM TRYING TO MAKE, LADIES AND GENTLEMEN, IS THE PICTURE YOU SEE OF CHAD FULKS, THE BLOATED CHAD FULKS, THE OVERWEIGHT CHAD FULKS, THE CHALKY, PASTY SKIN CHAD FULKS, THE CHAD FULKS THAT YOU HAVE SEEN IN THIS

COURTROOM LOOKING STRAIGHT AHEAD, ALL BENIGN, ALL SHY, ALL QUIET, THAT IS NOT THE CHAD FULKS. THAT IS NOT THE CRACK SMOKING RAPIST THAT ROAMED THE STREETS OF KENTUCKY AND WEST VIRGINIA AND SOUTH CAROLINA IN NOVEMBER OF 2002. AND YOU HAVE TO UNDERSTAND THAT. YOU HAVE TO GRASP THAT. IN ORDER FOR THE GOVERNMENT TO HAVE A FAIR TRIAL, IN ORDER FOR YOU TO MAKE AN INFORMED DECISION ON WHAT THE APPROPRIATE PUNISHMENT SHOULD BE, LADIES AND GENTLEMEN, EACH AND EVERY ONE OF YOU, WHEN YOU GO BACK TO YOUR JURY ROOM, YOU HAVE TO HAVE THE ABILITY TO CLOSE YOUR EYES AND ATTEMPT TO PICTURE, IN YOUR MIND, THE TESTIMONY AND EVIDENCE THAT YOU HAVE HEARD. AND PICTURE IN YOUR MIND WHAT TRULY HAPPENED. WHAT WAS THE TRUE REPRESENTATION OF WHAT HAPPENED IN NOVEMBER OF 2002? AND THE CHAD FULKS THAT THESE WOMEN SAW, THE CHAD FULKS THAT THESE WOMEN CONFRONTED, IS THAT CHAD FULKS. THAT IS THE CHAD. THAT IS A PICTURE OF CHAD FULKS TAKEN OUTSIDE THE FLORENCE COUNTY COURTHOUSE. THAT MUSCULAR CHAD FULKS. NOT THE ONE YOU SEE HERE IN THIS COURTROOM.

SATURDAY, NOVEMBER 16TH. THEY CONTINUE TO USE DRUGS. CHAD FULKS DRIVES BETH MCGUFFIN AND BRANDON TO THE J. C. PENNEY'S PARKING LOT WHERE SAMANTHA BURNS IS ABDUCTED. SAID LOOKING FOR A BAG OF CLOTHES, THEY DON'T FIND IT. BRANDON BASHAM GIVES BETH MCGUFFIN SAMANTHA BURNS'S RING. BACK WATCHING TV THAT NIGHT, THE SHOW COMES ON THE NEWS, COMES ON THAT NIGHT, THEY ARE TALKING ABOUT SAMANTHA BURNS. BOTH CHAD

FULKS AND BRANDON BASHAM ARE SITTING ON THE EDGE OF THE CHAIR. CHAD MAKES SOME COMMENT, NOT GOING TO FIND THAT WOMAN ALIVE, SATURDAY NIGHT THE 16TH.

SUNDAY, NOVEMBER 17TH, ATTEMPTED CARJACKING OF ANDREA FRANCIS. WE KNOW ABOUT 7:15 THAT NIGHT MS. FRANCIS, WITH HER MOTHER, FINISHED GOING WITH HER MOTHER TO THE ASHLAND MALL. WE KNOW THEY WENT TO A WAL-MART. LADIES AND GENTLEMEN, WE KNOW THAT ANDREA FRANCIS, THE 15 YEAR OLD, WAS WALKING AHEAD. IMAGINE THAT 15-YEAR-OLD TEENAGE GIRL WALKING AHEAD OF HER MOTHER. SHE IS IN THE PARKING LOT WALKING AHEAD OF HER MOTHER. WHY IS THAT IMPORTANT? BECAUSE CHAD FULKS AND BRANDON BASHAM HAD A PLAN. THEY HAD A PLAN THAT NIGHT. HOW DID BRANDON BASHAM GET TO THAT MALL? WELL, WE KNOW, LADIES AND GENTLEMEN, THAT BETH MCGUFFIN SAID THEY LEFT THAT DAY. THEY LEFT THAT SUNDAY, NOVEMBER 17TH. SHE THOUGHT THEY WERE GONE. THEY WERE GOING TO THE BIKE RALLY IN ARIZONA. WHO CHOSE THE MALL? WE KNOW BRANDON BASHAM DEFINITELY CAN'T DRIVE THAT BMW, THAT STICK, THAT STANDARD. CHAD FULKS. AGAIN, CHAD FULKS IS DRIVING. CHAD FULKS IS CHOOSING THE DESTINATION. YOU WONDERED WHY I PUT INTO EVIDENCE, THROUGH VERONICA EVANS, GOVERNMENT'S 352, WHICH WAS A RECEIPT. WHY IS THAT IMPORTANT? BECAUSE WE KNOW CHAD FULKS HAS BEEN IN THAT J. C. PENNEY BEFORE. THE DAY SHE WAS MARRIED, JUNE 11, 2002, SOME FIVE MONTHS BEFORE HE AND BRANDON BASHAM WOULD GO IN THERE SCOPING OUT WOMEN ON NOVEMBER 17TH, VERONICA EVANS IS AT

JA0420

THAT MALL BUYING SOMETHING ON HER WEDDING DAY.  WHO TOOK HER TO THAT MALL? CHAD FULKS.   BRANDON BASHAM DOESN'T KNOW HUNTINGTON.   BRANDON BASHAM DOESN'T KNOW ASHLAND.   IT IS CHAD FULKS DRIVING.  IT IS CHAD FULKS THAT WENT TO THAT MALL. AND WHAT IS THE PLAN? WELL,  LADIES AND GENTLEMEN,  THE PLAN IS THE SAME PLAN AS IT WAS WITH SAMANTHA BURNS.   AND THE PLAN IS THE SAME PLAN AS IT WAS WITH ALICE DONOVAN.   AND WHAT IS THAT PLAN? CHAD FULKS,  THAT BRANDON BASHAM,  YOU KNOW THE ONE THAT CHAD FULKS SAYS HE IS SO STUPID HE WILL DO ANYTHING, THAT BRANDON BASHAM GETS OUT ON FOOT AND THAT CHAD FULKS STAYS BEHIND IN THE CAR IN THE VEHICLE.   IT IS THE SAME PLAN THEY USE WITH SAMANTHA BURNS.   IT IS THE SAME PLAN THEY USE WITH ALICE DONOVAN, FROM WHICH YOU SAW WITH YOUR OWN VERY EYES. THAT IS THEIR PLAN.  AND, FOR THEM, IT IS A GOOD PLAN.   THEY GET RID OF THE BMW.  I MEAN, LUCK IS ABOUT TO RUN OUT.  HAD ALICE'S BMW FOR THREE DAYS.   PLAN IS TO GET RID OF THE BMW, GET THEM ANOTHER CAR, AND THEY HAVE THEMSELVES ANOTHER WOMAN. THAT IS THE PLAN.

BRANDON BASHAM DOESN'T KNOW ANDREA FRANCIS'S MOTHER IS WALKING 15, 20, 30 FEET BEHIND.  HE JUST SEES A YOUNG GIRL ON A CELL PHONE, AND HE TARGETS HER WHILE CHAD FULKS, IN HIS OWN WORDS, HE IS AT THE SCENE,  HE EVEN SAYS TO THE POLICE HE IS DRIVING AROUND, HE IS AT THE SCENE.   AND BRANDON BASHAM APPROACHES HER AND PUTS A GUN IN HER SIDE.  AND, THANK GOD, FOR ANDREA FRANCIS, THAT DEANNA FRANCIS WALKS UP.   THANK GOD,

SHE WENT TO THE WAL-MART AND MOVIE WITH HER MOM THAT DAY.

BRANDON BASHAM IS SPOOKED IN NUMBERS.  THE PLAN AIN'T WORKING OUT.  WASN'T TWO PEOPLE WITH SAMANTHA BURNS, WASN'T TWO PEOPLE WITH ALICE DONOVAN.  ALL OF A SUDDEN, THE MOTHER COMES UP, AND HE WALKS AWAY.  WHY IS THAT IMPORTANT? IF HE WAS DOING IT ALL ALONG, HE WOULD HAVE TAKEN OFF RUNNING.  WHY COULD HE WALK AWAY?  BECAUSE HE KNEW HIS PARTNER, HIS PARTNER WAS DRIVING AROUND IN ALICE DONOVAN'S BMW.  HE DIDN'T HAVE TO RUN AWAY.  HE DIDN'T START RUNNING UNTIL HE SAW THE COPS. HE WALKS AWAY BECAUSE HE KNOWS HIS PARTNER IS CIRCLING AROUND SOMEWHERE BECAUSE THAT IS THE PLAN.  AND IT IS THE SAME THING THEY DID WITH THE OTHER TWO WOMEN.

AND WHEN HE SEES THAT COP, HE TAKES OFF RUNNING.  AND WE KNOW WHAT HAPPENED.  BRANDON BASHAM TRIES TO KILL OFFICER DAVIS, NO QUESTION ABOUT IT.  HE TAKES OFF, SECURES THE PERIMETER, FEW HOURS LATER, HE IS CAUGHT.  THEY FIND THE .22 IN THE BOXCAR THE NEXT DAY.

WHAT ELSE HAPPENED THAT EVENING?  AND THIS IS CRITICAL, LADIES AND GENTLEMEN.  I WANT YOU TO THINK ABOUT THIS CLOSELY. WHAT ELSE HAPPENS THAT NIGHT? DO YOU REMEMBER AMY WARD? DO YOU REMEMBER AMY WARD, WHO I TALKED TO YOU ABOUT, NOVEMBER 10TH, THE WEEK BEFORE? WHAT DOES CHAD FULKS TRY TO DO WITH AMY WARD? CHAD FULKS TRIES TO LURE AMY WARD OUT.  IT WASN'T ENOUGH, LADIES AND GENTLEMEN, HE DIDN'T SUCCEED.  IT ISN'T BRANDON BASHAM'S PLAN.  ANOTHER WOMAN.  THAT WOMAN HAPPENED TO BE

JA0422

ANDREA FRANCIS, JUST LIKE SAMANTHA BURNS AND ALICE DONOVAN. HE DIDN'T KNOW ANDREA FRANCIS WAS 15 YEARS OLD.  HE DIDN'T KNOW HER PARENTS WERE DIVORCED.  HE DIDN'T KNOW HER MOM WAS GOING TO COLLEGE.  HE DIDN'T KNOW SHE WAS A SOPHOMORE IN HIGH SCHOOL.  HE DIDN'T KNOW, AND HE DIDN'T CARE.  THANK GOD THAT PLAN WAS FOILED.  THAT THAT PLAN DID NOT SUCCEED.  BUT CHAD FULKS'S APPETITE HAD NOT BEEN SATISFIED.  SO, WHAT DOES HE DO? HE CALLS, AND HE TRIES TO LURE AMY WARD.  HOW DO WE KNOW THAT? WHAT EVIDENCE PROVES THAT? WELL,  LADIES AND GENTLEMEN, THAT IS THE REASON WHY MR. SCHOOLS CALLED AGENT BRUNING TO THE WITNESS STAND.

LET ME WALK YOU THROUGH THIS.  WE KNOW THIS.  WE KNOW THAT ON NOVEMBER 10TH,  AMY WARD GOES WITH HER BOYFRIEND TO THE MALL,  TO THE WAVERLY WAL-MART RIGHT OUTSIDE OF PIKETON, OHIO, WHICH IS ABOUT 60 MILES FROM HUNTINGTON, WHICH IS ABOUT 30 MILES FROM PLYMOUTH,  WHICH PLYMOUTN, OHIO IS ABOUT 30 MILES FROM ASHLAND.  I WILL GET TO WHY THAT IS IMPORTANT.  WE KNOW THAT THESE ID'S, AMY WARD'S ID'S ARE FOUND WHERE? IN CHAD FULKS'S POCKET WHEN HE IS ARRESTED IN INDIANA ON NOVEMBER 20TH BY THE GOSHEN,  POLICE DEPARTMENT.  AMY WARD'S ID'S.  WHAT ELSE IS FOUND ON CHAD FULKS IN HIS POCKET WHEN HE WAS ARRESTED? THIS PREPAID SPRINT CARD IS FOUND, ALONG WITH AMY WARD'S ID'S IN CHAD FULKS'S POCKET WHEN HE WAS ARRESTED BY THE POLICE IN GOSHEN,  INDIANA.  SO WHAT DOES AGENT BRUNING DO?

BEFORE I GET TO THAT, WHAT ELSE DO WE HAVE?  FOUND IN CHAD

JA0423

FULKS'S ITEMS ARE A LOT OF CHAD FULKS'S PERSONAL PAPERS AND CHAD FULKS'S ADDRESS BOOK.  SO,  HIS ADDRESS BOOK AND PERSONAL PAPERS ARE FOUND WITH HIS ITEMS:  SPRINT CARD AND AMY WARD'S ID'S ARE FOUND IN HIS POCKET.  WHAT IS DONNA WARD'S TESTIMONY.  DONNA WARD TOOK THAT STAND AND SAID, ONE WEEK AFTER AMY'S PURSE WAS STOLEN -- WHAT WAS STOLEN FROM HER PURSE ALONG WITH HER ID? AMY'S CELLPHONE.  WHAT DOES AMY WARD HAVE IN HER CELLPHONE, LIKE WE ALL HAVE IN OUR CELLPHONE?  A PHONE BOOK.  WHAT NUMBERS ARE IN HER PHONE BOOK? HER RESIDENCE WHERE SHE LIVES WITH HER PARENTS AND HER MOM'S CELLPHONE. OKAY.  SO WHAT HAPPENS? ONE WEEK LATER, ON NOVEMBER 17TH, DONNA WARD GETS A PHONE CALL, BUT WE KNOW FROM THIS SPREADSHEET,  LADIES AND GENTLEMEN,  WE KNOW FROM THIS SPREADSHEET, IF YOU LOOK AT NUMBER 9,  THAT PREPAID SPRINT PIN NUMBER, THAT IS THIS CARD.  IF YOU LOOK AT NUMBER 9, THAT IS THIS CARD.  THAT IS THE CARD THAT CHAD FULKS HAD IN HIS POCKET.  THAT IS A NUMBER TO THE SPRINT CARD.  THE NEXT NUMBER OVER, THAT IS A PAY PHONE IN PLYMOUTH,  OHIO.  THAT NUMBER IS A PAY PHONE.  THE SPRINT CARD THAT WAS FOUND IN CHAD FULKS'S POCKET THE DAY HE WAS ARRESTED WAS USED FROM THAT PAY PHONE IN PLYMOUTH, OHIO, 30 MILES FROM WAVERLY, AND 30 MILES FROM ASHLAND,  KENTUCKY,  TO CALL THIS NUMBER, 740, THEN THERE WAS A 0.  THERE WAS A MISDIALED NUMBER, THE GOVERNMENT SUBMITS TO YOU, BECAUSE 947-714 AND ANOTHER NUMBER WOULD BE THE WARD RESIDENCE.  OF COURSE, THE CALL DIDN'T GO THROUGH.

THAT WAS 8:36 EASTERN TIME.  NOW, THE RECORD WILL SAY 7:36, IT WAS EXPLAINED TO YOU THAT SPRINT'S CORPORATE HEADQUARTERS IN KANSAS,  IT IS ACTUALLY 8:36 EASTERN TIME.  TWO MINUTES LATER,  WE ALSO KNOW THAT THIS SPRINT CARD, THAT WAS FOUND IN THE POCKET OF CHAD FULKS, WAS USED AT THE SAME PAY PHONE,  THE SAME PAY PHONE IN PLYMOUTH, OHIO, IS CALLING DONNA WARD'S CELLPHONE NUMBER.  THAT IS DONNA WARD'S CELLPHONE NUMBER, AT 8:38 P.M.

NOW,  WE KNOW THAT THE DISPATCH CALL WENT OUT BY MATT DAVIS AT 7:21.  SO,  AT 7:21 IS WHEN MATT DAVIS IS GETTING SHOT AT BY BRANDON BASHAM.  AT 7:21 EASTERN STANDARD TIME IS WHEN CHAD FULKS IS LEAVING THE SCENE. HE IS LEAVING.  HE SEES WHAT IS HAPPENING.  HE EVEN ADMITS HE SAW THE COPS CHASING HIM.  HE LEAVES HIM.  HE HAD PLENTY OF TIME.  HE HAD AN HOUR AND 17 MINUTES TO DRIVE 30 MILES.  AN HOUR AND 17 MINUTES TO DRIVE 30 MILES TO PLYMOUTH.  AND HE IS CALLING DONNA WARD. WHAT DOES DONNA WARD TELL YOU THAT THIS YOUNG MAN SAID OVER THE PHONE?  THAT SOMEBODY IS ASKING FOR AMY WARD.  THAT SOMEBODY SAYS THAT THEY ARE A JOB INTERVIEWER.  THEY WANT AMY WARD TO COME DOWN TO THE MALL AT 10:30 THAT NIGHT BECAUSE SHE APPLIED FOR A JOB AT A HARDWARE STORE.  HE IS LURING AMY WARD OUT.  WHO ELSE COULD HAVE MADE THAT CALL? WHO ELSE? WHO ELSE WOULD HAVE KNOWN? HOW WOULD THEY HAVE GOTTEN HER CELLPHONE NUMBER?

ASK YOURSELVES THIS.  THE DEFENSE, BY RECALLING HEATHER

JA0425

JO JACOBI AND GETTING HER TO SAY SHE LIVED IN PLYMOUTH, SHE HAD MET CHAD FULKS BEFORE, THIS IS THE SAME HEATHER JO JACOBI WHOSE PURSE WAS STOLEN, BY THE WAY, OUTSIDE THE MOVIE THEATER AT ASHLAND MALL.   SHE SAYS SHE PROBABLY WOULD HAVE GIVEN CHAD FULKS HER PHONE NUMBER.   REMEMBER ME TELLING YOU, WHAT ARE THE ODDS BRANDON BASHAM WOULD HAVE PULLED OVER ON THE SIDE OF THE MOUNTAIN? REMEMBER ME TELLING YOU, WHAT ARE THE ODDS AND ASKING YOU THAT QUESTION THAT HE WOULD JUST PULL OVER IN SAMANTHA BURNS'S CAR?

THINK ABOUT THE ODDS HERE.   THEY ARE GOING TO WANT YOU TO BELIEVE THAT SOMEHOW, THIS HEATHER JO JACOBI, WHO IS 30 MILES AWAY FROM FROM THE WARD FAMILY, THAT IS WHY MR. SCHOOLS ASKED THE PRIVATE INVESTIGATOR,  IT IS THE SAME AREA CODE,  740, JUST LIKE COLUMBIA HAS THE SAME AREA CODE AS FORT MILL,  OR SAME AREA CODE AS CAMDEN, THE PREFIXES ARE DIFFERENT.   THE PREFIXES ON CELL PHONES ARE DIFFERENT THAN LANDLINE PHONES. THEY ARE GOING TO WANT YOU TO BELIEVE THAT, SOMEHOW THEIR LOGIC IS THAT, HEATHER JO -- THAT CHAD FULKS, AFTER DEALING WITH A SITUATION WITH ANDREA FRANCIS, DRIVES TO OHIO,  PULLS OUT A PIECE OF PAPER,  DIALS IT,  LOOKING FOR A NUMBER FOR HEATHER JO JACOBI. HE DIALS A NUMBER, ONE NUMBER AWAY FROM THE WARD FAMILY.   AND, STATISTICALLY,  IT DOESN'T STOP THERE. TWO MINUTES LATER, LOOKING AT THAT SAME NUMBER, THAT NUMBER THAT IS A PLYMOUTH NUMBER THAT HE JUST HAPPENS TO DIAL THE NUMBER OF THE CELLPHONE OF DONNA WARD.   LADIES AND GENTLEMEN,

YOU HAVE A BETTER CHANCE OF WINNING THE SOUTH CAROLINA LOTTERY NEXT MONDAY, AND NEXT TUESDAY, AND NEXT WEDNESDAY, THREE DAYS IN A ROW. BECAUSE THAT IS IMPOSSIBLE. THAT IS, STATISTICALLY, IMPOSSIBLE. THERE IS NO OTHER CONCLUSION, NO OTHER CONCLUSION TO MAKE BUT THAT CHAD FULKS IS TRYING TO LURE AMY WARD OUT.

SO, THINK ABOUT IT NOW. AND ASK YOURSELVES THIS QUESTION. YOU KNOW, EACH ONE OF YOU JURORS CAME TO COURT SIX WEEKS AGO DURING A TWO-WEEK PROCESS OF SELECTING YOU. AND YOU CAME HERE AND YOU SAW A VIDEOTAPE OF JUDGE ANDERSON THAT WAS PLAYED FOR YOU. AND EACH AND EVERY ONE OF YOU KNEW ABOUT THE FACTS OF THIS CASE. YOU, GENERALLY, KNEW IT WAS ALICE DONOVAN. IT WASN'T SOME BLOWING UP A BUILDING, SERIAL KILLER. EACH ONE OF YOU WENT TO THE WITNESS STAND, YOU PUT YOUR HANDS OWN THE BIBLE AND SAID, IF THE FACTS AND CIRCUMSTANCES WARRANTED IT, I COULD GIVE THE DEATH PENALTY. EACH AND EVERY ONE OF YOU INDICATED THAT, WHEN JUDGE ANDERSON GAVE YOU THAT HYPOTHETICAL, REMEMBER THE HYPOTHETICAL, MOST OF YOU HEARD THE HYPOTHETICAL HAD NOTHING TO DO WITH THE FACTS OF THIS CASE, THE LEGAL PRINCIPLE, EACH AND EVERY ONE OF YOU, TWO PEOPLE DRIVING DOWN THE ROAD, ONE GUY STOPS, GOES IN THE FOOTBALL STADIUM, PULLS THE GUY OUT, DRAGS HIM IN THE WOODS, DUCT-TAPES HIM TO A TREE, SHOOTS HIM WITH A HIGH-POWERED RIFLE, THAT IS THE HYPOTHETICAL THE JUDGE GAVE TO SEE IF YOU COULD SEND SOMEBODY TO DIE IF THE EVIDENCE IS

JA0427

INCONCLUSIVE.  EVERY ONE OF YOU SAID, IF THE CIRCUMSTANCES WARRANTED IT, YOU COULD DO THAT.  YOU COULD SENTENCE SOMEBODY TO DIE, EVEN IF THEY DIDN'T STRIKE THE FATAL BLOW.

SO, ASK YOURSELVES THIS, LADIES AND GENTLEMEN.  IS THE KIDNAPING, AND THE RAPE, AND THE MURDER OF SAMANTHA BURNS, AND THE KIDNAPING, RAPE, AND MURDER OF ALICE DONOVAN, IS THAT NOT ENOUGH? IS THE INTENTIONAL KILLING OF TWO INNOCENT WOMEN NOT ENOUGH? WHAT WOULD IT TAKE? WOULD IT HAVE TAKEN BRANDON BASHAM AND CHAD FULKS'S SUCCESSFUL ABDUCTION AND RAPE AND MURDER OF ANDREA FRANCIS? YOU SAW ANDREA FRANCIS'S MOTHER ON THAT WITNESS STAND.  YOU SAW HER BREAK INTO TEARS.  YOU KNOW WHY? YOU KNOW WHY SHE BROKE INTO TEARS.  BECAUSE SHE KNEW HOW CLOSE, I SUBMIT TO YOU, HER DAUGHTER CAME TO FALLING PREY. IS THAT WHAT IT WOULD TAKE? WHAT DO YOU THINK THEY WOULD HAVE DONE TO ANDREA FRANCIS?  OR WOULD IT HAVE TAKEN THE ABDUCTION, AND THE RAPE, AND THE MURDER OF AMY WARD, IF CHAD FULKS HAD BEEN SUCCESSFUL IN LURING HER?

YOU SAW AMY WARD.  YOU GOT A PICTURE OF AMY WARD BACK IN YOUR JURY ROOM.  WHAT DO YOU THINK CHAD FULKS WOULD HAVE DONE TO AMY WARD? YOU HEARD WHAT CHAD FULKS DID TO AMBER FOWLER. AND YOU HEARD WHAT HE DID TO HEATHER GOODMAN.  AND YOU HEARD WHAT HE DID TO VERONICA EVANS.  YOU KNOW WHAT HE DID TO SAMANTHA BURNS.  YOU KNOW WHAT HE DID TO ALICE DONOVAN. WHAT DO YOU THINK HE WOULD HAVE DONE TO THIS LITTLE GIRL? IS THAT WHAT IT TAKES?

JA0428

THAT SUNDAY HE LEAVES.  HE DRIVES BACK TO HUNTINGTON, ABOUT 60 MILES AWAY.  GETS BACK INTO BETH MCGUFFIN'S HOUSE RIGHT BEFORE 11:00 O'CLOCK, AND HE LIES TO BETH MCGUFFIN. YOU KNOW, IF HE HAD NOTHING TO DO WITH ANY OF THIS,  WHEN SHE ASKED WHERE BRANDON IS,  HE TELLS BETH MCGUFFIN,  BRANDON, HE WENT BACK UP AND HOOKED BACK UP WITH HIS GIRLFRIEND AT THE MALL.  WHEN THE NEWS COMES ON, BRANDON'S FACE FLASHES ACROSS THE SCREEN,  OH, MY GOD, SHOT AT THE POLICE,  HE SAYS HE GOT IN A FIGHT.  THE POLICE OFFICER WAS CALLED AND SHOTS WERE FIRED.  IF HE IS A FOLLOWER,  HAD NOTHING TO DO WITH SAMANTHA BURNS OR ALICE DONOVAN, WHY DIDN'T HE TELL BETH MCGUFFIN, HIS CHILDHOOD FRIEND?  WHY DIDN'T HE TELL HER THE TRUTH?  BRANDON BASHAM IS IN CUSTODY AT THAT POINT. HE LIES, AND IT DOESN'T STOP THERE.

THE NEXT DAY, MONDAY, NOVEMBER 18TH,  HE IS IN OHIO.  REAL QUICKLY.  YOU HEARD THE TESTIMONY OF THOSE TROOPERS.  I WILL NOT SPEND A LOT OF TIME WITH IT.  YOU HEARD THE TESTIMONY OF THOSE TROOPERS ON MONDAY THE 18TH.  ON MONDAY, NOVEMBER 18TH, HE IS AT THAT REST AREA.  HE HAS GOT WEST VIRGINIA PLATES ON THAT BMW.  TROOPER HUNTER SPOTS THE CAR,  HE CALLS IT IN,  IT IS A STOLEN PLATE.  YOU HAVE SEEN THAT VIDEO.  YOU WILL HAVE THAT VIDEO.  WHAT DO YOU SEE CHAD FULKS DOING?  YOU REMEMBER THE TROOPER INDICATED THAT THE LIGHTS COME ON FIRST AND THERE IS A DELAY.  WHAT YOU DON'T SEE IS CHAD FULKS REACHING UNDER THAT SEAT.  WHAT IS HE REACHING FOR? YOU HAVE GOT A POLICE

JA0429

OFFICER, YOU HAVE SEEN THAT VIDEO, THAT POLICE OFFICER IS BEARING DOWN ON HIM BECAUSE HE IS REACHING FOR SOMETHING. WHAT IS HE REACHING FOR? DOES HE STOP? AND YOU CAN EVEN HEAR CHAD FULKS. OKAY, OKAY, OKAY. AND HE GOES ON A HIGH-SPEED CHASE, 128 MILES AN HOUR, WITH NO LIGHTS ON, ZIGGING IN AND OUT OF TRAFFIC, CROSSING THE MEDIAN. THE DEFENSE WOULD HAVE YOU BELIEVE THAT HE WASN'T A THREAT, THAT THIS WAS NOT A VIOLENT ACT, THAT HE WASN'T A THREAT TO THE PEOPLE ON THAT HIGHWAY. LADIES AND GENTLEMEN, HE THREATENED THE LIVES OF TROOPER HUNTER. HE ALMOST KILLED TROOPER MALO. YOU REMEMBER THAT TESTIMONY. HE IS ON THE SIDE OF THE ROAD. HE DOESN'T SEE HIM COMING. HE IS LAYING OUT THOSE SPIKE STICKS. HE HEARS THOSE RUMBLE PADS. HE, AT THE LAST MINUTE, GUT REACTION, JUMPS OUT OF THE WAY. CHAD FULKS CAME WITHIN FIVE FEET OF RUNNING OVER TROOPER MALO GOING 128 MILES AN HOUR.

CHAD FULKS IS NOT A THREAT TO ANYBODY. CHAD FULKS DIDN'T INTEND TO KILL ANYBODY. HIGH SPEED CHASES, LADIES AND GENTLEMEN, ARE NOT DANGEROUS. THINK OF ALL THE LAW ENFORCEMENT OFFICERS THAT ARE KILLED IN THE LINE OF DUTY EVERY SINGLE YEAR IN HIGH-SPEED CHASES. TELL IT TO THEIR WIDOWS, AND WIDOWERS, AND THEIR CHILDREN THAT THEY ARE NOT THAT DANGEROUS. TELL IT TO THE TRUCKDRIVERS THAT ARE OUT THERE. COULD HAVE FORCED A TRUCKDRIVER TO JACKKNIFE AND GOTTEN KILLED. CHAD FULKS ISN'T A DANGER TO ANYBODY. CHAD FULKS

JA0430

DIDN'T INTEND TO KILL ANYBODY.

TUESDAY, NOVEMBER 19TH.  ONE DAY AWAY FROM FINISHING.  I AM, ACTUALLY, ON TIME.  TUESDAY, NOVEMBER 19TH.  WHERE DOES CHAD FULKS GO?  HE GOES TO GOSHEN, INDIANA.  HE IS GOING HOME.  HE IS MAKING HIS CHOICES, AND HE IS GOING HOME, AND HE IS IN ALICE DONOVAN'S CAR.  HE GETS TO THE HOUSE ABOUT FIVE OR 6:00 O'CLOCK.  YOU RECALL THE TESTIMONY OF JAMES LAMBDIN.  WHAT IS HIS DEMEANOR? HERE IS A MAN, I WILL NOT GO OVER IT AGAIN.

THE COURT:  MR. GASSER.  I THINK I AM GETTING A SIGNAL WE NEED TO TAKE A BREAK SOMEWHERE ALONG IN HERE.  WHEN YOU GET TO A GOOD --

MR. GASSER:  I AM THERE.  FIVE MINUTES AWAY.

I SINCERELY APPRECIATE THE ATTENTION YOU HAVE SHOWN ME. I REALLY DO.  I APPRECIATE IT.  GETS TO HIS BROTHER'S HOUSE, AND WHAT IS HIS DEMEANOR LIKE?  HE IS CAREFREE.  HE IS SMOKING A SWISHER SWEET CIGAR.  YOU REMEMBER THAT TESTIMONY. ONE OF THE SAME WRAPPERS THAT WE GOT HIS FINGERPRINT ON. HE IS CHILLING OUT.  AND WHEN DAVION NOLTE AND JAMES LAMBDIN AND HIS BROTHER RONNIE WATCH THE LOCAL FOX NEWS THAT NIGHT, WATCH THE HIGH-SPEED CHASE, DAVION AND RONNIE CONFRONT HIM.  RONNIE ASKED HIM, ARE YOU IN THAT CAR, CHAD?  WHAT DOES CHAD FULKS DO?  THIS IS HIS BROTHER.  THIS ISN'T FBI OR JOHNNY GASSER. HE SMILES.  HE SMILES, YEAH, I GOT THE CAR.  IT IS PARKED A COUPLE BLOCKS AWAY.  I TOOK IT OFF SOME WOMAN IN SOUTH

CAROLINA OR OHIO.  RONNIE COULDN'T REMEMBER.  OBVIOUSLY, IT IS SOUTH CAROLINA.  THE OTHER BOY GOT STUPID.  I AM IN A LOT OF TROUBLE.  WHY IS THAT IMPORTANT? BRANDON BASHAM IS IN CUSTODY.  CHAD FULKS, WHO HIS LAWYERS WANT YOU TO BELIEVE THAT HE DIDN'T INTEND TO KILL ANYBODY, HE DIDN'T RAPE SAMANTHA,  HE DIDN'T KILL ALICE, HE HAS NOTHING TO DO WITH DISPOSING OF THE BODY.  ACCORDING TO ALL OF THEM, HE TELLS THEM ALL ABOUT IT.  HIS BLOOD BROTHER, THE TWO OF THEM BEFORE ANY COPS ARE INVOLVED,  BEFORE HE IS QUESTIONED BY ANY COPS, BEFORE ANY PROSECUTORS GET INVOLVED, BEFORE ANY DEFENSE LAWYERS GET INVOLVED, BEFORE THIS WHOLE PROCESS STARTS, HE IS WITH HIS BLOOD BROTHER.  HE HAS AN OPPORTUNITY WITH HIS BROTHER, THE MAN HE LOVES,  FAMILY, TO SAY, RONNIE,  I AM IN A LOT OF TROUBLE.  YOU AIN'T GOING TO BELIEVE WHAT THIS BRANDON BASHAM DID.  YOU AIN'T GOING TO BELIEVE WHAT HE DID.  YOU AIN'T GOING TO BELIEVE WHAT HE GOT ME INTO.  I HAD NOTHING TO DO WITH THIS.  HE SAYS NOTHING.

SOMETIMES, LADIES AND GENTLEMEN, IT IS NOT ONLY WHAT PEOPLE SAY THAT MATTERS,  IT IS WHAT PEOPLE DON'T SAY THAT IS EVERY BIT AS IMPORTANT.  HE HAD AN OPPORTUNITY TO SPILL HIS GUTS TO HIS BROTHER, AND HE SAYS NOTHING.  AND, I SUBMIT TO YOU, BECAUSE HE IS IN IT UP TO HIS NECK.  THAT IS THE TRUTH.

LAST DAY,  NOVEMBER 20TH.  THE DAY THAT CHAD FULKS IS, FINALLY, ARRESTED.  THE DAY THAT HE SEES JESUS.  HE GETS ANDREA ADAMS TO DRIVE HIM -- FOLLOW HIM IN THE BMW.  DUMPS

ALICE'S BMW.  THEY GO BACK TO THE HOUSE TO GET SOMETHING.

THEY ARE DRIVING AGAIN,  OSTENSIBLY TO GO TO SOMEWHERE,

SOMEBODY'S HOUSE.  CHAD FULKS SAYS PULL OVER, JUMPS OUT OF

THE CAR.  HE LEAVES THE CAR.  HE LEAVES THE KEY TO ALICE

DONOVAN'S BMW IN THE BACK SEAT OF ANDREA ADAMS CAR.  HE TRIES

TO BREAK INTO A HOUSE RIGHT THERE.  YOU SAW THE PHOTOGRAPH

RIGHT THERE.  TRIED TO BREAK IN SOMEBODY'S HOUSE.  HE FLEES.

HE IS, ULTIMATELY, APPREHENDED.  CERTAINLY, NO GUNS FOUND ON

HIM.  HE HAD EVERY OPPORTUNITY IN THE WORLD AFTER THAT

HIGH-SPEED CHASE.  HE GOT OHIO LICENSE PLATE AFTER THAT

CHASE.  THINK ABOUT ALL THE RIVERS, CREEKS, DUMPSTERS

EVERYWHERE HE COULD HAVE GOTTEN TO GET RID OF THESE GUNS.  AS

YOU KNOW, HE CAN PICK UP GUNS ANY TIME HE WANTS TO.

WE GOT THE FORENSIC EVIDENCE,  THE CUTTING FROM THE BACK

SEAT WITH CHAD FULKS'S SEMEN STAIN WHERE HE RAPED ALICE

DONOVAN.  FINGERPRINTS ON ITEMS INSIDE THE CAR OF CHAD FULKS

AND BRANDON BASHAM.  VACUUMINGS FROM THE TRUNK.  FORCIBLY

REMOVED HAIR CONSISTENT WITH CHAD FULKS AND BRANDON BASHAM.

WE GOT THE MAP,  LADIES AND GENTLEMEN.  THE 20 DAYS ARE

OVER.  IN 20 DAYS,  IN 20 DAYS,  LADIES AND GENTLEMEN,  CHAD

GOES FROM MADISONVILLE, KENTUCKY; THROUGH EVANSVILLE; TO

PORTAGE, WHERE HE ARMS HIMSELF WITH GUNS; TO HUNTINGTON, WEST

VIRGINIA, WHERE THE RAPE, KIDNAPING, MURDER, BODY DISPOSAL OF

SAMANTHA BURNS; DOWN TO MYRTLE BEACH, SOUTH CAROLINA AND

CONWAY, WHERE ALICE DONOVAN IS ABDUCTED, AND CARJACKED, AND

JA0433

RAPED, AND MURDERED; UP INTO WINNABOW; BACK TO SOUTH CAROLINA; EN ROUTE BACK TO RALEIGH, WHERE HE STEALS $600 OF HER MONEY; DRIVES ON BACK TO HUNTINGTON, WEST VIRGINIA, WHERE HE DOES HIS THING, WHERE HE PARTIES; AND WHEN HE GOES UP TO MARION, OHIO, AND THE HIGH-SPEED CHASE ALMOST KILLING TROOPER MALO; AND, BACK TO HIS BROTHER'S HOUSE, WHERE HE WAS ARRESTED.

I HAVE JUST GONE OVER WITH YOU 20 DAYS.  TWENTY DAYS IN THE LIFE OF CHAD FULKS IN NOVEMBER OF 2002.  TWENTY DAYS, ALMOST 2,300 MILES TRAVELLED, TWO INNOCENT WOMEN RAPED, TWO INNOCENT WOMEN KILLED, AND DOZENS AND DOZENS OF PEOPLE'S LIVES SHATTERED BECAUSE OF THE CHOICES THAT CHAD FULKS MADE.

THIS IS A GOOD TIME TO BREAK, YOUR HONOR.

THE COURT:  THANK YOU, MR. GASSER.  LADIES AND GENTLEMEN, PLEASE TAKE A 20-MINUTE RECESS AT THIS POINT. PLEASE GO TO YOUR JURY ROOM.

(WHEREUPON, THE FOLLOWING WAS HEARD OUTSIDE THE PRESENCE OF THE TRIAL JURY.)

THE COURT:  ONE QUICK QUESTION.  THE INDICTMENT GOES TO THE JURY FOR THEIR DELIBERATION.  SHOULD I SUBMIT THE ENTIRE INDICTMENT OR JUST COUNTS 1 AND 2?  WHAT IS THE GOVERNMENT'S POSITION?

MR. SCHOOLS:  WHATEVER DEFENSE WANTS.

MR. BLUME:  I THINK COUNTS 1 AND 2.  THOSE ARE THE ONES HE IS BEING SENTENCED ON.

THE COURT:  ALL RIGHT.  VERY GOOD.  WE WILL TAKE A

20-MINUTE RECESS.

(WHEREUPON, A SHORT RECESS WAS HELD.)

THE COURT:   AS TO THE JUROR MR. GOHRIG, WITH THE FUNERAL.   FOURTH CIRCUIT HAS HAS HELD THAT JURORS SHOULD NOT BE TOLD DURING THE TRIAL THEY ARE ALTERNATES.   THEN THEY WILL BE LESS SERIOUS AS BEING A JUROR.   HE IS NOT AN ALTERNATE. HE SAYS, IF HE IS A REGULAR JUROR, HE WANTS TO STAY.   IF HE IS AN ALTERNATE, HE WANTS TO BE EXCUSED TO GO TO THE FUNERAL.   I WOULD PROPOSE WE IGNORE THE ISSUE, AND IF HE ASKS MS. FLOYD AGAIN, TELL HIM WE WILL TAKE IT UP AT THE END OF THE DAY TODAY.   HOPEFULLY, GET THE CASE TO THEM AT THE END OF THE DAY TODAY,  FIND OUT HE IS A REGULAR JUROR, THE PROBLEM GOES AWAY. ANY PROBLEM WITH THAT?

MR. GASSER:  NO, SIR.

THE COURT:   ALL RIGHT.   VERY GOOD.   PLEASE BRING IN THE JURY.

(WHEREUPON, THE FOLLOWING WAS HEARD IN THE PRESENCE OF THE TRIAL JURY.)

THE COURT:   MR. GASSER,  YOU MAY CONTINUE.

MR. GASSER:  THANK YOU,  YOUR HONOR.  MAY IT PLEASE THE COURT.   I WOULD LIKE TO DISCUSS WITH YOU SOME OF THE APPLICABLE LAW THAT JUDGE ANDERSON IS GOING TO THOROUGHLY GO OVER WITH YOU LATER ON THIS AFTERNOON IN WHICH EACH AND EVERY ONE OF YOU WILL ALSO HAVE A COPY OF THE JURY CHARGE.

BEFORE I DO THAT, THIS 20-MINUTE BREAK ALLOWED ME TO LOOK

JA0435

YOU JURORS, INDIVIDUALLY OR COLLECTIVELY, INDIVIDUALLY, WOULD HAVE TO FIND, BY A PREPONDERANCE OF THE EVIDENCE, THAT A MITIGATING FACTOR EXISTS.  AND EVEN IF YOU SEE AND YOU ARE TOLD ABOUT MITIGATING FACTORS,  IF IT INVOLVES A FACT THAT YOU HEARD FROM THE WITNESS STAND,  JUST BECAUSE THE FACT IS TRUE, DOESN'T MEAN YOU HAVE TO ACCEPT IT AS A MITIGATING FACTOR.  FOR EXAMPLE, CHAD FULKS STOLE ITEMS WHEN HE WAS A KID, AND HIS PARENTS DIDN'T DO ANYTHING ABOUT IT.  YOU MAY FIND THAT AS A FACT,  BUT THAT DOESN'T NECESSARILY MEAN THAT IT MITIGATES, THAT IT LESSENS HIM RAPING WOMEN AND HIM CARJACKING WOMEN. SO,  WHEN A DEFENSE LAWYER INSTRUCTS YOU OR DEFENSE LAWYER ARGUES TO YOU ABOUT ALL THAT THEY PERCEIVE TO BE MITIGATING FACTORS,  THE FACT THEY MAY BE TESTIFIED TO,  THE FACT THEY MAY BE FACTS IN EVIDENCE, DOESN'T MEAN YOU JURORS HAVE TO ACCEPT IT AS MITIGATING, AS LESSENING HIS CULPABILITY.  THAT IS SOMETHING FOR YOU, INDIVIDUALLY, TO DECIDE THAT.

NOW, THE THRESHOLD INTENT FACTORS.  THESE ARE THE FOUR THRESHOLD INTENT FACTORS YOU SEE.  AGAIN,  YOU ARE ONLY ALLOWED TO FIND ONE.  ONCE YOU FOUND ONE,  MOVE ON.  JUST MOVE ON.  ONCE YOU FIND ONE, AT THAT POINT IN TIME, THE THRESHOLD, THE GATEWAY OF RESPONSIBILITY THAT YOU HAVE, HAS BEEN SATISFIED.  AND THEN YOU CAN DEFINE WHETHER OR NOT IT WAS THE AGGRAVATING FACTOR, WHICH I TOLD YOU ABOUT, WHICH HE ADMITTED TO, THEN YOU START THIS WEIGHING PROCESS.

NOW,  THE THRESHOLD INTENT FACTORS.  THE DEFENDANT,

HIMSELF, INTENTIONALLY KILLED THE VICTIM.   HE, HIMSELF.

THAT THE DEFENDANT INTENTIONALLY INFLICTED SERIOUS BODILY

INJURY THAT RESULTED IN THE DEATH OF THE VICTIM.   OBVIOUSLY,

LADIES AND GENTLEMEN,  THERE IS NO DIRECT EVIDENCE.  THERE IS

NO ONE THAT SAW IT AND CAME INTO THIS COURTROOM.   DIRECT

EVIDENCE IS WHEN SOMEBODY SEES SOMETHING, COMES IN THIS

COURTROOM AND TELLS YOU WHAT THEY SAW.   NO DIRECT EVIDENCE

THAT ANYBODY KILLED ALICE DONOVAN.   YOU ARE ALLOWED TO TAKE

ALL OF THE CIRCUMSTANCES AND ALL OF THE TESTIMONY, AND YOU ARE

ALLOWED TO BRING TO IT REASONABLE INFERENCES.  I WILL GET BACK

TO THAT.

     THE FIRST TWO DEAL WITH DIRECT EVIDENCE.   IN ORDER TO

FIND EITHER THE FIRST ONE OR SECOND ONE, YOU HAVE TO FIND THAT

THE EVIDENCE, YOU ARE SATISFIED BEYOND A REASONABLE DOUBT,

THAT CHAD FULKS, HIMSELF, INTENTIONALLY KILLED ALICE DONOVAN,

OR CHAD FULKS, HIMSELF, INTENTIONALLY INFLICTED SERIOUS BODILY

HARM.

     THE OTHER TWO ARE INTENT FACTORS THAT DEAL WITH SITUATIONS

IN WHICH THE DEFENDANT DID NOT STRIKE THE FATAL BLOW, OR YOU

DO NOT KNOW WHO STRUCK THE FATAL BLOW.   THAT IS WHAT I MEANT

WHEN CONGRESS PASSED THESE INTENT FACTORS.   THAT THERE MAY BE

SITUATIONS WHERE IT IS IMPOSSIBLE TO KNOW THAT, BUT THAT, TWO

PEOPLE -- TWO OR MORE PEOPLE'S ACTIONS ARE SO EGREGIOUS THAT

THEY CAN GET THE DEATH PENALTY.

     THE THIRD ONE IS, THE DEFENDANT, INTENTIONALLY,

PARTICIPATED IN AN ACT CONTEMPLATING THE LIFE OF A PERSON

WOULD BE TAKEN OR INTENDING LETHAL FORCE WOULD BE USED IN

CONNECTION WITH A PERSON.  THE PERSON DIED AS A DIRECT RESULT

OF THE ACT.   THIS IS A LOT OF LEGALESE.  THIS IS A

MOTIVATIONAL FACTOR.   A PERSON IS INTENTIONALLY INVOLVED IN

AN ACT,  THEIR MOTIVATION,  THEIR THOUGHT PROCESS IS, THEY ARE

CONTEMPLATING IT IS VERY LIKELY SOMEBODY MIGHT DIE, AND THEY

STILL INVOLVE THEMSELVES IN THAT ACT.

THE FOURTH ONE, THE DEFENDANT INTENTIONALLY AND

SPECIFICALLY ENGAGED IN AN ACT OF VIOLENCE, KNOWING THAT THE

ACT CREATED THE GRAVE RISK OF DEATH TO A PERSON, SUCH THAT

PARTICIPATION IN THE ACT CONSTITUTED RECKLESS DISREGARD OF

HUMAN LIFE.  THE PERSON DIED AS A DIRECT RESULT OF THE ACTS.

LADIES AND GENTLEMEN, I WILL TAKE THESE IN REVERSE ORDER.

THE GOVERNMENT SUBMITS TO YOU THAT NUMBER 4 OR NUMBER 3,

EITHER ONE, ARE NO-BRAINERS.   YOU TAKE IT IN THE LIGHT MOST

FAVORABLE TO THE DEFENDANT.  YOU TAKE EVERYTHING THAT THE

DEFENDANT SAID,  HIS WORDS ALONE, THE GOVERNMENT SUBMITS TO

YOU, FOUR AND THREE ARE PROVEN BEYOND A REASONABLE DOUBT.

HIS VERSION OF EVENTS.

LOOK AT NUMBER 4.   IT IS ABSOLUTELY A FACT HE HAS PLED

GUILTY TO IT.   CHAD FULKS INTENTIONALLY AND SPECIFICALLY

ENGAGED IN ACTS OF VIOLENCE.   HE HAS ADMITTED TO THE ARMED

KIDNAPING AND THE ARMED CARJACKING OF ALICE DONOVAN.   BY

DEFINITION, THOSE ARE ACTS OF VIOLENCE.   AND HE HAS ALSO

ADMITTED TO RAPING ALICE DONOVAN WHILE, IN HIS WORDS, BRANDON BASHAM HAD A GUN.  KIDNAPING,  CARJACKING, AND RAPE ARE NOT ONLY INTENTIONALLY  -- ARE INTENTIONAL ACTS OF VIOLENCE, LADIES AND GENTLEMEN,  BUT THAT ACT CREATED A GRAVE RISK OF DEATH.  THE JUDGE WILL DEFINE FOR YOU A GRAVE RISK OF DEATH. WAS THERE A SIGNIFICANT POSSIBILITY THAT THE VICTIM WAS GOING TO DIE DURING YOUR CRIMINAL CONDUCT, WHETHER YOU KILLED THE PERSON OR NOT? WELL,  THINK ABOUT IT.  HE IS INVOLVING HIMSELF ALONG WITH BRANDON BASHAM IN AN ACT OF CARJACKING, KIDNAPING, AND RAPE.  DO YOU, ACTUALLY, BELIEVE THAT THEY ARE GOING TO ALLOW THAT WOMAN TO LIVE AND TESTIFY AGAINST THEM? WAS THERE A GRAVE RISK OF DEATH TO ALICE DONOVAN?  I SUBMIT TO YOU THAT THE ONE EXAMPLE,  THE ONE FACT THAT CLEARLY INDICATES THAT THERE WAS A GRAVE RISK OF DEATH TO HER,  IS THAT SHE IS DEAD.  AND THEN, HIS PARTICIPATION, ACTED IN RECKLESS DISREGARD FOR HUMAN LIFE, AND THE VICTIM DIED AS A DIRECT RESULT THEREOF.

HIS PARTICIPATION, AND THAT IS WHAT I TALKED TO YOU ABOUT. CHAD FULKS WAS DRIVING THAT CAR.  CHAD FULKS DROVE TO NORTH CAROLINA.  CHAD FULKS DROVE OFF THE PAVED ROAD.  THIS IS ACCORDING TO HIM NOW.  THIS ISN'T THE GOVERNMENT'S VERSION, THIS IS HIS VERSION.  HE DROVE HER.  HE DROVE TO THAT ISOLATED AREA.  HE DROVE HER INTO THE WOODS THAT NIGHT WHERE IT WAS DARK.  HE DROVE DOWN THAT ISOLATED ROAD.  HE PARKED THAT CAR.  IF HE DOESN'T GET OFF THAT PAVED WAY, ALICE

DONOVAN IS ALIVE.  DOESN'T GET OFF THAT RURAL ROAD, ALICE DONOVAN IS ALIVE.  IF HE DOESN'T PARK THAT CAR, ALICE DONOVAN IS ALIVE.  IF HE DOESN'T ALLOW HER, ACCORDING TO HIM, BRANDON BASHAM TO TAKE HER WEARING HER PANTIES AND SHOES IN THE WOODS, ALICE DONOVAN IS ALIVE.  HOW IS THAT NOT RECKLESS DISREGARD OF HUMAN LIFE?  THIS IS IN THE LIGHT MOST FAVORABLE TO CHAD FULKS.  THIS IS IF YOU BELIEVE EVERY WORD OF CHAD FULKS.

SO FOUR AND THREE, IN HIS OWN WORDS, AGAIN, THIS DEFENDANT, INTENTIONALLY, PARTICIPATED IN AN ACT CONTEMPLATING THE LIFE OF A PERSON WOULD BE TAKEN.  AGAIN, THAT IS THE MOTIVATION.

THE JUDGE WILL DEFINE TO YOU "CONTEMPLATING."  IS IT MORE LIKELY THAN NOT? IS IT MORE LIKELY THAN NOT, AFTER PARTICIPATING IN THE KIDNAPING AND KILLING OF SAMANTHA BURNS? IS IT MORE LIKELY THAN NOT THAT, AFTER THEY KIDNAPED, AND CARJACKED, AND RAPED ALICE DONOVAN, THAT SHE WAS GOING TO DIE?

THE GOVERNMENT SUBMITS TO YOU, LADIES AND GENTLEMEN, YOU JURORS, CAN FIND ALSO, NUMBER ONE, THROUGH CIRCUMSTANTIAL EVIDENCE.  WHAT ARE THE CIRCUMSTANCES?  WHAT IS THE STATE OF MIND? WHAT IS CHAD FULKS'S CHARACTER? WHAT HAS BEEN PROVEN TO YOU TO SHOW, CIRCUMSTANTIALLY, HE AND BRANDON BASHAM, THEMSELVES, BOTH WOULD HAVE INTENTIONALLY PARTICIPATED IN THE INTENTIONAL KILLING OF ALICE DONOVAN? WHAT DO YOU HAVE IN THE RECORD? I WILL NOT GO OVER ALL OF THE TESTIMONY WITH YOU AGAIN.  I WILL HIGHLIGHT THREE OR FOUR THINGS.

FIRST OF ALL, LADIES AND GENTLEMEN, YOU HAVE THE WAY HE IS TREATING HAWKINS. I DON'T CARE WHAT YOU DO WITH HIM, HE IS THE ONE WHO IS THE MOST VIOLENT WITH THE SURVIVOR, JAMES HAWKINS. YOU HAVE GOT HIM, CHAD FULKS, TRYING TO RUN OVER BILLY MARTINI IN THE PARKING LOT OF COOPERS METAL. HE IS THE ONE DRIVING THAT CAR. HE IS THE ONE ACTING RECKLESSLY. YOU HAVE GOT CHAD FULKS TRYING TO SHOOT CARL JORDAN IN THE HEAD. HE IS TRYING TO KILL CARL JORDAN, A MAN WHO HAD MUCH LESS TIME TO SEE HIM, IDENTIFY HIM, THAN ALICE DONOVAN. YOU HAVE GOT HIM FLEEING, HIM ALMOST KILLING TROOPER MALO. YOU HAVE GOT HIM INVOLVED, ALONG WITH BRANDON BASHAM, IN THE ABDUCTION, AND THE KILLING, AND THE BODY DISPOSAL OF SAMANTHA BURNS. DO YOU HONESTLY BELIEVE THAT CHAD FULKS WAS GOING TO LEAVE IT UP TO BRANDON BASHAM AND BRANDON BASHAM, ALONE, TO TAKE CARE OF THE ONE WOMAN THAT COULD IDENTIFY HIM? THE ONE WOMAN THAT COULD COME INTO A SOUTH CAROLINA COURT AND PUT HIM AWAY? DO YOU THINK HE WAS GOING TO LEAVE THAT UP TO THE GUY HE SAYS IS SO STUPID? HE WILL DO ANYTHING.

ALL THE TESTIMONY THAT YOU HAVE HEARD FROM THE TIME THAT THEY ESCAPED, EVERYTHING THAT YOU HAVE HEARD IS CONSISTENT ON ONE FACT, THEY WERE TOGETHER. THEY WERE A TWO-MAN TEAM. EVERYTHING THEY DID TOGETHER, LADIES AND GENTLEMEN. THEY NEEDED EACH OTHER TO ESCAPE. THEY NEEDED EACH OTHER TO DO HAWKINS. THEY NEEDED EACH OTHER TO GO TO TALSMA'S RESIDENCE. THEY NEEDED EACH OTHER TO DO SAMANTHA BURNS. THEY NEEDED

EACH OTHER TO SCOPE OUT SAVANNAH BLUFF.  THEY NEEDED EACH OTHER TO ROB SAM JORDAN.  THEY WERE BOTH SHOOTING AT CARL JORDAN.  THEY NEEDED EACH OTHER TO ABDUCT ALICE DONOVAN.  THEY BOTH CARJACKED HER, BOTH KIDNAPED HER, BOTH RAPED HER.  DO YOU HONESTLY BELIEVE THAT, AT ONE POINT IN TIME, THAT THE TWO OF THEM WERE NOT GOING TO ACT TOGETHER?  CIRCUMSTANTIAL EVIDENCE, BOTH OF THEM, LADIES AND GENTLEMEN, INTENTIONALLY KILLED ALICE DONOVAN, THE GOVERNMENT SUBMITS TO YOU.

NOW, STATUTORY AGGRAVATING FACTOR.  AS I INDICATED, IT IS ADMITTED.  THE DEATH OF ALICE DONOVAN, THE INJURY, RESULTING IN THE DEATH OF ALICE DONOVAN, OCCURRED DURING FULKS'S COMMISSION, OR ATTEMPTED COMMISSION, OR DURING IMMEDIATE FLIGHT FROM, HIS COMMISSION OF AN OFFENSE UNDER TITLE 18, UNITED STATES CODE, SECTION 1201.  THE JUDGE WILL CHARGE YOU THAT CODE IS THE KIDNAPING CODE.  HE HAS ADMITTED TO THIS.  SO YOU CHECK OFF THE BOX, HE IS 18 -- YOU NEED ONLY TO FIND ONE OF THOSE FOUR INTENT FACTORS.  YOU CHECK OFF THE BOX ON AGGRAVATING FACTOR, AND THEN YOU MOVE ON.

WHERE ARE YOU NOW IN YOUR DELIBERATION PROCESS?  THE GOVERNMENT HAS INDICATED, THE GOVERNMENT SUBMITS, THAT THERE ARE THREE STATUTORY NONAGGRAVATING FACTORS.  THE FIRST ONE BEING, CHAD FULKS PARTICIPATED IN OTHER UNCHARGED ATTEMPTED MURDERS AND OTHER ACTS OF VIOLENCE; THE SECOND ONE BEING, FUTURE DANGEROUSNESS; AND, THE THIRD ONE BEING, VICTIM IMPACT.  THE GOVERNMENT IS ALLEGING THAT THE NONSTATUTORY -- WHAT MAKES

JA0442

JURY CHARGE

DECISION ON THE QUESTION OF PUNISHMENT IS A DECISION WHICH THE LAW, IN THE FINAL ANALYSIS, LEAVES UP TO YOU.

I WILL NOT BE ABLE TO CHANGE ANY DECISION YOU REACH REGARDING THE SENTENCE FOR MR. FULKS. THUS, I STRESS THE IMPORTANCE OF YOUR GIVING CAREFUL, THOUGHTFUL, AND THOROUGH CONSIDERATION TO ALL OF THE EVIDENCE YOU HAVE RECEIVED IN THIS PHASE OF THE CASE. I REMIND YOU THAT THE DEATH PENALTY IS NEVER MANDATORY. NONE OF YOU, INDIVIDUALLY, NOR THE JURY, COLLECTIVELY, IS EVER REQUIRED TO IMPOSE A SENTENCE OF DEATH.

I HAVE PREPARED A FULL SET OF INSTRUCTIONS ON THE APPLICABLE LAW IN ORDER TO ENSURE THAT YOU ARE CLEAR IN YOUR DUTIES AT THIS STAGE OF THE CASE. I HAVE ALSO PREPARED TWO VERDICT FORMS THAT DETAIL SPECIAL FINDINGS THAT YOU ARE ASKED TO MAKE, AND THE POSSIBLE DECISIONS YOU CAN RENDER AS TO EACH OF THE OFFENSES TO WHICH THE DEFENDANT HAS PREVIOUSLY ENTERED A PLEA OF GUILTY. THIS IS A COMPLICATED PROCESS, SO YOU WILL NEED TO PAY CLOSE ATTENTION.

YOU, THE JURY, ARE THE SOLE JUDGES OF THE FACTS IN THIS TRIAL. YOU MAY DECIDE ISSUES OF THE CREDIBILITY OF WITNESSES AND WHETHER OR NOT TO ACCEPT ANY PIECE OF EVIDENCE AS TRUE AND WHAT AMOUNT OF WEIGHT TO GIVE, IF ANY. YOU MAY ONLY CONSIDER EVIDENCE, INCLUDING TESTIMONY, DOCUMENTS, AND STIPULATIONS BETWEEN THE PARTIES RECEIVED IN THIS COURTROOM IN MAKING YOUR DETERMINATION.

THE ARGUMENTS OF THE ATTORNYES AND THE COMMENTS AND

JURY CHARGE

RACE, COLOR, RELIGIOUS BELIEFS, NATIONAL ORIGIN, OR SEX OF EITHER THE DEFENDANT OR THE VICTIM.

TO EMPHASIZE THE IMPORTANCE OF THIS CONSIDERATION, THE FEDERAL LAW REQUIRES EACH JUROR TO READ AND SIGN A CERTIFICATION STATEMENT ATTESTING TO THE FACT THAT RACE, COLOR, RELIGIOUS BELIEFS, NATIONAL ORIGIN, OR SEX PLAYED NO PART IN YOUR DECISION. EACH OF YOU SHOULD, THEREFORE, CAREFULLY READ THE STATEMENT FOUND ON THE SPECIAL VERDICT FORM IN SECTION SEVEN AND SIGN IN THE APPROPRIATE PLACE IN THE STATEMENT THAT ACCURATELY REFLECTS THE MANNER IN WHICH EACH OF YOU REACHED YOUR DECISION.

THE DEFENDANT, CHADRICK EVAN FULKS, DID NOT TESTIFY DURING THIS PROCEEDING. THERE IS NO BURDEN UPON A DEFENDANT TO PROVE THAT HE OR SHE SHOULD NOT BE SENTENCED TO DEATH. THE BURDEN IS ENTIRELY ON THE GOVERNMENT TO PROVE THAT A SENTENCE OF DEATH IS JUSTIFIED. ACCORDINGLY, THE FACT THAT THE DEFENDANT DID NOT TESTIFY MUST NOT BE CONSIDERED BY YOU IN ANY WAY OR EVEN DISCUSSED IN ARRIVING AT YOUR DECISION.

I HAVE PREPARED A FORM ENTITLED "SPECIAL VERDICT FORM" TO ASSIST YOU DURING YOUR DELIBERATION. YOU ARE REQUIRED TO RECORD YOUR DECISIONS ON THIS FORM. IN ADDITION, I ADVISE YOU THAT YOU MAY RECOMMEND ONE SENTENCE FOR COUNT ONE, AND A DIFFERENT SENTENCE FOR COUNT TWO. IN OTHER WORDS, YOU ARE NOT OBLIGATED TO IMPOSE THE SAME SENTENCE FOR BOTH COUNTS. YOU WILL, THUS, BE GIVEN A SPECIAL VERDICT FORM FOR COUNT ONE,

JURY CHARGE

THE CARJACKING CHARGE, AND A SEPARATE SPECIAL VERDICT FORM FOR COUNT TWO, THE KIDNAPING CHARGE.

SECTION ONE OF THE SPECIAL VERDICT FORM CONTAINS A SPACE TO RECORD YOUR FINDING ON THE DEFENDANT'S AGE.

SECTION TWO CONTAINS A SPACE TO RECORD YOUR FINDING ON THE THRESHOLD INTENT FACTORS.

SECTION THREE CONTAINS A SPACE TO RECORD YOUR FINDINGS ON THE STATUTORY AGGRAVATING FACTOR.

SECTION FOUR CONTAINS A SPACE TO RECORD YOUR FINDINGS ON NONSTATUTORY AGGRAVATING FACTORS.

AND, SECTION FIVE OF THE SPECIAL VERDICT FORM CONTAINS A SPACE TO RECORD YOUR FINDINGS ON MITIGATING FACTORS.

SECTION SIX PROVIDES A SPACE FOR YOUR DETERMINATION OF THE APPROPRIATE PUNISHMENT OF THE OFFENSE.

AND, SECTION SEVEN CONTAINS A CERTIFICATION STATEMENT AS REQUIRED BY FEDERAL LAW.

THERE ARE DESIGNATED SPACES FOR THE FOREMAN TO SIGN HIS OR HER NAME AS TO THE FINDINGS IN EACH SECTION.

IN SECTIONS SIX AND SEVEN,  ALL JURORS ARE REQUIRED TO AFFIX THEIR SIGNATURES.  AS NOTED EARLIER, THERE ARE TWO VERDICT FORMS BECAUSE YOU MUST RETURN A VERDICT OR PUNISHMENT FOR EACH OF THE TWO COUNTS.

YOUR VERDICT MUST BE BASED SOLELY ON THE EVIDENCE PRESENTED IN THIS COURTROOM IN ACCORDANCE WITH MY INSTRUCTIONS.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

FLORENCE DIVISION

UNITED STATES OF AMERICA,   )   CR. NO. 4:02-992
                            )   COLUMBIA, SC
                            )   JUNE 30, 2004
                            )
   VERSUS                   )
                            )
CHADRICK E. FULKS           )
        DEFENDANT.          )
                            )

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.,

CHIEF UNITED STATES DISTRICT COURT JUDGE

JURY TRIAL

VOLUME XXII

APPEARANCES:

FOR THE GOVERNMENT:          STROM THURMOND, JR., USA
                             SCOTT SCHOOLS, FIRST AUSA
                             JONATHAN S. GASSER, AUSA
                             UNITED STATES ATTORNEY'S OFFICE
                             1441 MAIN STREET, SUITE 500
                             COLUMBIA, SC  29201

FOR THE DEFENDANT:
                             WILLIAM F. NETTLES, IV, AFPD
                             FEDERAL PUBLIC DEFENDER'S OFFICE
                             MCMILLAN FEDERAL BUILDING
                             401 WEST EVANS STREET, ROOM 240
                             FLORENCE, SC 29503
                             JOHN H. BLUME, III, ESQ.
                             KEIR M. WEYBLE, ESQ.
                             BLUME AND WEYBLE
                             P. O. BOX 11744
                             COLUMBIA, SC  29211
                             SHERRI LYNN JOHNSON, ESQ.
                             1118 AUTUMN RIDGE LANE
                             ITHACA, NEW YORK 14850

COURT REPORTER:              DEBRA R. JERNIGAN, RPR, CRR
                             UNITED STATES COURT REPORTER
                             901 RICHLAND STREET
                             COLUMBIA, SC 29201

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION

*** *** *** *** ***

JA0446

THE COURT:  THE MARSHALS POINTED OUT TO ME LAST NIGHT, WE HAVE, AS EXHIBITS, ROUNDS OF AMMUNITION AND FIREARMS.  WHAT I TRADITIONALLY DO IS I TELL THE JURY THEY WILL HAVE THE WEAPONS, AND THE ROUNDS WILL REMAIN OUT HERE. IF THEY WANT TO LOOK AT THE AMMUNITION, WE WILL SWAP WITH THEM,  SEND THE ROUNDS IN, AND TAKE THE WEAPONS OUT.

MR. THURMOND:  ALL THE WEAPONS HAVE TRIGGER LOCKS ON THEM.

THE COURT:  BOTH SIDES CONSENT TO LET EVERYTHING GO IN?

WHAT DOES THE MARSHAL HAVE TO SAY?

THE MARSHAL:  THEY HAVE TRIGGER LOCKS.  I WAS WONDERING ABOUT THAT KNIFE.

THE COURT:  I THINK THE KNIFE NEEDS TO GO.  WE WILL SUBMIT EVERYTHING.  VERY GOOD.

PLEASE BRING IN THE JURY.

(WHEREUPON, THE FOLLOWING WAS HEAD IN THE PRESENCE OF THE TRIAL JURY.)

THE COURT:  MEMBERS OF THE JURY, WE HAVE GIVEN YOU A NEW PAGE 14 THAT HAD A CORRECTION.  ASK YOU TO CLIP OUT THE OLD ONE.  ALSO, I NEED TO TELL YOU ABOUT ONE INAPPROPRIATE WORD THAT I USED YESTERDAY WHEN I WAS CHARGING YOU,  I WILL LET YOU FINISH WITH PAGE 14, FIRST.

IF YOU WILL LOOK ON PAGE 20,  ON THE VERY FIRST LINE ON PAGE 20, I MISSPOKE LAST NIGHT.  THE VERY FIRST LINE I SAID, I

JA0447

FILED

JUN 3 0 2004

LARRY W. PROPES, CLERK
COLUMBIA, SC

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 4:02-992 (JFA,Jr.) |
| | ) | |
| vs. | ) | |
| | ) | SPECIAL VERDICT FORM |
| CHADRICK EVAN FULKS | ) | |
| | ) | |

COUNT ONE – CARJACKING RESULTING IN DEATH

I.    AGE OF DEFENDANT

*Instructions:* Answer "YES" or "NO":

1.    Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that:   CHADRICK EVAN FULKS was eighteen years of age or older at the time of the offense (carjacking resulting in death)?

☑ YES        ☐ NO        *Richard Dooling*
                                        Foreperson

*Instructions: If you answered "NO" with respect to the determination in this Section, then stop your deliberations, skip over Sections II, III, IV, V and VI of this form, and proceed to Section VII. Each juror should then carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the court that you have reached a decision.*

*If you answered "YES" with respect to the determination in this Section I,  proceed to Section II which follows.*

1

JA0448



## II.   THRESHOLD INTENT FACTOR

*Instructions:*   *Select below the Threshold Intent Factor, if any, you unanimously find that the government proved beyond a reasonable doubt. You may not select more than one.*

❏   1.   CHADRICK EVAN FULKS intentionally killed Alice Donovan.

❏   2.   CHADRICK EVAN FULKS intentionally inflicted serious bodily injury that resulted in the death of Alice Donovan.

❏   3.   CHADRICK EVAN FULKS intentionally participated in an act, contemplating that the life of Alice Donovan would be taken or intending that lethal force would be used in connection with Alice Donovan, and Alice Donovan died as a direct result of the act.

☑   4.   CHADRICK EVAN FULKS intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to Alice Donovan, such that participation in the act constituted a reckless disregard for human life, and Alice Donovan died as a direct result of the act.

❏   5.   The government failed to prove a threshold intent factor beyond a reasonable doubt.

*Richard Behrof*
Foreperson

*Instructions:*   *If you did not find any Threshold Intent Factor with respect to all of the determinations in this Section, then stop your deliberations, skip over Sections III, IV, V, and VI of this form, and proceed to Section VII. Each juror should carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the court that you have reached a decision.*

*If you found one of the Threshold Intent Factors in this Section II, proceed to Section III which follows.*

2

JA0449

## III. STATUTORY AGGRAVATING FACTOR

*Instructions:* *For the following Statutory Aggravating Factor, answer "YES" or "NO":*

1. Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the death of Alice Donovan, and the injury resulting in the death of Alice Donovan, occurred during CHADRICK EVAN FULKS' commission or attempted commission of, or during his immediate flight from, his commission of a kidnaping?

☑ YES     ☐ NO

*Richard Boehing*
Foreperson

*Instructions:* *If you answered "NO" with respect to the Statutory Aggravating Factor in this Section, then stop your deliberations, skip over Sections IV, V and VI of this form, and proceed to Section VII of this form. Each juror should then carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the court that you have reached a decision.*

*If you found the requisite age in Section I, the Threshold Intent Factor in Section II, and answered "Yes" with respect to the Statutory Aggravating Factor in this Section III, proceed to Section IV which follows.*

3

JA0450

## IV. NON-STATUTORY AGGRAVATING FACTORS

*Instructions:* *For each of the following Non-Statutory Aggravating Factors, answer "YES" or "NO":*

I.    Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant, CHADRICK EVAN FULKS:

1.    Escaped from a detention facility in Hopkins County, Kentucky on November 4, 2002, where he was awaiting trial on several serious charges?

☑ YES        ☐ NO        *Richard Hoehing*
                          Foreperson

2.    Subsequent to his escape, participated in a carjacking and kidnaping that resulted in the death of Samantha Burns, a 19-year-old woman in Huntington, West Virginia?

☑ YES        ☐ NO        *Richard Hoehing*
                          Foreperson

3.    Subsequent to his escape, participated in a first-degree burglary and other criminal conduct that resulted in the assault with intent to kill Carl Jordan, a citizen in Conway, South Carolina?

☑ YES        ☐ NO        *Richard Hoehing*
                          Foreperson

4.    Subsequent to his escape, participated in the kidnaping and carjacking of James Hawkins, a citizen of Hanson, Kentucky?

☑ YES        ☐ NO        *Richard Hoehing*
                          Foreperson

5.    Subsequent to his escape, participated in a high-speed vehicle chase that resulted in endangering the lives and safety of Ohio State Police Officers?

☑ YES        ☐ NO        *Richard Hoehing*
                          Foreperson

If you find that one or more of the acts in 1-5 occurred beyond a reasonable doubt, do you find, further, that CHADRICK EVAN FULKS participated in additional uncharged murder, attempted murders, or other serious acts of violence, and that this factor is aggravating?

☑ YES        ☐ NO        *Richard Hoehing*
                          Foreperson

4

JA0451

II.    Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant, CHADRICK EVAN FULKS, would be a danger in the future to the lives and safety of other persons, including, but not limited to, inmates and correctional officers in an institutional correctional setting, and that this factor is aggravating?

☑ YES        ☐ NO            _Richard Boeliry_
                             Foreperson

III.   Do you, the jury, unanimously find that the government has established beyond a reasonable doubt the effect of the death of Alice Donovan on her family, including the extent and scope of the injuries and losses suffered by Alice Donovan and her family, and that this factor is aggravating?

☑ YES        ☐ NO            _Richard Boeliry_
                             Foreperson

_Instructions_:   _Regardless of whether you answered "YES" or "NO" with respect to the Non-Statutory Aggravating Factors in this Section IV, proceed to Section V, which follows._

5

JA0452

## V. MITIGATING FACTORS

*Instructions:* For each of the following Mitigating Factors, indicate in the space provided, the number of jurors who have found it proved by a preponderance of the evidence and that it is mitigating.

*A finding with respect to a Mitigating Factor may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a Mitigating Factor must consider such a factor in considering whether to impose a sentence of death or a sentence of life in prison without parole, regardless of the number of other jurors who agree. Further, any juror may also weigh a Mitigating Factor found by another juror, even if he or she did not also find that factor to be mitigating:*

| Mitigating Factor: | Number of Jurors Finding the Mitigating Factor: |
|---|---|
| 1. Chadrick Evan Fulks's mother abused alcohol while she was pregnant with him. | 12 |
| 2. Chadrick Evan Fulks's brain was permanently damaged by his mother's drinking during her pregnancy. | 9 |
| 3. Chadrick Evan Fulks has an I.Q. between 77 and 79. | 4 |
| 4. Chadrick Evan Fulks's ability to process information is impaired because he has Fetal Alcohol Spectrum Disorder. | 0 |
| 5. Chadrick Evan Fulks's ability to control his impulses is impaired because he has Fetal Alcohol Spectrum Disorder. | 1 |
| 6. Chadrick Evan Fulks's ability to make good decisions is impaired because he has Fetal Alcohol Spectrum Disorder. | 0 |
| 7. Chadrick Evan Fulks's ability to understand cause and effect, and predict the consequences of his actions, is impaired because he has Fetal Alcohol Spectrum Disorder. | 0 |
| 8. Chadrick Evan Fulks's ability to learn from his mistakes is impaired as a result of his neurological damage. | 0 |
| 9. Chadrick Evan Fulks suffered from learning disabilities as a child. | 12 |
| 10. Chadrick Evan Fulks tried hard in school but could never do well. | 0 |

6

JA0453

11.    Chadrick Evan Fulks's parents cared so little for his education
       that they never helped him with homework, and even left him
       at school with soiled pants.                                        _10_

12.    Chadrick Evan Fulks was neglected by both of his parents.           _12_

13.    Chadrick Evan Fulks lived in a house that was often filthy
       and infested with roaches and rats.                                 _12_

14.    Chadrick Evan Fulks's parents did not provide him
       with adequate clothing or school supplies.                          _12_

15.    Chadrick Evan Fulks frequently went hungry or was
       uncertain whether he would get food as a child.                     _11_

16.    Chadrick Evan Fulks's parents sold food stamps to get money for beer.   _12_

17.    Chadrick Evan Fulks's parents drank to excess almost every day.     _6_

18.    Chadrick Evan Fulks was often left without supervision.             _12_

19.    Chadrick Evan Fulks was permitted to roam the streets as a young child.   _12_

20.    A principal, a police officer, and a probation officer all recommended
       Chadrick Evan Fulks be removed from the home at the age of nine,
       but he was not removed.                                             _12_

21.    Chadrick Evan Fulks's parents gave him little attention or affection.   _12_

22.    Chadrick Evan Fulks was subjected to emotional abuse as a child.    _12_

23.    Chadrick Evan Fulks was subjected to physical abuse as a child.     _12_

24.    Chadrick Evan Fulks grew up seeing his parents frequently
       fighting each other.                                                _12_

25.    Chadrick Evan Fulks grew up seeing heavy drinking and
       frequent fighting by other adults in his own house.                _12_

26.    Chadrick Evan Fulks learned at home that violence and
       fighting were a normal part of relationships between men and women. _4_

27.    Chadrick Evan Fulks grew up seeing graphic photographs
       of naked women papering the walls and ceiling of his basement.     _12_

7

JA0454

28. Chadrick Evan Fulks's father showed him pornographic movies as young child.    _12_

29. Chadrick Evan Fulks's mother was often half dressed around the house.    _0_

30. Chadrick Evan Fulks was sexually abused as a child.    _0_

31. Chadrick Evan Fulks started drinking at age nine and using marijuana at eleven or twelve, and his parents made no effort to stop him.    _12_

32. Chadrick Evan Fulks's brother taught him to inhale gasoline and paint as a young teenager.    _12_

33. Chadrick Evan Fulks's father encouraged him to steal.    _0_

34. Chadrick Evan Fulks's mother ignored his stealing.    _12_

35. Chadrick Evan Fulks's brothers taught him to steal, fight, and break into cars.    _12_

36. Chadrick Evan Fulks attempted suicide at age thirteen.    _12_

37. Chadrick Evan Fulks was diagnosed with depression, substance abuse, and possible sociopathic tendencies at age fourteen.    _10_

38. Chadrick Evan Fulks's capacity to conform his conduct to the requirements of law was impaired.    _0_

39. Chadrick Evan Fulks took part in the offenses under mental and/or emotional disturbance.    _0_

40. Chadrick Evan Fulks was under the influence of alcohol and drugs at the time of his offenses.    _0_

41. Other factors in Chadrick Evan Fulks's childhood, background, or character weigh against imposition of a sentence of death.    _1_

42. No one has escaped from a high security federal prison since 1993.    _8_

43. Chadrick Evan Fulks pleaded guilty to kidnaping and carjacking resulting in death.    _12_

8

JA0455

## VI. DETERMINATION OF SENTENCE

**Life in prison without possibility of release  (unanimous vote)**

We, the jury, as to CHADRICK EVAN FULKS, **do not** unanimously find that the aggravating factor(s) proved in this case outweigh(s) the mitigating factor(s) as to justify a sentence of death; or that in the absence of any mitigating factor, that the aggravating factor or factors alone justify a sentence of death. We, therefore, unanimously conclude that CHADRICK EVAN FULKS shall be sentenced to life imprisonment without possibility of release.

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____
                                      Foreperson

                                      _____
                                      Date

*If you answer that a sentence of life in prison without possibility of release shall be imposed, then you must proceed to Section VII.*

**OR**

9

JA0456

**Death (unanimous vote)**

We, the jury, as to CHADRICK EVAN FULKS, unanimously find beyond a reasonable doubt that the aggravating factor(s) proved in this case outweigh(s) the mitigating factor(s) so as to justify a sentence of death; or, in the absence of any mitigating factor, that the aggravating factor or factors alone justify a sentence of death. We, therefore, unanimously conclude that CHADRICK EVAN FULKS shall be sentenced to death.

Foreperson

6/30/04

Date

*If you answer that a sentence of death shall be imposed, then you must proceed to Section VII.*

10

JA0457

## VII. CERTIFICATION STATEMENT

By signing below, each juror certifies that consideration of the race, color, religious beliefs, national origin, or sex of the defendant, CHADRICK EVAN FULKS, or the victim, Alice Donovan, was not involved in reaching his or her individual decision, and that the individual juror would have made the same recommendation regarding a sentence for the crime or crimes in question regardless of the race, color, religious beliefs, national origin, or sex of the defendant, or the victim.

Cynthia D. Steele

Anne H. Lee

John M Norringer

Lisa J Harvey

Gary R Bryar

Sylvia O. Allison

Mary Ellen Huggins

Pearl Gordon

Elizabeth Paylor

Richard Boehning
_____
Foreperson

6/30/04
_____
Date

11

JA0458

FILED

JUN 3 0 2004

LARRY W. PROPES, CLERK
COLUMBIA, SC

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 4:02-992 (JFA,Jr.) |
| | ) | |
| vs. | ) | |
| | ) | SPECIAL VERDICT FORM |
| CHADRICK EVAN FULKS | ) | |
| | ) | |

## COUNT TWO – KIDNAPING RESULTING IN DEATH

### I.    AGE OF DEFENDANT

*Instructions:*  *Answer "YES" or "NO":*

1.    Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that:   CHADRICK EVAN FULKS was eighteen years of age or older at the time of the offense (kidnaping resulting in death)?

☑ YES        ☐ NO        *Richard Hoehing*
_____
Foreperson

*Instructions: If you answered "NO" with respect to the determination in this Section, then stop your deliberations, skip over Sections II, III, IV, V and VI of this form, and proceed to Section VII. Each juror should then carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the court that you have reached a decision.*

*If you answered "YES" with respect to the determination in this Section I,  proceed to Section II which follows.*

1

JA0459



## II.    THRESHOLD INTENT FACTOR

*Instructions*:    Select below the Threshold Intent Factor, if any, you unanimously find that the government proved beyond a reasonable doubt.  You may not select more than one.

❑    1.    CHADRICK EVAN FULKS intentionally killed Alice Donovan.

❑    2.    CHADRICK EVAN FULKS intentionally inflicted serious bodily injury that resulted in the death of Alice Donovan.

❑    3.    CHADRICK EVAN FULKS intentionally participated in an act, contemplating that the life of Alice Donovan would be taken or intending that lethal force would be used in connection with Alice Donovan, and Alice Donovan died as a direct result of the act.

☑    4.    CHADRICK EVAN FULKS intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to Alice Donovan, such that participation in the act constituted a reckless disregard for human life, and Alice Donovan died as a direct result of the act.

❑    5.    The government failed to prove a threshold intent factor beyond a reasonable doubt.

*Richard Zeehuy*
Foreperson

*Instructions*:    If you did not find any Threshold Intent Factor with respect to all of the determinations in this Section, then stop your deliberations, skip over Sections III, IV, V, and VI of this form, and proceed to Section VII.  Each juror should carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision.  You should then advise the court that you have reached a decision.

*If you found one of the Threshold Intent Factors in this Section II, proceed to Section III which follows.*

2

JA0460

## III. STATUTORY AGGRAVATING FACTOR

*Instructions: For the following Statutory Aggravating Factor, answer "YES" or "NO":*

1.    Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the death of Alice Donovan, and the injury resulting in the death of Alice Donovan, occurred during CHADRICK EVAN FULKS' commission or attempted commission of, or during his immediate flight from, his commission of a kidnaping?

☑ YES        ☐ NO        *Richard Doehring*
                                                  Foreperson

*Instructions: If you answered "NO" with respect to the Statutory Aggravating Factor in this Section, then stop your deliberations, skip over Sections IV, V and VI of this form, and proceed to Section VII of this form. Each juror should then carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the court that you have reached a decision.*

*If you found the requisite age in Section I, the Threshold Intent Factor in Section II, and answered "Yes" with respect to the Statutory Aggravating Factor in this Section III, proceed to Section IV which follows.*

3

JA0461

## IV. NON-STATUTORY AGGRAVATING FACTORS

*Instructions: For each of the following Non-Statutory Aggravating Factors, answer "YES" or "NO":*

I.    Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant, CHADRICK EVAN FULKS:

1.    Escaped from a detention facility in Hopkins County, Kentucky on November 4, 2002, where he was awaiting trial on several serious charges?

    ☑ YES    ❏ NO    _Richard Boehly_
    Foreperson

2.    Subsequent to his escape, participated in a carjacking and kidnaping that resulted in the death of Samantha Burns, a 19-year-old woman in Huntington, West Virginia?

    ☑ YES    ❏ NO    _Richard Boehly_
    Foreperson

3.    Subsequent to his escape, participated in a first-degree burglary and other criminal conduct that resulted in the assault with intent to kill Carl Jordan, a citizen in Conway, South Carolina?

    ☑ YES    ❏ NO    _Richard Boehly_
    Foreperson

4.    Subsequent to his escape, participated in the kidnaping and carjacking of James Hawkins, a citizen of Hanson, Kentucky?

    ☑ YES    ❏ NO    _Richard Boehring_
    Foreperson

5.    Subsequent to his escape, participated in a high-speed vehicle chase that resulted in endangering the lives and safety of Ohio State Police Officers?

    ☑ YES    ❏ NO    _Richard Boehly_
    Foreperson

If you find that one or more of the acts in 1-5 occurred beyond a reasonable doubt, do you find, further, that CHADRICK EVAN FULKS participated in additional uncharged murder, attempted murders, or other serious acts of violence, and that this factor is aggravating?

    ☑ YES    ❏ NO    _Richard Boehly_
    Foreperson

JA0462

II.     Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant, CHADRICK EVAN FULKS, would be a danger in the future to the lives and safety of other persons, including, but not limited to, inmates and correctional officers in an institutional correctional setting, and that this factor is aggravating?

☑ YES          ☐ NO               _Richard Boehling_
                                           Foreperson

III.    Do you, the jury, unanimously find that the government has established beyond a reasonable doubt the effect of the death of Alice Donovan on her family, including the extent and scope of the injuries and losses suffered by Alice Donovan and her family, and that this factor is aggravating?

☑ YES          ☐ NO               _Richard Boehling_
                                           Foreperson

_Instructions_:    _Regardless of whether you answered "YES" or "NO" with respect to the Non-Statutory Aggravating Factors in this Section IV, proceed to Section V, which follows._

5

JA0463

## V. MITIGATING FACTORS

*Instructions: For each of the following Mitigating Factors, indicate in the space provided, the number of jurors who have found it proved by a preponderance of the evidence and that it is mitigating.*

*A finding with respect to a Mitigating Factor may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a Mitigating Factor must consider such a factor in considering whether to impose a sentence of death or a sentence of life in prison without parole, regardless of the number of other jurors who agree. Further, any juror may also weigh a Mitigating Factor found by another juror, even if he or she did not also find that factor to be mitigating:*

| Mitigating Factor: | Number of Jurors Finding the Mitigating Factor: |
|---|---|
| 1. Chadrick Evan Fulks's mother abused alcohol while she was pregnant with him. | 12 |
| 2. Chadrick Evan Fulks's brain was permanently damaged by his mother's drinking during her pregnancy. | 9 |
| 3. Chadrick Evan Fulks has an I.Q. between 77 and 79. | 4 |
| 4. Chadrick Evan Fulks's ability to process information is impaired because he has Fetal Alcohol Spectrum Disorder. | 0 |
| 5. Chadrick Evan Fulks's ability to control his impulses is impaired because he has Fetal Alcohol Spectrum Disorder. | 1 |
| 6. Chadrick Evan Fulks's ability to make good decisions is impaired because he has Fetal Alcohol Spectrum Disorder. | 0 |
| 7. Chadrick Evan Fulks's ability to understand cause and effect, and predict the consequences of his actions, is impaired because he has Fetal Alcohol Spectrum Disorder. | 0 |
| 8. Chadrick Evan Fulks's ability to learn from his mistakes is impaired as a result of his neurological damage. | 0 |
| 9. Chadrick Evan Fulks suffered from learning disabilities as a child. | 12 |
| 10. Chadrick Evan Fulks tried hard in school but could never do well. | 0 |

6

JA0464

11. Chadrick Evan Fulks's parents cared so little for his education that they never helped him with homework, and even left him at school with soiled pants. _10_

12. Chadrick Evan Fulks was neglected by both of his parents. _12_

13. Chadrick Evan Fulks lived in a house that was often filthy and infested with roaches and rats. _12_

14. Chadrick Evan Fulks's parents did not provide him with adequate clothing or school supplies. _12_

15. Chadrick Evan Fulks frequently went hungry or was uncertain whether he would get food as a child. _11_

16. Chadrick Evan Fulks's parents sold food stamps to get money for beer. _12_

17. Chadrick Evan Fulks's parents drank to excess almost every day. _6_

18. Chadrick Evan Fulks was often left without supervision. _12_

19. Chadrick Evan Fulks was permitted to roam the streets as a young child. _12_

20. A principal, a police officer, and a probation officer all recommended Chadrick Evan Fulks be removed from the home at the age of nine, but he was not removed. _12_

21. Chadrick Evan Fulks's parents gave him little attention or affection. _12_

22. Chadrick Evan Fulks was subjected to emotional abuse as a child. _12_

23. Chadrick Evan Fulks was subjected to physical abuse as a child. _12_

24. Chadrick Evan Fulks grew up seeing his parents frequently fighting each other. _12_

25. Chadrick Evan Fulks grew up seeing heavy drinking and frequent fighting by other adults in his own house. _12_

26. Chadrick Evan Fulks learned at home that violence and fighting were a normal part of relationships between men and women. _4_

27. Chadrick Evan Fulks grew up seeing graphic photographs of naked women papering the walls and ceiling of his basement. _12_

7

JA0465

28. Chadrick Evan Fulks's father showed him pornographic movies as young child. _12_

29. Chadrick Evan Fulks's mother was often half dressed around the house. _0_

30. Chadrick Evan Fulks was sexually abused as a child. _0_

31. Chadrick Evan Fulks started drinking at age nine and using marijuana at eleven or twelve, and his parents made no effort to stop him. _12_

32. Chadrick Evan Fulks's brother taught him to inhale gasoline and paint as a young teenager. _12_

33. Chadrick Evan Fulks's father encouraged him to steal. _0_

34. Chadrick Evan Fulks's mother ignored his stealing. _12_

35. Chadrick Evan Fulks's brothers taught him to steal, fight, and break into cars. _12_

36. Chadrick Evan Fulks attempted suicide at age thirteen. _12_

37. Chadrick Evan Fulks was diagnosed with depression, substance abuse, and possible sociopathic tendencies at age fourteen. _10_

38. Chadrick Evan Fulks's capacity to conform his conduct to the requirements of law was impaired. _0_

39. Chadrick Evan Fulks took part in the offenses under mental and/or emotional disturbance. _0_

40. Chadrick Evan Fulks was under the influence of alcohol and drugs at the time of his offenses. _0_

41. Other factors in Chadrick Evan Fulks's childhood, background, or character weigh against imposition of a sentence of death. _1_

42. No one has escaped from a high security federal prison since 1993. _8_

43. Chadrick Evan Fulks pleaded guilty to kidnaping and carjacking resulting in death. _12_

8

JA0466

## VI. DETERMINATION OF SENTENCE

**Life in prison without possibility of release  (unanimous vote)**

We, the jury, as to CHADRICK EVAN FULKS, **do not** unanimously find that the aggravating factor(s) proved in this case outweigh(s) the mitigating factor(s) as to justify a sentence of death; or that in the absence of any mitigating factor, that the aggravating factor or factors alone justify a sentence of death.  We, therefore, unanimously conclude that CHADRICK EVAN FULKS shall be sentenced to life imprisonment without possibility of release.

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____
                                          Foreperson

                                          _____
                                          Date

*If you answer that a sentence of life in prison without possibility of release shall be imposed, then you must proceed to Section VII.*

**OR**

9

JA0467

**Death (unanimous vote)**

We, the jury, as to CHADRICK EVAN FULKS, unanimously find beyond a reasonable doubt that the aggravating factor(s) proved in this case outweigh(s) the mitigating factor(s) so as to justify a sentence of death; or, in the absence of any mitigating factor, that the aggravating factor or factors alone justify a sentence of death. We, therefore, unanimously conclude that CHADRICK EVAN FULKS shall be sentenced to death.

_Cynthia D. Steele_

_Anne H. Lee_

_Lisa J. Haney_

_Sylvia O. Allison_

_Mary Ellen Huggins_

_Pearl Gordon_

_Elizabeth Pfeifer_

_Richard Sochring_
Foreperson

_6/30/04_
Date

*If you answer that a sentence of death shall be imposed, then you must proceed to Section VII.*

10

JA0468

## VII. CERTIFICATION STATEMENT

By signing below, each juror certifies that consideration of the race, color, religious beliefs, national origin, or sex of the defendant, CHADRICK EVAN FULKS, or the victim, Alice Donovan, was not involved in reaching his or her individual decision, and that the individual juror would have made the same recommendation regarding a sentence for the crime or crimes in question regardless of the race, color, religious beliefs, national origin, or sex of the defendant, or the victim.

Cynthia D. Steele

Anne H. Lee

Lisa J. Harvey

Joan M Doringe,

_____

Sylvia O. Allison

_____

Mary Ellen Huggins

Pearl Borden

Elizabeth Plyler

Richard Boehring
Foreperson

6/30/04
Date

11

12-1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

UNITED STATES OF AMERICA,    )    CR. NO. 4:02-992
                  )    COLUMBIA, SC
                  )    SEPTEMBER 29, 2004
                  )
    VERSUS           )
                  )
BRANDON L. BASHAM,       )
      DEFENDANT.     )
_____)

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.,
CHIEF UNITED STATES DISTRICT COURT JUDGE
JURY TRIAL
VOLUME XII

APPEARANCES:

FOR THE GOVERNMENT:        SCOTT SCHOOLS, FIRST AUSA
                        JONATHAN S. GASSER, AUSA
                        JOHN DUANE, AUSA
                        UNITED STATES ATTORNEY'S OFFICE
                        1441 MAIN STREET, SUITE 500
                        COLUMBIA, SC  29201

FOR THE DEFENDANT:        JACK SWERLING, ESQ.
                        1720 MAIN STREET
                        SUITE 301
                        COLUMBIA, SC  29201

                        GREG HARRIS, ESQ.
                        1720 MAIN STREET
                        SUITE 301
                        COLUMBIA, SC  29201

COURT REPORTER:           DEBRA R. JERNIGAN, RPR, CRR
                        UNITED STATES COURT REPORTER
                        901 RICHLAND STREET
                        COLUMBIA, SC 29201

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
*** *** *** ***

ANY OF THOSE ITEMS.

I TOLD YOU ABOUT THERE WAS NOT GOING TO BE AN ISSUE ABOUT POSSESSING THE WEAPONS. THERE IS NO QUESTION THAT MR. BASHAM, AS WELL AS MR. FULKS, POSSESSED THE WEAPONS THAT THE GOVERNMENT SAID THEY POSSESSED. NOT ONLY FROM MR. TALSMA'S HOUSE, BUT ALSO FROM SAM JORDAN'S HOUSE. THAT IS NOT IN DISPUTE EITHER. WE ARE NOT ARGUING ABOUT THAT.

I TOLD YOU AT THE BEGINNING WE HAD NO CONTENTION, NOT TAKING ANY ISSUE WITH THE FACT THAT A BURGLARY WAS COMMITTED AT SAM JORDAN'S HOUSE AND THAT THOSE GUNS WERE BEING STOLEN. THERE WAS NO QUESTION ABOUT THE FACT THAT THERE WAS A CONFRONTATION WITH CARL JORDAN. AND YOU ARE NOT GOING TO HAVE A PROBLEM UNDERSTANDING WHAT HAPPENED IN THAT SITUATION EITHER. THERE WAS NO QUESTION. BRANDON BASHAM WAS THERE. BRANDON BASHAM PARTICIPATED. BUT THAT IS ANOTHER ONE OF THE CASES, A SITUATION WHERE THE GOVERNMENT IS ASKING YOU TO INFER AS A SIMILAR ACT TO LOOK AT THE INTENT OF MR. BASHAM AS IT RELATES TO WHAT HE IS CHARGED WITH IN THE INDICTMENT. WE SUBMIT THAT IS ONE OF THOSE ISSUES THAT YOU ALSO CAN LOOK AT THAT SHOWS THAT MR. BASHAM DID NOT HAVE THE INTENT AS TO THE CRIMES CHARGED IN THE INDICTMENT.

WE ALSO TOLD YOU THERE WAS NOT GOING TO BE ANY DISPUTE ABOUT MS. HYMAN'S TRUCK BEING STOLEN.

ALSO TOLD YOU THERE WAS NO QUESTION ABOUT THE ABDUCTION OF ALICE DONOVAN. SAID THAT RIGHT UP FRONT. THERE WAS NO

QUESTION THAT MS. DONOVAN WAS ABDUCTED.

WHAT WE SAID AT THE BEGINNING OF THE CASE, IF YOU WILL REMEMBER WHAT I SAID WAS, THAT MR. BASHAM PARTICIPATED IN HER ABDUCTION. MR. BASHAM PARTICIPATED IN TAKING HER CAR. THE DIFFERENCE IN WHAT THE GOVERNMENT CONTENDS AND WHAT WE CONTEND IS THAT MR. BASHAM DID NOT HAVE THE INTENT TO HURT OR THE INTENT TO KILL ALICE DONOVAN.

NOW, AS TO THE CARJACKING STATUTE, THAT IS AN ELEMENT OF THE OFFENSE. IN ORDER TO BE GUILTY OF CARJACKING IN COUNT 1, YOU ACTUALLY HAVE TO HAVE THE INTENT WHEN YOU TAKE THE CAR OF KILLING OR SERIOUSLY INJURING THE PERSON OR BEING PREPARED TO, IF THE PERSON DOES NOT RELINQUISH THE VEHICLE. WE SUBMIT TO YOU THAT THE CARJACKING CASE IS IN ISSUE, A SITUATION WE STILL CONTEND THAT THE GOVERNMENT HAS NOT PROVEN THAT BRANDON BASHAM HAD THE INTENT TO HURT OR KILL ALICE DONOVAN WHEN SHE WAS ABDUCTED, ALTHOUGH SHE WAS ABDUCTED.

AS TO THE KIDNAPPING STATUTE, THE JUDGE WILL INSTRUCT YOU THAT YOU CAN FIND MR. BASHAM GUILTY OF THE KIDNAPPING, WHICH IS CONCEDED. WHAT WE CONTEND IS IN ISSUE IS WHETHER OR NOT MR. BASHAM INTENDED THE RESULT, AND THAT WAS HER DEATH. SO, THOSE ARE SOME OF THE THINGS IN ISSUE THAT WE HAVE IN THIS CASE. AND THAT IS STILL AN ISSUE. AND, AGAIN, WHILE THE GOVERNMENT CONTENDS THAT THERE ARE CERTAIN FACTS THAT LEAD TO IT TO SHOW INTENT ON THE PART OF MR. BASHAM AS TO THOSE CRIMES, WE SUBMIT THERE ARE CERTAIN THINGS IN THIS CASE THAT

FINDING MR. BASHAM GUILTY OR NOT GUILTY OF THAT CONSPIRACY.

NOW, YOU DON'T HAVE TO FIND HIM GUILTY OF ALL OF THE CRIMES THE GOVERNMENT HAS ALLEGED IN FINDING THAT CONSPIRACY TO FIND HIM GUILTY OF THAT CONSPIRACY. IT IS ALL A PARTNERSHIP IN CRIME. TWO PEOPLE SET OUT TO COMMIT A CRIME, AGREE TO COMMIT THE CRIME, GUILTY OF CONSPIRACY. WHAT WE DO SAY, IT COMES BACK TO WHAT I JUST SAID BEFORE, THERE IS AN ISSUE ABOUT WHETHER OR NOT BRANDON BASHAM COMMITTED THE CARJACKING AS DEFINED BY THE LAW. THERE IS AN ISSUE AS TO WHETHER OR NOT BRANDON BASHAM, WE SUBMIT, COMMITTED A CARJACKING, RESULTING IN DEATH, EVEN IF YOU BELIEVE HE COMMITTED THE CARJACKING. THAT WOULD BE A DECISION YOU WILL HAVE TO MAKE WHEN YOU DECIDE COUNT 4.

ANOTHER DECISION YOU WILL HAVE TO MAKE IS WHETHER OR NOT THE CONSPIRACY INCLUDED THE KIDNAPPING, RESULTING IN DEATH. YOU COULD FIND THAT THE CONSPIRACY DID INVOLVE THE KIDNAPPING, BUT WE SUBMIT IT DID NOT INVOLVE THE KIDNAPPING, RESULTING IN DEATH, AS I HAVE DEFINED THAT TO YOU.

COUNT 3, YES, IT IS ONE OF THE MATTERS THAT THE GOVERNMENT HAS ALLEGED IN THAT CONSPIRACY, TRANSPORTING IN INTERSTATE COMMERCE A MOTOR VEHICLE.

COUNT 6 IS USING A FIREARM DURING AND IN RELATION TO A CRIME OF VIOLENCE. NOW, IF YOU FIND MR. BASHAM GUILTY OF COUNTS 1 AND 2, THAT, BASICALLY, SATISFIES THAT PARTICULAR COUNT, THAT IS, USING A FIREARM DURING AND IN RELATION TO A

CRIME OF VIOLENCE. BUT AS WE, AGAIN, SUBMIT CARJACKING REALLY WAS NOT ONE OF THE CRIMES THAT WAS COMMITTED IN THIS CASE BECAUSE OF THAT LACK OF INTENT ON THE PART OF MR. BASHAM. KIDNAPPING STILL WOULD BE.

AS FAR AS COUNT 7, FELON IN POSSESSION OF A FIREARM. YES, HE WAS A FELON IN POSSESSION OF A FIREARM.

AND COUNT 8, WAS HE IN POSSESSION OF STOLEN FIREARMS? YES, HE WAS. THERE IS NOT ANY ISSUE HERE ABOUT WHETHER YOU HAVE TO FIND CONSTRUCTIVE OR ACTUAL POSSESSION OF THE WEAPONS IN THIS CASE. I AM STANDING HERE, TELLING YOU THAT MR. BASHAM POSSESSED THE WEAPONS THAT WERE TAKEN OUT OF MR. TALSMA'S HOUSE, AND HE ALSO POSSESSED WEAPONS TAKEN OUT OF SAM JORDAN'S HOUSE. YOU WON'T HAVE TO MAKE ANY DECISION AS TO THOSE COUNTS EITHER.

COUNT 5 IS CONSPIRACY TO USE AND CARRY FIREARMS IN RELATION TO AND POSSESS FIREARMS IN FURTHERANCE OF A CRIME OF VIOLENCE. IN OTHER WORDS, THE GOVERNMENT HAS ALLEGED ANOTHER CONSPIRACY, BUT THE CONSPIRACY IN THIS CASE, IN THIS COUNT, IS IN RELATIONSHIP TO POSSESS FIREARMS IN THE CRIME OF VIOLENCE AND FURTHER YOUR CRIME OF VIOLENCE. I HAVE ALREADY SPOKEN TO YOU ABOUT WHAT OUR POSITION IS WITH RESPECT TO THE CARJACKING, AND WHAT OUR POSITION IS WITH RESPECT TO THE KIDNAPPING.

AS TO COUNT 6, USE OF A FIREARM DURING AND IN RELATION TO A CRIME OF VIOLENCE. AGAIN, THAT IS GOING TO BE SOMETHING

THAT YOU, DEPENDING UPON WHAT YOUR FINDINGS ARE AS TO COUNT 1 AND COUNT 2, THEN YOUR DECISION ON COUNT 6 WILL BE RELATIVELY EASY.

AS TO COUNT 7, FELON IN POSSESSION, THEN THE FINDING, OBVIOUSLY, SHOULD BE GUILTY IN THAT SITUATION.

AND, IN COUNT 8, POSSESSION OF STOLEN FIREARM, ALSO IN THAT COUNT, YOUR DECISION SHOULD BE GUILTY. AND THERE IS NO DISPUTE ABOUT THAT. SO, THOSE ARE THE EIGHT COUNTS IN THE INDICTMENT.

NOW, AS FAR AS WHETHER OR NOT THE GOVERNMENT HAS PROVEN THE CARJACKING AND THE KIDNAPPING, RESULTING IN DEATH, AS WELL AS THE CONSPIRACIES THAT INVOLVE THOSE TWO PARTICULAR COUNTS, I WOULD LIKE TO REVIEW WITH YOU SOME TESTIMONY THAT YOU HEARD OVER THE LAST COUPLE OF DAYS. MR. GASSER DID AN EXCELLENT JOB OF VIEWING THE TESTIMONY IN A LIGHT MOST FAVORABLE TO THE GOVERNMENT, WHICH IS WHAT HE IS SUPPOSED TO DO. I AM TRYING TO PRESENT TO YOU SOME FACTORS THAT WE WOULD LIKE YOU TO CONSIDER IN DECIDING THESE VERY WEIGHTY ISSUES BEFORE YOU. I AM GOING TO GO AHEAD, AND INSTEAD OF DOING IT DAY-BY-DAY BASIS, I WOULD LIKE TO REVIEW WITH YOU SOME OF THE WITNESSES AS THEY APPEARED IN ORDER SO THAT WE CAN SEE THEM IN CONTEXT, AND YOU CAN REMEMBER THEM AS THEY WERE PRESENTED TO YOU, AND THEN WE WILL GO BACK AND MAYBE DO A LITTLE SUMMARY OF WHAT SOME OF THESE WITNESSES SAID OR WHAT THEIR TESTIMONY CUMULATIVELY SHOWS.

BEEN REACHING FOR OR WHAT BRANDON BASHAM MIGHT HAVE BEEN DOING. BRANDON BASHAM MIGHT HAVE BEEN DUCKING.

MARGARET MOORE. I WANT YOU TO REMEMBER THIS ABOUT THAT PARTICULAR SITUATION AFTER THEY WENT TO MARGARET MOORE'S HOUSE. BRANDON BASHAM WENT UP TO THE DOOR, THERE IS NO QUESTION. AND WHEN SHE SAID, NO, NOT GOING TO LET YOU USE THE PHONE, NOT GOING TO TAKE YOU FOR A RIDE, BRANDON BASHAM LEFT. BRANDON BASHAM WAS NOT TRYING TO HURT MARGARET MOORE. BRANDON BASHAM WALKED AWAY FROM THE DOOR. WHO CAME BACK AND TRIED TO GET IN THE HOUSE? WHO TRIED TO GET MS. MOORE TO COME BACK OUT, BUT COULDN'T? THAT WAS CHAD FULKS. YES, THEY WENT AHEAD AND THEY DID STEAL MS. HYMAN'S VEHICLE. THAT IS THE VEHICLE THEY HAD WHEN THEY WENT TO THE MALL.

LADIES AND GENTLEMEN, THE EVENTS THAT TOOK PLACE AT THE MALL, AND THE EVENTS THAT TOOK PLACE IN WEST VIRGINIA ARE VERY TRAGIC SITUATIONS. CANNOT HIDE BEHIND THOSE. NOT TRYING TO HIDE BEHIND THEM. THEY DID HAPPEN. AT THE WAL-MART IN SOUTH CAROLINA, THERE IS NO QUESTION THAT BRANDON BASHAM LEFT THE VEHICLE AND GOT IN THE VEHICLE WITH ALICE DONOVAN. THERE IS NO QUESTION ABOUT THAT, THAT HE LEFT THE VEHICLE, THE TRUCK THERE AT THE WAL-MART, CHAD FULKS GOT IN THE BMW. MR. GASSER IS EXACTLY CORRECT. THERE WERE SEVERAL OCCASIONS WHEN THEY WERE DRIVING ALONG THE ROAD AND CHAD FULKS WAS STOPPING TO USE THE ATMS THAT BRANDON BASHAM WAS ALONE WITH ALICE DONOVAN. THERE IS NO QUESTION ABOUT THAT. I DON'T DISPUTE

THAT WITH THE GOVERNMENT IN ANY WAY WHATSOEVER.  THAT HE HAD THE OPPORTUNITY, IF HE WANTED, TO LET ALICE DONOVAN GO.  BUT I SUBMIT TO YOU THAT BRANDON BASHAM, HAVING ALREADY HAD THE EXPERIENCE WITH CHAD FULKS ABOUT JAMES HAWKINS, IT WAS NOT HIS UNDERSTANDING, IT WAS NOT HIS INTENT TO HURT OR KILL ALICE DONOVAN.  THAT MAY HAVE BEEN CHAD FULKS'S INTENT FROM THE VERY BEGINNING, BUT IT WAS NOT BRANDON BASHAM'S INTENT TO GO AHEAD AND DO THAT FROM THE VERY BEGINNING OR AT ANY TIME ALONG THE WAY.  BUT, YES, DID HE HOLD HER? DID HE HAVE THE OPPORTUNITY TO LET HER GO? YES, HE DID.  NOT GOING TO DISPUTE THAT WITH YOU.  I AM NOT GOING TO STAND UP HERE AND TELL YOU THAT.

CHAD FULKS DID USE ALL OF THOSE ATM MACHINES.  HE WAS THE ONE THAT HAD THE ABILITY TO GO AHEAD AND DO THAT.  DO YOU REMEMBER EARLIER THERE WAS TESTIMONY THAT BRANDON BASHAM DIDN'T EVEN HAVE THE ABILITY TO USE AN ATM CARD OR EVEN USE A CALLING CARD.  AND THEY MADE THEIR WAY UP NORTH, UP TO NORTH CAROLINA.

AND, YES, IT IS JUST NO WAY FOR ANY OF US TO RECREATE IN OUR MINDS THE FEAR THAT ALICE DONOVAN HAD.  THERE IS NO WAY FOR ANY OF US IN OUR MINDS TO UNDERSTAND WHAT HER FAMILY WENT THROUGH.  WE MAY THINK WE CAN UNDERSTAND IT, SINCE WE DIDN'T GO THROUGH IT, WE CAN NEVER POSSIBLY FEEL IT.  IT IS AN AWFUL SITUATION.  AND AS I TOLD YOU, THERE IS NO QUESTION THAT BRANDON BASHAM PARTICIPATED IN THAT KIDNAPPING.  THE

COMMERCE. THIS REQUIRES THE GOVERNMENT TO PROVE THAT, AT SOME TIME IN THE PAST, THE VEHICLE HAD BEEN SHIPPED, DRIVEN, OR TRANSPORTED BETWEEN ONE STATE AND ANOTHER, OR BETWEEN THE UNITED STATES AND A FOREIGN COUNTRY.

IT IS NOT NECESSARY THAT THE GOVERNMENT PROVE THAT THE DEFENDANT HAD ANY INVOLVEMENT IN THE INTERSTATE SHIPPING, DRIVING, OR TRANSPORTATION, OR THAT THE DEFENDANT KNEW THAT THE VEHICLE HAD PREVIOUSLY BEEN SHIPPED, DRIVEN, OR TRANSPORTED IN INTERSTATE OR FOREIGN COMMERCE.

THE THIRD ELEMENT THAT THE GOVERNMENT MUST PROVE BEYOND A REASONABLE DOUBT IS THAT THE DEFENDANT TOOK THE VEHICLE FROM THE VICTIM BY USING FORCE AND VIOLENCE OR BY ACTING IN AN INTIMIDATING MANNER.

THE GOVERNMENT CAN MEET ITS BURDEN ON THIS ELEMENT EITHER BY PROVING THE DEFENDANT USED FORCE AND VIOLENCE OR THAT THE DEFENDANT ACTED IN AN INTIMIDATING MANNER. THE GOVERNMENT DOES NOT HAVE TO PROVE THAT THE DEFENDANT USED FORCE AND VIOLENCE IF IT PROVED THAT THE DEFENDANT ACTED IN AN INTIMIDATING MANNER.

THE PHRASE "INTIMIDATING MANNER" MEANS THAT THE DEFENDANT DID OR SAID SOMETHING THAT WOULD MAKE AN ORDINARY, REASONABLE PERSON FEAR BODILY HARM. YOUR FOCUS SHOULD BE ON THE DEFENDANT'S BEHAVIOR. THE GOVERNMENT DOES NOT HAVE TO PROVE THAT THE DEFENDANT'S BEHAVIOR CAUSED OR COULD HAVE CAUSED GREAT TERROR OR PANIC, BUT IT MUST SHOW THAT AN ORDINARY

PERSON WOULD HAVE FEARED BODILY HARM BECAUSE OF THE DEFENDANT'S BEHAVIOR.  THE GOVERNMENT ALSO DOES NOT HAVE TO PROVE THAT THE DEFENDANT MADE EXPLICIT THREATS OF BODILY HARM. IF YOU FIND THAT THE DEFENDANT CONFRONTED THE VICTIM IN SUCH A WAY THAT IT WOULD REASONABLY CREATE A FEAR OF BODILY HARM, THAT IS SUFFICIENT.

THE FOURTH ELEMENT THE GOVERNMENT MUST PROVE BEYOND A REASONABLE DOUBT IS THAT THE DEFENDANT ACTED WITH INTENT TO CAUSE DEATH OR SERIOUS BODILY HARM.

TO ESTABLISH THIS ELEMENT,  THE GOVERNMENT MUST PROVE THAT, AT THE MOMENT THE DEFENDANT DEMANDED OR TOOK CONTROL OVER THE VEHICLE,  THE DEFENDANT POSSESSED INTENT TO SERIOUSLY KILL -- EXCUSE ME, SERIOUSLY HARM OR KILL THE VICTIM.

THE GOVERNMENT MAY ALSO MEET ITS BURDEN AS TO THE INTENT ELEMENT BY PROVING, AT THE MOMENT THE DEFENDANT DEMANDED OR TOOK CONTROL OF THE VEHICLE,  THAT THE DEFENDANT POSSESSED THE INTENT TO SERIOUSLY HARM OR KILL THE VICTIM, IF NECESSARY, TO STEAL THE CAR.  THE GOVERNMENT NEED NOT PROVE THAT THE DEFENDANT ACTUALLY INTENDED TO CAUSE THE HARM; IT IS SUFFICIENT THAT THE DEFENDANT WAS CONDITIONALLY PREPARED TO ACT IF THE VICTIM FAILED TO RELINQUISH THE CAR.

EVIDENCE THAT THE DEFENDANT INTENDED TO FRIGHTEN THE VICTIM IS NOT SUFFICIENT BY ITSELF TO PROVE AN INTENT TO HARM OR KILL.  IT IS, HOWEVER, ONE OF THE FACTS YOU MAY CONSIDER IN DETERMINING WHETHER THE GOVERNMENT HAS MET ITS BURDEN.

THE VEHICLE WHAT STOLEN.

AND, NUMBER THREE, THE DEFENDANT TRANSPORTED THE MOTOR VEHICLE IN INTERSTATE COMMERCE.

I HAVE ALREADY DEFINED INTERSTATE COMMERCE FOR YOU EARLIER. THAT SAME DEFINITION APPLIES TO THIS COUNT 3, AS WELL.

COUNT SIX. COUNT SIX OF THE INDICTMENT CHARGES THAT ON OR ABOUT THE 14TH DAY OF NOVEMBER 2002, IN THE DISTRICT OF SOUTH CAROLINA, CHADRICK EVAN FULKS AND BRANDON LEON BASHAM, KNOWINGLY USED AND CARRIED A FIREARM DURING AND IN RELATION TO AND POSSESSED A FIREARM IN FURTHERANCE OF CRIMES OF VIOLENCE, WHICH MAY BE PROSECUTED IN A COURT OF THE UNITED STATES AS CHARGED IN COUNTS 1 AND 2.

SECTION 924(C)(1)(A) OF TITLE 18 OF THE UNITED STATES CODE PROVIDES, IN PART, THAT:

"ANY PERSON WHO, DURING AND IN RELATION TO ANY CRIME OF VIOLENCE, FOR WHICH THE PERSON MAY BE PROSECUTED IN A COURT OF THE UNITED STATES, USES OR CARRIES A FIREARM, OR WHO, IN FURTHERANCE OF ANY SUCH CRIME, POSSESSES A FIREARM..."

SHALL BE GUILTY OF AN OFFENSE AGAINST THE UNITED STATES.

IN ORDER FOR YOU TO FIND THE DEFENDANT GUILTY OF THIS CHARGE, THE GOVERNMENT MUST PROVE THREE ELEMENTS BEYOND A

REASONABLE DOUBT.

NUMBER 1, THE DEFENDANT USED, CARRIED, OR POSSESSED A FIREARM.

NUMBER TWO, THE DEFENDANT USED OR CARRIED THE FIREARM DURING AND IN RELATION TO OR POSSESSED THE FIREARM IN FURTHERANCE OF A CRIME OF VIOLENCE.

AND, NUMBER THREE, THE CRIME OF VIOLENCE MAY BE PROSECUTED IN A COURT OF THE UNITED STATES.

THE TERM "CRIME OF VIOLENCE" MEANS AN OFFENSE THAT IS A FELONY AND HAS AS ONE OF ITS ESSENTIAL ELEMENTS, THE USE, ATTEMPTED USE, OR THREATENED USE OF PHYSICAL FORCE AGAINST THE PERSON OR PROPERTY OF ANOTHER, OR AN OFFENSE THAT BY ITS VERY NATURE INVOLVES A SUBSTANTIAL RISK THAT SUCH PHYSICAL FORCE MAY BE USED IN COMMITTING THE OFFENSE.

THE OFFENSES ALLEGED IN COUNT 1, CARJACKING, RESULTING IN DEATH, AND COUNT 2 OF THE INDICTMENT, KIDNAPPING, RESULTING IN DEATH, ARE CRIMES OF VIOLENCE. IF YOU FIND THE DEFENDANT GUILTY ON EITHER COUNT 1 OR COUNT 2, THE THIRD ELEMENT OF COUNT 6 WILL BE MET.

NOW, IN ORDER TO PROVE THAT THE DEFENDANT USED THE FIREARM, THE GOVERNMENT MUST PROVE BEYOND A REASONABLE DOUBT AN ACTIVE EMPLOYMENT OF THE FIREARM BY THE DEFENDANT DURING AND IN RELATION TO THE COMMISSION OF THE CRIME OF VIOLENCE. THIS DOES NOT MEAN THAT THE DEFENDANT MUST ACTUALLY FIRE OR ATTEMPT TO FIRE THE WEAPON, ALTHOUGH THOSE OBVIOUSLY

CONSTITUTE USES OF THE WEAPON. BRANDISHING, DISPLAYING, OR EVEN REFERRING TO THE WEAPON SO THAT OTHERS PRESENT KNEW THAT THE DEFENDANT HAD THE FIREARM AVAILABLE IF NEEDED, ALL CONSTITUTE USE OF THE FIREARM. HOWEVER, THE MERE POSSESSION OF A FIREARM AT OR NEAR THE SITE OF THE CRIME WITHOUT ACTIVE EMPLOYMENT AS I HAVE JUST DESCRIBED IT IS NOT SUFFICIENT TO CONSTITUTE A USE OF THE FIREARM.

IN ORDER TO PROVE THAT THE DEFENDANT CARRIED THE FIREARM, THE GOVERNMENT MUST PROVE BEYOND A REASONABLE DOUBT THAT THE DEFENDANT KNOWINGLY POSSESSED THE FIREARM AND BEARED, MOVED, CONVEYED, OR TRANSPORTED THE FIREARM IN SOME WAY.

TO PROVE THAT THE DEFENDANT POSSESSED A FIREARM IN FURTHERANCE OF THE CRIME, THE GOVERNMENT MUST PROVE THAT THE DEFENDANT HAD POSSESSION OF THE FIREARM AND THAT SUCH POSSESSION WAS IN FURTHERANCE OF THAT CRIME. POSSESSION MEANS THAT THE DEFENDANT EITHER HAD PHYSICAL POSSESSION OF THE FIREARM ON HIS PERSON OR THAT HE HAD DOMINION AND CONTROL OVER THE PLACE WHERE THE FIREARM WAS LOCATED AND HAD THE POWER AND INTENTION TO EXERCISE CONTROL OVER THE PLACE WHERE THE FIREARM WAS LOCATED. TO POSSESS A FIREARM IN FURTHERANCE OF THE CRIME MEANS THAT THE FIREARM HELPED FORWARD, ADVANCE, OR PROMOTE THE COMMISSION OF THE CRIME. THE MERE POSSESSION OF THE FIREARM AT THE SCENE OF THE CRIME IS NOT SUFFICIENT UNDER THIS DEFINITION. THE FIREARM MUST HAVE PLAYED SOME PART IN FURTHERING THE CRIME IN ORDER FOR THIS ELEMENT TO BE

SATISFIED.

THE TERM FIREARM MEANS ANY WEAPON THAT WILL OR IS DESIGNED TO OR MAY READILY BE CONVERTED TO EXPEL A PROJECTILE BY THE ACTION OF AN EXPLOSIVE. THE GOVERNMENT DOES NOT HAVE TO PROVE THAT THE WEAPON THE DEFENDANT ALLEGEDLY POSSESSED WAS AN ILLEGAL WEAPON.

COUNT SEVEN. COUNT SEVEN OF THE INDICTMENT CHARGES THAT ON OR ABOUT THE 14TH DAY OF NOVEMBER, 2002, IN THE DISTRICT OF SOUTH CAROLINA, CHADRICK EVAN FULKS AND BRANDON LEON BASHAM, HAVING BEEN CONVICTED OF A CRIME PUNISHABLE BY IMPRISONMENT FOR A TERM EXCEEDING ONE YEAR, KNOWINGLY DID POSSESS IN AND AFFECTING COMMERCE FIREARMS, THAT IS AN H&R .22 CALIBER 9-SHOT MODEL 949 REVOLVER; A LLAMA MINI MAX, .45 CALIBER PISTOL; A REMINGTON 870, 12-GAUGE SHOTGUN; A MARLIN MODEL 882SS.22 CALIBER RIFLE; REMINGTON MODEL 1100 12-GAUGE SHOTGUN; A MARLIN MODEL 60 .22 CALIBER RIFLE; AND A RPI CONNECTICUT VALLEY ARMS MAGBOLT 150 RIFLE, EACH OF WHICH HAD BEEN SHIPPED AND TRANSPORTED IN INTERSTATE COMMERCE.

SECTION 922(G) OF TITLE 18 OF THE UNITED STATES CODE PROVIDES, IN PART, THAT IT SHALL BE A CRIME FOR ANY PERSON:

"WHO HAS BEEN CONVICTED IN ANY COURT OF A CRIME PUNISHABLE BY IMPRISONMENT FOR A TERM EXCEEDING ONE YEAR TO SHIP OR TRANSPORT IN INTERSTATE OR FOREIGN COMMERCE OR

ALTHOUGH YOU MUST UNANIMOUSLY AGREE UPON THE SAME OVERT ACT THAT WAS COMMITTED, THE GOVERNMENT IS NOT REQUIRED TO PROVE MORE THAN ONE OF THE OVERT ACTS CHARGED.

THE OVERT ACT MAY, BUT FOR THE ALLEGED ILLEGAL AGREEMENT, APPEAR TOTALLY INNOCENT AND LEGAL.

FINALLY, COUNT FIVE. COUNT FIVE OF THE INDICTMENT CHARGES, ON OR ABOUT THE 4TH DAY OF NOVEMBER 2002 TO ON OR ABOUT THE 20TH DAY OF NOVEMBER 2002, IN THE DISTRICT OF SOUTH CAROLINA, CHADRICK EVAN FULKS AND BRANDON LEON BASHAM DID KNOWINGLY, INTENTIONALLY, AND UNLAWFULLY COMBINE, CONSPIRE, AND AGREE TOGETHER AND HAVE A TACIT UNDERSTANDING WITH EACH OTHER AND OTHERS KNOWN TO THE GRAND JURY, TO KNOWINGLY USE AND CARRY FIREARMS DURING AND IN RELATION TO AND TO POSSESS FIREARMS IN FURTHERANCE OF CRIMES OF VIOLENCE WHICH ARE PROSECUTABLE IN A COURT OF THE UNITED STATES, AS CHARGED IN COUNTS 1 AND 2.

SECTION 924(C) OF TITLE 18 OF THE UNITED STATES CODE PROVIDES, IN PART, THAT:

"A PERSON WHO CONSPIRES TO USE AND

CARRY FIREARMS DURING AND IN

RELATION TO, OR TO POSSESS FIREARMS

IN FURTHERANCE OF A CRIME OF

VIOLENCE PROSECUTABLE IN A COURT OF

THE UNITED STATES..."

SHALL BE GUILTY OF AN OFFENSE AGAINST THE UNITED STATES.

THE ELEMENTS OF THE FEDERAL CRIME OF CONSPIRACY TO USE AND CARRY FIREARMS DURING AND IN RELATION TO AND TO POSSESS FIREARMS IN THE FURTHERANCE OF A CRIME OF VIOLENCE ARE:

NUMBER ONE, THERE WAS AN AGREEMENT OR CONSPIRACY BETWEEN TWO OR MORE PERSONS TO USE AND CARRY FIREARMS DURING AND IN RELATION TO A CRIME OF VIOLENCE OR TO POSSESS FIREARMS IN FURTHERANCE OF A CRIME OF VIOLENCE.

NUMBER TWO, THE DEFENDANT KNEW OF THE CONSPIRACY.

NUMBER THREE, THE DEFENDANT KNOWINGLY AND VOLUNTARILY BECAME A PART OF THE CONSPIRACY.

I HAVE ALREADY EXPLAINED TO YOU WHAT CONSTITUTES A CONSPIRACY IN MY INSTRUCTIONS REGARDING COUNT FOUR. THOSE INSTRUCTIONS APPLY TO COUNT FIVE, AS WELL. YOU SHOULD NOTE, HOWEVER, THAT THERE IS ONE DIFFERENCE BETWEEN THE TWO CONSPIRACY COUNTS. COUNT FOUR HAS THE ADDED REQUIREMENT THAT THE GOVERNMENT PROVE AT LEAST ONE OVERT ACT IN FURTHERANCE OF THE CONSPIRACY WAS COMMITTED; COUNT FIVE HAS NO SUCH OVERT ACT REQUIREMENT.

NOW, YOU WILL NOTE THAT THE INDICTMENT CHARGES THAT THE OFFENSES WERE COMMITTED ON OR ABOUT A CERTAIN DATE. THE GOVERNMENT DOES NOT HAVE TO PROVE WITH CERTAINTY THE EXACT DATE OF THE ALLEGED OFFENSE. IT IS SUFFICIENT IF THE GOVERNMENT PROVES BEYOND A REASONABLE DOUBT THAT THE OFFENSE WAS COMMITTED ON A DATE REASONABLY NEAR THE DATE ALLEGED.

THE WORD "KNOWINGLY," AS THAT TERM HAS BEEN USED FROM

TIME TO TIME IN THESE INSTRUCTIONS, MEANS THAT THE ACT WAS DONE VOLUNTARILY AND INTENTIONALLY AND NOT BECAUSE OF MISTAKE OR ACCIDENT.

THE WORD "WILLFULLY," AS THAT TERM HAS BEEN USED FROM TIME TO TIME IN THESE INSTRUCTIONS, MEANS THAT THE ACT WAS COMMITTED DELIBERATELY AND INTENTIONALLY AS CONTRASTED WITH ACCIDENTALLY, CARELESSLY, OR UNINTENTIONALLY.

NOW, A SEPARATE CRIME OR OFFENSE IS CHARGED IN EACH COUNT OF THE INDICTMENT. EACH CHARGE AND THE EVIDENCE PERTAINING TO IT SHOULD BE CONSIDERED SEPARATELY. THE FACT THAT YOU MAY FIND THE DEFENDANT GUILTY OR NOT GUILTY AS TO ONE OF THE OFFENSES CHARGED SHOULD NOT AFFECT YOUR VERDICT AS TO ANY OTHER OFFENSE CHARGED. I CAUTION YOU, MEMBERS OF THE JURY, THAT YOU ARE HERE TO DETERMINE FROM THE EVIDENCE IN THIS CASE WHETHER THE DEFENDANT IS GUILTY OR NOT GUILTY. THE DEFENDANT IS ON TRIAL ONLY FOR THOSE SPECIFIC OFFENSES ALLEGED IN THE INDICTMENT.

ALSO, THE QUESTION OF PUNISHMENT SHOULD NEVER BE CONSIDERED BY THE JURY IN ANY WAY IN DECIDING THIS PHASE OF THE CASE. IF THE DEFENDANT IS CONVICTED ON COUNT ONE OR TWO, WE WILL MOVE INTO A PENALTY PHASE AT WHICH YOU, THE JURY, WILL DECIDE THE PUNISHMENT. IF THE DEFENDANT IS CONVICTED ON COUNTS THREE THROUGH EIGHT, THE JUDGE, NOT THE JURY, DECIDES THE PUNISHMENT.

LET ME GO BACK AND MAKE ONE CORRECTION THAT IS ON THE

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

FLORENCE DIVISION

**FILED**

SEP 3 0 2004

LARRY W. PROPES, CLERK
COLUMBIA, SC

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CR. NO.: 4:02-992 |
| | ) | |
| v. | ) | VERDICT |
| | ) | |
| BRANDON LEON BASHAM | ) | |
| | ) | |

WE, THE JURY, following due deliberations in the above matter, unanimously return the following verdict in the above-referenced case:

1.    As to Count 1 (Carjacking), we find the defendant Brandon Leon Basham:

☐ Not Guilty        ☑ Guilty

Special Interrogatory:

If you found Brandon Leon Basham guilty on Count 1, has the government proved beyond a reasonable doubt that Alice Donovan died as a result of being carjacked?

☐ No        ☑ Yes

2.    As to Count 2 (Kidnapping), we find the defendant Brandon Leon Basham:

☐ Not Guilty        ☑ Guilty

Special Interrogatory:

If you found Brandon Leon Basham guilty on Count 2, has the government proved beyond a reasonable doubt that Alice Donovan died as a result of being kidnapped?

☐ No        ☑ Yes

JA0487

3.    As to Count 3 (Interstate Transportation of Stolen Motor Vehicle), we find the defendant Brandon Leon Basham:

☐ Not Guilty      ☑ Guilty

4.    As to Count 4 (Conspiracy to Carjack Resulting in Death, Kidnap Resulting in Death, Transport a Stolen Motor Vehicle in Interstate Commerce, Possess Firearms by a Convicted Felon, and Possess Stolen Firearms), we find the defendant Brandon Leon Basham:

☐ Not Guilty      ☑ Guilty

If you found the defendant guilty of Count 4, please indicate which substantive Count or Counts you found the defendant conspired to violate:

☑ Count 1 (Carjacking Resulting in Death)

☑ Count 2 (Kidnapping Resulting in Death)

☑ Count 3 (Transporting a Stolen Motor Vehicle in Interstate Commerce)

☑ Count 7 (Possession of Firearms by a Convicted Felon)

☑ Count 8 (Possession of Stolen Firearms)

5.    As to Count 5 (Conspiracy to Use and Carry Firearms During and in Relation to and to Possess Firearms in the Furtherance of a Crime of Violence), we find the defendant Brandon Leon Basham:

☐ Not Guilty      ☑ Guilty

6.    As to Count 6 (Use of a Firearm During and in Relation to a Crime of Violence), we find the defendant Brandon Leon Basham:

☐ Not Guilty      ☑ Guilty

7.    As to Count 7 (Felon in Possession of a Firearm), we find the defendant Brandon Leon Basham:

☐ Not Guilty      ☑ Guilty

JA0488

8.    As to Count 8 (Possession of Stolen Firearms), we find the defendant Brandon Leon Basham:

☐ Not Guilty        ☑ Guilty

SO SAY WE ALL, this 30 day of September , 2004

FOREPERSON

JA0489

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

UNITED STATES OF AMERICA,   )   CR. NO. 4:02-992
)   COLUMBIA, SC
)   OCTOBER 12, 2004
)
   VERSUS   )
)
BRANDON L. BASHAM,   )
   DEFENDANT.   )
_____)

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.,
CHIEF UNITED STATES DISTRICT COURT JUDGE
JURY TRIAL
VOLUME XV

APPEARANCES:

FOR THE GOVERNMENT:   SCOTT SCHOOLS, FIRST AUSA
JONATHAN S. GASSER, AUSA
JOHN DUANE, AUSA
UNITED STATES ATTORNEY'S OFFICE
1441 MAIN STREET, SUITE 500
COLUMBIA, SC  29201

FOR THE DEFENDANT:   JACK SWERLING, ESQ.
1720 MAIN STREET
SUITE 301
COLUMBIA, SC  29201

GREG HARRIS, ESQ.
1720 MAIN STREET
SUITE 301
COLUMBIA, SC  29201

COURT REPORTER:   DEBRA R. JERNIGAN, RPR, CRR
UNITED STATES COURT REPORTER
901 RICHLAND STREET
COLUMBIA, SC 29201

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
*** *** *** ***

GREEN PAPER, WHICH YOU MAY INSERT INTO YOUR NOTEBOOK. WE WILL HAVE THESE COPIES FOR YOU ABOUT MIDMORNING TODAY BECAUSE OF SOME EDITORIAL CHANGES THAT NEEDED TO BE MADE. PRINT IT ON GREEN PAPER SO YOU WON'T CONFUSE IT WITH THE CHARGES YOU RECEIVED IN WRITING IN THE FIRST PHASE OF THIS TRIAL. AT THE END OF THIS PHASE, I WILL GIVE YOU MORE DETAILED GUIDANCE ON HOW YOU ARE TO GO ABOUT REACHING YOUR DECISION.

YOU HAVE UNANIMOUSLY FOUND THE DEFENDANT GUILTY OF ALL EIGHT COUNTS IN THE INDICTMENT. FOR PURPOSES OF YOUR PARTICIPATION IN THIS PROCEEDING, HOWEVER, WE NEED TO FOCUS ONLY ON THE FIRST TWO COUNTS. THE FIRST TWO COUNTS CHARGE MR. BASHAM WITH OFFENSES FOR WHICH THE PENALTY IS EITHER LIFE IMPRISONMENT WITHOUT THE POSSIBILITY OF RELEASE OR DEATH. THESE TWO OFFENSES ARE: COUNT ONE, CARJACKING, RESULTING IN DEATH; AND COUNT TWO, KIDNAPPING, RESULTING IN DEATH.

THERE ARE TWO FORMS OF PUNISHMENT POSSIBLE UNDER THE LAW FOR THE OFFENSES FOR WHICH MR. BASHAM WAS FOUND GUILTY. NUMBER ONE, LIFE IMPRISONMENT WITHOUT THE POSSIBILITY OF RELEASE, WHICH MEANS JUST WHAT THOSE WORDS IMPLY. THE DEFENDANT WOULD SERVE THE REST OF HIS NATURAL LIFE IN PRISON WITH NO POSSIBILITY OF BEING RELEASED UNDER ANY CIRCUMSTANCES.

OR, NUMBER TWO, THE DEATH PENALTY, WHICH MEANS JUST WHAT THOSE WORDS IMPLY, MR. BASHAM WOULD BE PUT TO DEATH.

WHETHER OR NOT THE CIRCUMSTANCES IN THIS CASE AUTHORIZE OR JUSTIFY IMPOSING A SENTENCE OF LIFE IMPRISONMENT WITHOUT THE

POSSIBILITY OF RELEASE OR DEATH, IS A DECISION THAT THE LAW LEAVES ENTIRELY UP TO YOU. THE DEATH PENALTY IS NEVER MANDATORY. THAT DECISION IS TO BE MADE BY YOU AT THE COMPLETION OF THE PROCEEDING THAT WE ARE ABOUT TO BEGIN, WHICH IS KNOWN AS THE PENALTY PHASE TRIAL. ONCE YOU RETURN YOUR VERDICT, I AM REQUIRED BY LAW TO SENTENCE THE DEFENDANT IN ACCORDANCE WITH YOUR DECISION. YOU SHOULD NOT TAKE ANYTHING THAT I MAY SAY OR DO DURING THIS PHASE OF THE PROCEEDING AS INDICATING WHAT I THINK OF THE EVIDENCE OR WHAT I THINK YOUR VERDICT SHOULD BE.

NOW, THE PENALTY PHASE WILL PROCEED IN THE FOLLOWING ORDER.

FIRST, THE PARTIES WILL HAVE THE OPPORTUNITY TO MAKE OPENING STATEMENTS. THE GOVERNMENT WILL MAKE AN OPENING STATEMENT AT THE BEGINNING OF THE CASE. THE DEFENDANT MAY MAKE AN OPENING STATEMENT FOLLOWING THE GOVERNMENT, BUT HE IS NOT REQUIRED TO MAKE AN OPENING STATEMENT. WHAT IS SAID IN THE OPENING STATEMENT IS NOT EVIDENCE. THE OPENING STATEMENT SIMPLY SERVES AS AN INTRODUCTION TO THE EVIDENCE THAT THE PARTY MAKING THE OPENING STATEMENT INTENDS TO PRODUCE DURING THE TRIAL.

SECOND, AFTER THE OPENING STATEMENTS, THE GOVERNMENT WILL GO FIRST AND INTRODUCE EVIDENCE THAT IT FEELS AUTHORIZES OR JUSTIFIES THE IMPOSITION OF THE DEATH PENALTY FOR EACH OF THE TWO CHARGES AS TO WHICH MR. BASHAM WAS FOUND GUILTY.

IT IS THE DEFENDANT'S BURDEN TO ESTABLISH ANY MITIGATING FACTORS BY A PREPONDERANCE OF THE EVIDENCE.  TO PROVE SOMETHING BY A PREPONDERANCE OF THE EVIDENCE IS TO PROVE THAT IT IS MORE LIKELY TRUE THAN NOT TRUE.  A PREPONDERANCE OF THE EVIDENCE MEANS THAT THE GREATER WEIGHT OF THE EVIDENCE IN TERMS OF THE QUALITY AND PERSUASIVE VALUE, NOT THE AMOUNT OF EVIDENCE.  THE PREPONDERANCE OF THE EVIDENCE IS NOT NECESSARILY DETERMINED BY THE GREATER NUMBER OF WITNESSES OR EXHIBITS PRESENTED BY THE GOVERNMENT OR BY A DEFENDANT.  IT IS DETERMINED BY CONSIDERING ALL OF THE EVIDENCE AND DECIDING WHICH OF THE EVIDENCE IS MORE BELIEVABLE.  IF, ON ANY ISSUE IN THE CASE, THE EVIDENCE IS EQUALLY BALANCED, YOU CANNOT FIND THAT ISSUE HAS BEEN PROVED.  TO PROVE SOMETHING BY THE PREPONDERANCE OF THE EVIDENCE IS A LESSER STANDARD OF PROOF THAN PROOF BEYOND A REASONABLE DOUBT.

AFTER YOU HAVE DECIDED UPON THE AGGRAVATING AND MITIGATING FACTORS THAT ARE PRESENTED AS TO THE DEFENDANT, THE LAW REQUIRES YOU TO WEIGH THESE FACTORS AND TO DECIDE WHETHER YOU ARE UNANIMOUSLY PERSUADED THAT THE AGGRAVATING FACTORS SUFFICIENTLY OUTWEIGH ANY MITIGATING FACTORS TO JUSTIFY IMPOSING A SENTENCE OF DEATH.  YOU SHOULD DO THIS WITH REGARD TO EACH OF THE TWO COUNTS OF THE INDICTMENT.  EVEN IF YOU DETERMINE THAT NO MITIGATING FACTORS HAVE BEEN PROVEN TO EXIST, YOU MUST CONSIDER WHETHER THE AGGRAVATING FACTORS THAT HAVE BEEN PROVEN ARE THEMSELVES SUFFICIENT TO JUSTIFY IMPOSING

A SENTENCE OF DEATH.  AS I HAVE TOLD YOU PREVIOUSLY, THE DEATH PENALTY IS NEVER AUTOMATIC.

I WILL GIVE YOU MORE DETAILED INSTRUCTIONS OF THE WEIGHING OF AGGRAVATING AND MITIGATING FACTORS BEFORE YOU BEGIN YOUR DELIBERATIONS.  HOWEVER, I INSTRUCT YOU NOW THAT ONLY THE AGGRAVATING AND MITIGATING FACTORS, NOT THE THRESHOLD INTENT FACTORS, ARE TO BE WEIGHED IN DETERMINING THE APPROPRIATE SENTENCE; AND YOU MUST NOT SIMPLY COUNT THE NUMBER OF AGGRAVATING AND MITIGATING FACTORS AND REACH A DECISION BASED ON WHICH NUMBER IS GREATER, YOU MUST CONSIDER THE WEIGHT AND VALUE OF EACH FACTOR AND MAKE YOUR DECISION ACCORDINGLY AS TO EACH COUNT.

PASSION, PREJUDICE, AND ANY ARBITRARY CONSIDERATIONS HAVE NO ROLE TO PLAY IN YOUR EFFORTS TO REACH A JUST RESULT IN THIS CASE.  IN CAREFULLY WEIGHING THE VARIOUS FACTORS AT ISSUE IN THIS CASE, YOU ARE CALLED UPON TO MAKE A UNIQUE, INDIVIDUALIZED JUDGMENT ABOUT THE APPROPRIATENESS OF IMPOSING A SENTENCE OF LIFE IN PRISON WITHOUT THE POSSIBILITY OF RELEASE OR DEATH UPON THE DEFENDANT FOR EACH OF THE TWO COUNTS AT ISSUE HERE.

IN SHORT, WHAT IS CALLED FOR IN THE WEIGHING PROCESS -- EXCUSE ME, IN SHORT, WHAT IS CALLED FOR IN WEIGHING THE VARIOUS FACTORS IS NOT MATHEMATICAL SKILLS, BUT YOUR CAREFUL, CONSIDERED, AND MATURE JUDGMENT.  AT THIS FINAL WEIGHING STAGE IN THE PROCESS, YOU ARE NOT CALLED UPON SIMPLY TO FIND

EVIDENCE.  JUST REMEMBER,  REMEMBER ANYTHING THAT I HAVE SAID THIS MORNING,  IT IS NOT BRANDON BASHAM'S CHOICE,  IT IS YOUR CHOICE.

THE COURT:  THANK YOU,  MR. HARRIS. PLEASE CALL YOUR FIRST WITNESS.

MR. GASSER:  YOUR HONOR,  PRIOR TO CALLING THE FIRST WITNESS,  AT THIS TIME,  PURSUANT TO STATUTE AND THE CASE LAW, THE GOVERNMENT WOULD MOVE TO INCORPORATE ALL OF THE TESTIMONY, BOTH DIRECT,  CROSS,  AND REDIRECT OF THE 89 WITNESSES PRESENTED IN THE GUILT STAGE.  WE WOULD MOVE TO INCORPORATE ALL OF THE EVIDENCE AND EXHIBITS THAT WERE INTRODUCED DURING THE GUILT PHASE.  WE WOULD MOVE TO INCORPORATE ALL OF THE STIPULATIONS THAT WERE AGREED UPON BETWEEN THE GOVERNMENT AND DEFENSE COUNSEL FOR MR. BASHAM.

THE COURT:  ALL RIGHT.  MEMBERS OF THE JURY,  I TOLD YOU IN THE PRELIMINARY INSTRUCTIONS IN YOUR CONSIDERATION OF THE DECISION YOU MUST MAKE IN THIS PHASE OF THE TRIAL,  YOU MAY REFER BACK TO ALL OF THE EVIDENCE THAT WAS ADMITTED IN THE FIRST TRIAL, THE GUILT PHASE.  THAT INCLUDES THE TESTIMONY OF WITNESSES,  BOTH ON DIRECT AND CROSS-EXAMINATION,  THE EXHIBITS THAT WERE OFFERED FOR YOUR REVIEW,  AND ANY STIPULATIONS THAT WERE REACHED BY THE PARTIES.  ALL OF THAT INFORMATION IS ONCE AGAIN BEFORE YOU AS YOU GO ABOUT DECIDING THIS PHASE OF THE TRIAL.  YOU MAY PROCEED.

MR. GASSER:  THANK YOU.  AT THIS TIME, THE GOVERNMENT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

UNITED STATES OF AMERICA,    )    CR. NO. 4:02-992
    )    COLUMBIA, SC
    )    NOVEMBER 1, 2004
    )
    VERSUS    )
    )
BRANDON L. BASHAM,    )
    DEFENDANT.    )
_____    )

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.,
CHIEF UNITED STATES DISTRICT COURT JUDGE
JURY TRIAL XXIX

APPEARANCES:

FOR THE GOVERNMENT:    SCOTT SCHOOLS, FIRST AUSA
    JONATHAN S. GASSER, AUSA
    JOHN DUANE, AUSA
    UNITED STATES ATTORNEY'S OFFICE
    1441 MAIN STREET, SUITE 500
    COLUMBIA, SC  29201

FOR THE DEFENDANT:    JACK SWERLING, ESQ.
    STEVE HISKER, ESQ.
    1720 MAIN STREET
    SUITE 301
    COLUMBIA, SC  29201

    GREG HARRIS, ESQ.
    1720 MAIN STREET
    SUITE 301
    COLUMBIA, SC  29201

COURT REPORTER:    DEBRA R. JERNIGAN, RPR, CRR
    UNITED STATES COURT REPORTER
    901 RICHLAND STREET
    COLUMBIA, SC 29201

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
*** *** *** ***

BUT WHEN THE BURNS'S FAMILY AND DONOVAN'S FAMILY WERE TESTIFYING, HE SHED NO TEARS. THAT WAS THE ONLY REFERENCE TO THE COURTROOM DEMEANOR SITTING AT THE DEFENSE TABLE; HOWEVER, AS THE COURT HAS JUST RULED, I CAN COMMENT ALL I WANT ABOUT HIS DEMEANOR WITH REGARD TO HIS OUTBREAK IN THE COURTROOM, AND WHAT HE DID, AND HOW HE IS MORE CONCERNED --

THE COURT: THAT WAS THE SUBJECT OF TESTIMONY. THAT WAS THE SUBJECT OF TESTIMONY.

MR. GASSER: YES, SIR.

THE COURT: TO THE EXTENT YOU WANT TO SUGGEST THAT THAT OUTBREAK SUGGESTS A LACK OF REMORSE, I THINK THAT IS FAIR GAME BECAUSE, AS I SAID EARLIER, THAT WAS TESTIFIED ABOUT. ALL RIGHT. ARE YOU READY TO PROCEED?

MR. SWERLING: JUDGE, MAY I STEP IN THE REST ROOM A MOMENT?

THE COURT: ALL RIGHT. GO AHEAD. WE WILL JUST WAIT RIGHT HERE.

(WHEREUPON, A SHORT RECESS WAS HELD.)

THE COURT: ALL RIGHT. BRING IN THE JURY, PLEASE.

(WHEREUPON, THE FOLLOWING WAS HEARD IN THE PRESENCE OF THE TRIAL JURY.)

THE COURT: THE COURT RECOGNIZES MR. JOHN GASSER FOR THE GOVERNMENT IN HIS CLOSING ARGUMENT.

MR. GASSER: MAY IT PLEASE THE COURT. GENTLEMEN. GOOD MORNING, LADIES AND GENTLEMEN. WE HAVE AGAIN REACHED

THAT STAGE, THE SENTENCING PHASE OF THIS TRIAL, WHICH IS KNOWN AS CLOSING ARGUMENTS.  THE PROCEDURE IS EXACTLY THE SAME AS IT WAS DURING THE GUILT PHASE OF THE ARGUMENT, WHICH YOU HAVE ALREADY DEALT WITH.  THAT IS, I HAVE AN OPPORTUNITY, SINCE THE BURDEN OF PROOF IS ON THE GOVERNMENT IN THIS CASE, TO COME BEFORE YOU AND PROVIDE MY CLOSING REMARKS TO YOU.  CLOSING REMARKS, AT THIS STAGE, ARE ACTUALLY SOMEWHAT SHORTER THAN CLOSING REMARKS DURING THE GUILT PHASE BECAUSE YOU HAVE OBVIOUSLY HEARD ALL OF THAT TESTIMONY AND SIMPLY HAVE TO INCORPORATE THAT TESTIMONY VERBALLY ON THE RECORD.  SO, THEY WILL BE SOMEWHAT SHORTER, BUT, AGAIN, SOME LENGTH TO IT.

AS I ASK YOU TO DO, AND AS YOU DID FOR ME AND MR. SWERLING DURING THE GUILT PHASE, WE SIMPLY RESPECTFULLY REQUEST THAT YOU PAY ATTENTION TO US, AND I KNOW THAT YOU WILL BECAUSE YOU HAVE PAID REMARKABLE ATTENTION OVER THE LAST SEVERAL WEEKS AS THE SENTENCING PHASE HAS TAKEN PLACE.

THE IMPORTANCE OF JURY SERVICE, I AM SURE, WAS OBVIOUS TO EACH AND EVERY ONE OF YOU, PROBABLY SOMEWHAT IN THE ABSTRACT WHEN YOU CAME TO COURT SOME TIME BACK IN AUGUST, SOME OF YOU THE FIRST WEEK OR TWO IN SEPTEMBER. I WOULD LIKE TO THINK THAT YOUR EXPERIENCE ON THIS JURY HAS BEEN EDUCATIONAL.  I KNOW AT TIMES IT HAS BEEN DIFFICULT SITTING THROUGH TESTIMONY, GOING BACK INTO YOUR JURY ROOM.  I KNOW YOU HAVE HAD TIME AWAY FROM YOUR FAMILY, TIME AWAY FROM YOUR FRIENDS, TIME AWAY FROM YOUR WORK, AND I KNOW THAT HAS BEEN DIFFICULT.  AND

I KNOW I SPEAK ON BEHALF OF THE DEFENSE ATTORNEYS, AS WELL, WE THANK YOU FOR THE REMARKABLE, REMARKABLE ATTENTION THAT YOU HAVE GIVEN THIS CASE.

LET ME APPROACH 9-11. AMERICA ELECTIONS WILL BE HELD TOMORROW. I THINK ONE OF THE THINGS THAT I HOPE YOU HAVE A SENSE OF IS PRIDE. PRIDE IN BEING A PART OF YOUR GOVERNMENT, A PART OF A SYSTEM OF JUSTICE IN WHICH SO MANY AMERICANS HAVE GIVEN THE ULTIMATE SACRIFICE TO. AND REGARDLESS OF WHAT VERDICT YOU REACH IN THIS CASE, IF THERE IS ONE THING EACH AND EVERY ONE OF YOU CAN TAKE AWAY FROM THIS EXPERIENCE, IT IS PRIDE. NO ONE WILL BE ABLE TO QUESTION YOUR VERDICT.

EACH AND EVERY ONE OF YOU, INCLUDING YOU ALTERNATES THAT MAY NOT SIT, EACH AND EVERY ONE OF YOU, EACH AND EVERY ONE OF YOU IS FACED WITH A CIVIC RESPONSIBILITY, AND YOU HAVE MET THAT RESPONSIBILITY. AND NO ONE, NO ONE HAS A RIGHT TO JUDGE YOU OR JUDGE YOUR VERDICT. YOUR VERDICT WILL BE INDIVIDUAL, AND YOUR VERDICT WILL BE COLLECTIVE, AND IT WILL BE A JUST VERDICT, WHETHER IT BE LIFE IN PRISON WITHOUT PAROLE OR WHETHER IT BE THE DEATH PENALTY. YOU SHOULD BE PROUD OF THAT FACT.

MR. SCHOOLS MENTIONED TO YOU IN HIS OPENING REMARKS DURING THE SENTENCING PHASE THAT BRANDON BASHAM HAS MADE A NUMBER OF OTHER CHOICES SINCE HE WAS ARRESTED ON THESE CHARGES. AND THEN HE OUTLINED FOR YOU SOME OF THE CHOICES THAT MR. BASHAM MADE, HIS CONDUCT, HIS ACTIONS SINCE HE WAS ARRESTED. I AM

GOING TO TALK TO YOU ABOUT THAT DURING A PORTION OF MY CLOSING REMARKS. ONE THING I WANT TO REMIND YOU, I WANT TO REMIND YOU LADIES AND GENTLEMEN OF SOMETHING. IT HAS BEEN 32 DAYS SINCE YOU JURORS CONVICTED BRANDON BASHAM OF THE KIDNAPPING, RESULTING IN DEATH AND CARJACKING, RESULTING IN DEATH OF 44-YEAR-OLD ALICE DONOVAN. IT HAS BEEN 32 DAYS. BUT DESPITE THAT TIME PERIOD, DESPITE ALL OF THE EVIDENCE AND TESTIMONY YOU HEARD DURING THE SENTENCING PHASE FROM THE GOVERNMENT'S WITNESSES AND FROM THE WITNESSES CALLED ON BEHALF OF MR. BASHAM, ONE THING REMAINS ABSOLUTELY CLEAR. FROM THE TIME WE STARTED ON AUGUST 30TH SELECTING YOU JURORS, YOU HAVE HEARD THE TESTIMONY OF THE 89 WITNESSES DURING THE GUILT PHASE, AND THEN YOU HAVE HEARD THE TESTIMONY OF THE 44 GOVERNMENT WITNESSES, THE 31 DEFENSE WITNESSES, AND THE TWO WITNESSES THE GOVERNMENT OFFERED IN REPLY, ONE THING IS ABSOLUTELY CLEAR, THIS CASE HAS ALWAYS BEEN AND WILL ALWAYS BE ABOUT ALICE DONOVAN AND SAMANTHA BURNS AND THE CHOICES THAT BRANDON BASHAM MADE IN NOVEMBER OF 2002.

MR. HARRIS STATED TO YOU JURORS IN HIS OPENING REMARKS IN THE SENTENCING PHASE THAT DURING THE SENTENCING PHASE OF A DEATH PENALTY CASE OR IN THIS CASE, THE FOCUS SHOULD NOT BE ON WHAT HAPPENED, BUT WHY IT HAPPENED. LADIES AND GENTLEMEN, AS I STAND BEFORE YOU TODAY, THE GOVERNMENT CANNOT DISAGREE ANY MORE STRONGLY WITH THAT STATEMENT. WHY THIS HAPPENED, THAT MAY BE RELEVANT IN AN ACADEMIC SETTING,

THAT MAY BE RELEVANT AT A SEMINAR OR A CONFERENCE OF THOSE INDIVIDUALS THAT DEAL WITH ISSUES SUCH AS THAT, BUT THAT IS NOT RELEVANT FOR A JURY AND A CRIMINAL JUSTICE SYSTEM THAT OUR COUNTRY HAS TO DECIDE WHETHER LIFE IN PRISON WITHOUT PAROLE OR DEATH IS THE APPROPRIATE PUNISHMENT BASED ON THE FACTS, AND CIRCUMSTANCES, AND THE CONDUCT, AND ACTIONS OF A CRIMINAL DEFENDANT. IN THIS CASE, BRANDON BASHAM. WHAT HAPPENED IS CLEARLY THE MOST RELEVANT ISSUE THAT YOU JURORS WILL HAVE TO DECIDE UPON IN DETERMINING WHAT THE APPROPRIATE PUNISHMENT IS.

MR. SWERLING SAID SOMETHING WAY BACK ON SEPTEMBER 13TH IN HIS OPENING REMARKS DURING THE GUILT PHASE THAT WAS ABSOLUTELY TRUE AND IT WAS ABSOLUTELY GENUINE. IT WAS TRUE AND IT WAS GENUINE. MR. SWERLING STOOD BEFORE YOU DURING HIS OPENING REMARKS OF THE GUILT PHASE OF THIS TRIAL ON SEPTEMBER 13TH AND SAID, LADIES AND GENTLEMEN, I AM DEEPLY SORRY FOR THE DESPICABLE ACTS COMMITTED AGAINST ALICE DONOVAN. WHEN MR. SWERLING MADE THAT STATEMENT, HE WAS NOT ONLY SPEAKING ON HIS OWN BEHALF, HE WAS SPEAKING ON BEHALF OF MR. HARRIS. BECAUSE MR. SWERLING AND MR. HARRIS, THEY ARE DEEPLY SORRY. THEY ARE GOOD HUSBANDS, THEY ARE GOOD FATHERS, THEY ARE GOOD MEN. AND WHEN MR. SWERLING STOOD BEFORE YOU, HE WAS SPEAKING FROM HIS HEART.

LADIES AND GENTLEMEN, FOR YOUR ROLE, FOR YOUR PURPOSE, THE RELEVANT FACT IS THAT BRANDON BASHAM IS NOT. HE IS NOT. YOU HAVE SEEN THE TESTIMONY AND THE EVIDENCE OF BRANDON

BASHAM'S COURSE OF CONDUCT ON NOVEMBER 2002.  HAVE YOU SEEN BRANDON BASHAM'S CONDUCT AND HIS ACTIONS SINCE HE WAS ARRESTED AND CHARGED WITH THE MOST SERIOUS OFFENSES KNOWN TO MAN, THE INTENTIONAL CARJACKING, KIDNAPPING, AND KILLING OF TWO RANDOM, INNOCENT WOMEN.  YOU HAVE SEEN HIS CONDUCT.  YOU HAVE SEEN HIS ATTITUDE.  BRANDON BASHAM CARES MORE ABOUT GETTING A PINCH OF DIP OF TOBACCO BETWEEN HIS CHEEK AND GUM DURING THE MORNING AND AFTERNOON BREAKS OF THESE PROCEEDINGS THAN HE DOES ABOUT WHAT HE DID TO 19-YEAR-OLD SAMANTHA BURNS ALONG THE BANKS OF THE GUYANDOTTE RIVER.  HE CARES MORE ABOUT THAT HIGH, ABOUT THAT RUSH THAN WHAT HE DID TO ALICE DONOVAN ON A SUNNY NOVEMBER DAY IN CONWAY, SOUTH CAROLINA.

AND IT MIGHT BE HARD FOR YOU TO UNDERSTAND THAT.  YOU ARE GOOD PEOPLE.  YOU GO ABOUT YOUR BUSINESS, AND YOU HAVE YOUR OWN LIVES, AND YOU ARE HONEST CITIZENS OF SOUTH CAROLINA. AND IT MAY BE DIFFICULT FOR YOU TO COMPREHEND HOW SOMEONE CAN JUST NOT CARE.  BUT, LADIES AND GENTLEMEN, FACTS ARE FACTS. WE DO NOT LIVE IN A FANTASY LAND.  THIS IS SOMETHING YOU ARE USED TO SEEING ON TELEVISION, OR SEEING IN THE MOVIES, OR READING ABOUT IN A NOVEL.  IT WAS MAKE-BELIEVE TO YOU BEFORE YOU ENTERED THIS PROCESS.  BUT THE FACT OF THE MATTER IS, IS THAT THAT MAN SITTING OVER THERE AT THAT TABLE DOES NOT CARE ONE BIT ABOUT WHAT HE DID TO THESE TWO WOMEN.  AND IF THERE IS ANYTHING YOU REMEMBER DURING MY CLOSING ARGUMENT, IF THERE IS ANYTHING YOU REMEMBER THE REST OF TODAY, I ASK YOU, I ASK

YOU, BACK IN THAT JURY ROOM, REMEMBER THAT FACT. EMBRACE THAT FACT. ACCEPT THAT FACT, BRANDON BASHAM DOESN'T CARE.

MY OUTLINE FOR THESE CLOSING REMARKS WILL BE THAT I WILL DISCUSS WITH YOU THE LAW, THE LAW IN GENERAL. I WILL TALK TO YOU ABOUT SOME OF THE GATEWAY FACTORS, THE THREE GATEWAY FACTORS THE JUDGE DISCUSSED WITH YOU THAT YOU MUST FIND BEFORE YOU CAN EVEN CONSIDER THE DEATH PENALTY. I WOULD SPEND SOME TIME WITH YOU TALKING ABOUT THE INTENT FACTOR THAT YOU MUST FIND. I WOULD DISCUSS WITH YOU THE NONSTATUTORY AGGRAVATING FACTORS OR CIRCUMSTANCES, THE EVIDENCE AND TESTIMONY RELATED TO THE NONSTATUTORY AGGRAVATING FACTORS THAT THE GOVERNMENT HAS ALLEGED. AND THOSE ARE FACTORS WHICH SEPARATES A CASE, MAKES A HORRIBLE HOMICIDE MUCH MORE CRUELER, MUCH WORSE. THOSE ARE THE FACTORS THAT JUSTIFY THE SENTENCING OF A CRIMINAL DEFENDANT TO DEATH FOR HIS ACTIONS, FOR HIS CONDUCT.

I WILL DISCUSS WITH YOU, AS WELL, THE STATUTORY OR DEFENSE MITIGATION EVIDENCE AS WELL, VERY BRIEFLY. I WILL DISCUSS WITH YOU, IN GENERAL, DEFENSE MITIGATION, AS WELL. I WILL HAVE A FINAL POINT OR TWO BEFORE I WILL SIT DOWN.

BEFORE I GET TO THE LAW, A COUPLE OTHER POINTS I WANT TO DISCUSS WITH YOU OR REMIND YOU BECAUSE IT HAS BEEN 32 DAYS, 33 DAYS, ACTUALLY, SINCE I SUMMARIZED THE GOVERNMENT'S CASE IN GUILT FOR YOU JURORS. REMEMBER, THE EVIDENCE AND THE TESTIMONY THAT YOU SAW DURING THE GUILT PHASE OF THIS CASE, THIS WAS A TWO-MAN TEAM. THIS WAS BRANDON BASHAM AND CHAD

FULKS ACTING TOGETHER AS A TEAM.  THEIR ACTIONS,  THEIR CONDUCT,  THEIR CHOICES WERE MADE AS A TEAM.  BRANDON BASHAM COULD NOT HAVE CARJACKED AND KIDNAPPED SAMANTHA BURNS OR ALICE DONOVAN WITHOUT CHAD FULKS.  AND CHAD FULKS COULD NOT HAVE CARJACKED AND KIDNAPPED SAMANTHA BURNS AND ALICE DONOVAN WITHOUT BRANDON BASHAM.  THEY ARE EQUALLY CULPABLE.  BUT FOR THE ACTIONS OF BRANDON BASHAM, AND BUT FOR THE ACTIONS OF CHAD FULKS,  SAMANTHA BURNS WOULD BE ALIVE TODAY AND ALICE DONOVAN WOULD BE ALIVE TODAY.  BUT FOR BRANDON BASHAM'S ACTIONS, SAMANTHA BURNS WOULD BE FINISHING UP HER EDUCATION AT MARSHAL UNIVERSITY.  SHE WOULD STILL HAVE ALL OF HER HOPES AND DREAMS. AND ALICE DONOVAN WOULD STILL BE WORKING,  WOULD STILL BE WORKING ON HER DREAM HOUSE,  AND WOULD PROBABLY BE TALKING TO HER COWORKERS RIGHT NOW AND SHOWING THEM PHOTOGRAPHS OF WHAT HER GRANDCHILDREN DRESSED AS FOR HALLOWEEN.  BUT FOR BRANDON BASHAM AND CHAD FULKS,  NOT ONLY WOULD SAMANTHA BURNS BE ALIVE TODAY,  NOT ONLY WOULD ALICE DONOVAN BE ALIVE TODAY,  BUT NONE OF US,  NO ONE IN THIS COURTROOM WOULD BE HERE TODAY.

THIS CASE HAS ALWAYS BEEN ABOUT CHOICES.  IT HAS ALWAYS BEEN ABOUT CHOICES.  LADIES AND GENTLEMEN,  ON NOVEMBER 11TH, 2002,  BRANDON BASHAM CHOSE SAMANTHA BURNS.  HE DIDN'T KNOW SAMANTHA BURNS.  HE DIDN'T KNOW SHE WAS A STUDENT AT MARSHALL UNIVERSITY.  HE DIDN'T KNOW SHE WAS A LOVING DAUGHTER AND SISTER.  HE DIDN'T KNOW SHE HAD FRIENDS, THAT SHE ENJOYED PLAYING SOFTBALL ON HER HIGH SCHOOL TEAM.  HE DIDN'T KNOW

THAT SHE LOVED TO SHOP. HE HAD NO IDEA THAT, ON THAT VERY DAY, SHE HAD GONE TO LUNCH WITH HER MOTHER AND TALKED ABOUT FINISHING HER EDUCATION, FINDING SOMEONE TO FALL IN LOVE WITH, GETTING MARRIED, HAVING CHILDREN, AND RAISING HER FAMILY IN THE SAME LOCATION OF WEST VIRGINIA AS HER PARENTS AND HER GRANDPARENTS. BRANDON BASHAM DIDN'T KNOW THOSE THINGS. BRANDON BASHAM DIDN'T CARE.

ON NOVEMBER 14TH, HE MADE ANOTHER CHOICE. HE CHOSE ALICE DONOVAN. BRANDON BASHAM DIDN'T KNOW ALICE DONOVAN. HE DIDN'T KNOW SHE WAS A 44-YEAR-OLD GRANDMOTHER AND MOTHER. HE DIDN'T KNOW SHE WAS A DEVOTED WIFE TO BARRY. HE DIDN'T KNOW ALICE HAD A GREAT SENSE OF HUMOR, WAS A HARD WORKER. HE DIDN'T KNOW SHE ENJOYED CATS, SHE LOVED FLOWERS, AND GARDENING. SHE HAD JUST FINISHED BUILDING HER DREAM HOUSE. BRANDON BASHAM DIDN'T KNOW THOSE THINGS. AND HE DIDN'T CARE.

YOU SEE, IN NOVEMBER OF 2002, BRANDON BASHAM HAD TWO VERY IMPORTANT CHOICES TO MAKE WHEN IT CAME TO SAMANTHA BURNS AND ALICE DONOVAN, TWO VERY IMPORTANT CHOICES. SHOULD THEY LIVE OR SHOULD THEY DIE? AND BRANDON BASHAM WAS CONSISTENT IN HIS DECISION-MAKING. BECAUSE, BOTH TIMES, BRANDON BASHAM CHOSE DEATH.

THERE WAS NOBODY LOOKING OUT FOR THE INTEREST OF SAMANTHA BURNS AND ALICE DONOVAN ON THOSE DAYS. THERE WERE NO RULES OR REGULATIONS ALONG THE BANKS OF THE GUYANDOTTE OR OHIO RIVER TO PROTECT SAMANTHA BURNS. NO LAWS TO PROTECT ALICE DONOVAN

IN THE WOODS OF NORTH OR SOUTH CAROLINA, WHEREVER SHE MAY BE. ON THOSE DAYS, IT WAS THE LAW, ACCORDING TO BRANDON BASHAM AND CHAD FULKS, THAT PREVAILED. THEIR LAW, THEIR RULES, THEIR CHOICES. BRANDON BASHAM AND CHAD FULKS WERE ALICE DONOVAN'S JUDGE, THEY WERE ALICE DONOVAN'S JURY, AND THEY WERE ALICE DONOVAN'S EXECUTIONERS. THE TRAVESTY OF IT ALL, LADIES AND GENTLEMEN, IS THAT ALICE DONOVAN AND SAMANTHA BURNS TRULY WERE INNOCENT WOMEN. YOU CAN'T CHANGE THAT. YOU CAN'T CHANGE THAT. BUT YOU CERTAINLY HAVE THE POWER AND THE AUTHORITY TO REACH A VERDICT THAT HOLDS BRANDON BASHAM ACCOUNTABLE FOR HIS ACTIONS. AND THAT IS EXACTLY WHAT WE ARE GOING TO ASK YOU TO DO LATER ON THIS AFTERNOON IS HOLD HIM ACCOUNTABLE FOR HIS ACTIONS.

NOW THE LAW, IN GENERAL. BEFORE YOU CAN EVEN CONSIDER SENTENCING MR. BASHAM TO DEATH BY LAW, PROCEDURALLY, YOU HAVE TO FIND -- TAKE CERTAIN STEPS, AND THE JUDGE HAS ALREADY KIND OF DESCRIBED THOSE STEPS FOR YOU IN HIS INITIAL CHARGE TO YOU. YOU NEED TO TAKE CERTAIN STEPS BEFORE YOU CAN EVEN CONSIDER THE DEATH PENALTY AND MAKE CERTAIN FINDINGS BEYOND A REASONABLE DOUBT. THOSE ARE COMMONLY REFERRED TO AS GATEWAY FACTORS. THERE ARE BASICALLY THREE GATEWAY FACTORS THAT YOU JURORS UNANIMOUSLY MUST FIND BEYOND A REASONABLE DOUBT BEFORE YOU CAN EVEN CONSIDER SENTENCING MR. BASHAM TO DEATH. THE FIRST GATEWAY FACTOR IS THAT YOU MUST FIND, AT THE TIME THAT HE COMMITTED THE CRIMES OF CARJACKING, RESULTING IN DEATH, AND

KIDNAPPING RESULTING IN DEATH, YOU MUST FIND THAT MR. BASHAM WAS 18 YEARS OLD AT THAT TIME. THAT HAS OBVIOUSLY BEEN AGREED UPON. HE WAS 21 YEARS, AT THE TIME. THAT IS NOT AN ISSUE THAT YOU MUST DECIDE. TECHNICALLY, YOU HAVE TO DECIDE ON THAT, VOTE ON THAT, CHECK IT OFF.

SECOND GATEWAY FACTOR THAT YOU MUST FIND UNANIMOUS BEYOND A REASONABLE DOUBT, WHICH IS KNOWN AS A THRESHOLD INTENT FACTOR. I AM GOING TO GET INTO THAT IN A MOMENT. THERE WILL BE A CHART UP HERE IN A MOMENT. I WILL GET INTO THAT IN A MOMENT. THE JUDGE WILL CHARGE YOU THAT YOU JURORS ARE ONLY ALLOWED TO FIND ONE. NOW, THE GOVERNMENT SUBMITS TO YOU THAT THERE IS ACTUALLY EVIDENCE IN WHICH YOU JURORS COULD FIND FOUR OR ALL FOUR OF THEM. BUT, AS A MATTER OF LAW, YOU ARE ONLY REQUIRED TO FIND ONE. AND ONCE YOU FIND ONE, ONCE YOU FIND WHICH ONE IS THE MOST APPROPRIATE FOR THIS CASE, YOU CAN ONLY FIND ONE. YOU CAN ONLY SELECT ONE, DESPITE THE FACT THAT THERE IS EVIDENCE YOU BELIEVE THERE ARE TWO, OR THREE, OR ALL FOUR PRESENT.

ONCE YOU FIND HE IS 18 YEARS OLD AT THE TIME THE CRIME WAS COMMITTED, THEN YOU GO TO THE THRESHOLD INTENT FACTOR. SELECT ONE OF THE THRESHOLD INTENT FACTORS THAT IS PRESENT IN THIS CASE. I WILL GET TO THOSE AGAIN ON HOW THE EVIDENCE SUGGESTS THAT AT LEAST ONE, IF NOT MORE OF THOSE FACTORS ARE PRESENT.

THE THIRD, THIRD GATEWAY FACTOR YOU MUST FIND BEYOND A REASONABLE DOUBT UNANIMOUSLY, THE PRESENCE OF THE STATUTORY

AGGRAVATING FACTOR THE GOVERNMENT HAS ALLEGED AND THE JUDGE CHARGED YOU IN THE OPENING. THE GOVERNMENT -- THE STATUTORY AGGRAVATING FACTOR THAT THE GOVERNMENT ALLEGED IS THAT ALICE DONOVAN DIED IN THE COURSE OF A KIDNAPPING. I KNOW MOST OF YOU ARE PROBABLY SAYING TO YOURSELVES, JUST AS MR. SCHOOLS INDICATED, WELL, YOU ALREADY FOUND THAT FACTOR, THAT IS CORRECT. BUT YOU HAVE TO, YOU HAVE TO FOLLOW TECHNICAL PROCEDURES IN THIS CASE. I WILL DISCUSS THAT BRIEFLY WITH YOU, AS WELL, WHAT I MEAN BY THAT. THOSE ARE THE GATEWAY FACTORS.

I AM ALSO GOING TO DISCUSS WITH YOU NONSTATUTORY AGGRAVATING FACTORS. BUT, LADIES AND GENTLEMEN, ONCE YOU FIND HE IS 18, MR. BASHAM, AT THE TIME OF THE CRIME, ONCE YOU FIND ONE OF THOSE STATUTORY THRESHOLD INTENT FACTORS, AND ONCE YOU FIND THE PRESENCE OF THE AGGRAVATING FACTOR, THE KIDNAPPING, YOU ARE THEN AUTHORIZED TO CONSIDER GIVING MR. BASHAM THE DEATH PENALTY. YOU CAN THEN START DISCUSSING WHETHER THE DEATH PENALTY OR LIFE WITHOUT PAROLE IS THE APPROPRIATE PUNISHMENT.

NOW, WE ARE GOING TO DISCUSS WITH YOU NONSTATUTORY AGGRAVATING FACTORS. THERE ARE THREE GENERAL CATEGORIES OF NONSTATUTORY AGGRAVATING FACTORS THAT I WILL DISCUSS WITH YOU THAT YOU HAVE HEARD TESTIMONY AND EVIDENCE ON. THE GOVERNMENT DOESN'T HAVE TO PROVE ANY. YOU CAN SENTENCE, ONCE YOU FIND THE GATEWAY FACTORS BASED ON THE FACTS AND

TESTIMONY OF THIS CASE, YOU CAN SENTENCE MR. BASHAM TO DIE SIMPLY FOR WHAT HE DID TO ALICE DONOVAN. SIMPLY FOR WHAT HE DID TO ALICE DONOVAN, ONCE YOU FIND THOSE THREE GATEWAY FACTORS. TO THE EXTENT YOU DO FIND AND THE EVIDENCE IS OVERWHELMING, WHEN I WALK YOU THROUGH SOME OF THESE, YOU WILL RECOGNIZE THAT FACT. TO THE EXTENT THAT YOU JURORS FIND NONSTATUTORY AGGRAVATING FACTORS, YOU MUST DO SO BEYOND A REASONABLE DOUBT, UNANIMOUSLY.

ALSO, YOU HAVE HEARD TESTIMONY, YOU WILL HEAR ARGUMENT, YOU HEARD THE JUDGE DISCUSS WITH YOU IN HIS OPENING INSTRUCTIONS BOTH STATUTORY AND NONSTATUTORY MITIGATING FACTORS. WHAT ARE THEY? WELL, JUST AS AGGRAVATING FACTORS ARE EVIDENCE AND TESTIMONY THAT MAKES EITHER BRANDON BASHAM WORSE OFF OR THE CRIME ITSELF WORSE OFF, AGGRAVATES THE CRIME, NONSTATUTORY AND STATUTORY MITIGATING FACTORS, IF YOU BELIEVE THEM, DEPENDING UPON WHAT WEIGHT YOU WANT TO GIVE THEM IF THEY ARE EVEN PRESENT, TEND TO LESSEN SOME OF THE INVOLVEMENT IN THE CRIME OR TEND TO LESSEN WHAT THE APPROPRIATE PUNISHMENT SHOULD BE.

A COUPLE POINTS ON THE STATUTORY AND NONSTATUTORY MITIGATING FACTORS. FIRST OF ALL, THE GOVERNMENT HAS NO BURDEN. THE GOVERNMENT DOES NOT HAVE ANY BURDEN WHATSOEVER WITH REGARD TO MITIGATING FACTORS. THE BURDEN LIES SOLELY WITH THE DEFENDANT. THE DEFENDANT MUST PROVE TO ANY ONE OF YOU, ANY ONE OF YOU BY A PREPONDERANCE OF THE EVIDENCE THE

PRESENCE AND EXISTENCE OF A STATUTORY OR NONSTATUTORY MITIGATING FACTOR.   THE GOVERNMENT HAS NO BURDEN WHATSOEVER IN THIS PROCEDURE IN THE SENTENCING PHASE OF A DEATH PENALTY CASE.

SECOND POINT WE NEED TO KNOW.   JUST BECAUSE THE JUDGE HAS INCLUDED THE STATUTORY MITIGATING OR NONSTATUTORY MITIGATING FACTORS ON THE VERDICT FORM, JUST BECAUSE THEY ARE PRESENT, DOESN'T MEAN THEY ACTUALLY EXIST.   JUST LIKE THE ALLEGATIONS THE GOVERNMENT PUTS, THE ELEMENTS OF THE CRIME YOU ALL FOUND BEYOND A REASONABLE DOUBT, JUST BECAUSE THEY WERE PRESENT ON THE VERDICT FORM IN THE GUILT PHASE, YOU STILL HAD TO FIND BEYOND A REASONABLE DOUBT UNANIMOUSLY THAT THEY EXISTED. JUST BECAUSE THEY ARE LISTED ON THE VERDICT FORM DOES NOT NECESSARILY MEAN THAT THEY ARE PRESENT OR THEY EXIST OR THAT THE DEFENSE HAS SATISFIED THEIR BURDEN.   AND MORE IMPORTANTLY, MORE IMPORTANTLY, JUST BECAUSE ANY ONE OF YOU, OR A GROUP OF YOU, OR ALL OF YOU JURORS MAY FIND THE PRESENCE OF A MITIGATING FACTOR, THAT DOES NOT NECESSARILY MEAN THAT SOMEHOW SHOULD WEIGH IN FAVOR OF LIFE WITHOUT PAROLE.   THAT IS STILL YOUR DECISION.   IT IS YOUR DECISION TO PUT WHATEVER WEIGHT OR NO WEIGHT ON A MITIGATING FACTOR, IF YOU SO FIND ONE.

ONE OTHER POINT ON MITIGATING FACTORS AND AGGRAVATING FACTORS.  JUST BECAUSE YOU MIGHT FIND MORE AGGRAVATING FACTORS THAN MITIGATING FACTORS DOESN'T MEAN YOU SHOULD AUTOMATICALLY

VOTE FOR DEATH.  JUST BECAUSE YOU MAY FIND A NUMBER OR MORE OF MITIGATING FACTORS THAN AGGRAVATING FACTORS, IT DOESN'T MEAN YOU SHOULD AUTOMATICALLY VOTE FOR DEATH.  THAT IS NOT THE WAY THE PROCESS WORKS.  IT IS A WEIGHING PROCESS.

FOR EXAMPLE, THE JUDGE CHARGED YOU IN THE GUILT PHASE, YOU DON'T COUNT UP THE NUMBER OF WITNESSES.  HE WILL TELL YOU IN THIS PHASE, JUST BECAUSE THE GOVERNMENT CALLED 46 WITNESSES, THE DEFENSE CALLED 31, DOESN'T MEAN YOU SHOULD AUTOMATICALLY VOTE FOR DEATH.  IF THE DEFENDANT HAD CALLED 101 AND THE GOVERNMENT CALLED 46, YOU SHOULDN'T AUTOMATICALLY VOTE FOR LIFE.  IT IS THE SAME WITH PRESENCE OF AGGRAVATING AND MITIGATING FACTORS.  YOU DON'T COUNT UP THE FACTORS.  THERE MAY BE ONE AGGRAVATING FACTOR, IF IT IS SERIOUS AND SIGNIFICANT ENOUGH, THERE MAY BE 50 MITIGATING FACTORS.  YOU CAN STILL SENTENCE MR. BASHAM TO DIE.  A 50-POUND BARBELL WEIGHS MORE THAN 50 FEATHERS, SAME CONCEPT.

NOW, THIS WEIGHING PROCESS, LADIES AND GENTLEMEN, ONCE YOU HAVE DETERMINED THE PRESENCE OF THE GATEWAY FACTORS, WHICH YOU MUST BEFORE YOU CAN CONSIDER THE DEATH PENALTY, 18, ONE THRESHOLD INTENT FACTOR, AGGRAVATING CIRCUMSTANCE OF KIDNAPPING, ONCE YOU HAVE DETERMINED THAT, THEN YOU REVIEW THE NONSTATUTORY MITIGATING FACTORS, WHICH ARE THE OTHER VIOLENT CRIMES AND ACTS OF VIOLENCE THAT BRANDON BASHAM COMMITTED, FUTURE DANGEROUSNESS AND EVIDENCE SUBMITTED ON THE IMPACT THIS CRIME HAS HAD ON ALICE DONOVAN'S FAMILY AND

FRIENDS.    THOSE ARE THE NONSTATUTORY AGGRAVATING FACTORS. YOU CAN REVIEW THOSE.    ONCE YOU REVIEW ANY STATUTORY NONSTATUTORY MITIGATING FACTOR,   ONCE YOU HAVE DONE THAT, ONCE YOU HAVE REVIEWED ALL OF THIS EVIDENCE AND TESTIMONY,, THEN YOU MUST ENGAGE IN BOTH INDIVIDUALLY AND COLLECTIVELY A WEIGHING PROCESS.   IT IS A SUBJECTIVE PROCESS.    IT IS NOT AN OBJECTIVE ANALYSIS.    IT IS A SUBJECTIVE PROCESS, BOTH INDIVIDUALLY IN YOUR HEART AND IN YOUR MINDS COLLECTIVELY AS A JURY.    THAT YOU SUBJECTIVELY WEIGH ALL OF THE EVIDENCE AND TESTIMONY IN AGGRAVATION AND MITIGATION, AND REACH WHAT YOU BELIEVE TO BE IS THE APPROPRIATE SENTENCE IN THIS CASE.    AND YOUR VERDICT MUST BE UNANIMOUS.

NOW, THE STATUTORY THRESHOLD FACTOR.  MR. SCHOOLS DISCUSSED THIS SLIDE WITH YOU IN HIS OPENING STATEMENT, AND THE JUDGE HAS ALSO DISCUSSED IT WITH YOU IN HIS INITIAL INSTRUCTIONS.   YOU MUST FIND, AFTER YOU FIND MR. BASHAM WAS AT LEAST 18 YEARS OLD AT THE TIME, THIS IS THE NEXT CHECK MARK.   YOU MUST FIND THE PRESENCE OF ONE OF THESE THRESHOLD INTENT FACTORS.   THE DEFENDANT, HIMSELF, INTENTIONALLY KILLED THE VICTIM.   THE DEFENDANT, HIMSELF, INTENTIONALLY INFLICTED SERIOUS BODILY INJURY THAT RESULTED IN THE DEATH OF THE VICTIM.   NOW,  THOSE ARE ACTUAL -- MR. BASHAM ACTUALLY, PHYSICALLY,  EITHER KILLING ALICE DONOVAN OR DOING SOMETHING TO HER TO WHERE SHE ULTIMATELY DIED.

THRESHOLD FACTORS THREE AND FOUR ARE FACTORS YOU CAN

CONSIDER IF YOU DON'T THINK BRANDON BASHAM'S HAND HAD A ROLE IN ACTUALLY KILLING ALICE DONOVAN. THAT IS WHAT THREE AND FOUR, THE DEFENDANT INTENTIONALLY PARTICIPATED IN AN ACT CONTEMPLATING THAT THE LIFE OF A PERSON WOULD BE TAKEN OR INTENDING THAT LETHAL FORCE WOULD BE USED IN CONNECTION WITH A PERSON, OTHER THAN ONE OF THE PARTICIPANTS IN THE OFFENSE, AND THE VICTIM DIED AS A DIRECT RESULT OF THE ACT, OR THE DEFENDANT INTENTIONALLY AND SPECIFICALLY ENGAGED IN AN ACT OF VIOLENCE, KNOWING THAT THE ACT CREATED A GRAVE RISK OF DEATH TO A PERSON, OTHER THAN ONE OF THE PARTICIPANTS IN THE OFFENSE, SUCH THAT PARTICIPATION IN THE ACT CONSTITUTED A RECKLESS DISREGARD FOR HUMAN LIFE, AND THE VICTIM, ALICE DONOVAN, DIED AS A DIRECT RESULT OF THE ACT.

I SUBMIT -- LET ME TAKE THESE BACKWARDS. I SUBMIT ON THE TESTIMONY AND EVIDENCE YOU HAVE HEARD, AND BASED ON THE VERDICTS YOU HAVE FOUND, THREE AND FOUR ARE NO-BRAINERS. NO-BRAINERS. LOOK AT NUMBER FOUR. THE DEFENDANT INTENTIONALLY AND SPECIFICALLY ENGAGED IN AN ACT OF VIOLENCE. LADIES AND GENTLEMEN, YOU HAVE CONVICTED BRANDON BASHAM AND, HE HAS ADMITTED IN STATEMENTS THAT HE KNOWINGLY ENGAGED IN THE ACT OF KIDNAPPING AND THE ACT OF CARJACKING ARMED WITH A DEADLY WEAPON, KNOWING THAT THE ACT CREATED A GRAVE RISK OF DEATH TO A PERSON, BEING ALICE DONOVAN.

LADIES AND GENTLEMEN, ANYTIME YOU ROB SOMEBODY, OR CARJACK SOMEBODY, OR KIDNAP SOMEBODY AT GUNPOINT,

PARTICULARLY AFTER YOU DID IT 72 HOURS BEFORE TO A 19-YEAR-OLD GIRL, THAT IS CREATING GRAVE RISK.    BY DEFINITION, ARMED CARJACKING, ARMED KIDNAPPING IS A RISK OF DEATH TO ANY CITIZEN IN THIS STATE.    BY HIS ADMISSIONS, BY YOUR VERDICT, BY YOUR CONVICTION OF BRANDON BASHAM, YOU HAVE FOUND INTENT LEVEL FOUR, THAT IS IF YOU BELIEVE MR. BASHAM'S HAND HAD NOTHING TO DO WITH KILLING ALICE DONOVAN.

RECKLESS DISREGARD FOR HUMAN LIFE.    ARMED WITH A GUN. BRANDON BASHAM IS IN THE BACK SEAT OF THAT CAR.    IN THE VERY LEAST, IN THE LIGHT MOST FAVORABLE TO BRANDON BASHAM, HE IS THE ONE THAT APPROACHED ALICE DONOVAN WITH A GUN WHILE CHAD FULKS WAS IN THE TRUCK.    HE IS THE ONE THAT SAT IN THAT BACK SEAT.    HE IS THE ONE THAT HELD THE GUN AT HER SIDE THAT KEPT HER FROM WALKING OUT OF THAT CAR WHEN CHAD FULKS WENT MULTIPLE TIMES TO USE THE ATM MACHINE.    TWO TO THREE MINUTES CHAD FULKS WAS IN THE CONVENIENT STORE IN SHALLOTTE, NORTH CAROLINA.    THE ONLY THING KEEPING ALICE DONOVAN FROM WALKING TO HER FREEDOM, FROM KEEPING HER ALIVE TODAY ALL THE TIMES CHAD FULKS WALKED AWAY FROM THAT CAR ON NOVEMBER 14TH, ONLY ONE PERSON, ONLY ONE PERSON, THAT WAS BRANDON BASHAM.

SO, BY YOUR CONVICTIONS, BY HIS ADMISSIONS, AND BY COMMON SENSE, NUMBER FOUR IS PRESENT, AND THAT IS IF YOU DON'T FIND HIS HAND ACTUALLY HAD A ROLE IN KILLING ALICE DONOVAN.

SAME THING WITH NUMBER THREE.    NUMBER THREE, THE

DEFENDANT INTENTIONALLY PARTICIPATED IN AN ACT CONTEMPLATING THAT THE LIFE OF A PERSON WOULD BE TAKEN. LADIES AND GENTLEMEN, THIS IS THE MOTIVATIONAL FACTOR. HE HAD ALREADY CARJACKED, AND KIDNAPPED, AND KILLED ONE WOMAN. WHAT DO YOU THINK HIS MOTIVATION WAS? WHAT DO YOU THINK BRANDON BASHAM'S MOTIVATION IS? HE IS APPROACHING THE CAR WITH ALICE DONOVAN WITH THE GUN IN HER SIDE. DO YOU THINK EITHER CHAD FULKS OR BRANDON BASHAM, AFTER CARJACKING, KIDNAPPING, ROBBING ALICE DONOVAN, AFTER SPENDING ALL OF THAT TIME WITH ALICE DONOVAN, DO YOU THINK FOR ONE MINUTE THEY WOULD DROP HER OFF AT THE CORNER AND SAY, GO CALL THE POLICE. IDENTIFY ME IN A SOUTH CAROLINA COURTROOM. SEND ME AWAY TO PRISON FOR THE REST OF MY LIFE. CONTEMPLATING THAT A LIFE OF A PERSON WOULD BE TAKEN, USING LETHAL FORCE.

THE GUN PROVIDES LETHAL FORCE. AND, AGAIN, LADIES AND GENTLEMEN, FOR YOU JURORS TO HAVE CONVICTED MR. BASHAM OF CARJACKING, YOU HAD TO HAVE FOUND THAT INTENT FACTOR. YOU HAD TO HAVE FOUND, AT THE TIME OF THE CRIME, THAT BRANDON BASHAM INTENDED TO CAUSE DEATH OR SERIOUS BODILY HARM. AND, LADIES AND GENTLEMEN, YOU HAVE CONVICTED BRANDON BASHAM. HE IS GUILTY OF KIDNAPPING, RESULTING IN DEATH; HE IS GUILTY OF CARJACKING, RESULTING IN DEATH. NOT ONLY AS A MATTER OF FACT, BUT AS A MATTER OF LAW. YOU HAVE CONVICTED HIM ON THOSE TWO CHARGES. SO, EITHER ONE OF THOSE TWO ARE CLEARLY PRESENT BY YOUR PREVIOUS VERDICTS, AND BY THE TESTIMONY OF THE WITNESSES,

AND THE ADMISSION OF THE DEFENDANT.

NOW, WITH REGARD TO WHETHER OR NOT THE DEFENDANT INTENTIONALLY KILLED ALICE DONOVAN, LET'S LOOK AT THE EVIDENCE THAT INDICATES MR. BASHAM'S HAND HAD A ROLE IN ACTUALLY KILLING ALICE DONOVAN. FIRST, YOU HAVE GOT THE STATEMENTS OF MR. BASHAM ALONE ON NOVEMBER 25TH. IF YOU RECALL, THE STATEMENT TO FBI AGENTS VITO AND MALEY IN KENTUCKY, IN THE PRESENCE OF HIS OWN LAWYER, IN THE PRESENCE OF HIS LAWYER, TALKING ABOUT THE CEMETERY WHERE ALICE WAS KILLED. MR. BASHAM -- DO YOU REMEMBER THE TESTIMONY FROM THE AGENT? THIS IS WHERE MR. BASHAM SAID, "THEY DID THEIR THING." WHERE THEY DID THEIR THING AT THE CEMETERY. TELLING AGENT VITO AND AGENT MALEY THAT ALICE DONOVAN'S BODY WILL BE FOUND 20 TO 25 FEET DRAGGING DISTANCE OFF OF THE ROAD. HE TALKS ABOUT HOW AFTERWARDS, AFTER HE PARTICIPATED IN THE DRAGGING OF ALICE DONOVAN'S BODY, HE GOT BACK IN THE CAR AND GOT HIGH. THOSE ARE BRANDON BASHAM'S STATEMENTS TO TWO FBI AGENTS IN THE PRESENCE OF A LAWYER.

BUT IT DOESN'T STOP THERE. BECAUSE THREE DAYS LATER, ON THANKSGIVING DAY, ON NOVEMBER 28TH, UP IN THE BEE TREE FARM AREA OF WINNABOW, BRUNSWICK COUNTY, NORTH CAROLINA, DO YOU REMEMBER THE TESTIMONY OF SHERIFF HEWITT, IN THE PRESENCE OF HIS LAWYER, MR. LITTLEJOHN? BRANDON BASHAM, RIDING IN THE VAN THAT DAY, SEEING THOSE HUNTERS WALKING DOWN THE ROAD, SEEING THAT DOE RUN ACROSS THE PATH, BRANDON BASHAM SAYS, "HERE, I

COULDN'T EVEN KILL A DEER, AND I HAVE" -- AND THEN HE WAS STOPPED BY MR. LITTLEJOHN.   "HERE I COULDN'T EVEN KILL A DEER, AND I HAVE" --

BUT IT DOESN'T STOP THERE.   BECAUSE LATER ON, AT THE END OF THAT DAY WHEN EVERYBODY IS FRUSTRATED, THEY GET BACK TO THAT CEMETERY,  THE CEMETERY YOU HAVE SEEN PICTURES OF.  MR. PERDUE TESTIFIED ABOUT SEEING ALICE DONOVAN'S BMW.  SEEING THAT REAR LIGHT THEY GO BACK TO THAT CEMETERY.  WHAT DOES BRANDON BASHAM SAY IN THE PRESENCE OF SHERIFF HEWITT?  IT IS NOT REALLY WHAT HE SAYS,  IT IS WHAT HE DOES.  HE IS SHACKLED. HE DESCRIBES A PURSE STRAP, AND HE DEMONSTRATES,  HE DEMONSTRATES TO SHERIFF HEWITT HOW ALICE DONOVAN WAS STRANGLED.   AND THEN HE TELLS SHERIFF HEWITT,  "I THREW THE PURSE STRAP INTO THE WOODS."  HE HAS DEMONSTRATED.   HE EVEN HAS HIS ARMS DOWN.   YOU SAW SHERIFF HEWITT STAND UP THERE AND SHOW.

NOW,  DOES THAT MEAN BRANDON BASHAM'S STRANGLING OF ALICE DONOVAN IS THE ONLY HAND THAT CAUSED ALICE DONOVAN'S DEATH? THE GOVERNMENT DOESN'T SUBMIT THAT.   THE GOVERNMENT SUBMITS, AND SUBMITTED ALL ALONG, THAT CHAD FULKS IS JUST AS RESPONSIBLE.   CHAD FULKS HAD EVERY RIGHT, AS WELL, TO MAKE SURE ALICE DONOVAN DIED.   THEY HAD GUNS,  KNIVES. MR. FULKS HAD EVERY INCENTIVE, AS WELL, TO MAKE SURE THAT SHE WAS DEAD.

DID HE STOP THERE? CHRISTMAS EVE, DECEMBER 24TH, 2002, WHO DID BRANDON BASHAM REACH OUT TO? WHO DID HE REACH OUT TO? HE

REACHES OUT TO MR. CLIFFORD JAY.  MR. JAY, WHO IS A COUNSELOR OF MR. BASHAM.  THE SAME CLIFFORD JAY MR. BASHAM TOOK A KNIFE AND TOOK A SWING AT HIS THROAT WHEN MR. JAY WOKE HIM UP.  MR. BASHAM IS A TEENAGER, TOOK THAT KNIFE, TRIED TO SLASH MR. JAY'S THROAT.  MR. JAY, BEING A COUNSELOR, BEING SOMEBODY THAT WORKS WITH CHILDREN, HE DIDN'T HOLD THAT AGAINST MR. BASHAM.  YOU HEARD HIS TESTIMONY, AND SOME OF THE TESTIMONY FROM TEACHERS AND SOCIAL WORKERS, HE CONTINUED TO WORK WITH MR. BASHAM.  HE CONTINUED TO BEFRIEND MR. BASHAM'S FAMILY. HE CONTINUED TO LOOK OUT FOR MR. BASHAM.  AND ON DECEMBER 24TH, ON CHRISTMAS EVE, AS BRANDON BASHAM WAS SITTING IN JUST CARE IN COLUMBIA, SOUTH CAROLINA, HE REACHES OUT TO CLIFFORD JAY.  YOU HAVE THE PHONE RECORDS.

AT THAT POINT IN TIME, MR. BASHAM'S ONLY CHARGE WITH ALICE DONOVAN, NOBODY FROM KENTUCKY, NOBODY KNEW ANYTHING ABOUT IT, NEWSPAPERS, NOBODY HAD REPORTED ANYTHING ABOUT SAMANTHA BURNS, HE WASN'T CHARGED WITH ANY OF THAT.  THE ONLY THING HE WAS CHARGED WITH WAS ALICE DONOVAN. A 44-YEAR-OLD WOMAN FROM GALIVANT'S FERRY, SOUTH CAROLINA.  MR. JAY ASKED MR. BASHAM WHEN MR. BASHAM CALLS HIM, NEEDS SOMEONE TO TALK TO ON CHRISTMAS EVE, MR. BASHAM TELLS MR. JAY, OR MR. JAY ASKS MR. BASHAM, BRANDON, "IS IT TRUE WHAT THEY ARE SAYING ABOUT YOU IN THE PAPERS?" AND WHAT WAS MR. BASHAM'S RESPONSE? "YES, SIR, MR. C. J., WE KILLED THEM.  YES, SIR, MR. C. J., WE KILLED THEM."

THINK ABOUT ALL OF THE PEOPLE WHO HAD INTERVIEWED MR. BASHAM, AND ALL OF THE PEOPLE -- LAW ENFORCEMENT PEOPLE AND EVERYBODY WHO WAS INTERVIEWING HIM WHEN HE KNEW WHAT HE SAID COULD BE USED AGAINST HIM. HERE HE IS REACHING OUT TO SOMEONE THAT HAS NO IDEA THE AUTHORITIES WILL EVER TALK TO, "WE KILLED THEM." THE WORDS OF BRANDON BASHAM. THE DEFENDANT INTENTIONALLY KILLED THE VICTIM. "WE KILLED THEM." "WE TIED THE WOMAN TO A TREE IN NORTH CAROLINA." THAT IS WHAT HE TELLS MR. JAY.

NOW, DOES IT STOP THERE? THAT IS DIRECT EVIDENCE FROM THE MOUTH OF BRANDON BASHAM. THERE IS CIRCUMSTANTIAL EVIDENCE, AS WELL. WHAT IS THE CIRCUMSTANTIAL EVIDENCE YOU HAVE HEARD? I WILL NOT GO THROUGH EVERYTHING, YOU HAVE HEARD IT. I WILL JUST TOUCH ON NAMES, AND DATES, AND EVENTS SO IT WILL REFRESH YOUR MEMORY. YOU GOT HIS ROLE IN SAMANTHA BURNS'S THREE DAYS BEFORE ALICE DONOVAN. HIS ROLE IN THE CARJACKING AND KIDNAPPING OF SAMANTHA BURNS. NOW, AFTER CARJACKING, KIDNAPPING, AND KILLING SAMANTHA BURNS, DO YOU THINK FOR ONE MINUTE BRANDON BASHAM WOULD ALLOW ALICE DONOVAN TO SURVIVE? YOU HAVE HIS ROLE. THREE DAYS AFTER ALICE DONOVAN, WHEN HE ATTEMPTS TO KIDNAP AND CARJACK ANDREA FRANCIS AT THE MALL IN ASHLAND, KENTUCKY, IT WAS BRANDON BASHAM WHO WALKED UP TO HER. BRANDON BASHAM STUCK THAT GUN IN HER SIDE. BRANDON BASHAM TRYING TO GET IN THAT CAR. DON'T GET ME WRONG, THEY HAD THE SAME MO. CHAD FULKS WAS DRIVING THAT BMW AROUND,

SAME MO. EQUALLY AS GUILTY. BUT IT WAS BRANDON BASHAM DOING THE DIRTY WORK ON THE GROUND AT THE PARKING LOT AT THE CAR WITH THE 15-YEAR-OLD GIRL.

WHAT OTHER CIRCUMSTANTIAL EVIDENCE DO YOU HAVE? YOU HAVE HIS GENERAL CHARACTER OF VIOLENCE THROUGHOUT THIS CRIME SPREE. THINK ABOUT ALL OF THE -- FIRST OF ALL, HE ARMED HIMSELF WITH A GUN. HE WAS ARMED WITH A GUN THE ENTIRE TIME. THAT IS TESTIMONY FROM TINA SEVERANCE AND ANDREA RODDY SUGGESTED. HE IS THE ONE WHO CONTINUOUSLY HAD HIMSELF WITH A GUN. HE IS THE ONE THREATENING POLICE OFFICERS. IF HE WAS THREATENING TO KILL POLICE OFFICERS IF THEY KNOCKED ON THE DOOR IN STURGIS, MICHIGAN, DO YOU THINK HE WOULD LEAVE ALICE DONOVAN ALIVE? HE WAS THREATENING TO KILL THE TEENAGERS OVER THE MONEY. HE WAS THREATENING TO KILL BETH MCGUFFIN'S BROTHER IF THEY RIPPED THEM OFF WITH A DRUG DEAL.

ARMED WITH A GUN, THREATENING, AND GUESS WHAT? DO YOU THINK HE IS CAPABLE? THEY WANT YOU TO BELIEVE IT IS MERE PUFFING. YOU SAW IT FOR YOURSELF. YOU HEARD IT FROM MATTHEW DAVIS. YOU SAW HOW BRANDON BASHAM IS INTENTIONALLY KILLING SOMEONE IF IT MEANS NOT GETTING CAUGHT. YOU HEARD THE TESTIMONY FROM MATT DAVIS. YOU HEARD HIM SAY HOW BRANDON SHOT ONCE IN THE AIR AND TURNED AROUND AND DREW DOWN ON HIM. HE TRIED TO KILL MATT DAVIS. WHAT DO YOU THINK WOULD HAVE HAPPENED IF THAT BULLET HAD HIT MATT DAVIS IN THE HEAD, FATHER OF TWO CHILDREN? YOU HAVE SEEN HIM. YOU HAVE SEEN

HIS CAPABILITY OF INTENDING TO KILL PEOPLE THAT MIGHT HARM HIM, THAT MIGHT PUT HIM AWAY. YET, BRANDON BASHAM DIDN'T INTENTIONALLY KILL ALICE DONOVAN. LIES. YOU CAN USE HIS LIES AS CONSCIOUSNESS OF GUILT. WHY ELSE IS HE LYING IF HE DIDN'T HAVE A HAND IN KILLING ALICE DONOVAN?

HE IS LYING TO LAW ENFORCEMENT FROM THE BEGINNING, LADIES AND GENTLEMEN. HE HAS ALICE DONOVAN ALIVE, THEN HE HAS HER DEAD. HE HAS ALICE DONOVAN IN KENTUCKY, THEN HE HAS HER IN SOUTH CAROLINA. HE HAS HER IN NORTH CAROLINA. WHEN FIRST CONFRONTED, HE TOLD THEM CHAD FULKS IS CAPABLE OF HURTING ANYONE, WOULD NOT HURT ALICE DONOVAN. WHEN THE FOCUS IS ON BRANDON BASHAM, HE SAID CHAD FULKS DID EVERYTHING, AND I AM AFRAID OF CHAD FULKS. HE IS BLAMING OTHERS.

YOU PROBABLY MAY HAVE FORGOTTEN THE NUMBER OF TIMES MR. DUANE, MR. SCHOOLS, AND I POINTED OUT THE GENOGRAM, ALL OF THE SOCIAL WORKERS, NURSES, DOCTORS, COUNSELORS, BRANDON BASHAM BLAMES OTHERS. BRANDON BASHAM BLAMES OTHERS. BRANDON BASHAM BLAMES OTHERS. A PATTERN THAT HAS BEEN WITH HIM SINCE TEN YEARS OLD HAS CONTINUED ON UNTIL AS WE SIT HERE TODAY.

LADIES AND GENTLEMEN, BRANDON BASHAM AND CHAD FULKS DID EVERYTHING TOGETHER DURING THAT 14 DAYS FROM NOVEMBER 4TH UNTIL HE WAS ARRESTED, BASHAM WAS, ON THE 17TH. DO YOU THINK AFTER WHAT THEY DID WITH ALICE DONOVAN, AFTER WHAT THEY DID WITH SAMANTHA BURNS THAT THEY BOTH WOULDN'T HAVE A ROLE IN KILLING ALICE DONOVAN? OR AS BRANDON TELLS MR. JAY, "WE

KILLED THEM?" YOU CAN ONLY FIND ONE OF THOSE FOUR. THE GOVERNMENT SUBMITS ALL FOUR OF THEM ARE PRESENT. HE KILLED ALICE DONOVAN. THE GOVERNMENT RESPECTFULLY REQUESTS THAT YOU COME BACK WITH THE THRESHOLD INTENT FACTOR THAT TELLS MR. BASHAM, WE FIND THAT YOU KILLED ALICE DONOVAN. AND IF YOU WANT TO GIVE HIM ANY BENEFIT OF THE DOUBT, THREE AND FOUR, THERE IS AN OVERWHELMING AMOUNT, FLIP A COIN.

NOW, AGGRAVATING FACTOR. KIDNAPPING, THE DEATH OF ALICE DONOVAN, AND THE INJURY RESULTING IN THE DEATH OF ALICE DONOVAN. THIS, LADIES AND GENTLEMEN, YOU HAVE ALREADY FOUND. YOU HAVE FOUND THIS AGGRAVATING FACTOR WHEN YOU FOUND MR. BASHAM GUILTY OF KIDNAPPING. AGAIN, THIS IS MERE FORMALITY. YOU HAVE ALREADY FOUND HIM BEYOND A REASONABLE DOUBT GUILTY OF KIDNAPPING. HE STANDS IN THE LAW GUILTY OF KIDNAPPING. SO, 18 YEARS OLD, THRESHOLD INTENT FACTOR, AND THEN ONE STATUTORY AGGRAVATING FACTOR, KIDNAPPING.

AT THIS JUNCTURE, LADIES AND GENTLEMEN, YOU JURORS, AS A MATTER OF LAW, CAN CONSIDER SENTENCING MR. BASHAM TO THE DEATH PENALTY. IN FACT, LADIES AND GENTLEMEN, YOU CAN SENTENCE HIM TO THE DEATH PENALTY EVEN IF YOU DON'T FIND ANY NONSTATUTORY AGGRAVATING FACTORS. ONCE YOU FIND THOSE GATEWAY FACTORS, IF YOU BELIEVE IT IS WARRANTED, YOU JURORS CAN SENTENCE MR. BASHAM TO DIE FOR SIMPLY WHAT HE DID TO ALICE DONOVAN.

AND REMEMBER WHAT HE DID TO ALICE DONOVAN, LADIES AND

GENTLEMEN. BRANDON BASHAM AND CHAD FULKS TARGETED ALICE DONOVAN, A WOMAN ALONE WITH A NICE CAR. THEY KIDNAPPED AND CARJACKED ALICE DONOVAN IN BROAD DAYLIGHT AT GUNPOINT IN A WAL-MART PARKING LOT, THE LARGEST RETAIL SHOPPING CENTER IN THE WORLD, IN FRONT OF HUNDREDS OF CARS AND PEOPLE. THEY ROBBED ALICE DONOVAN OF HER MONEY. AND THAT DAY, WE KNOW, AT LEAST BY MR. FULKS, ALICE DONOVAN WAS ROBBED OF SOMETHING MORE PRECIOUS. SHE WAS ROBBED OF HER DIGNITY. THE FORENSIC EVIDENCE INDICATES, AT LEAST, THAT MR. FULKS RAPED ALICE DONOVAN IN THE BACK SEAT OF HER CAR. AT THE VERY LEAST, MR. BASHAM STOOD BY AND WATCHED AS A LOOKOUT OR WHATEVER PLEASURE HE GOT.

NOW, WHAT WE DON'T HAVE, LADIES AND GENTLEMEN, IS ALICE DONOVAN'S BODY TO SEE ANY KIND OF EVIDENCE THAT MAY BE OBTAINED FROM HER BODY. WE DON'T HAVE PANTIES OR CLOTHES BECAUSE BRANDON BASHAM AND CHAD FULKS GOT RID OF HER BODY, AND GOT RID OF HER CLOTHES, AND WE'RE INCAPABLE OF BRINGING YOU WHATEVER FORENSIC EVIDENCE THAT MAY HAVE REVEALED. BRANDON BASHAM AND CHAD FULKS MADE ALICE DONOVAN MAKE A PHONE CALL TO HER DAUGHTER AND LIE AT GUNPOINT SO THAT THEY COULD CONTINUE TO DO AND HAVE TIME TO DO WITH HER WHATEVER THEY DID. BRANDON BASHAM AND CHAD FULKS KILLED ALICE DONOVAN WHEN THEY WERE FINISHED WITH HER. THEY WERE DONE. THEY KILLED HER. AND BRANDON BASHAM AND CHAD FULKS THEN DISPOSED OF ALICE DONOVAN'S BODY IN SUCH A WAY THAT IT HAS BEEN UNRECOVERABLE

FOR LAW ENFORCEMENT AND, MORE IMPORTANTLY, FOR THE FAMILIES. THAT IS WHAT BRANDON BASHAM DID TO ALICE DONOVAN.

YOU JURORS, ONCE YOU FIND THOSE THRESHOLD FACTORS, CAN SENTENCE HIM TO DEATH SIMPLY FOR THOSE EGREGIOUS, VILE, AND VICIOUS ACTS AGAINST ALICE DONOVAN.  BUT THERE IS MORE. THERE IS MUCH MORE.  WHAT ARE THE NONSTATUTORY AGGRAVATING FACTORS?  THREE OF THEM.  PARTICIPATION IN ADDITIONAL UNCHARGED MURDERS, ATTEMPTED MURDERS, OR OTHER SERIOUS ACTS OF VIOLENCE.  NOW, THIS FRAME IS GOING TO BE UP HERE FOR A SHORT PERIOD OF TIME.  I WILL GO THROUGH THE EVIDENCE ON EACH ONE OF THOSE THREE.

LADIES AND GENTLEMEN, ALL YOU HAVE TO DO IS FIND ONE THING, ONE THING BEYOND A REASONABLE DOUBT TO FIND ANY ONE OF THOSE THREE CATEGORIES OR ONE PIECE OF EVIDENCE OR TESTIMONY. WHAT DO I MEAN BY THAT? I WILL DISCUSS WITH YOU, PARTICIPATION IN ADDITIONAL UNCHARGED MURDERS, ATTEMPTED MURDERS, OR OTHER SERIOUS ACTS OF VIOLENCE.  THERE ARE FIVE OF THEM.  IN FACT, I GUESS THERE ARE FIVE OF THEM.

ESCAPING FROM THE HOPKINS COUNTY DETENTION CENTER IS A FEDERAL LAW, AN ESCAPE IS.  YOU CONSIDER IT AN ACT OF VIOLENCE.  AND YOU HEARD THE TESTIMONY, I AM NOT GOING TO GO INTO IT, LADIES AND GENTLEMEN, BUT THAT REQUIRED PLANNING, IT REQUIRED DECEPTION, AND IT REQUIRED NERVE.  AND BOTH OF THEM ESCAPED.  NO QUESTION, MR. FULKS, AT THAT TIME, HAD MORE MOTIVE TO ESCAPE, NO QUESTION ABOUT IT.  BUT, AGAIN, IT

REQUIRED BOTH OF THEM. THERE IS NO WAY ONE OF THEM COULD HAVE GOTTEN UP ON THAT ROOF. IT REQUIRED BOTH OF THEM. IT REQUIRED MR. BASHAM'S KNOWLEDGE OF WHERE HIS BUS WAS WITH THE CHANGE OF CLOTHES. AND HE IS THE ONE WHO APPROACHED DIAN BLAIR. AND HE WAS EVERY BIT INVOLVED IN THAT PLANNING AND THAT DECEPTION.

LADIES AND GENTLEMEN, LET ME JUST TELL YOU RIGHT THERE. THE BABYING OF BRANDON BASHAM NEEDS TO STOP. IT NEEDS TO STOP RIGHT HERE AND RIGHT NOW. THE BABYING OF BRANDON BASHAM. HE WAS A 21-YEAR-OLD MAN WHEN HE ESCAPED WITH CHAD FULKS. A 21-YEAR-OLD MAN. THERE ARE 18 AND 19-YEAR-OLD MEN AND WOMEN SPILLING THEIR BLOOD IN TWO WARFRONTS ON ANOTHER CONTINENT MUCH YOUNGER THAN THIS MAN. HE IS RESPONSIBLE. HE IS NOT A CHILD. THE BABYING STOPS TODAY.

CARJACKING AND KIDNAPPING, RESULTING IN THE DEATH OF SAMANTHA BURNS. I WON'T GO OVER ALL OF THE EVIDENCE TODAY. I WILL TOUCH ON IT. THE PHYSICAL EVIDENCE, THE CANDY BOX FOUND IN THEIR VAN. THE RING, SAMANTHA BURNS'S RING THAT BRANDON BASHAM HAD THAT HE GAVE TO BETH MCGUFFIN. IT HAS BEEN IDENTIFIED, SIMILAR RING, OR THE EXACT SAME RING, JUST A DIFFERENT RING BECAUSE WE NEVER FOUND THE RING, BUT MS. BURNS WAS ABLE TO LOCATE THE JEWELER AND GET THE EXACT ONE AS BEING IN THE POSSESSION OF BRANDON BASHAM, MS. SEVERANCE, AND MS. MCGUFFIN.

THE ATM PHOTOGRAPH, HIS PARTNER AIDING AND ABETTING.

SAMANTHA BURNS'S DRIVER'S LICENSE THAT TINA SEVERANCE FOUND IN A BAG IN A MOTEL ROOM DOWN AT LAKE SHORE MOTEL THE DAY BEFORE ALICE DONOVAN WAS ABDUCTED. FOUR PIECES OF PHYSICAL EVIDENCE THAT LINKS BRANDON BASHAM TO THE CARJACKING, KIDNAPPING, KILLING OF SAMANTHA BURNS. DON'T FORGET THAT NO DRIVE THEORY, MR. BASHAM COULDN'T DRIVE. MR. BASHAM COULDN'T DRIVE. IN ORDER TO GET THE VAN AND SAMANTHA BURNS'S CAR TO THE APPROPRIATE LOCATIONS, THERE IS ONLY ONE WAY THAT COULD HAVE HAPPENED. CHAD FULKS HAD TO BE DRIVING THE VAN, AND SAMANTHA BURNS HAD TO BE DRIVING HER CAR, AND BRANDON BASHAM HAD TO BE IN SAMANTHA BURNS'S CAR. IF THERE IS NO ONE IN SAMANTHA BURNS'S CAR, SHE GOES HOME. SHE GOES TO THE POLICE STATION. SHE GOES TO A CROWD OF PEOPLE. BRANDON BASHAM CAN'T DRIVE. THINK OF ALL OF THE HOURS AND ALL OF THE MILES THAT WERE DRIVEN THAT SAMANTHA BURNS DROVE IN HER CAR, DRIVING UP THAT MOUNTAINSIDE WITH CHAD FULKS LEADING THE WAY IN THE VAN. SAMANTHA BURNS DRIVING UP THAT MOUNTAINSIDE TO GET HER CAR UP THERE. BRANDON BASHAM IN THAT CAR. ALL NIGHT, MAKING CHOICES, MAKING DECISIONS ALONE.

THEY BURNED HER CAR. THEY BURNED THE CAR SO NO PHYSICAL EVIDENCE COULD BE FOUND IN THE CAR. WHAT DID CHAD FULKS AND BRANDON BASHAM DO WITH THAT CAR? WHY DID THEY NEED TO BURN THAT CAR? THERE WAS MUD ON BOTH SIDES OF THE VAN UPON ITS RETURN TO THE MOTEL. MUD ON THE CLOTHING OF BOTH BRANDON BASHAM AND CHAD FULKS, WHICH CLEARLY INDICATES THAT BOTH OF

THEM HAD A ROLE IN DUMPING HER BODY IN EITHER THE GUYANDOTTE OR OHIO.  WHATEVER RIVER THEY DUMPED HER IN, THEY ARE BOTH MUDDY,  MUD ON BOTH SIDES OF THE VAN,  BOTH DECKED OUT IN CAMO.

FROM 6:30, SHE WALKS OUT OF THE J. C. PENNEY'S MALL, UNTIL 3:15 THE GENTLEMAN HEARS THE FIRE AND SEES THE FIRE. THAT IS NINE HOURS SAMANTHA BURNS HAD TO BE ALIVE TO DRIVE HER CAR UP TO THE TOP OF THAT MOUNTAIN.  CHAD FULKS AND BRANDON BASHAM,  MANY TIMES BRANDON BASHAM HAD SAMANTHA BURNS ALONE, BUT THEY HAD HER FOR NINE HOURS.  FIVE FOOT TWO,  105 POUNDS, SAMANTHA BURNS.  AND THEN THEY DISPOSED OF HER BODY.  WHEN THEY WERE DONE WITH HER, JUST LIKE WHEN THEY WERE DONE WITH ALICE, THEY DISPOSED OF HER BODY, BRANDON BASHAM AND CHAD FULKS DID.

LADIES AND GENTLEMEN,  BRANDON BASHAM AND THIS CANDY BOX. THIS CANDY MEANT MORE TO HIM THAN THE LIFE OF A 19-YEAR-OLD GIRL.  THEY THROW SAMANTHA BURNS INTO A RIVER LIKE A PIECE OF GARBAGE WHEN THEY WERE DONE WITH HER.  YET, HE KEEPS HIS CANDY.

THE BURGLARY OF SAM JORDAN'S RESIDENCE RESULTING IN THE ATTEMPTED MURDER OF CARL JORDAN.  AIDING AND ABETTING. DESPITE THE FACT IT WAS MR. FULKS THAT SHOT THROUGH THE WINDOW,  HE WAS PRESENT.  HE IS GUILTY AS A PRINCIPAL IN THE BURGLARY.  HE IS INSIDE THE RESIDENCE. HE IS ATTEMPTING TO STEAL.  ALREADY UNLOADED GUNS AND JEWELRY OF SAM JORDAN'S

WIFE AND HIS OWN GUNS IN THE VAN.  GUILTY OF BURGLARY AS A PRINCIPAL.  GUILTY OF ATTEMPTED MURDER.  AIDING AND ABETTING. TWO PEOPLE ARE GUILTY OF THE FACTS OF THEIR CODEFENDANT, AIDING AND ABETTING.  YOU DON'T HAVE TO FIND HE, HIMSELF, ATTEMPTED TO KILL CARL JORDAN.  HE WAS PRESENT AIDING AND ABETTING MR. FULKS.  HE IS JUST AS GUILTY.

KIDNAPPING AND CARJACKING OF JAMES HAWKINS.  REMEMBER HE INITIATED THE KNOCK ON THE DOOR,  HE INITIATED THE THREATS. AGAIN, EVERYTHING THAT BRANDON BASHAM DID TO JAMES HAWKINS, CHAD FULKS IS GUILTY OF.  EVERYTHING THAT CHAD FULKS DID TO JAMES HAWKINS, BRANDON BASHAM IS GUILTY OF, UNDER THE LAW, AIDING AND ABETTING.

THE ATTEMPTED MURDER OF ASHLAND POLICE OFFICER MATT DAVIS. REMEMBER THIS, LADIES AND GENTLEMEN,  I AM NOT GOING TO GO OVER ALL THE FACTS IN EVIDENCE,  I HAVE ALREADY DISCUSSED IT. HE ATTEMPTED TO KILL OFFICER MATTHEW DAVIS.  HE ATTEMPTED TO KILL OFFICER MATTHEW DAVIS AFTER HIS ATTEMPT TO KIDNAP AND CARJACK 15-YEAR-OLD ANDREA FRANCIS DID NOT SUCCEED.  LADIES AND GENTLEMEN,  SEVERAL WEEKS AGO, EACH AND EVERY ONE OF YOU, NOT IN THIS COURTROOM,  IN ANOTHER COURTROOM DOWN THE HALL, EACH AND EVERY ONE OF YOU TOOK THAT WITNESS STAND,  WENT THROUGH THE SAME PROCESS.  PRIOR TO TAKING THE WITNESS STAND, EACH AND EVERY ONE OF YOU HAD AN OPPORTUNITY TO SEE THE VIDEO THAT JUDGE ANDERSON HAD MADE SO YOU KNEW THIS CASE WAS ABOUT A 44-YEAR-OLD WOMAN BEING ABDUCTED, CARJACKED, AND KILLED.

WHILE YOU WERE ON THAT WITNESS STAND, YOU KNEW YOU WOULD HEAR EVIDENCE AND TESTIMONY ABOUT A 19-YEAR-OLD GIRL FROM HUNTINGTON, WEST VIRGINIA.  EACH AND EVERY ONE OF YOU ANSWERED JUDGE ANDERSON'S QUESTIONS.  YOU ANSWERED QUESTIONS FROM THE PROSECUTION.  YOU ANSWERED QUESTIONS FROM DEFENSE COUNSEL. AND YOU SAID THAT YOU WOULD CONSIDER LIFE.  YOU ALSO SAID, GIVEN THE APPROPRIATE CIRCUMSTANCES, YOU COULD GIVE THE DEATH PENALTY AGAINST A FELLOW CITIZEN.   YOU KNEW IT WASN'T A CASE OF FLYING PLANES INTO A BUILDING; YOU KNEW IT WASN'T A CASE OF A GROUP OF CHILDREN BEING KILLED.  YOU KNEW, BASICALLY, WHAT THE GENERAL FACTS WERE.  EACH AND EVERY ONE OF YOU TOOK THAT WITNESS STAND.  YOU SAID IF THE CIRCUMSTANCES WARRANTED, I COULD SENTENCE A FELLOW CITIZEN TO THE DEATH PENALTY.

YOU HAVE SEEN MR. BASHAM'S INVOLVEMENT IN THE RANDOM CARJACKING,  KIDNAPPING,  TERRORIZING, AND KILLING OF A 19-YEAR-OLD GIRL.   YOU HAVE SEEN HIM ATTEMPT TO KILL OFFICER MATT DAVIS.  YOU HAVE SEEN HIM IN THE CARJACKING, KIDNAPPING, AND KILLING OF A 44-YEAR-OLD WOMAN, AND DISPOSING OF HER BODY. I ASK YOU THIS.  WHAT MORE DID BRANDON BASHAM HAVE TO DO TO WARRANT THE DEATH PENALTY?

YOU SAW ANDREA FRANCIS TAKE THAT WITNESS STAND.   YOU SAW HER.   SHE WAS 15 YEARS OLD, AT THE TIME.   WHAT DO YOU THINK BRANDON BASHAM AND CHAD FULKS WOULD HAVE DONE TO ANDREA FRANCIS? WHAT DO YOU THINK THEY WOULD HAVE DONE WITH THAT YOUNG GIRL IF BRANDON BASHAM HAD BEEN SUCCESSFUL IN CARJACKING

AND KIDNAPPING HER? WHAT DOES IT TAKE? IS IT THE RANDOM CARJACKING AND KILLING OF THREE INNOCENT WOMEN? DOES BRANDON BASHAM NEED TO MAKE A HAT TRICK? IS THE KILLING OF TWO WOMEN AND WHAT HE DID TO ALICE AND SAMANTHA NOT ENOUGH? THOSE WOULD BE QUESTIONS THAT ONLY YOU, YOURSELVES, CAN RESOLVE IN YOUR HEART AND IN YOUR MIND.

NEED DANGEROUSNESS. ESCAPE RISK AS A RESULT OF FORMER ESCAPES. LADIES AND GENTLEMEN, HE HAS TRIED, AND TRIED, AND TRIED. IT IS NOT NECESSARILY WHETHER OR NOT HE IS GOING TO BE SUCCESSFUL OR NOT, IT IS THE FACT THAT LAW ENFORCEMENT OFFICIALS, PRISON OFFICIALS, POSSIBLY HOSPITAL PEOPLE, WHEN HE FEIGNS HIS SUICIDE ATTEMPT, WILL BE DEALING WITH BRANDON BASHAM'S ESCAPE ATTEMPTS FOR THE REST OF HIS LIFE.

HE ADMITTED TO NUMEROUS ACTS OF VIOLENCE AFTER HIS ESCAPE FROM JAIL. HE, HIMSELF, HAS ADMITTED TO NUMEROUS ACTS OF VIOLENCE AGAINST OTHER CITIZENS. FAILURE TO ADAPT HIS BEHAVIOR TO SOCIETAL NORMS, THEREBY DEMONSTRATING SIGNIFICANTLY LOW REHABILITATIVE POTENTIAL. LADIES AND GENTLEMEN, YOU HEARD ALL OF THE TESTIMONY, HIS FAILING TO ADAPT TO SOCIETAL NORMS. HE CANNOT BE REHABILITATED. YOU HEARD FROM HOPKINS COUNTY DETENTION CENTER, THIS IS WHEN HE IS ONLY SERVING A FIVE-YEAR SENTENCE. YOU HEARD HIS CONDUCT OF HOARDING DRUGS, THREATENING OFFICERS, HIS MASTURBATING IN FRONT OF FEMALE EMPLOYEES, YOU HEARD THAT TESTIMONY.

LADIES AND GENTLEMEN, SINCE HE HAS BEEN CHARGED WITH

THESE CRIMES, HE HAS ONLY GOTTEN WORSE.  YOU HEARD CHRIS SCHAFFER TESTIFY.  THIS WAS DURING CROSS-EXAMINATION BY MR. HARRIS.  CHRIS SCHAFFER TESTIFIED THAT I COULD MANAGE BRANDON BASHAM WHEN HE WAS ONLY SERVING A FIVE-YEAR FORGERY SENTENCE.  I DON'T KNOW WHETHER I COULD EVEN HANDLE BRANDON BASHAM IF HE IS SERVING LIFE WITHOUT PAROLE.  THAT WASN'T IN RESPONSE TO A GOVERNMENT'S QUESTION, THAT WAS IN RESPONSE TO A DEFENSE QUESTION.

JUST CARE.  REMEMBER MALITA COOK?  SHE NOW WORKS FOR AIR FREIGHT SERVICE.  JANUARY 9TH, 2003,  MR. BASHAM, HE HAD ONLY BEEN IN SOUTH CAROLINA -- BEEN IN CUSTODY NOT VERY LONG, SEVERAL WEEKS.  ON THE PHONE HE IS LAUGHING,  HE IS BRAGGING, AND HE IS CURSING ABOUT HIS ESCAPE.  HE IS CHARGED WITH THE MOST SERIOUS OFFENSES, AND HE IS LAUGHING AND BRAGGING ABOUT IT.  YOU HEARD FROM DR. CYNTHIA MCFADDEN,  HEAD OF MENTAL HEALTH SERVICES.  TWO THINGS IMPORTANT ABOUT WHAT DR. MCFADDEN SAID.  SHE SAID HE IS ONE OF THE MOST WORST INMATES WE EVER HAD TO DEAL WITH AT JUST CARE.  REMEMBER HOW SHE TALKED ABOUT HOW HE WAS VERY MANIPULATIVE?  MANIPULATIVE AND DISRUPTIVE IN SOME OF THE GROUP SESSIONS.  SHE OBSERVED THAT, AS WELL.

AND YOU REMEMBER WHAT SHE SAID ABOUT WHEN HE CLAIMED HE WAS HEARING VOICES.  THIS IS REALLY IMPORTANT.  DO YOU KNOW WHAT DR. MCFADDEN DID? SHE FOLLOWED HER TRAINING AND GOOD OLD COMMON SENSE.  MR. BASHAM IS CLAIMING WHEN HE IS TALKING TO

HER IN A CLINICAL SETTING, I AM HEARING VOICES. SO WHAT DID MS. MCFADDEN DO? SHE INSTRUCTED HER SOCIAL WORKERS, HER NURSES, HER COUNSELORS, WATCH MR. BASHAM WHEN HE DOESN'T KNOW YOU ARE WATCHING HIM. WATCH HIM WHEN HE IS INTERACTING WITH THE OTHER CLIENTS, OTHER INMATES, WITH OTHER PATIENTS. WATCH HIM WHEN HE IS IN HIS ROOM AND HE DOESN'T KNOW. GUESS WHAT? NONE OF THEM, ZERO, NO EVIDENCE OF HIM TALKING TO HIMSELF. NO EVIDENCE OF ACTING BIZARRE. NO HALLUCINATIONS. TELLS A CLINICIAN IN A ROOM IN A HOSPITAL SETTING, GEE, I AM HEARING VOICES. BUT WHEN YOU LOOK AT IT OBJECTIVELY, AND YOU ANALYZE IT OBJECTIVELY LIKE DR. MCFADDEN DID, NOTHING, NO EVIDENCE OF IT. IN FACT, WHEN SHE CONFRONTED HIM ABOUT IT, HE GOT ANGRY WITH HER. HE GOT ALL UPSET. HE GOT DISRESPECTFUL.

WHAT ELSE DID YOU HEAR AT JUST CARE? YOU HEARD THE ESCAPE ATTEMPT. YOU HAVE SEEN THAT ROPE. I AM NOT GOING TO PULL THAT THING OUT AGAIN. THIS IS A MAN WHO HAS POOR PLANNING. HE HAD TO HOARD ALL OF THOSE SHEETS TOGETHER. FIRST OF ALL, HAD TO GET ALL OF THE SHEETS WHEN HE IS ONLY SUPPOSED TO HAVE TWO. HE HAD TO HIDE THEM. WE KNOW HE IS GOOD AT UNSCREWING SCREWS. THERE WAS A VENT IN THERE. HOARDED THEM WITHOUT ANY OF THE GUARDS OR NURSES KNOWING ABOUT IT. HAD TO HIDE THEM. HAD TO CHOOSE AND SELECT THE TIME TO TWIST THOSE THINGS, AND TIE, AND GET THEM TOGETHER. HAD TO HAVE ENOUGH TO GET DOWN FROM THE THIRD STORY, NOT THE FOURTH STORY WINDOW. HE CUT

THROUGH THAT SCREEN, AS WELL.   THE ESCAPE PLOT IN MR. BASHAM'S MIND.

AND THEN YOU HEARD AGAIN JUST HIS GENERAL DEMEANOR.   YOU HEARD FROM ALVIN  S. GLENN DETENTION FACILITY INDIVIDUALS.   I WILL NOT GO THROUGH EACH EVENT,  I WILL NOT PUT A CHART UP THERE.   YOU PAID UNBELIEVABLY CLOSE ATTENTION THROUGH ALL OF THOSE WITNESSES.   I WANT TO SUMMARIZE THAT TESTIMONY.  FROM ALVIN  S. GLENN DETENTION FACILITY, YOU HEARD, AGAIN, HIS GENERAL CONDUCT, HIS THREATENING, ASSAULTIVE BEHAVIOR, AND IT HAS ONLY GOTTEN WORSE,  LADIES AND GENTLEMEN.   IT HAS GOTTEN WORSE SINCE HE HAS BEEN CHARGED WITH THESE OFFENSES, SINCE HE HAS BEEN AWAITING ON WHAT HIS DEATH PENALTY JURY IS GOING TO DO.   ASSAULTING, THREATENING CONDUCT.   HIM INCITING OTHER INMATES.  WORSE THAN OTHER INMATES AT ALVIN S. GLENN DETENTION FACILITY DO.   HIS HOARDING DRUGS AND CONTRABAND.   HIS ATTITUDE.   I DON'T CARE.  WHAT ARE THEY GOING TO DO TO ME? I DON'T CARE.   THERE IS NOTHING THEY WILL DO TO ME.   HIS TARGETED MASTURBATION.   WE CALLED OFFICER DENNY -- I'M SORRY, NURSE DENNING, NURSE WHITE, NURSE SEVERUD, NURSE GILLESPIE, WITHIN FOUR TO FIVE WEEKS FOR TWO TIMES A MONTH,  THE ONE HE TARGETED,  SURE,  IT IS NOT UNUSUAL FOR THEM TO WALK UP ON SOMEBODY WHEN THE INMATE DOESN'T KNOW THEY ARE BEING APPROACHED,  THE INMATE MAY BE UNDER THE SHEETS DOING HIS THING, OR HAVE THE BACK TURNED TO THEM IN THE SHOWER.  BUT WHAT EVERY ONE OF THEM WERE CONSISTENT IN WAS WHAT BRANDON

BASHAM DID WAS DIFFERENT THAN ANY OTHER INMATE.  AT TIMES, THERE ARE 900 INMATES AT THE ALVIN  S. GLENN DETENTION CENTER. AND WHAT HE DID WAS DIFFERENT THAN ALL OF THE OTHER INMATES. HE TARGETED THEM.   HE WAITED UNTIL HE KNEW THEY WERE COMING AND ASKED FOR SOMETHING.  HE TARGETED THEM.   YOU REMEMBER OFFICER KENNETH BROWN TESTIFYING WHEN OFFICER SANDERS CAME AT ONE POINT IN TIME TO HIM,  A FEMALE OFFICER, TO APPROACH MR. BASHAM,  MR. BASHAM WAS MASTURBATING,  EJACULATED, AND LAUGHED AND TOLD OFFICER BROWN ABOUT IT.   OFFICER BROWN WORKED AT CCI, ONE OF THE MOST SUPER MAX PRISONS IN SOUTH CAROLINA.  HE SAID HE HAD NEVER SEEN AN INMATE DO SOMETHING LIKE THAT.

WHAT ABOUT SOME OF THE OTHER OFFICERS THAT TESTIFIED? FRANCIS KIRKLAND IS THE GENTLEMAN THAT SPENT 20-PLUS YEARS IN MILITARY,  DEEPLY IN HIS CHURCH,  TESTIFIED ABOUT AN INCIDENT WHERE HE TOOK A TOWEL,  MR. BASHAM BEING OUT OF THE CELL, BEING MOVED FOR ONE REASON OR ANOTHER.   MR. BASHAM IS ALL UPSET AND ANGRY.  APPROACHED AND ASSAULTED OFFICER KIRKLAND. HE WAS ABLE,  MR. BASHAM WAS ABLE TO GET OUT OF HIS HANDCUFFS AND CUFF OFFICER KIRKLAND.   AND HE WAS, IN HIS LANGUAGE,  NOT MINE,  NOT OFFICER KIRKLAND'S, YOU REMEMBER OFFICER KIRKLAND'S INTENSITY,  "I CAN KILL YOU, MOTHER FUCKER.  I WILL KILL YOU." NOT MY WORDS, AND THAT IS THE INTENSITY OF OFFICER KIRKLAND. TRYING TO BITE HIM.   TRYING TO BITE HIM.   HE DIDN'T BITE HIM.   BRANDON BASHAM HAS GOT A 50-YEAR LIFE EXPECTANCY, IF YOU GO BY ACTURIAL TABLE, THAT IS COMMON SENSE.   I DON'T KNOW

WHAT KIND OF COMMUNICABLE DISEASES BRANDON BASHAM MIGHT GET IN PRISON. TRYING TO BITE OFFICER KIRKLAND AFTER HE GETS OUT OF HIS CUFFS AND HE IS CUFFING HIM, HE IS THREATENING HIM, AND IT IS ALL OVER A TOWEL. OFFICER KIRKLAND TOLD YOU ABOUT THE INCIDENT WITH NICHOLAS ON JULY 6TH, 2004. MR. BASHAM HAD A VISITOR, GOT ALL ANGRY, UPSET, TOOK FIVE GUARDS TO SECURE HIM, CARRY HIM BACK TO HIS CELL. HE HAD GRABBED OFFICER SANDERS -- NICK DANIELS' SHIRT. REQUIRED A PRESSURE POINT TO GET OFF OF NICK DANIELS' SHIRT. CALLED NICK DANIELS, VERIFIED THAT. ALSO TESTIFIED ABOUT THE NUMEROUS INSTANCES OF MR. BASHAM INCITING OTHER INMATES TO VIOLENCE.

WE CONTACTED AND WE CALLED OFFICER JAMES SMITH, KIND OF A BIG GUY. JAMES SMITH IS ONE OF THE GUYS THAT HAD TO COME DOWN AND GET MR. BASHAM OFF OF FRANCIS KIRKLAND IN 2003. TOLD YOU ABOUT MR. BASHAM THROWING FLUIDS. ABOUT MR. BASHAM TAKING A SWING AT HIM, CONSTANT THREATS. WORSE INMATE HE EVER HAD TO DEAL WITH AT ALVIN S. GLENN DETENTION. LEE JAMES, EX-MILITARY, SOMEBODY USED TO DEALING WITH YOUNG MEN. OFFICER LEE SAID HOARDING AND GETTING CONTRABAND OUT OF BRANDON BASHAM'S CELL. MR. LEE SAID HE WAS THE ONLY INMATE EVER TO LAY A HAND ON HIM THE ENTIRE TIME HE HAS BEEN THERE. FRANCIS KIRKLAND, IN THE 11 YEARS HE HAS BEEN AT THE DETENTION FACILITY, NO ONE HAS EVER DONE TO HIM WHAT BRANDON BASHAM DID TO HIM ON DECEMBER 31.

WE CALLED OFFICER ROBERT WATERS, 22-AND-A-HALF YEARS IN

MILITARY DEALING WITH YOUNG PEOPLE. OFFICER WATERS TOLD YOU ABOUT AN INCIDENT WHERE HE WAS BREAKING UP A FIGHT WITH ANOTHER INMATE, BETWEEN AN INMATE AND MR. BASHAM. TOLD THE OTHER INMATE TO GO UP AGAINST THE WALL. HE COMPLIED. NOT MR. BASHAM. TOOK MULTIPLE GUARDS TO SECURE MR. BASHAM. TOLD HIM HOW STRONG MR. BASHAM WAS. TOLD YOU HOW BRANDON NEVER ADMITS HIS FAULTS. HE TOLD YOU HOW MANIPULATIVE BRANDON BASHAM WAS.

ROBERT MCEACHERN TALKED ABOUT THE FEIGNED SUICIDES. WHAT IS IMPORTANT ABOUT THAT? MCEACHERN SAID BRANDON BASHAM BRAGGED TO ANOTHER INMATE, "WATCH, I AM GOING TO A HOSPITAL TONIGHT." SURE ENOUGH, HE GOT OUT OF THAT FACILITY. HE FAKED A SUICIDE, GOT OUT OF THE HOSPITAL, AND REQUIRED PHYSICAL RESTRAINTS. THAT IS WHAT OFFICER MCEACHERN TESTIFIED TO.

CALLED ERIC DASH TO TALK ABOUT ALL OF THE CONTRABAND AND DRUGS THAT MR. BASHAM SWAPS WITH OTHER INMATES. OFFICER DASH SAID IN HIS EIGHT YEARS AT THE DETENTION FACILITY, BRANDON BASHAM IS THE WORST INMATE HE EVER HAD TO DEAL WITH.

MARKIOL ANDERSON, WHO TESTIFIED ABOUT THE SCREWS, FINDING THE SCREWS, AND HIM HOARDING TOWELS, AND HIM HOARDING OTHER CONTRABAND. AND I END WITH THE RICHLAND COUNTY FOLKS WITH THIS STATEMENT FROM THAT WITNESS STAND. I DON'T KNOW WHETHER IT WAS ON DIRECT OR CROSS, BUT MARKIOL ANDERSON SAID IT IS JUST A MATTER OF TIME BEFORE SOMEBODY GETS HURT. OFFICER

ANDERSON SAID THAT TO Y'ALL.

LADIES AND GENTLEMEN, WE THEN CALLED THE BUTNER INDIVIDUALS. THEY TALKED TO YOU ABOUT THE PHONE CALL. BRANDON BASHAM TRYING TO USE SOME SORT OF CODE TO GET HIS SISTER TO BRING HIM CONTRABAND. HE WILL HAVE 300 MINUTES OF PHONE CALL SERVICE A MONTH IN THE BOP. THREE HUNDRED (300) MINUTES. YOU KNOW, LADIES AND GENTLEMEN, THAT IS 298 MINUTES MORE A MONTH THAN HE GAVE ALICE DONOVAN AND SAMANTHA BURNS TO TALK TO THEIR FAMILY MEMBERS. HE WILL HAVE 298 MINUTES A MONTH MORE THAN SAMANTHA BURNS AND ALICE DONOVAN HAD WITH SAMANTHA'S MOTHER AND ALICE'S DAUGHTER.

THEN YOU HEARD ABOUT THE JULY 23RD, 2004, INCIDENT IN WHICH HIS FAMILY WAS VISITING AND OVER A PAIR OF HANES UNDERWEAR, HE GOT IN A FIGHT. YOU HEARD FROM SHELLIE ANDERSON, OFFICER SHELLIE ANDERSON, LEWIS COUNCIL, AND LIEUTENANT LEDFORD. YOU SAW HOW BIG THOSE THREE GUYS WERE. YOU SAW HOW LARGE THEY WERE. IT TOOK ALL THREE OF THEM. ALL THREE OF THEM ALMOST TEN MINUTES TO CONTROL MR. BASHAM. ALL THREE OF THEM. LADIES AND GENTLEMEN, YOU HEARD LIEUTENANT LEDFORD AND THESE OFFICERS TESTIFY. "IF I HAD A SHANK, I WILL KILL YOU, MOTHER FUCKER. I WILL KILL YOU. I AM GOING TO KILL YOU." THE INTENSITY OF BRANDON BASHAM'S THREATENING TO KILL LIEUTENANT LEDFORD. HE CONTINUES WITH HIS THREATS ALL THE WAY UP TO AUGUST 3RD WHEN HE LEFT THAT FACILITY. SHELLIE ANDERSON TOLD YOU, SHELLIE ANDERSON, OFFICER SHELLIE

ANDERSON, HE TOLD YOU THAT HE HAS WORKED NINE-AND-A-HALF YEARS IN THE FEDERAL BOP AS A CORRECTIONAL OFFICER IN THE NORTH CAROLINA PRISON SYSTEMS. HE SAID IT WAS THE MOST FORCE AND THE LONGEST PERIOD OF TIME IT TOOK HIM EVER TO GET AN INMATE UNDER CONTROL IN NINE-AND-A-HALF YEARS WORKING WITH INMATES IN THE NORTH CAROLINA STATE AND FEDERAL SYSTEM. YOU HEARD ABOUT WHEN MR. BASHAM GOT BACK THERE IN JULY AND AUGUST OF LAST YEAR THROUGH LEWIS COUNCIL. YOU HEARD ABOUT HIM INCITING THE OTHER INMATES.

YOU HEARD OFFICER COUNCIL TALK ABOUT THE CELL, UNITED STATES VERSUS CELL. AT TIMES, INMATES ARE SO PSYCHOTIC, OR SO PSYCHOTIC THAT A FEDERAL JUDGE IN THIS CASE, SINCE IT IS BOP, HAS TO ORDER FORCED MEDICATION. INMATES THAT ARE WAY OFF, WAY WORSE OFF THAN MR. BASHAM, THAT IS CELL, CELL-INDUCED MEDICATION. YOU HEARD OFFICER COUNCIL TALK ABOUT THEY GET A FIVE-MAN CONTROL TEAM, FIVE OFFICERS, AND THEY GO AND THEY ARE TRAINED TO TALK TO THEM, AND GET THEM CALMED DOWN, AND GET THEM TO A POINT WHERE THEY WILL COOPERATE. THESE ARE THE HEAVILY PSYCHOTIC INMATES. WHAT DID YOU HEAR FROM OFFICER COUNCIL? MR. BASHAM, RIGHT WHEN THEY GET THESE INMATES UNDER CONTROL, HE STARTS INCITING THEM. HE STARTS INCITING THEM. WHY IS THAT IMPORTANT? BECAUSE THEN THE SAFETY OF THAT INMATE, THAT HEAVILY PSYCHOTIC INMATE, IS AT RISK. THE SAFETY OF THOSE OFFICERS ARE AT RISK BECAUSE OF MR. BASHAM'S INCITING. HE DIDN'T DO IT ONCE. HE DIDN'T DO IT

TWICE.   OFFICER COUNCIL SAID HE DID IT FIVE OR SIX TIMES WHEN HE WAS BROUGHT BACK IN JULY AND AUGUST.  HE IS THE ONLY INMATE,  ONLY INMATE ON THAT WARD TO HAVE DONE SUCH A THING.

JENNIFER MIOSI.  YOU HEARD HER TESTIMONY.  YOU SAW THAT WOMAN FROM THE WITNESS STAND.  I WILL NOT GO OVER HER TESTIMONY.  SHE TESTIFIED FOR A GOOD BIT OF TIME.  YOU HEARD HOW BRANDON BASHAM TARGETED HER THROUGH OFFICER ALLEN,  HOW HE WAS FIXATED ON HER.  TWENTY-EIGHT (28) PERCENT OF THE BOP EMPLOYEES ARE WOMEN.  TWENTY-EIGHT (28) PERCENT.  YOU HEARD HOW HE TARGETED NURSE MIOSI.  HE WAITED TO MAKE SURE SHE WOULD BE THERE.  HE WASN'T UNDER HIS SHEETS,  HE WASN'T FACING HIS WALL,  HE TARGETED HER.  HE TRIED TO EJACULATE ON HER HANDS. HE TOLD HER, AT ONE POINT IN TIME,  TO JUST STAND THERE WHILE HE IS MASTURBATING.  LET ME FINISH SO I CAN WATCH YOU.

ON JULY 25TH, IN A FIT OF RAGE,  BRANDON BASHAM TOLD NURSE MIOSI,  I AM NOT GOING TO USE THE WORDS,  HE THREATENED TO SODOMIZE HER.   THIS IS BRANDON BASHAM IN A SUPERMAX SINGLE CELL,  NOT BRANDON BASHAM IN GENERAL POPULATION WHERE THE MANIPULATIVE BRANDON BASHAM,  ONCE HE KNOWS HE NEEDS TO ACT GOOD SO HE CAN GET IN GENERAL POPULATION,  BY ACTING GOOD,  HE IS MINGLING WITH ALL OF THE STAFF IN GENERAL POPULATION,  HE THREATENED TO SODOMIZE JENNIFER MIOSI.  NOW,  IF THERE WASN'T A DOOR BETWEEN THE TWO OF THEM,  DO ANY OF YOU JURORS ACTUALLY BELIEVE THAT HE WOULDN'T HAVE ATTEMPTED TO MAKE GOOD ON THAT THREAT?

AUGUST 3RD, 2004 THIS YEAR, HE IS GETTING TRANSFERRED BACK HERE. HE KEESTERED BATTERIES. EVEN GOES ACROSS, HE IS SMUGGLING, HE IS HOARDING THEM. HE LIES TO DEPUTY O'BRIEN OF THE MARSHAL SERVICE ABOUT THEM. HE IS THREATENING. THREATENED LIEUTENANT LEDFORD. "I SHOULD HAVE KILLED YOU." THREATENED HIM. "I SHOULD HAVE FUCKED YOU UP. YOU KNOW, I WILL BE BACK HERE. I WILL BE BACK HERE." BECAUSE, WHAT ELSE IS HE DOING? AIN'T NO JURY IN THE WORLD GOING TO GIVE ME THE DEATH PENALTY. IN FACT, FROM THE TRANSCRIPT, FROM THE REAL LIVE TRANSCRIPT, IF YOU REMEMBER OFFICER ANDERSON OR OFFICER COUNCIL, HE SAID, "I AIN'T SWEATING THIS SHIT. I AIN'T WORRIED. THE WORSE THEY CAN DO TO ME IS GIVE ME LIFE. I WILL SEE YOU BACK HERE." THAT IS THE ATTITUDE OF BRANDON BASHAM.

U.S. MARSHALS, SEPTEMBER 3RD THIS YEAR. HE COMES TO COURT THAT FRIDAY, HE SAYS HE IS SICK. COMES INTO THE COURTROOM, CLAIMS HE IS SICK. HE IS HYPERVENTILATING. GETS HIM TO THE HOSPITAL. BEFORE ANY PERSON SEES HIM, BEFORE ANY NURSE INTERVIEWS HIM, BEFORE ANY TREATMENT, ALL OF A SUDDEN BRANDON BASHAM IS FEELING MUCH BETTER. HE IS LAUGHING, JOKING AROUND. HE IS DIAGNOSED, THEY BRING HIM BACK. HE SEES A CIGARETTE. HE GOES TO PICK IT UP, HE FIGHTS, HE RESISTS. IT TOOK THE MARSHALS AND THE SECURITY DETAIL, IN BROAD DAYLIGHT, FROM THE PARKING LOT OF RICHLAND MEMORIAL HOSPITAL A FEW BLOCKS AWAY FROM HERE, TO GET HIM UNDER CONTROL, BACK IN

THE VAN, ALL OVER A CIGARETTE BUTT.  LADIES AND GENTLEMEN, WHAT WAS PART OF HIS TREATMENT IN THAT HOSPITAL EMERGENCY ROOM? WHAT DID THE DOCTOR AND THE NURSE GIVE HIM? A SHOT OF VALIUM.  IT STILL TOOK MULTIPLE OFFICERS TO CONTROL HIM, TO CONTROL HIS RAGE OVER A CIGARETTE BUTT.

SEPTEMBER 20TH, 2004, IN THIS VERY COURT ROOM WHILE YOU JURORS WERE SITTING BACK IN YOUR JURY ROOM.  IT TOOK SIX OFFICERS, FOUR MARSHALS, AND TWO FBI AGENTS TO CONTROL MR. BASHAM.  TO CONTROL HIM TO MAKE SURE HE DOESN'T HURT HIMSELF OR ANYBODY ELSE.  SIX OFFICERS.  THEY HAD TO TAKE HIM TO THE GROUND TWICE.  HE WAS CURSING, HE WAS TAUNTING, SIX OF THEM, ALL OVER DIP.

YOU KNOW WHAT IS REALLY IMPORTANT ABOUT THAT INCIDENT? THIS PERSON WHO IS SUPPOSED TO HAVE ALWAYS, EVERY TIME HE ACTS BAD, AND HE CAN'T HELP HIMSELF, HE PLANNED IT.  YOU HEARD THE DEPUTY MARSHAL TAKE THE WITNESS STAND.  HE WAS RIDING UP FROM THE LUNCH BREAK IN THE ELEVATOR BOASTING AND BRAGGING, WE AIN'T GOING TO BE THERE VERY LONG.  I WILL BE DOWNSTAIRS SHORTLY.  HE PLANNED IT.  DEMONSTRATES LACK OF REMORSE, USE OF ILLEGAL NARCOTICS.

I AM ALMOST THROUGH.  I APPRECIATE YOU BEARING WITH ME. I REALLY DO.  DEMONSTRATED A LACK OF REMORSE FOR THE CRIMES HE HAS COMMITTED.  USE OF ILLEGAL NARCOTICS DURING THE CRIME SPREE.  YOU KNOW, SOME OF YOU MIGHT THINK THAT SENTENCING A MAN LIKE BRANDON BASHAM TO PRISON FOR THE REST OF HIS LIFE IS

WORSE THAN THE DEATH PENALTY.  THAT BRANDON BASHAM WILL SIT IN HIS CELL AND THINK ABOUT WHAT HE DID TO SAMANTHA BURNS EVERY DAY AND THINK ABOUT WHAT HE DID TO ALICE DONOVAN EVERY DAY.  AND YOU KNOW SOMETHING? YOU MIGHT BE RIGHT, IF BRANDON BASHAM HAD A CONSCIENCE.  IF BRANDON BASHAM SHOWED THE LEAST BIT OF REMORSE.  IF THERE WAS OBJECTIVE EVIDENCE THAT HE CARED ONE BIT ABOUT WHAT HE DID TO THESE TWO WOMEN, YOU MIGHT BE RIGHT.  BUT HE DOESN'T.  HE DOESN'T.  SO, WHEN HE IS SITTING IN HIS JAIL CELL, YOU GIVE HIM A LIFE SENTENCE AND HE IS IN GENERAL POPULATION, HE WILL HAVE HIS GAMES, HE WILL HAVE HIS TV, HE WILL HAVE ACCESS TO A LIBRARY, HAVE HIS 300 MINUTES, HAVE THE VISITORS COMING, HAVE HIS JOB, HAVE HIS BOOKS, HE WILL HAVE HIS MAGAZINES, HE WILL HAVE INTRAMURAL SPORTS.  AND DURING ALL OF THAT TIME WHEN HE IS EATING HIS FOOD, WATCHING HIS COLOR TELEVISION, READING HIS BOOKS, TALKING TO HIS FAMILY, NONE OF IT, NOT ONE MINUTE OF IT WILL HE BE REFLECTIVE UPON WHAT HE DID TO THESE TWO WOMEN.

WHAT KIND OF A MAN, LADIES AND GENTLEMEN, ASK YOURSELVES, WHEN YOU ARE DETERMINING WHAT THE APPROPRIATE PUNISHMENT WOULD BE, WHAT KIND OF A MAN ABDUCTS AND KILLS A 19-YEAR-OLD GIRL AND 24 HOURS LATER IS SMOKING MARIJUANA AND DRINKING IN A SOUTH CAROLINA MOTEL ROOM? WHAT KIND OF A MAN ABDUCTS, AND KIDNAPS, AND KILLS A 44-YEAR-OLD WOMAN, 24 HOURS LATER IS IN HUNTINGTON, WEST VIRGINIA SMOKING CRACK, AND DRINKING BEER, AND HAVING SEX WITH BETH MCGUFFIN? WHAT KIND OF

MEN DO SUCH THINGS? WHAT WAS HIS DEMEANOR LIKE ON NOVEMBER 15TH WHEN CHAD FULKS AND BRANDON BASHAM RETURNED TO BETH MCGUFFIN'S HOUSE? THE TWO OF THEM, THEY WERE LAUGHING, THEY WERE JOKING, THEY WERE TALKING ABOUT GOING TO A BIKE RALLY. THEY ACTED AS BEST FRIENDS, ACCORDING TO THE WITNESSES THAT OBSERVED THEM.

ON FRIDAY NIGHT, NOVEMBER 15TH, FOUR DAYS AFTER SAMANTHA BURNS WAS MISSING, HER DAD, HER DAD, JOHN BURNS, ON THAT FRIDAY NIGHT, DON'T YOU THINK HE WAS HITTING THE WOODS OF HUNTINGTON, WEST VIRGINIA? DON'T YOU THINK IN HIS MIND HE WAS ASKING HIS MAKER FOR INTERVENTION? DON'T YOU THINK HE WAS WONDERING WHERE IS HIS LITTLE GIRL? WHAT HAS HAPPENED TO HIS LITTLE GIRL? AND WHEN JOHN BURNS IS LOOKING FOR HIS LITTLE GIRL, WHAT IS BRANDON BASHAM DOING? HE IS GETTING HIGH. HE IS CELEBRATING WITH CHAD FULKS. DON'T YOU THINK THAT FRIDAY NIGHT, SEVERAL HUNDRED MILES AWAY WHEN BARRY DONOVAN SEES THAT ATM PHOTOGRAPH AND REALIZES THAT HIS WIFE HAS BEEN ABDUCTED, WHEN BARRY DONOVAN IS WONDERING, WHERE IS ALICE? I WASN'T THERE FOR ALICE. WHO IS PROTECTING ALICE? AS BARRY DONOVAN, AS HIS HEAD HIT HIS PILLOW THAT NIGHT, WHAT WAS BRANDON BASHAM DOING? HE WAS LAUGHING, HE WAS JOKING, HE WAS HAVING SEX, HE WAS HAVING A GOOD TIME. AS THE BODY OF SAMANTHA BURNS LAY IN SOME BODY OF WATER, FLOATING SOMEWHERE, AS ALICE DONOVAN IS DEAD, LAYING IN SOME WOODED AREA IN EITHER NORTH OR SOUTH CAROLINA, BRANDON BASHAM AND CHAD FULKS WERE DOING THEIR

THING.  LIFE WAS GOOD.  THEY HAD THEIR DRUGS, THEY HAD THEIR ALCOHOL, AND BRANDON BASHAM HAD IT GOOD.  NO, LIFE WAS GOOD.  NO REMORSE, NO CONSCIENCE, IT HAS JUST GOTTEN BETTER.

LADIES AND GENTLEMEN, BRANDON BASHAM WEARS THESE ATROCITIES LIKE A BADGE OF HONOR.  HE IS PROUD, HE IS ARROGANT, HE DON'T CARE.  I ASK YOU, LADIES AND GENTLEMEN, WHEN YOU GO BACK THERE TO REACH A VERDICT THAT STRIPS HIM FROM HIS TWISTED SENSE OF SELF-RIGHTEOUSNESS WHEN IT COMES TO WHAT HE DID TO THESE TWO WOMEN, REACH A SENTENCE THAT PUNISHES HIM, A PUNISHMENT THAT HE SO RICHLY DESERVES.

I AM GOING TO BRIEFLY DISCUSS WITH YOU THE DEFENSE MITIGATION, IN GENERAL, AND THEN I AM GOING TO SIT DOWN.  I WILL HAVE AN OPPORTUNITY TO DISCUSS IN REPLY.  FIRST OF ALL, YOU NEED TO BE VERY CLEAR ON THIS.  THE GOVERNMENT IS ASKING YOU, IN RELYING ON REACHING A DEATH SENTENCE, THE TESTIMONY AND THE EVIDENCE IN THE GUILT PHASE, THE AGGRAVATING CIRCUMSTANCES I HAVE JUST DISCUSSED WITH YOU, THAT IS WHAT WE ARE RELYING ON IN ASKING YOU TO SENTENCE MR. BASHAM TO DEATH.  THE GOVERNMENT HAS NO BURDEN WHEN IT COMES TO MITIGATION.  WE DID NOT NEED TO CALL ANY WITNESSES.  WE DECIDED TO CALL DR. CAPEHART, AT LEAST, TO PUT SOME OF WHAT THEIR WITNESSES WERE SAYING IN PROPER PERSPECTIVE.  WE DIDN'T HAVE TO DO THAT.  WE HAVE NO BURDEN TO DO THAT.  WE ARE NOT RELYING ON BRANDON BASHAM'S PAST OR WHAT ISSUES HE MIGHT BE DEALING WITH WHEN WE WERE ASKING YOU JURORS TO SENTENCE HIM TO DEATH.

BUT, GENERALLY, WHAT DID THEIR EXPERTS SAY? WHAT IS THE MOST IMPORTANT THING THEY SAID? BRANDON BASHAM KNOWS THE DIFFERENCE BETWEEN RIGHT AND WRONG, AND THERE IS NO CAUSE-AND-EFFECT BETWEEN WHATEVER ISSUES BRANDON BASHAM IS DEALING WITH IN THE KIDNAPPING AND CARJACKING RANDOMLY OF TWO INNOCENT WOMEN.  THERE IS NO CAUSE-AND-EFFECT. IT IS NOT LIKE IF YOU WERE BORN INTO AN ALCOHOLIC FAMILY, YOU RUN THE RISK OF BEING ALCOHOLIC.  THERE IS NO CAUSE-AND-EFFECT OF BRANDON BASHAM'S UPBRINGING OR ANY PROBLEMS BRANDON BASHAM HAS WITH THE EFFECT OF HIM RANDOMLY TARGETING, AND KIDNAPPING, AND KILLING TWO INNOCENT WOMEN.  EVERY SINGLE DEFENSE EXPERT TOOK THAT WITNESS STAND AND ACKNOWLEDGED THAT BECAUSE THEY HAD TO. BECAUSE THAT IS A FACT.  NO CAUSE AND EFFECTS.  THERE ARE THOUSANDS AND THOUSANDS OF KIDS AND ADULTS WALKING THIS COUNTRY, STREETS OF OUR NEIGHBORHOOD, OF THIS STATE, AND OF ALL 50 STATES THAT GREW UP IMPOVERISHED, MUCH POORER THAN BRANDON BASHAM, WITH PHYSICAL DISABILITIES HE DID NOT HAVE. WITH SIGNIFICANT, SIGNIFICANT MENTAL ISSUES THAT DON'T KILL, THAT DON'T CARJACK.  THERE ARE TENS OF THOUSANDS, HUNDREDS OF THOUSANDS OF CITIZENS, OF 21-YEAR-OLD MEN IN THIS COUNTRY THAT SEE VIOLENCE, THAT GET BEATEN BY THEIR PARENTS THAT DON'T KILL AND CARJACK.  AND THAT IS ABSOLUTELY CRITICAL.

THEIR WITNESSES OPINED THREE THINGS:  BASICALLY, THAT BRANDON BASHAM HAS -- HE CAN'T CONTROL HIS IMPULSES.  THAT BECAUSE OF BRAIN INJURY, THAT HE HAS DIFFICULTY MAKING

APPROPRIATE CHOICES.  THAT IS THAT EXECUTIVE FUNCTIONING YOU HEARD ABOUT.  AND THAT HE HAS DEMENTIA OR MEMORY LOSS. MEMORY LOSS.   YOU KNOW, THIS WEEKEND, AS I WAS REFLECTING UPON WHAT I WAS GOING TO SAY TO YOU,  LADIES AND GENTLEMEN,  I THOUGHT ABOUT ALL THE TIME THAT WAS SPENT THAT YOU HAD TO SIT THROUGH DIRECT EXAMINATION AND CROSS-EXAMINATION OF, I MEAN, LITERALLY,  HOURS AND DAYS OF TESTIMONY ABOUT WHETHER OR NOT BRANDON BASHAM HAD A MEMORY PROBLEM.  I WAS SITTING ON MY BACK PORCH LAST NIGHT AND IT CAME TO ME.   BRANDON BASHAM HAS A MEMORY PROBLEM.   WHAT DIFFERENCE DOES THAT MAKE? WHAT DOES BRANDON BASHAM HAVING A MEMORY PROBLEM HAVE TO DO WITH TARGETING ALICE DONOVAN IN THE WAL-MART PARKING LOT, AND KIDNAPPING, AND CARJACKING HER? WHAT DOES A MEMORY PROBLEM HAVE ANYTHING TO DO WITH THE FACTS AND CIRCUMSTANCES OF THIS CASE AS TO WHAT HAPPENED TO SAMANTHA BURNS AND WHAT HAPPENED TO ALICE DONOVAN? WHAT DOES A MEMORY PROBLEM HAVE TO DO WITH THAT, IF YOU SO FIND THAT HE HAS A MEMORY PROBLEM?

IMPULSE BEHAVIOR.  IMPULSE CONTROL.  HE HAS DIFFICULTY CONTROLLING HIS IMPULSES.  SO, I GUESS THE ARGUMENT IS,  TO EXPLAIN BRANDON BASHAM'S CONDUCT DURING THIS CRIME SPREE,  THE VIOLENT ACTS HE COMMITTED,  TO EXPLAIN HIS CONDUCT IN THIS COURTROOM,  TO EXPLAIN HIS CONDUCT WHILE INCARCERATED THAT HE HAS DIFFICULTY CONTROLLING HIS IMPULSES, THAT IS THE EXPLANATION.  WELL THEN, ASK YOURSELVES THIS, LADIES AND GENTLEMEN.  YOU KNOW,  ALICE DONOVAN WAS NAKED IN THE BACK

SEAT OF THAT CAR. WE KNOW THAT WHEN CHAD FULKS, AT LEAST, AT THE VERY LEAST, RAPED HER. HE IS IN THE PRESENCE OF ALICE DONOVAN, IN THE PRESENCE OF SAMANTHA BURNS. THEY WANT YOU TO BELIEVE HE CAN'T CONTROL HIS IMPULSES, WHICH EXPLAINS WHY HE WAS INVOLVED IN A CARJACKING AND KIDNAPPING. HE WAS ABLE TO CONTROL HIS IMPULSES. HE DIDN'T LAY A FINGER ON ALICE DONOVAN. DIDN'T LAY A FINGER ON SAMANTHA BURNS. HE IS ABLE TO CONTROL HIS IMPULSES THERE, BUT NOT CONTROL HIS IMPULSES IN GETTING INVOLVED IN CRIMINAL CONDUCT TO BEGIN WITH. IS THAT LOGICAL? IS THAT RATIONAL? IS THAT REASONABLE?

AND WITH REGARD TO THIS EXECUTIVE FUNCTIONING, DIFFICULTY MAKING CHOICES. I AM NOT GOING TO GO OVER ALL OF THE EVIDENCE THAT WE CROSS-EXAMINED AND PROVIDED IN OUR CASE IN CHIEF. WE CROSS-EXAMINED ALL OF THE TIMES, ALL OF THE STEPS BRANDON BASHAM HAD TO TAKE IN DECEIVING PEOPLE, GOING ABOUT HIS CRIMINAL CONDUCT AND PLANNING. I WILL NOT GO OVER IT ALL AGAIN, YOU HEARD IT ALREADY ONE TIME. PUT IT IN PROPER PERSPECTIVE, NOT ABLE TO MAKE GOOD CHOICES. LEAVING YOUR BICYCLE OUT IN THE RAIN IS NOT MAKING A GOOD CHOICE. YOU TURN TO DRUGS OR ALCOHOL TO DEAL WITH A PROBLEM IS NOT MAKING A GOOD CHOICE. YOU ENGAGE IN PETTY THEFT OR FORGERIES BECAUSE YOU WANT MONEY. PETTY CRIMINAL ACTIVITY IS NOT MAKING A GOOD CHOICE. IT IS AN AWFUL LARGE LEAP, LADIES AND GENTLEMEN, TO USE THIS WHOLE IDEA THAT HE HAS DIFFICULTY MAKING CHOICES TO THE RANDOM KIDNAPPING AND CARJACKING AND

KILLING OF TWO WOMEN.  YOU JUST CAN'T DO IT.  YOU JUST CAN'T DO IT.

BOTTOM LINE IS, LADIES AND GENTLEMEN, FROM ALL OF THE TESTIMONY AND EVIDENCE YOU HAVE HEARD, FROM THE TIME MR. BASHAM WAS TEN YEARS OLD, YOU HAVE HEARD DOZENS AND DOZENS OF TREATMENT FACILITIES.  MR. BASHAM HAS HAD THE OPPORTUNITY TO HAVE COUNSELORS, MENTAL HEALTH WORKERS, NURSES, DOCTORS, SOCIAL WORKERS PROVIDE HIM ASSISTANCE, PROVIDE HIM MEDICATION. AND EACH AND EVERY TIME, I WILL NOT GO THROUGH IT ALL, YOU HEARD THE TESTIMONY, YOU HEARD THE CROSS-EXAMINATION FROM MR. SCHOOLS WITH MANY OF THE WITNESSES, EACH AND EVERY TIME, WHERE OTHER INDIVIDUALS IN LIKE SITUATIONS WITH MR. BASHAM WAS TAKING ADVANTAGE OF WHAT HAPPENED, WHAT THESE FACILITIES HAD TO OFFER, HE WASN'T.  HE WAS MANIPULATING, HE WAS DECEIVING, HE WAS REJECTING.  THOSE WERE THE CHOICES THAT HE WAS MAKING. PEOPLE, LADIES AND GENTLEMEN, WERE TRYING TO OFFER HIM HELP WHEN HE WAS A YOUNGSTER. HE REJECTED IT.  AND REMEMBER, ALL OF THAT TESTIMONY WAS BEFORE HE WAS 18 YEARS OLD.  THREE YEARS GO BY, LADIES AND GENTLEMEN, BEFORE HE CHOOSES TO ESCAPE AND KILL THESE TWO WOMEN.  THREE YEARS.

THE DEFENSE WANTS YOU TO FOCUS ON WHEN HE WAS A CHILD. THE GOVERNMENT ASKS YOU TO FOCUS ON HIS CONDUCT WHEN HE IS A MAN.  WHEN HE IS A MAN.  THE GOVERNMENT'S EXPERTS OPINED THAT ANTISOCIAL PERSONALITY DISORDER, WHERE THERE IS NO TREATMENT, ANTISOCIAL PERSONALITY DISORDER IS WHAT BRANDON

BASHAM HAS.   YOU KNOW WHAT?  YOU LOOK AT THE FACTORS I GO OVER IN MY REPLY, IT EXPLAINS HIS BEHAVIOR.   IT EXPLAINS HIS BEHAVIOR IN THIS CRIME SPREE.

DEFENSE EXPERTS OPINE THAT HE HAS A SELF OR INDUCED, INHALANT-INDUCED PSYCHOSIS.  AND THAT HE HAS GOT DEMENTIA, MEMORY LOSS.   DR. WATTS, ON THE WITNESS STAND IN RESPONSE TO MR. SCHOOLS, ACKNOWLEDGED THAT THOSE TWO PROBLEMS DON'T EXPLAIN HIS BEHAVIOR.   SO,  THE GOVERNMENT'S PSYCHIATRIST DIAGNOSED HIM WITH SOMETHING THAT EXPLAINED HIS BEHAVIOR AGAINST SAMANTHA BURNS AND ALICE DONOVAN.  AND THE DEFENSE EXPERT OPINES TWO PROBLEMS IN WHICH SHE ACKNOWLEDGES DOES NOT EXPLAIN HIS BEHAVIOR.   WHO GOT IT RIGHT? THAT IS FOR YOU TO DECIDE.   YOU KNOW, DECIDING ON WHO GOT IT RIGHT ON THAT ISSUE CLEARLY ONLY GOES TO SHOW WHAT MITIGATION,  WHAT WEIGHT YOU WILL CONSIDER TO GIVE THAT WHEN YOU ARE DELIBERATING AS TO WHAT THE APPROPRIATE PUNISHMENT WILL BE.  REGARDLESS OF ALL OF THE YELLING,  RAISING VOICES,  AND ATTACKING SOMEONE FOR WHAT SCHOOL THEY WENT TO,  THE FACTS SPEAK FOR THEMSELVES,  LADIES AND GENTLEMEN.

AND ONE OF THE TOUGHER POINTS YOU CAN'T FORGET, THERE IS ABSOLUTELY NO QUESTION MR. BASHAM KNEW RIGHT FROM WRONG.   NO QUESTION, THAT WHATEVER HIS ISSUES ARE, THERE IS NO CAUSE-AND-EFFECT.

LASTLY,  AS I INDICATED TO YOU,  LADIES AND GENTLEMEN, MR. BASHAM IS 23 NOW; HE WAS 21 AT THE TIME OF THESE CRIMES.

ON MAY 7TH, 1958, THE HAND OF GOD TOUCHED A SOUL WITH ALICE DONOVAN AND CREATED LIFE. ON APRIL 23RD, 1983, THAT SAME MIRACLE PRODUCED SAMANTHA BURNS TO JOHN AND KANDI BURNS IN A SMALL TOWN OUTSIDE OF HUNTINGTON, WEST VIRGINIA. IN NOVEMBER OF 2002, AT THE HANDS OF BRANDON BASHAM, ALICE DONOVAN AND SAMANTHA BURNS'S LIVES WERE TERMINATED IN A CRUEL, HORRIBLE MANNER FOR NO JUST CAUSE, NO EXCUSE. AND YOU CAN'T CHANGE THAT. BUT UNDER THIS SYSTEM, YOU DO HAVE THE POWER TO HOLD BRANDON BASHAM ACCOUNTABLE. YOU HAVE THE ABILITY, LADIES AND GENTLEMEN, WHEN YOU GO BACK TO YOUR JURY ROOM LATER ON THIS AFTERNOON, TO HOLD MR. BASHAM RESPONSIBLE FOR THE CHOICES THAT HE MADE FOR WHAT HE DID TO SAMANTHA AND FOR WHAT HE DID TO ALICE. IT WILL BE YOUR CHOICE, IN THE FINAL ANALYSIS. YOUR CHOICE WHAT THE APPROPRIATE PUNISHMENT SHOULD BE.

ON BEHALF OF THE UNITED STATES GOVERNMENT, I SIMPLY ASK YOU TO CHOOSE WISELY.

THE COURT: MEMBERS OF THE JURY, LET'S TAKE A 15-MINUTE RECESS. WE WILL COME BACK AND HEAR THE DEFENDANT'S ARGUMENT.

(WHEREUPON, THE FOLLOWING WAS HEARD OUTSIDE THE PRESENCE OF THE TRIAL JURY.)

THE COURT: TWO THINGS, MR. SWERLING. CAN YOU GIVE ME SOME CLOSE APPROXIMATION OF HOW LONG YOU WILL TAKE? I HAVE TO ORDER THE LUNCH. I AM NOT TRYING TO RUSH YOU OR HOLD YOU

FLIPPING PAGES, EXPLAINING PAGES. I WILL TELL THEM THEY AREN'T LIMITED BY THE LIST. I TELL THEM IN THE TEXT EARLIER IN THE CHARGE THEY AREN'T LIMITED. I WILL TELL THEM AGAIN WHEN WE GET TO THE VERDICT FORM.

MR. HARRIS: WILL IT BE IN WRITING FOR THEM TO TAKE BACK WITH THEM, YOUR HONOR?

THE COURT: NO.

MR. HARRIS: WE WOULD ASK THAT THAT BE IN SOME FORM OF WRITING.

THE COURT: IT WILL BE IN THE JURY CHARGE. IT WILL BE IN THE JURY CHARGE. I WILL GO BACK AND READ THAT BACK TO THEM VERBATIM, TELL THEM IT IS NOT ON THE LIST. TELL THEM THEY CAN CONSIDER ANY OTHER FACTOR THAT THEY THINK IS MITIGATING. ALL RIGHT. PLEASE BRING IN THE JURY.

(WHEREUPON, THE FOLLOWING WAS HEARD IN THE PRESENCE OF THE TRIAL JURY.)

THE COURT: ALL RIGHT. THE COURT RECOGNIZES MR. GASSER FOR HIS REPLY ARGUMENT.

MR. GASSER: MAY IT PLEASE THE COURT, YOUR HONOR. LADIES AND GENTLEMEN, AS YOU KNOW, I SAID I WOULD DO AGAIN AS I DID IN THE GUILT PHASE PORTION OF THIS PROCESS. I HAVE THE RIGHT, REPRESENTING THE GOVERNMENT AND THE CITIZENS OF SOUTH CAROLINA, TO COME BEFORE YOU AND REPLY TO MR. SWERLING. I BELIEVE I KEPT IT RIGHT TO 30 MINUTES IN THE GUILT STAGE, THAT IS WHAT I PLAN ON DOING NOW.

YOU HAVE EATEN LUNCH, YOU HAVE HEARD A LOT THIS MORNING. I KNOW YOU ARE READY TO GET RIGHT TO THE WORK THIS DAY. I PLAN ON KEEPING IT AT A LIMITED TIME.

ONE OF THE THINGS I WANTED TO MAKE CLEAR IS THAT THE GOVERNMENT IS NOT RELYING ON ANY ONE FACT IN ASKING YOU JURORS TO SENTENCE MR. BASHAM. IT WASN'T THE FACT HE HOARDS HIS DRUGS THAT HE DESERVES THAT SENTENCE. IT WASN'T THE FACT THAT HE PARTICIPATED IN THE ATTEMPTED MURDER OF MATT DAVIS THAT HE DESERVES THE DEATH SENTENCE. I AM SURE YOU CAN ALL UNDERSTAND THAT, BUT TO KIND OF TAKE IT IN CONTEXT, SO BRANDON BASHAM DOES SUCH-AND-SUCH, IS THAT A REASON TO KILL HIM? SO BRANDON BASHAM DID SUCH-AND-SUCH, IS THAT A REASON TO KILL HIM? THAT IS CLEARLY BEING -- TAKING FACTS AND EVIDENCE OUT OF CONTEXT IN WHAT WE ARE ASKING YOU TO DO. WE ARE ASKING YOU TO CONSIDER ALL OF THE FACTS, ALL OF THE TESTIMONY, AND ALL OF THE ACTIONS, AND ALL OF THE CONDUCT OF BRANDON BASHAM. AND WE ARE ASKING YOU TO CONSIDER ALL OF THE MITIGATION EVIDENCE THAT WAS PRESENTED BY THE DEFENSE.

THE GOVERNMENT NEVER SUGGESTED TO YOU IN OPENING STATEMENTS IN THE PENALTY PHASE, I DID NOT SUGGEST TO YOU THAT YOU JURORS SHOULD NOT CONSIDER EVERY ASPECT, EVERY ANSWER FROM EVERY WITNESS PRESENTED TO YOU BY THE GOVERNMENT AND THE DEFENSE IN THIS CASE. YOU SHOULD ABSOLUTELY CONSIDER ALL OF THE TESTIMONY AND ALL OF THE EVIDENCE. AND IT IS UP TO YOU JURORS TO DECIDE WHAT, IF ANY, WEIGHT OF ANY OF THE TESTIMONY

OR ANY OF THE EVIDENCE SHOULD BE GIVEN. IT IS TOTALLY UP TO YOU. THE LAWYERS CAN'T TELL YOU WHAT TO CONSIDER. THE LAWYERS CAN'T TELL YOU WHAT WEIGHT. THE JUDGE CAN'T TELL YOU WHAT WEIGHT. YOU WILL HAVE TO CONSIDER ALL OF THE EVIDENCE. IT IS TOTALLY YOUR PREROGATIVE, LADIES AND GENTLEMEN.

ONE OF THE THINGS I WANT TO MAKE ABSOLUTELY CLEAR AGAIN. AT ONE POINT IN TIME, MR. SWERLING INDICATED THAT ONE TIME IN HIS LIFE BRANDON BASHAM WAS KIND TO CHASE WHEN HE WAS 10, 11 YEARS OLD. AND HE MADE THE STATEMENT, AND THIS IS THE BOY THAT THE GOVERNMENT IS ASKING YOU TO KILL. NO, IT IS NOT. THAT IS WHAT I MEANT WHEN I TALKED TO YOU IN MY CLOSING ARGUMENT.

ONE OF THE THINGS THE DEFENSE WANTS YOU TO FOCUS ON IS BRANDON BASHAM. BECAUSE, LET'S FACE IT, NO CITIZEN, NO 16 CITIZENS WOULD EVER CONSIDER, SHOULD THEY EVER CONSIDER KILLING A TEN YEAR OLD OR KILLING A 12 YEAR OLD. AND WE ARE NOT ASKING YOU TO DO THAT. WE ARE ASKING YOU, LADIES AND GENTLEMEN, TO LOOK AT BRANDON BASHAM, THE MAN, BRANDON BASHAM THE MAN AT 21 YEARS OLD, NOW 23 YEARS OLD, BUT 21 YEARS OLD WHEN HE WAS KIDNAPPING AND CARJACKING THESE TWO WOMEN AND KILLING THESE TWO WOMEN. BRANDON BASHAM, THE MAN. BRANDON BASHAM'S ACTIONS AS A MAN. THE GOVERNMENT SUBMITS THAT IS WHERE THE FOCUS OF YOUR ATTENTION SHOULD BE ON, BRANDON BASHAM, THE MAN. BECAUSE HE IS A MAN, HE COMMITTED THESE CRIMES. A MAN WHO SITS HERE BEFORE YOU ON TRIAL,

LADIES AND GENTLEMEN.

NOW, A COUPLE OF GENERAL POINTS I WILL TALK TO YOU ABOUT THAT MR. SWERLING DISCUSSED WITH YOU. FIRST OF ALL, CHAD FULKS. NEED I REMIND YOU AGAIN THAT CHAD FULKS AND BRANDON BASHAM WERE CHARGED WITH THE SAME EXACT CRIMES? THAT DEATH NOTICES WERE PROVIDED AGAINST MR. BASHAM AND MR. FULKS? THAT IT RESOLVED A LEGAL ISSUE THAT THESE CASES WERE SEVERED? YOUR SOLE RESPONSIBILITY, YOUR SOLE RESPONSIBILITY IS THE APPROPRIATE PUNISHMENT OF MR. BASHAM. THE GOVERNMENT SOUGHT THE DEATH PENALTY AGAINST MR. FULKS AND THE GOVERNMENT SOUGHT THE DEATH PENALTY AGAINST MR. BASHAM. BECAUSE IT IS THE GOVERNMENT'S POSITION THAT AN OBJECTIVE VIEWPOINT OF THIS EVIDENCE INDICATES THAT THEY WERE BOTH EQUALLY CULPABLE IN SAMANTHA BURNS AND THE ALICE DONOVAN CASE. THE GOVERNMENT IS SEEKING -- THE GOVERNMENT HAS SOUGHT DEATH PENALTIES AGAINST BOTH OF THESE INDIVIDUALS. THAT IS VERY IMPORTANT. THAT IS EXTREMELY CRITICAL FOR YOU TO UNDERSTAND THAT THE GOVERNMENT IS NOT SAYING THAT CHAD FULKS IS LESS CULPABLE THAN BRANDON BASHAM. NEVER HAVE SAID THAT.

THE GOVERNMENT 'S POSITION IS THE TWO OF THEM ARE EQUALLY CULPABLE. IT JUST SO HAPPENS IT IS YOUR LEGAL RESPONSIBILITY FOR YOU TO DETERMINE BRANDON BASHAM'S APPROPRIATE PUNISHMENT. HE SPOKE ABOUT MR. FULKS. LET'S PUT MR. FULKS IN PERSPECTIVE HERE.

THERE IS NO QUESTION MR. FULKS WAS LEADING THE PACK AS FAR

AS WHO WAS DRIVING THE CAR AND WHERE THEY WERE GOING.   THERE IS ABSOLUTELY NO QUESTION ABOUT THAT.   BUT I REMIND YOU, LADIES AND GENTLEMEN, WHO WAS THE ONE THAT TOOK THE LEAD DURING ALL OF THOSE HOURS WHEN SAMANTHA BURNS WAS ALONE IN THE CAR WITH HER PERPETRATOR?  IT WAS BRANDON BASHAM BECAUSE MR. FULKS HAD TO BE DRIVING THE VAN.   AS MR. FULKS WAS IN THE VAN, IT WAS MR. BASHAM TAKING THE LEAD.   IT WAS MR. BASHAM THAT HAD THAT GUN ON SAMANTHA BURNS, THE GOVERNMENT SUBMITS TO YOU.  WHO WAS THE ONE WHO TOOK THE LEAD AND APPROACHED ANDREA FRANCIS?  IT WAS MR. BASHAM THAT TOOK THE LEAD.

THEY MENTIONED THE FACT THAT THE ACTS OF MR. BASHAM ARE MERE PUFFING, BUT THAT THE FACTS OF MR. FULKS SHOW VIOLENCE. THERE IS NO QUESTION, WE ARE THE ONES THAT PRESENTED THE EVIDENCE WHEN MR. FULKS TRIED TO SHOOT CARL JORDAN IN THE HEAD,  HE TRIED TO KILL CARL JORDAN.  THE GOVERNMENT PRESENTED THAT TESTIMONY WHEN I DIRECTLY EXAMINED MR. JORDAN.   NO QUESTION, WE AGREE.   WHY IS IT A VIOLENT ACT WHEN MR. FULKS IS TRYING TO SHOOT MR. JORDAN IN THE HEAD,  AND IT IS NOT A VIOLENT ACT WHEN MR. BASHAM IS TRYING TO KILL MATT DAVIS?  HOW DO YOU DISTINGUISH THE TWO? THE FACT THAT HE WAS THREATENING TO KILL THOSE STURGIS MICHIGAN POLICE OFFICERS IS MERE PUFFING, WHEN CHAD FULKS POINTS THE GUN AT TINA SEVERANCE'S FACE,  IT IS AN ACT OF VIOLENCE.   HOW CAN YOU HAVE IT BOTH WAYS? YOU CAN'T.

REASONABLE PEOPLE, I SUBMIT TO YOU, CLEARLY, WHEN LOOKING

AT THIS EVIDENCE, THERE IS EVIDENCE IN THE RECORD THAT CHAD FULKS WAS VIOLENT TOWARDS INNOCENT PEOPLE, AND THERE IS EVIDENCE IN THE RECORD THAT BRANDON BASHAM WAS VIOLENT TOWARDS INNOCENT PEOPLE.  EQUALLY VIOLENT.  CHAD FULKS, AS I TOLD YOU IN MY GUILT PHASE, I AM NOT DEFENDING THE GUY.  THE GOVERNMENT'S POSITION IS CHAD FULKS DESERVES TO DIE FOR THESE CRIMES, TOO.  CHAD FULKS DIDN'T KILL JAMES HAWKINS EITHER. IN FACT, IF YOU REMEMBER, CHAD FULKS SAID, YOU DO WITH HIM WHAT YOU WANT TO.  SO, WHEN IT WAS LEFT UP TO CHAD FULKS LEAVING IT UP TO BRANDON BASHAM, MR. HAWKINS SURVIVED.  TWO WOMEN ARE DEAD.

THEY WANT YOU TO BELIEVE THAT BRANDON BASHAM CAN BE EASILY MANIPULATED.  THERE IS NO QUESTION ABOUT IT.  BRANDON BASHAM, HE HAS BEEN ON BOTH ENDS OF THIS.  HE CAN BE EASILY MANIPULATED.  HE HAS ATTEMPTED TO AND, IN FACT, HAS MANIPULATED PEOPLE BEFORE.  REMEMBER JAMES EDWARDS' TESTIMONY?  THERE ARE LEADERS AND FOLLOWERS IN PRISON.  THERE ARE LEADERS AND FOLLOWERS IN PRISON.

IT IS INTERESTING, WHEN MR. SWERLING WAS EXPLAINING TO YOU WHY, PUTTING IN CONTEXT WHY MR. BASHAM WOULD REACT THE WAY HE DID WITH SOME OF THE GUARDS, WELL, SOME OF THESE GUARDS WOULD TELL HIM WHAT TO DO AND HE DIDN'T LIKE THAT.  THAT IS NOT HOW YOU DEAL WITH BRANDON BASHAM.  YOU DON'T TELL BRANDON BASHAM WHAT TO DO.  DO YOU REMEMBER THAT PORTION OF HIS CLOSING ARGUMENT? SO, ON THE ONE HAND, THEY WANT YOU TO

BELIEVE THAT BRANDON BASHAM CAN'T BE TOLD WHAT TO DO BY THE PRISON GUARDS, AND ON THE OTHER HAND, BRANDON BASHAM IS BEING TOLD WHAT TO DO THROUGHOUT THIS ENTIRE CRIME SPREE BY CHAD FULKS. HOW DO YOU BALANCE THOSE TWO? THEY WANT YOU TO BELIEVE THAT, THEY OFFER AS AN EXPLANATION, YOU CAN'T TELL BRANDON BASHAM WHAT TO DO BY A PRISON GUARD OR ELSE HE WILL EXPLODE. ON THE OTHER HAND, THEY WANT YOU TO BELIEVE THAT CHAD FULKS WAS TELLING HIM EVERYTHING OF WHAT TO DO. HE IS LEADING HIM. I'M NOT TALKING ABOUT LEADING ABOUT WHERE THEY ARE GOING. IT DOESN'T MAKE SENSE. YOU CAN'T HAVE IT BOTH WAYS.

YOU RECALL THE BEST EXPLANATION FOR CHAD FULKS AND BRANDON BASHAM DURING THAT TIME PERIOD. TINA SEVERANCE SAID, LIKE TWO PEAS IN A POD.

AND AS FAR AS WHO THE ACTUAL KILLER IS, THE FACT THAT IT DOESN'T PASS THE SMELL TEST. I WILL USE HIS OWN ANALOGY. WHAT DIDN'T MR. SWERLING TALK TO YOU ABOUT? HE DIDN'T TALK TO YOU ABOUT THE ADMISSION BRANDON BASHAM MADE TO AGENT VITO AND AGENT MALEY, THIS IS WHERE "THEY DID THEIR THING." HE DIDN'T TELL YOU ABOUT BRANDON BASHAM STANDING IN FRONT OF SHERIFF HEWITT WITH THAT PURSE AS IF HE HAS A BELT AND DOING THIS AND SAYING HE THREW THAT BELT STRAP INTO THE WOODS. HE DIDN'T MENTION ANYTHING TO YOU ABOUT BRANDON BASHAM REACHING OUT TO MR. C. J., TO CLIFFORD JAY ON CHRISTMAS EVE, DECEMBER 2003, SAYING, "WE KILLED THEM." DOES THAT PASS THE SMELL TEST AS

ALONG WITH, IF YOU CHOOSE TO DO SO.   YOU DON'T HAVE TO, BUT YOU ARE CERTAINLY ALLOWED TO FOLLOW ALONG WITH ME ON THE WRITTEN PAGES.   IF YOU FOLLOW ALONG WITH ME,  STAY WITH ME, PLEASE DO NOT READ AHEAD.

MEMBERS OF THE JURY,  NOW THAT YOU HAVE HEARD ALL OF THE EVIDENCE IN THE CASE AND THE ARGUMENTS OF THE ATTORNEYS,  IT BECOMES MY DUTY TO INSTRUCT YOU ON THE RULES OF LAW THAT YOU MUST FOLLOW IN ARRIVING AT YOUR DECISION AS TO WHETHER THE DEFENDANT,  BRANDON LEON BASHAM,  COULD BE SENTENCED TO LIFE IN PRISON WITHOUT THE POSSIBILITY OF RELEASE OR SENTENCED TO DEATH.   NO OTHER LESSER SENTENCE IS AUTHORIZED UNDER THE LAW FOR THE OFFENSES OF WHICH THE DEFENDANT HAS BEEN FOUND GUILTY. YOUR UNANIMOUS FINDING OF GUILT IN THE PREVIOUS GUILT PHASE OF THIS TRIAL ENSURES THAT HE WILL BE PUNISHED WITH ONE OF THE TWO MOST SEVERE PUNISHMENTS AVAILABLE UNDER LAW.

AS YOU KNOW,  THE DEFENDANT HAS BEEN FOUND GUILTY TO TWO OFFENSES FOR WHICH THE DEATH PENALTY IS AVAILABLE: CARJACKING, RESULTING IN DEATH AND KIDNAPPING, RESULTING IN DEATH.   YOU WILL HAVE TO DECIDE THE APPROPRIATE PUNISHMENT AND RETURN INDIVIDUAL VERDICTS FOR EACH OF THE TWO COUNTS. THE INSTRUCTIONS THAT I GIVE YOU TODAY APPLY EQUALLY TO BOTH COUNTS.   I REMIND YOU THAT, AT THE TIME YOU WERE SELECTED AS JURORS,  EACH OF YOU ASSURED ME THAT YOU WOULD FOLLOW THE LAW AS I TOLD YOU IT APPLIED.   IT IS IMPERATIVE THAT YOU DO THAT. REGARDLESS OF ANY OPINION YOU MAY HAVE AS TO WHAT THE LAW IS,

OR SHOULD BE, IT WOULD BE A VIOLATION OF YOUR OATHS, AS JURORS, TO BASE YOUR VERDICT UPON ANY OTHER VIEW OF THE LAW THAN WHAT I GIVE YOU IN THESE INSTRUCTIONS. YOU AND YOU ALONE WILL DECIDE WHETHER THE DEFENDANT SHOULD BE SENTENCED TO LIFE IN PRISON OR EXECUTED.

THE LAW DOES NOT DECIDE WHICH IS THE APPROPRIATE SENTENCE. THE LAW DOES NOT ASSUME THAT EVERY DEFENDANT WHO IS FOUND GUILTY OF COMMITTING A CAPITAL CRIME SHOULD BE SENTENCED TO DEATH. NOR DOES THE LAW PRESUME THAT THIS DEFENDANT, IN PARTICULAR, SHOULD BE SENTENCED TO DEATH. RATHER, YOUR DECISION ON THE QUESTION OF PUNISHMENT IS A DECISION WHICH THE LAW IN THE FINAL ANALYSIS LEAVES UP TO YOU.

I WILL NOT BE ABLE TO CHANGE ANY DECISION THAT YOU REACH REGARDING THE SENTENCE FOR MR. BASHAM. THUS, I STRESS THE IMPORTANCE OF YOUR GIVING CAREFUL, THOUGHTFUL, AND THOROUGH CONSIDERATION TO ALL OF THE EVIDENCE YOU HAVE RECEIVED IN THIS PHASE OF THE CASE. I REMIND YOU THAT THE DEATH PENALTY IS NEVER MANDATORY: NONE OF YOU INDIVIDUALLY, NOR THE JURY COLLECTIVELY, IS EVER REQUIRED TO IMPOSE A SENTENCE OF DEATH.

I HAVE PREPARED A FULL SET OF INSTRUCTIONS ON THE APPLICABLE LAW IN ORDER TO ENSURE THAT YOU ARE CLEAR IN YOUR DUTIES AT THIS STAGE OF THE CASE. I HAVE ALSO PREPARED TWO VERDICT FORMS THAT DETAIL SPECIAL FINDINGS THAT YOU ARE ASKED TO MAKE, AND THE POSSIBLE DECISIONS YOU CAN RENDER AS TO EACH OF THE OFFENSES OF WHICH THE DEFENDANT HAS BEEN FOUND GUILTY.

THIS IS A COMPLICATED PROCESS, SO YOU WILL NEED TO PAY CLOSE ATTENTION.

YOU, THE JURY, ARE THE SOLE JUDGES OF THE FACTS IN THIS TRIAL. YOU MAY DECIDE ISSUES OF THE CREDIBILITY OF WITNESSES AND WHETHER OR NOT TO ACCEPT ANY PIECE OF EVIDENCE AS TRUE AND WHAT AMOUNT OF WEIGHT TO GIVE IT, IF ANY. YOU MAY ONLY CONSIDER EVIDENCE, INCLUDING TESTIMONY, DOCUMENTS, AND STIPULATIONS BETWEEN THE PARTIES, RECEIVED IN THIS COURTROOM IN MAKING YOUR DETERMINATION. THE EVIDENCE YOU MAY CONSIDER INCLUDES ALL EVIDENCE RECEIVED DURING BOTH THE GUILT PHASE AND THE PENALTY PHASE OF THIS TRIAL.

THE ARGUMENTS OF THE ATTORNEYS AND THE COMMENTS AND RULINGS OF THE COURT ARE NOT EVIDENCE. YOU MAY CONSIDER BOTH DIRECT AND CIRCUMSTANTIAL EVIDENCE, AND YOU MAY USE YOUR COMMON SENSE, GOOD JUDGMENT, AND LIFE EXPERIENCE IN DETERMINING WHETHER THE THRESHOLD INTENT, AGGRAVATING, OR MITIGATING FACTORS ARE ESTABLISHED.

DIRECT EVIDENCE IS EVIDENCE THAT A WITNESS TESTIFIES TO AS TO WHAT THE WITNESS SAW, HEARD, OR OBSERVED. IN OTHER WORDS, WHEN A WITNESS TESTIFIES ABOUT WHAT IS KNOWN TO THE WITNESS OF THE WITNESS'S OWN KNOWLEDGE, OR BY VIRTUE OF HIS OR HER OWN SENSES, WHAT HE OR SHE SEES, FEELS, TOUCHES, OR HEARS, THAT IS DIRECT EVIDENCE.

CIRCUMSTANTIAL EVIDENCE IS EVIDENCE WHICH TENDS TO PROVE A FACT BY PROOF OF OTHER FACTS. CIRCUMSTANTIAL EVIDENCE, IN

YOU MUST DECIDE, IN REGARD TO BOTH OFFENSES, WHETHER THE AGGRAVATING FACTORS, WHICH YOU HAVE FOUND TO EXIST, SUFFICIENTLY OUTWEIGHS THE MITIGATING FACTORS FOUND TO EXIST FOR THAT OFFENSE, SO AS TO JUSTIFY IMPOSING A SENTENCE OF DEATH, RATHER THAN A SENTENCE OF LIFE WITHOUT THE POSSIBILITY OF RELEASE; OR, IN THE ABSENCE OF ANY MITIGATING FACTORS, WHETHER THE AGGRAVATING FACTORS ALONE ARE SUFFICIENT TO JUSTIFY IMPOSING A SENTENCE OF DEATH, RATHER THAN A SENTENCE OF LIFE, WITHOUT THE POSSIBILITY OF RELEASE.

THE WEIGHING PROCESS YOU ARE CALLED UPON TO UNDERTAKE IN THIS PART OF THE TRIAL IS DIFFERENT FROM THE FACT-FINDING PROCESS. IF YOU FIND THE THRESHOLD INTENT, AGGRAVATING, AND MITIGATING FACTORS, YOU MUST USE YOUR EXPERIENCE, JUDGMENT, AND COMMON SENSE IN WEIGHING THE AGGRAVATING AND MITIGATING FACTORS TO ARRIVE AT YOUR ULTIMATE DETERMINATION IN THIS CASE.

AS TO ALL OF THE FACTORS THAT THE GOVERNMENT MUST PROVE IN THIS CASE, I INSTRUCT YOU THAT THE GOVERNMENT MUST PROVE THE FACTOR TO EACH AND EVERY ONE OF YOU BEYOND A REASONABLE DOUBT. IF THE GOVERNMENT FAILS TO PROVE A FACTOR BEYOND A REASONABLE DOUBT, THEN YOU MUST FIND THAT THAT FACTOR HAS NOT BEEN PROVEN. THUS, WHILE THE GOVERNMENT'S BURDEN OF PROOF IS A STRICT OR HEAVY BURDEN, IT IS NOT NECESSARY THAT THE FACTOR BE PROVED BEYOND ALL POSSIBLE DOUBT. IT IS ONLY REQUIRED THAT THE GOVERNMENT'S PROOF EXCLUDE ANY REASONABLE DOUBT CONCERNING THE EXISTENCE OF THE FACTOR.

RECORD YOUR DECISIONS ON THIS FORM.  IN ADDITION, I ADVISE YOU THAT YOU MAY RECOMMEND ONE SENTENCE FOR COUNT 1 AND A DIFFERENT SENTENCE FOR COUNT 2.  IN OTHER WORDS, YOU ARE NOT OBLIGATED TO IMPOSE THE SAME SENTENCE FOR BOTH COUNTS.  THUS, YOU WILL BE GIVEN A SPECIAL VERDICT FORM FOR COUNT 1, WHICH IS THE CARJACKING, AND A SEPARATE SPECIAL VERDICT FORM FOR COUNT 2, WHICH IS THE KIDNAPPING.

SECTION 1 OF THE VERDICT FORM CONTAINS A SPACE FOR YOU TO RECORD YOUR FINDING ON THE DEFENDANT'S AGE; SECTION TWO IS A SPACE FOR YOUR FINDING ON THE THRESHOLD INTENT FACTOR; SECTION THREE IS A SPACE FOR FINDINGS ON STATUTORY AGGRAVATING FACTOR; SECTION FOUR IS A SPACE FOR THE FINDINGS ON THE NONSTATUTORY AGGRAVATING FACTORS; SECTION 5 CONTAINS SPACES TO RECORD FINDINGS ON MITIGATING FACTORS; SECTION 6 PROVIDES A SPACE FOR YOUR DETERMINATION OF THE APPROPRIATE PUNISHMENT; AND SECTION 7 CONTAINS THE CERTIFICATION STATEMENT REQUIRED BY FEDERAL LAW.

THERE ARE DESIGNATED SPACES FOR THE FOREPERSON AND JURORS TO SIGN THEIR NAMES AS TO THE FINDINGS IN EACH SECTION WHERE IT IS NECESSARY.  AS NOTED EARLIER, THERE ARE TWO VERDICT FORMS BECAUSE YOU MUST RETURN A VERDICT OR PUNISHMENT FOR EACH OF THE TWO COUNTS.

YOUR VERDICT MUST BE BASED SOLELY ON THE EVIDENCE PRESENTED IN THIS COURTROOM AND IN ACCORDANCE WITH MY INSTRUCTIONS.

UNITED STATES DISTRICT COURT

**FILED**

FOR THE DISTRICT OF SOUTH CAROLINA

NOV 2 2004

FLORENCE DIVISION

LARRY W. PROPES, CLERK
COLUMBIA, SC

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 4:02-992 (JFA,Jr.) |
| | ) | |
| vs. | ) | |
| | ) | **SPECIAL VERDICT FORM** |
| BRANDON LEON BASHAM | ) | |
| | ) | |

## COUNT 1 – CARJACKING RESULTING IN DEATH

### I.    AGE OF DEFENDANT

*Instructions:*  Answer "YES" or "NO":

1.    Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that:   Brandon Leon Basham was eighteen years of age or older at the time of the offense (carjacking resulting in death)?

☑ YES        ☐ NO        _____Cynthia Wilson_____
Foreperson

*Instructions:*  *If you answered "NO" with respect to the determination in this Section, then stop your deliberations, skip over Sections II, III, IV, V and VI of this form, and proceed to Section VII. Each juror should then carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the court that you have reached a decision.*

*If you answered "YES" with respect to the determination in this Section I, proceed to Section II which follows.*

Count 1                                                                                       Page 1  805

JA0563

## II.   THRESHOLD INTENT FACTOR

*Instructions:   Select below the Threshold Intent Factor, if any, you unanimously find that the government proved beyond a reasonable doubt.  You may not select more than one.*

❏     1.     Brandon Leon Basham intentionally killed Alice Donovan.

❏     2.     Brandon Leon Basham intentionally inflicted serious bodily injury that resulted in the death of Alice Donovan.

❏     3.     Brandon Leon Basham intentionally participated in an act, contemplating that the life of Alice Donovan would be taken or intending that lethal force would be used in connection with Alice Donovan, and Alice Donovan died as a direct result of the act.

☑     4.     Brandon Leon Basham intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to Alice Donovan, such that participation in the act constituted a reckless disregard for human life, and Alice Donovan died as a direct result of the act.

❏     5.     The government failed to prove a threshold intent factor beyond a reasonable doubt.

*Cynthia Wilson*
Foreperson

*Instructions:  If you did not find any Threshold Intent Factor, then stop your deliberations, skip over Sections III, IV, V, and VI of this form, and proceed to Section VII.  Each juror should carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the court that you have reached a decision.*

*If you found one of the Threshold Intent Factors in this Section II, proceed to Section III which follows.*

Count 1                                                                                                          Page 2

JA0564

## III. STATUTORY AGGRAVATING FACTOR

*Instructions:* For the following Statutory Aggravating Factor, answer "YES" or "NO":

1.     Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the death of Alice Donovan, or the injury resulting in the death of Alice Donovan, occurred during Brandon Leon Basham's commission or attempted commission of, or during his immediate flight from, his commission of a kidnapping?

☑ YES          ☐ NO

*Phillica Wilson*
Foreperson

*Instructions:* If you answered "NO" with respect to the Statutory Aggravating Factor in this Section, then stop your deliberations, skip over Sections IV, V and VI of this form, and proceed to Section VII of this form. Each juror should then carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the court that you have reached a decision.

If you found the requisite age in Section I, the Threshold Intent Factor in Section II, and answered "Yes" with respect to the Statutory Aggravating Factor in this Section III, proceed to Section IV which follows.

Count 1                                                                                          Page 3

## IV.  NON-STATUTORY AGGRAVATING FACTORS

*Instructions*: *For each of the following Non-Statutory Aggravating Factors, answer "YES" or "NO":*

I.      Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant, Brandon Leon Basham:

1.      Escaped from a detention facility in Hopkins County, Kentucky on November 4, 2002, where he was serving a five-year sentence related to forgery convictions?

☑ YES      ☐ NO

Cynthia Wilson
Foreperson

2.      Subsequent to his escape, participated in a carjacking and kidnapping that resulted in the death of Samantha Burns, a 19-year-old woman in Huntington, West Virginia?

☑ YES      ☐ NO

Cynthia Wilson
Foreperson

3.      Subsequent to his escape, participated in a first-degree burglary and other criminal conduct that resulted in the assault with intent to kill Carl Jordan, a citizen of Conway, South Carolina?

☑ YES      ☑ NO

Cynthia Wilson
Foreperson

4.      Subsequent to his escape, participated in the kidnapping and carjacking of James Hawkins, a citizen of Hanson, Kentucky?

☑ YES      ☐ NO

Cynthia Wilson
Foreperson

5.      Subsequent to his escape, participated in the attempted murder of a police officer in Ashland, Kentucky?

☑ YES      ☐ NO

Cynthia Wilson
Foreperson

Count 1                                                                                            Page 4

JA0566

If you find that one or more of the acts in 1-5 occurred beyond a reasonable doubt, do you find, further, that this factor or factors is aggravating?

      ☑ YES     ❑NO

*Phillia Wilson*
Foreperson

II.    Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant, Brandon Leon Basham, would be a danger in the future to the lives and safety of other persons, including, but not limited to, inmates and correctional officers in an institutional correctional setting, and that this factor is aggravating?

      ❑ YES     ☑NO

*Phillia Wilson*
Foreperson

III.    Do you, the jury, unanimously find that the government has established beyond a reasonable doubt the effect of the death of Alice Donovan on her family, including the extent and scope of the injuries and losses suffered by Alice Donovan and her family, and that this factor is aggravating?

      ☑YES     ❑NO

*Phillia Wilson*
Foreperson

*Instructions*: *Regardless of whether you answered "YES" or "NO" with respect to the Non-Statutory Aggravating Factors in this Section IV, proceed to Section V, which follows.*

Count 1

Page 5

## V.  MITIGATING FACTORS

*Instructions: For each of the following Mitigating Factors, indicate in the space provided, the number of jurors, if any, who have found it proved by a preponderance of the evidence and that it is mitigating.*

*A finding with respect to a Mitigating Factor may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a Mitigating Factor must consider such a factor in considering whether to impose a sentence of life in prison without the possibility of release or a sentence of death, regardless of the number of other jurors who agree. Further, any juror may also weigh a Mitigating Factor found by another juror, even if he or she did not also find that factor to be mitigating:*

| Statutory<br>Mitigating Factors: | Number of Jurors Finding<br>the Mitigating Factor: |
|---|---|
| 1.    Impaired capacity.  Brandon Leon Basham's capacity to appreciate the wrongfulness of his conduct or to conform conduct to the requirements of law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge, and this factor is mitigating. | 6 |
| 2.    Duress.  Brandon Leon Basham was under unusual and substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge, and this factor is mitigating. | 0 |
| 3.    Minor participation. Brandon Leon Basham is punishable as a principal in the offense, which was committed by another, but his participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge, and this factor is mitigating. | 0 |
| 4.    Brandon Leon Basham did not have a significant prior history of other criminal conduct, and this factor is mitigating. | 0 |
| 5.    Disturbance.  Brandon Leon Basham committed the offense under severe mental or emotional disturbance, and this factor is mitigating. | 1 |

Count 1

| Non-Statutory Mitigating Factors: | Number of Jurors Finding the Mitigating Factor: |
|---|---|
| 1.      Brandon Leon Basham played a lesser role than Chadrick Evan Fulks in the kidnapping and carjacking of Alice Donovan, and this factor is mitigating. | 0 |
| 2.      Brandon Leon Basham's family, including both his maternal and paternal sides, has a history of violence, substance abuse, and mental illness, including schizophrenia, psychosis, depression, delusions, paranoia, and suicide, including numerous suicide attempts by Brandon's mother, and this factor is mitigating. | 12 |
| 3.      Brandon Leon Basham's mother abused alcohol and illegal drugs while she was pregnant with him and had a negative attitude towards prenatal care, and this factor is mitigating. | 8 |
| 4.      Brandon Leon Basham's parents spent most of the family's money on drugs and alcohol and Brandon frequently saw both parents intoxicated or under the influence, and this factor is mitigating. | 8 |
| 5.      Brandon Leon Basham's mother entertained strange men at her home for drugs and sex, sometimes kicking Brandon, Jimmie, and Charlotte out of the house on such occasions, and sometimes allowing the family to remain, resulting in Brandon Leon Basham occasionally seeing his mother involved with these strange men, and this factor is mitigating. | 7 |
| 6.      Brandon Leon Basham was sexually abused by men, and this factor is mitigating. | 7 |
| 7.      Brandon Leon Basham's parents often engaged in physical, verbal, and emotional violence towards each other and towards Brandon and his sister Charlotte, and this factor is mitigating. | 12 |
| 8.      Brandon Leon Basham's parents did not know how to take care of a special needs child and never concerned themselves with his education or treatment, and this factor is mitigating. | 0 |
| 9.      Brandon Leon Basham's parents and family failed to show up for visits or conferences at hospitals and institutions, and this factor is mitigating. | 0 |

Count 1                                                                                                          Page 7

10.    Brandon Leon Basham had inconsistent and inefficient nutrition provided to him in his home, and this factor is mitigating.    _O_

11.    Brandon Leon Basham's home was often filthy and infected with roaches, and this factor is mitigating.    _O_

12.    Brandon Leon Basham's mother removed him from appropriate care facilities, refused to follow recommendations of doctors and counselors, and refused to give him his prescribed medication for his mental illness, but gave him illegal drugs instead, and this factor is mitigating.    _10_

13.    Brandon Leon Basham's mother encouraged him to steal to support their drug habits, and this factor is mitigating.    _12_

14.    Brandon Leon Basham began huffing gasoline, smoking marijuana, and smoking crack cocaine at a young age, and this factor is mitigating.    _12_

15.    Brandon Leon Basham was diagnosed with ADHD [Attention-Deficit/ Hyperactivity Disorder] as a young child, was placed in a mental hospital for the first time at age 10, and was subsequently placed in several mental health facilities and institutions, and this factor is mitigating.    _2_

16.    Brandon Leon Basham has received inconsistent care and has been prescribed an ever-changing mix of medicines, including antipsychotics, anxiolytics, antidepressants, and anticonvulsants, and this factor is mitigating.    _3_

17.    Brandon Leon Basham suffers from emotional, behavioral, and learning disabilities and was placed in special education classes in early elementary school, and this factor is mitigating.    _O_

18.    Brandon Leon Basham shows signs of neurological damage due to head trauma and substance abuse, which has inhibited his ability to process information and inhibit impulses, and this factor is mitigating.    _O_

19.    Brandon Leon Basham suffers from dementia due to multiple etiologies, inhalant induced psychosis with hallucinations, and anxiety disorder not otherwise specified and ADHD, combined type, and this factor is mitigating.    _1_

20.    Brandon Leon Basham has a mental condition that causes him to reject prescribed medications and self-medicate with other non-prescribed substances such as illegal drugs and alcohol, and this factor is mitigating.    _O_

Count 1    Page 8

21.    Brandon Leon Basham is unable to operate a car, an ATM machine, or a phone card, and this factor is mitigating.

*0*

22.    Brandon Leon Basham has suffered from low self esteem, sadness, and hopelessness from a young age, and this factor is mitigating.

*0*

23.    Brandon Leon Basham has attempted suicide several times, and this factor is mitigating.

*0*

24.    Brandon Leon Basham's intelligence scores have been deteriorating due to head injuries and substance abuse at an early age, and his I.Q. level is now in the low 70s, and this factor is mitigating.

*0*

25.    Brandon Leon Basham is easily influenced and led by others, and this factor is mitigating.

*6*

26.    At the time of the offenses, Brandon Leon Basham was suffering from severe mental and emotional disturbances, and this factor is mitigating.

*1*

27.    At the time of the offenses, Brandon Leon Basham was not on his prescribed medication, and this factor is mitigating.

*0*

28.    At the time of the offenses, Brandon Leon Basham was under the influence of alcohol and drugs, and this factor is mitigating.

*0*

29.    Brandon Leon Basham has never harmed anyone in a correctional facility with or without a weapon, and this factor is mitigating.

*0*

30.    No one has escaped from a high security federal prison since 1993, and this factor is mitigating.

*0*

Count 1

## VI.  DETERMINATION OF SENTENCE

### Life in prison without possibility of release

We unanimously conclude that Brandon Leon Basham shall be sentenced to life imprisonment without possibility of release.

_____
Foreperson

_____
Date

*If you answer that a sentence of life in prison without possibility of release shall be imposed, then you must proceed to Section VII.*

**OR**

Count 1                                                                                                          Page 10

**Death**

We, the jury, as to Brandon Leon Basham, unanimously find beyond a reasonable doubt that the aggravating factor(s) proved in this case outweigh(s) the mitigating factor(s) so as to justify a sentence of death; or, in the absence of any mitigating factor, that the aggravating factor or factors alone justify a sentence of death. We, therefore, unanimously conclude that Brandon Leon Basham shall be sentenced to death.

_(signatures)_

Foreperson

_November 2, 2004_
Date

*If you answer that a sentence of death shall be imposed, then you must proceed to Section VII.*

Count 1

Page 11

JA0573

## VII.  CERTIFICATION STATEMENT

By signing below, each juror certifies that consideration of the race, color, religious beliefs, national origin, or sex of the defendant, Brandon Leon Basham, or the victim, Alice Donovan, was not involved in reaching his or her individual decision, and that the individual juror would have made the same recommendation regarding a sentence for the crime or crimes in question regardless of the race, color, religious beliefs, national origin, or sex of the defendant or the victim.

_____

Foreperson

November 2, 2004
Date

Count 1                                                                                                           Page 12

JA0574

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

FLORENCE DIVISION

**FILED**

NOV 2 2004

LARRY W. PROPES, CLERK
COLUMBIA, SC

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 4:02-992 (JFA,Jr.) |
| | ) | |
| vs. | ) | |
| | ) | **SPECIAL VERDICT FORM** |
| BRANDON LEON BASHAM | ) | |
| | ) | |

## COUNT 2 – KIDNAPPING RESULTING IN DEATH

### I.     AGE OF DEFENDANT

*Instructions:*  *Answer "YES" or "NO":*

1.     Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that:   Brandon Leon Basham was eighteen years of age or older at the time of the offense (kidnapping resulting in death)?

☑ YES        ☐ NO        *Cynthia Wilson*
                                                    Foreperson

*Instructions:*  *If you answered "NO" with respect to the determination in this Section, then stop your deliberations, skip over Sections II, III, IV, V and VI of this form, and proceed to Section VII. Each juror should then carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision.  You should then advise the court that you have reached a decision.*

*If you answered "YES" with respect to the determination in this Section I,  proceed to Section II which follows.*

Count 2                                                                                                          Page 1   806

## II.    THRESHOLD INTENT FACTOR

*Instructions:    Select below the Threshold Intent Factor, if any, you unanimously find that the government proved beyond a reasonable doubt.  You may not select more than one.*

❏    1.    Brandon Leon Basham intentionally killed Alice Donovan.

❏    2.    Brandon Leon Basham intentionally inflicted serious bodily injury that resulted in the death of Alice Donovan.

❏    3.    Brandon Leon Basham intentionally participated in an act, contemplating that the life of Alice Donovan would be taken or intending that lethal force would be used in connection with Alice Donovan, and Alice Donovan died as a direct result of the act.

☑    4.    Brandon Leon Basham intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to Alice Donovan, such that participation in the act constituted a reckless disregard for human life, and Alice Donovan died as a direct result of the act.

❏    5.    The government failed to prove a threshold intent factor beyond a reasonable doubt.

*Cynthia Wilson*
Foreperson

*Instructions:    If you did not find any Threshold Intent Factor, then stop your deliberations, skip over Sections III, IV, V, and VI of this form, and proceed to Section VII.  Each juror should carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision.  You should then advise the court that you have reached a decision.*

*If you found one of the Threshold Intent Factors in this Section II, proceed to Section III which follows.*

Count 2

## III.  STATUTORY AGGRAVATING FACTOR

*Instructions*:  *For the following Statutory Aggravating Factor, answer "YES" or "NO":*

1.    Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the death of Alice Donovan, or the injury resulting in the death of Alice Donovan, occurred during Brandon Leon Basham's commission or attempted commission of, or during his immediate flight from, his commission of a kidnapping?

☑ YES        ❏ NO

*Cynthia Wilson*
Foreperson

*Instructions*:  *If you answered "NO" with respect to the Statutory Aggravating Factor in this Section, then stop your deliberations, skip over Sections IV, V and VI of this form, and proceed to Section VII of this form.  Each juror should then carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision.  You should then advise the court that you have reached a decision.*

*If you found the requisite age in Section I, the Threshold Intent Factor in Section II, and answered "Yes" with respect to the Statutory Aggravating Factor in this Section III, proceed to Section IV which follows.*

Count 2                                                                                                          Page 3

## IV. NON-STATUTORY AGGRAVATING FACTORS

*Instructions*: *For each of the following Non-Statutory Aggravating Factors, answer "YES" or "NO":*

I.    Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant, Brandon Leon Basham:

1.    Escaped from a detention facility in Hopkins County, Kentucky on November 4, 2002, where he was serving a five-year sentence related to forgery convictions?

☑ YES    ☐ NO

*Cynthia Wilson*
Foreperson

2.    Subsequent to his escape, participated in a carjacking and kidnapping that resulted in the death of Samantha Burns, a 19-year-old woman in Huntington, West Virginia?

☑ YES    ☐ NO

*Cynthia Wilson*
Foreperson

3.    Subsequent to his escape, participated in a first-degree burglary and other criminal conduct that resulted in the assault with intent to kill Carl Jordan, a citizen of Conway, South Carolina?

☑ YES    ☐ NO

*Cynthia Wilson*
Foreperson

4.    Subsequent to his escape, participated in the kidnapping and carjacking of James Hawkins, a citizen of Hanson, Kentucky?

☑ YES    ☐ NO

*Cynthia Wilson*
Foreperson

5.    Subsequent to his escape, participated in the attempted murder of a police officer in Ashland, Kentucky?

☑ YES    ☐ NO

*Cynthia Wilson*
Foreperson

Count 2                                                                          Page 4

If you find that one or more of the acts in 1-5 occurred beyond a reasonable doubt, do you find, further, that this factor or factors is aggravating?

☑ YES        ☐ NO

*Cynthia Wilson*
Foreperson

II.    Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant, Brandon Leon Basham, would be a danger in the future to the lives and safety of other persons, including, but not limited to, inmates and correctional officers in an institutional correctional setting, and that this factor is aggravating?

☐ YES        ☑ NO

*Cynthia Wilson*
Foreperson

III.    Do you, the jury, unanimously find that the government has established beyond a reasonable doubt the effect of the death of Alice Donovan on her family, including the extent and scope of the injuries and losses suffered by Alice Donovan and her family, and that this factor is aggravating?

☑ YES        ☐ NO

*Cynthia Wilson*
Foreperson

*Instructions:    Regardless of whether you answered "YES" or "NO" with respect to the Non-Statutory Aggravating Factors in this Section IV, proceed to Section V, which follows.*

Count 2                                                                                    Page 5

## V. MITIGATING FACTORS

*Instructions: For each of the following Mitigating Factors, indicate in the space provided, the number of jurors, if any, who have found it proved by a preponderance of the evidence and that it is mitigating.*

*A finding with respect to a Mitigating Factor may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a Mitigating Factor must consider such a factor in considering whether to impose a sentence of life in prison without the possibility of release or a sentence of death, regardless of the number of other jurors who agree. Further, any juror may also weigh a Mitigating Factor found by another juror, even if he or she did not also find that factor to be mitigating:*

Statutory                                                          Number of Jurors Finding
Mitigating Factors:                                               the Mitigating Factor:

1.    Impaired capacity.  Brandon Leon Basham's capacity to appreciate the wrongfulness of his conduct or to conform conduct to the requirements of law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge, and this factor is mitigating.    __4__

2.    Duress.  Brandon Leon Basham was under unusual and substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge, and this factor is mitigating.    __0__

3.    Minor participation. Brandon Leon Basham is punishable as a principal in the offense, which was committed by another, but his participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge, and this factor is mitigating.    __0__

4.    Brandon Leon Basham did not have a significant prior history of other criminal conduct, and this factor is mitigating.    __0__

5.    Disturbance.  Brandon Leon Basham committed the offense under severe mental or emotional disturbance, and this factor is mitigating.    __1__

| Non-Statutory Mitigating Factors: | Number of Jurors Finding the Mitigating Factor: |
|---|---|

1.    Brandon Leon Basham played a lesser role than Chadrick Evan Fulks in the kidnapping and carjacking of Alice Donovan, and this factor is mitigating.

_0_

2.    Brandon Leon Basham's family, including both his maternal and paternal sides, has a history of violence, substance abuse, and mental illness, including schizophrenia, psychosis, depression, delusions, paranoia, and suicide, including numerous suicide attempts by Brandon's mother, and this factor is mitigating.

_12_

3.    Brandon Leon Basham's mother abused alcohol and illegal drugs while she was pregnant with him and had a negative attitude towards prenatal care, and this factor is mitigating.

_6_

4.    Brandon Leon Basham's parents spent most of the family's money on drugs and alcohol and Brandon frequently saw both parents intoxicated or under the influence, and this factor is mitigating.

_5_

5.    Brandon Leon Basham's mother entertained strange men at her home for drugs and sex, sometimes kicking Brandon, Jimmie, and Charlotte out of the house on such occasions, and sometimes allowing the family to remain, resulting in Brandon Leon Basham occasionally seeing his mother involved with these strange men, and this factor is mitigating.

_5_

6.    Brandon Leon Basham was sexually abused by men, and this factor is mitigating.

_6_

7.    Brandon Leon Basham's parents often engaged in physical, verbal, and emotional violence towards each other and towards Brandon and his sister Charlotte, and this factor is mitigating.

_12_

8.    Brandon Leon Basham's parents did not know how to take care of a special needs child and never concerned themselves with his education or treatment, and this factor is mitigating.

_0_

9.    Brandon Leon Basham's parents and family failed to show up for visits or conferences at hospitals and institutions, and this factor is mitigating.

_0_

Count 2

Page 7

JA0581

10.    Brandon Leon Basham had inconsistent and inefficient nutrition provided to him in his home, and this factor is mitigating.    _0_

11.    Brandon Leon Basham's home was often filthy and infected with roaches, and this factor is mitigating.    _1_

12.    Brandon Leon Basham's mother removed him from appropriate care facilities, refused to follow recommendations of doctors and counselors, and refused to give him his prescribed medication for his mental illness, but gave him illegal drugs instead, and this factor is mitigating.    _4_

13.    Brandon Leon Basham's mother encouraged him to steal to support their drug habits, and this factor is mitigating.    _4_

14.    Brandon Leon Basham began huffing gasoline, smoking marijuana, and smoking crack cocaine at a young age, and this factor is mitigating.    _10_

15.    Brandon Leon Basham was diagnosed with ADHD [Attention-Deficit/ Hyperactivity Disorder] as a young child, was placed in a mental hospital for the first time at age 10, and was subsequently placed in several mental health facilities and institutions, and this factor is mitigating.    _2_

16.    Brandon Leon Basham has received inconsistent care and has been prescribed an ever-changing mix of medicines, including antipsychotics, anxiolytics, antidepressants, and anticonvulsants, and this factor is mitigating.    _4_

17.    Brandon Leon Basham suffers from emotional, behavioral, and learning disabilities and was placed in special education classes in early elementary school, and this factor is mitigating.    _1_

18.    Brandon Leon Basham shows signs of neurological damage due to head trauma and substance abuse, which has inhibited his ability to process information and inhibit impulses, and this factor is mitigating.    _1_

19.    Brandon Leon Basham suffers from dementia due to multiple etiologies, inhalant induced psychosis with hallucinations, and anxiety disorder not otherwise specified and ADHD, combined type, and this factor is mitigating.    _1_

20.    Brandon Leon Basham has a mental condition that causes him to reject prescribed medications and self-medicate with other non-prescribed substances such as illegal drugs and alcohol, and this factor is mitigating.    _0_

Count 2    Page 8

21.    Brandon Leon Basham is unable to operate a car, an ATM machine, or a phone card, and this factor is mitigating.        0

22.    Brandon Leon Basham has suffered from low self esteem, sadness, and hopelessness from a young age, and this factor is mitigating.        0

23.    Brandon Leon Basham has attempted suicide several times, and this factor is mitigating.        0

24.    Brandon Leon Basham's intelligence scores have been deteriorating due to head injuries and substance abuse at an early age, and his I.Q. level is now in the low 70s, and this factor is mitigating.        0

25.    Brandon Leon Basham is easily influenced and led by others, and this factor is mitigating.        4

26.    At the time of the offenses, Brandon Leon Basham was suffering from severe mental and emotional disturbances, and this factor is mitigating.        0

27.    At the time of the offenses, Brandon Leon Basham was not on his prescribed medication, and this factor is mitigating.        0

28.    At the time of the offenses, Brandon Leon Basham was under the influence of alcohol and drugs, and this factor is mitigating.        0

29.    Brandon Leon Basham has never harmed anyone in a correctional facility with or without a weapon, and this factor is mitigating.        0

30.    No one has escaped from a high security federal prison since 1993, and this factor is mitigating.        0

Count 2

## VI.  DETERMINATION OF SENTENCE

**Life in prison without possibility of release**

We unanimously conclude that Brandon Leon Basham shall be sentenced to life imprisonment without possibility of release.

_____
Foreperson

_____
Date

*If you answer that a sentence of life in prison without possibility of release shall be imposed, then you must proceed to Section VII.*

**OR**

Count 2                                                                                      Page 10

**Death**

We, the jury, as to Brandon Leon Basham, unanimously find beyond a reasonable doubt that the aggravating factor(s) proved in this case outweigh(s) the mitigating factor(s) so as to justify a sentence of death; or, in the absence of any mitigating factor, that the aggravating factor or factors alone justify a sentence of death. We, therefore, unanimously conclude that Brandon Leon Basham shall be sentenced to death.

_____    _____
_____    _____
_____    _____
_____    _____
_____    _____
_____    _____
                             Foreperson

                             _November 2, 2004_
                             Date

*If you answer that a sentence of death shall be imposed, then you must proceed to Section VII.*

Count 2                                                    Page 11

## VII.  CERTIFICATION STATEMENT

By signing below, each juror certifies that consideration of the race, color, religious beliefs, national origin, or sex of the defendant, Brandon Leon Basham, or the victim, Alice Donovan, was not involved in reaching his or her individual decision, and that the individual juror would have made the same recommendation regarding a sentence for the crime or crimes in question regardless of the race, color, religious beliefs, national origin, or sex of the defendant or the victim.

Foreperson

Date

Count 2

Page 12

JA0586

# CERTIFICATE OF SERVICE

I, Peter Williams, hereby certify that on this date I served the foregoing document by ECF filing on the following party:

Kathleen Stoughton, Esq.
Office of the United States Attorney
1441 Main Street, Suite 500
Columbia, SC 29201

*/s/ Peter Williams*
PETER WILLIAMS

Dated: July 21, 2023